AO 91 (Rev. 11/82) — **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>DEFENDANT<br>Rami Najm ASAD-GHANEM, aka<br>Rami GHANEM | DOCKET NO.<br>M 15 02296 |
|---|---|
| | MAGISTRATE'S CASE NO. |

Complaint for violation of Title 18, United States Code, Sections 554, 1956 (a)(2)(A), and Title 22, United States Code, Section 2778

| NAME OF MAGISTRATE JUDGE<br>HONORABLE GAIL J. STANDISH | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>August 2015 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

18 U.S.C. §§ 554, 1956(a)(2)(A); 22 U.S.C. § 2778

Defendant violated Title 18 U.S.C. § 554 (Smuggling Goods out of the United States), Title 18 U.S.C. § 1956(a)(2)(A) (Money Laundering), and Title 22 U.S.C. § 2778 (Arms Export Control Act).

See Attached Affidavit.

LODGED
2015 NOV 25 AM 11:01
CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF
LOS ANGELES
BY:

FILED
CLERK, U.S. DISTRICT COURT
NOV 25 2015
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**Matthew L. Peterson**    /S/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – HSI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE<br>November 25, 2015 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Melissa Mills x0627          REC: Detention

## A F F I D A V I T

I, Matthew L. Peterson, having been duly sworn, do hereby declare and state as follows:

### I.

### INTRODUCTION

1.    I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), United States Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), Office of the Special Agent in Charge, Los Angeles, California. I have been employed in this capacity since December 2010 and am assigned to the Counter-Proliferation Investigations Center, which is responsible for investigating criminal violations of United States export laws related to military items, controlled "dual use" commodities, and sanctioned or embargoed countries. Prior to my position as an HSI SA, I was employed as an Intelligence Analyst with the Federal Government for six years. I have a B.A. in Political Science, an M.S. in Criminal Justice, and I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia, where I underwent approximately 23 weeks of formal training in conducting criminal investigations. I have received formal and specialized training in federal laws and regulations relating to weapons counter-proliferation and export control violations, including the Arms Export Control Act ("AECA"), Title 22, United

1

States Code, Section 2778, and the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Parts 120-130.  Furthermore, I have conducted and/or participated in criminal investigations involving these laws and regulations.

      2.    The facts set forth in this affidavit are based upon (1) my personal involvement in this investigation; (2) my review of reports and other documents related to this investigation; (3) my training and experience; and (4) information obtained from other law enforcement officers and witnesses.  I make this affidavit in support of a criminal complaint and arrest warrant for Rami Najm ASAD-GHANEM, aka Rami GHANEM ("GHANEM"), for violations of AECA and the ITAR; Title 18, United States Code, Section 554 (Smuggling Goods out of the United States); and Title 18 U.S.C. § 1956(a)(2)(A) (Money Laundering).  As set forth herein, there is probable cause to believe that GHANEM purchased export-controlled defense articles and components knowing the same to be intended for exportation contrary to the laws of the United States, and transmitted funds from Jordan to the United States to promote the unlawful activity.

      3.    This affidavit is intended to show that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of, or the government's investigation into, the matters

described herein.  I have set forth only those facts and circumstances that I believe are necessary to establish probable cause for the issuance of the requested complaint and arrest warrant.  Unless specifically indicated otherwise, all communications and statements described in this affidavit are related in substance and in part only and some contain errors in the original text, for example in e-mail communications. Further, all dates noted in this affidavit are on or about the date listed.

## II.

## LEGAL BACKGROUND

A.   AECA and ITAR: Regulations on the Export of Munitions

4.   AECA regulates the export from the United States of defense articles that are covered by the United States Munitions List (hereafter the "USML").  The implementing regulations for the AECA are the ITAR.

5.   The USML is included in the ITAR at 22 C.F.R. § 121.1. Under the AECA, the President of the United States is authorized to designate those items considered to be "defense articles" covered by the USML.  Section 120.1 of the ITAR describes the President's delegation of this authority to the Secretary of State by Executive Order 11958, as amended.  The Directorate of Defense Trade Controls ("DDTC"), an agency within the Department of State, is charged with controlling the export of defense

articles and defense services covered by the USML.  Pursuant to

§ 121.1 of the ITAR, USML is broken down into categories.  The

categories applicable to this case include Category I (Firearms,

Close Assault Weapons and Combat Shotguns), which generally

restricts firearms and their "[c]omponents, parts, accessories

and attachments;" Category III (Ammunition); and Category VII

(Optical and Guidance and Control Equipment).

     6.    Pursuant to § 123.1(a) of the ITAR, "[a]ny person who

intends to export or to import temporarily a defense article

must obtain the approval of the Directorate of Defense Trade

Controls prior to the export or temporary import, unless the

export or temporary import qualifies for an exemption under the

provisions of this subchapter."[1]

     7.    Section 127.1(a)(1) of the ITAR provides:

> Without first obtaining the required license or
> other written approval from the Directorate of
> Defense Trade Controls, it is unlawful:
>
> > (1) To export or attempt to export from the
> > United States any defense article or technical
> > data or to furnish or attempt to furnish any
> > defense service for which a license or written
> > approval is required by this subchapter;
>
> > (2) To reexport or retransfer or attempt to
> > reexport or retransfer any defense article,
> > technical data, or defense service from one
> > foreign end-user, end-use, or destination to

---

[1] Although certain provisions of the ITAR were amended effective
October 25, 2013, those provisions expand the scope of certain
prohibitions but leave the relevant language at issue here in
place.  78 Fed. Reg. 52680 (Aug. 26, 2013).

another foreign end-user, end-use, or
destination for which a license or written
approval is required by this subchapter,
including, as specified in § 126.16(h) and
§ 126.17(h) of this subchapter, any defense
article, technical data, or defense service
that was exported from the United States
without a license pursuant to any exemption
under this subchapter;

. . .

(4) To conspire to export, import, reexport,
retransfer, furnish or cause to be exported,
imported, reexported, retransferred or
furnished, any defense article, technical data,
or defense service for which a license or
written approval is required by this
subchapter.

8.   Registration with the DDTC as a broker is a
precondition for the issuance of any license or other approval
for export, although it does not in and of itself confer any
export rights or privileges.  The AECA addresses brokering
activities, providing at 22 U.S.C. § 2778 (b)(1)(A)(ii)(I):

As prescribed in regulations issued under this
section, every person (other than an officer or
employee of the United States Government acting in
official capacity) who engages in the business of
brokering activities with respect to the
manufacture, export, import, or transfer of any
defense article or defense service designated by
the President under subsection (a)(1) of this
section, or in the business of brokering activities
with respect to the manufacture, export, import, or
transfer of any foreign defense article or defense
service (as defined in subclause (IV)), shall
register with the United States Government agency
charged with the administration of this section,
and shall pay a registration fee which shall be
prescribed by such regulations.

. . .

(II) Such brokering activities shall include the
financing, transportation, freight forwarding, or
taking of any other action that facilitates the

5

manufacture, export, or import of a defense article or defense service.

9.   The brokering provision is further codified at §
129.3(a) of the ITAR, which provides that the brokering
provision applies to U.S. persons residing abroad:

> Any U.S. person, wherever located, and any foreign person located in the United States or otherwise subject to the jurisdiction of the United States (notwithstanding § 120.1(c)), who engages in the business of brokering activities (as defined in this part) with respect to the manufacture, export, import, or transfer of any defense article or defense service subject to the controls of this subchapter (see part 121) or any "foreign defense article or defense service" (as defined in § 129.2) is required to register with the Directorate of Defense Trade Controls.

**B.   Laundering of Monetary Instruments**

10.   Title 18 U.S.C. § 1956(a)(2)(A) (Money Laundering)
provides:

> (a)(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> > (A) with the intent to promote the carrying on of specified unlawful activity;
> >         . . .
>
> > (7) the term "specified unlawful activity"
means—
> >
> > > . . .
> > >
> > > (v) smuggling or export control violations involving—
> > > > (I) an item controlled on the United States Munitions List established under section 38 of the

Arms Export Control Act (22 U.S.C. 2778); or

. . .

(D) an offense under... section 554 (relating to smuggling goods from the United States),... (relating to violations) of the Export Administration Act of 1979,...

**D.   Outbound Smuggling**

11.   Title 18, United States Code, Section 554 (Smuggling Goods out of the United States) provides:

(a) In General. - Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

Here the predicate "contrary to any law or regulation," as required by the statute, is a violation of the AECA or the ITAR.

### III.

### STATEMENT OF PROBABLE CAUSE

**A.   Summary**

12.   Since 2010, HSI has been investigating GHANEM for suspected involvement in the illegal smuggling of United States

7

ITAR-controlled weapons and other restricted defense articles from the United States to foreign destinations.  GHANEM is a naturalized U.S. citizen who emigrated from Jordan to the United States.  GHANEM's Jordanian passport indicates that GHANEM was born in Nablus, West Bank.  In July 2014, an HSI human Source of Information ("SOI") introduced GHANEM to a Los Angeles, California-based HSI undercover agent ("UCA") who is posing as a black market arms smuggler.[2]  GHANEM and the UCA have exchanged numerous e-mails, phone calls and messages, and have twice met in Europe to discuss smuggling ITAR-controlled items from the United States.

13.  In August 2015, GHANEM placed an order with the UCA for ITAR-controlled .50 caliber sniper rifles, pistols, ammunition, and night vision goggles ("NVGs"), as well as related accessories.  The order was valued at over $220,000, which included the UCA's smuggling fees from the United States to Libya, the destination provided by GHANEM.

14.  In late August 2015, GHANEM told the UCA that he wired $90,000 to the UCA as a down payment for the order.  On September 2, 2015, a bank wire deposit in the amount of $89,971 was received in in an HSI-controlled undercover bank account

---

[2] The SOI has no known criminal history.  However, the SOI is a former business associate of GHANEM, and the SOI has advised me that he believes that GHANEM failed to uphold his end of a past business deal with the SOI.

located in the Central District of California, which the UCA had
provided to GHANEM in order to receive payment for the military
items.   The sender of the wire payment was identified as
GHANEM's trading and logistics firm in Jordan.   GHANEM confirmed
in a recorded phone call that he wired the money to the UCA.   In
order to conceal the true nature of the order, GHANEM has
requested that the UCA invoice the military items as "juice,"
which GHANEM later requested be changed to "generators."   This
is consistent with statements made by GHANEM in a previous
September 2014 meeting with the UCA, at which time GHANEM said
that he always uses a "cover" contract with respect to shipping
military goods.

     15.   In October 2015, an additional bank wire deposit in
the amount of $89,971 was received in the aforementioned HSI-
controlled undercover bank account.   The sender of the wire
payment was again identified as GHANEM's trading and logistics
firm in Jordan.   As described below, this second payment
prompted the export of GHANEM's shipment in early November 2015.
As described below, HSI agents are using a "ruse" shipment that
contains approximately 12,000 pounds of water, but that the UCA
has conveyed to GHANEM contains GHANEM's aforementioned weapons
order.   GHANEM believes his shipment of military goods will
arrive in Libya in December 2015, and has agreed with the UCA to
inspect the shipment in Greece as it transits to its purported

ultimate destination.

> **B.   GHANEM'S Previous Efforts to Obtain USML Items**

16.   I have learned from HSI agents in Norfolk, Virginia, that in 2010, they identified GHANEM as a person possibly involved in the illegal smuggling of ITAR-controlled weapons and other restricted military equipment from the United States to Jordan.   I have read reports documenting that investigation and therefore know that, in June 2011, GHANEM and a Virginia-based HSI undercover agent ("VA UCA") engaged via e-mail regarding GHANEM's request for 40 G36 military-style assault rifles, which GHANEM claimed were for the Jordanian Armed Forces ("JAF"). GHANEM did not commit to an order with the VA UCA, according to the reports documenting HSI Norfolk's investigation.

17.   However, according to reports I read that documented interviews with JAF officers, GHANEM's request for weapons from the VA UCA was not legitimate.   Specifically, HSI agents assigned to Amman, Jordan ("HSI Amman") inquired with the JAF regarding GHANEM's order.   The inquiry revealed that GHANEM's purported buyer was not, at that time, attempting to procure any weapons.

18.   In August 2012, HSI Norfolk received a federal search warrant for one of GHANEM's e-mail accounts, ramithe@gmail.com

(GHANEM's "Gmail account").[3]  The search warrant was issued by
the Honorable Tommy E. Miller, United States Magistrate Judge
for the Eastern District of Virginia, on August 22, 2012.  I
read the reports prepared by the HSI SA who reviewed e-mails
pursuant to the warrant.  The reports indicate that GHANEM was
involved in several attempts to procure military weapons.  For
example, the reviewing SA observed the following e-mails
involving GHANEM's Gmail account:

      a.   An incoming e-mail dated April 18, 2012, titled
"Fwd: Letter," containing an attachment.  The attachment, quoted
in the investigative report, reads in pertinent part:

> I would like to inform you that I will send the
> contract that Mr. Kolikov requested in our
> private meeting regarding your factories military
> products and that so you can study them and I can
> market your products and this through private
> relations with the decisions makers in the Arab
> and African countries with regards to purchasing
> weapons and military equipments.

      b.   An e-mail dated June 16, 2012, titled
"specification for 9x19 caliber Parabellum Semiautomatic Pistol"
from GHANEM to a Poland-based supplier of armaments and military
equipment.  In the e-mail, GHANEM stated, "Please be advice[sic]
that we are looking for QTY 500 of the 9mm pistol & QTY 40 of
the 40mm cartridge pistol, customer (Jordan Public Safety) will

---

[3]  On May 14, 2015, I obtained a second search warrant for
ramithe@gmail.com, authorized by the Honorable Michael R.
Wilner, United States Magistrate Judge for the Central District
of California under case number 15-0904M.

issue EUC."

C.    GHANEM'S Introduction to the UCA

19.    My investigation of GHANEM began in May 2014, when I
learned via a Los Angeles-area industry supplier of military
goods that GHANEM had contacted the firm by e-mail seeking to
establish a business relationship.    Subsequently, I queried
GHANEM's name through a U.S. Department of State database and
learned that GHANEM is a United States citizen who, at the time
of the query, had last applied for a U.S. passport in June 2010.
According to the 2010 application, GHANEM's full name is Rami
Najm GHANEM, and he was born in Amman, Jordan on June 13, 1966.
GHANEM provided his e-mail address as rami@allghanem.com in the
application.    Some of GHANEM's e-mail communications with the
UCA were made from this rami@allghanem.com account.

20.    I contacted the SOI and asked, without context, if the
SOI had ever heard of the name Rami GHANEM.    The SOI stated that
he/she did know GHANEM, elaborating that he/she had worked with
GHANEM in Jordan procuring security equipment over ten years
earlier.    The SOI reported that since the time the SOI and
GHANEM worked together, GHANEM had stolen money from several
individuals in Jordan as well as bribed and blackmailed several
high-level Jordanian military officials in order to obtain
military procurement contracts.    The SOI reported that as a
result of the bribes and debts, GHANEM had been exiled from

Jordan.  The SOI also reported that GHANEM worked with a JAF officer who provided GHANEM with weapons end-user certificates in order to obtain military weapons, but that GHANEM diverted the weapons shipments to a non-Jordanian customer in Cyprus.

21.  On June 5, 2014, at my request, the SOI sent an e-mail to GHANEM seeking to re-establish contact with GHANEM.  GHANEM responded on June 8, 2014, inviting the SOI to contact him in Egypt to discuss future business requirements.

22.  On June 11, 2014, the SOI called GHANEM at the Egyptian phone number that GHANEM had provided.  During the conversation, which was recorded and which I have listened to, the SOI told GHANEM that he/she operates an aerospace procurement firm in the United States and has access to civilian and military goods.

23.  GHANEM responded by e-mail on June 18, 2014, with the following current military weapons requirements:

    1.  AK 47 as many as you have
    2.  All type of Sniper rifle as many as you have
    3.  Machine Gun (7.62x54, 12.7mm, 14.5mm, 23mm) all
    types and as many as you have.
    4.  PKC as many as you have
    5.  Mortar (60mm, 80mm & 120mm) mortar and missile as
many as you have
    6.  Anti-tank and anti-armored vehicles
    7.  Armored vehicles
    8.  Ammunitions for all type any QTY you have will buy
    As soon as I arrive to Iraq they will require heavy
    arms for us to be prepared.
    Thanks

24.  In July 2014, the SOI introduced GHANEM by phone to

the UCA.   The SOI and the UCA met in person on July 21, 2014,

and called GHANEM.   During the call, a recording of which I have

reviewed, GHANEM said that he needed weapons and other military

equipment.   The UCA told GHANEM that he could help procure some

of the items, including sniper rifles and NVGs.   As is evident

in the below transcript from the call, the UCA informed GHANEM

that the transaction would be in violation of U.S. export

regulations:

> UCA:  Okay.  Alright, uhh, let me ask you a
> couple of questions.
> GHANEM:  Go ahead.
> UCA:  What about the funding?  Do you have the
> money in place to wire the money over?
> GHANEM:  Yeah, they have the money [UI].[4]
> UCA:  Now I am going to dealing with you directly
> right?  I'm not dealing with a government entity
> over there, am I?
> GHANEM:  No, no.  You're gonna deal with our
> company.
> UCA:  Do you understand why I ask that?
> GHANEM:  I, I understand about the funds.
> UCA:  Yeah, because I, I don't apply for a
> license to send it, and I'm sure [SOI] has
> explained that to you or not, so if we're gonna
> do this it's going to be under the table.  If
> they want to go directly to U.S. Government, I'm
> not your guy to talk to.
> GHANEM:  I understand my friend.  [UCA], I am a
> U.S. citizen, too.
> UCA:  What's that?
> GHANEM:  Understand, I am a U.S. citizen, too.
> UCA:  Okay.
> GHANEM:  Okay, we are, we are all in the same
> boat.
> UCA:  I understand.  So you know, ahhh, I'm going

---

[4]  Here and at other times, portions of recorded conversations
captured in this investigation were unintelligible, which have
been annotated with "UI."

to be just as much in trouble if we don't get a license.

25.   On July 22, 2014, the UCA sent the SOI an e-mail reflecting pricing for several military items that GHANEM had said he needed during the July 21, 2014 phone call.  The list included, among other military items, pricing for 200 units of U.S.-origin M-4 carbine assault rifles priced at $234,000.  The SOI forwarded this e-mail to GHANEM on July 22, 2014.

26.   On August 10, 2014, GHANEM sent an e-mail to the UCA and SOI indicating that he needed sniper rifles and other weapons without the "proper documentations."  Specifically, GHANEM's e-mail reads as follows, in pertinent part (underlined in original):

> Brothers,
>
> My contact at the higher administration for "Imam Hussein" peace be upon him possession of the holy city of Karbala, had requested from me all arms (new technology) (best of the best) such as:
>
> Sniper rifles with all accessories even silencers
>
> Rifles
>
> Machine guns
>
> Vests
>
> Uniforms
>
> Shoes
>
> Anti-explosive equipment
>
> Pistols with and without silencer
>
> Latest ammunitions
>
> All arms we can supply knowing that we don't have the proper documentations

15

27.   On August 19, 2014, the UCA and the SOI called GHANEM to discuss GHANEM's requirements and to solidify plans to meet in person.   During the phone call, which was recorded and I have listened to, the following topics were discussed:

a.   The outstanding order requested by GHANEM for 200 M-4 assault rifles.

b.   Meeting in person in anticipation of larger future orders.

c.   GHANEM's very strong "market" with "Shi'a" groups in Iraq, Iran, and Lebanon, which GHANEM has experience with and who like GHANEM "very much."

d.   The UCA told GHANEM, referring to the arms negotiation, that "this is sensitive," and reiterated that neither party would want to make a mistake and "regret it for the rest of our lives."   GHANEM responded, "for sure," adding, "you are a U.S. citizen; I am too.   So your concern is the same as my concern."

e.   The UCA, referencing the weapons deal, said "it is my understanding that, of course, you don't want me to apply for an export license because we know we're not going to get it."   GHANEM responded "yeah."   The UCA added, "so we're doing everything under the table based on your wish."   GHANEM responded, "yes."   GHANEM then added that this is the reason why it is important to meet "face to face."

16

f.    The UCA, the SOI, and GHANEM agreed to meet in Athens, Greece, in September 2014 to further discuss potential business.

### D.    The First Meeting in Athens, Greece

28.    On September 18, 2014, the UCA and the SOI met with GHANEM in Athens, Greece.  Based on my review of the recording of this meeting, I know that during the meeting the following information was exchanged, in pertinent part:

a.    GHANEM said that he has requests for goods on behalf of Iranians whom he did not identify.  GHANEM provided 11 documents to the UCA outlining requirements which he claimed were on behalf of Iran.  The documents detailed part numbers that appear to be for Bell helicopters and F-5 and F-14 military fighter aircraft, according to my review of the documents and discussions with the UCA, who speaks and reads Farsi and helped me review the documents.

b.    GHANEM said that he is very careful with whom he deals.

c.    GHANEM said that his "black market" activities have been in the Eastern Bloc, and that he could get "anything" for the UCA from there.

d.    The UCA said: "obviously, you know about export licenses and end user certificates and all the legal stuff we have to deal with in the U.S."  GHANEM responded, "Yes."  The

17

UCA added, "some people will come to me and say, umm, end-user certificate, we'll give it to you, or, you know, apply for an export license. That, that's not my thing. Go find somebody who will apply for that. That's not me." GHANEM responded "okay," and later said, "being an American, I have to watch myself." The UCA continued: ". . . Unless you have connections, if you go knock on a military supplier, alright, they'll ask you, 'okay, where's it going? Give me an end-user certificate.' You're gonna have to apply for an export license, and the State Department gets involved. Alright?" GHANEM responded, "yeah." The UCA informed GHANEM, referring to the Department of State export license process, "that's not what I do." The UCA later added, "as long as you're willing to do business with me based on what I told you, I'm good." GHANEM replied, "I don't have a problem; I only want to confirm with you."

      f.    GHANEM said that he was looking for a particular sniper rifle that could cover a distance of 4500-5000 meters. GHANEM said that his potential supplier at a U.S. company said that "ITAR" was required and that the supplier would not ship the items illegally. As described in more detail below, e-mails that I discovered in GHANEM's Gmail account, pursuant to a search warrant, indicate that GHANEM was in fact dealing with a U.S.-based company regarding the procurement of custom sniper rifles shortly before GHANEM met with the UCA in September 2014,

and that the company indicated the rifles required a valid U.S. Department of State export license prior to export.

g.   The UCA, referring to the arms transaction, asked how GHANEM intended to pay for this "project."  GHANEM replied that in the U.S., "cash" would not work for this project. Therefore, GHANEM would likely use a bank wire to pay.  GHANEM said that whenever he uses the "standard" payment method by way of a bank, he uses a "cover" contract.  GHANEM then clarified that the contract would "just change the items" detailed in the contract.   As described below, GHANEM ultimately paid the UCA for ITAR-controlled weapons with a bank wire, and he requested that the UCA provide GHANEM with a false invoice for the weapons reflecting the sale of juice, which GHANEM later requested to be changed to reflect a fictitious sale of industrial generators.

29.   Following the first Greece meeting, communication between GHANEM and the UCA tapered because of apparent suspicions by GHANEM.   On January 11, 2015, the UCA received a phone call from GHANEM.   The call was recorded and I have listened to the recording of the conversation.   During the conversation, the following information was exchanged:

a.   The UCA asked GHANEM if GHANEM had any concerns about doing business with the UCA.   GHANEM replied that whenever GHANEM asked the SOI about the UCA and the SOI's experience with the UCA, the SOI always gave the "positive" side and that, in

the opinion of GHANEM, the SOI is too complimentary of the UCA.

     b.   GHANEM then clarified that GHANEM had reservations about working with any new individual in "this business," and then added that because the UCA is Iranian,[5] GHANEM is not sure who is watching what the UCA is doing.

     c.   GHANEM said that he wanted to get to know the UCA better before doing business with the UCA and that he would be willing to meet with the UCA again in person to get to know the UCA better.

     d.   The UCA invited GHANEM to again meet with the UCA so they could sit down in person and discuss the UCA's capabilities in detail.  GHANEM accepted the UCA's invitation.

     e.   GHANEM reiterated it was important to know who he was dealing with, because "one mistake, and you lose what you built all your life."

   30.  On January 15, 2015, the UCA sent GHANEM an e-mail proposing dates for the next in-person meeting.

**E.  The Second Meeting in Athens, Greece**

   31.  In March 2015, GHANEM again met with the UCA and the SOI in Athens, Greece to discuss potential business.  I have listened to recordings of the meetings, wherein GHANEM and the UCA discussed the UCA's ability to supply military goods,

---

[5] GHANEM believes that the UCA is an Iranian-American, based on information conveyed to GHANEM by the SOI.

including NVGs and other military optics.  On March 11, 2015,
the UCA sent the following message, which I have reviewed, to
GHANEM regarding the March 10 meeting and an anticipated follow-
up meeting:

> Rami,
>
> Per our discussion from yesterday, I can supply you
> with the following equipment on an ongoing basis, and
> with reasonable lead time:
>
> PVS-14 Night Vision Goggles
> AN/AVS-9 Night Vision Goggles
> PVS-27 Night Vision Sniper Scope manufactured by FLIR
> DBAL-A Infrared Illuminator
>
> We can talk numbers and volume over dinner tonight if
> you like.
> Regards,
> [The UCA]

32.  During a series of follow-up meetings on March 11,
2015, GHANEM met with the UCA and the SOI to discuss volume and
other details regarding sales and export logistics of the above-
referenced military optics.  According to the UCA, during the
meeting, the UCA showed GHANEM working models of the
aforementioned PVS-14 and AN/AVS-9 NVGs.  After inspecting the
NVGs, GHANEM made two phone calls using speakerphone to clients
who GHANEM reportedly believed would be interested in the NVGs.
The conversations were in English.  One potential buyer asked
where GHANEM could deliver the NVGs, to which GHANEM replied
that GHANEM could deliver the NVGs to the buyer's "bedroom."

33.  The following day, March 12, 2015, GHANEM called the

21

UCA and informed him that GHANEM had received very good feedback
on the military optics from potential buyers in Egypt, Ukraine,
and Greece.  I have listened to the recording of this call.

34.  On March 17, 2015, following the meetings, the UCA
sent four e-mails, each containing a datasheet and pricing for
each of the above-referenced military optics, to GHANEM.  I have
reviewed those e-mails

**F.   Search Warrant Executed on GHANEM's Gmail Account**

35.  On May 14, 2015, the Honorable Michael R. Wilner,
United States Magistrate Judge for the Central District of
California, authorized a search and seizure warrant for
ramithe@gmail.com.[6]  According to registration information
provided by Google, Inc., the user of ramithe@gmail.com provided
the following registration information when establishing the e-
mail account:

    Name: Rami Ghanem
    E-mail: ramithe@gmail.com
    Status: Enabled
    Recovery e-Mail: ramithe@me.com
    Created on: 2009/12/13-23:15:46-UTC
    IP: 188.123.176.220, on 2009/12/13-23:15:46-UTC
    Language Code: en
    SMS: +37282432246
    Alternate e-Mail(s): rami@caravaname.com

36.  Login history for the account indicates that
ramithe@gmail.com was accessed from the following Internet
Protocol ("IP") addresses on March 10 and 11, 2015, when GHANEM

---

[6] The warrant was assigned case number 15-0904M.

met with the UCA in Greece:

    194.219.47.145
    195.97.11.60

According to open-source IP address tracing tools, these IP

addresses are allocated to computer or cellular networks based

in Athens, Greece.

    37.   In addition to his discussions with the UCA, content

from GHANEM's Gmail account shows that GHANEM is aware of U.S.

export requirements, the ITAR in particular, as well as ITAR

brokering registration requirements.  For example, I observed

the following e-mails in GHANEM's Gmail account as a result of

the May 2015 search warrant:

        a.   On April 10, 2012, GHANEM received an e-mail from

an employee of an identify U.S. company titled, "FW: Rep

agreement for Jordan and Lebanon."  The e-mail reads: "Here is

the connection to the Department of State for the broker

agreement.  Please see below."  The employee's e-mail included

a forwarded e-mail that offered a hyperlink to the DDTC

website: "DOS website address is: http://www.pmddtc.state.gov."

        b.   On May 31, 2013, GHANEM received an e-mail from

the above employee that contained the following points, in

pertinent part:

> If [an identified U.S. company] is to deal with you--
> you have to be on the export license and you need to
> pass the due diligence.  Please this is important.
> There is also an issue of registering as a broker

23

with the Department of State--have you ever done
this?

GHANEM responded to the e-mail on the same day, May 31, 2013,
addressing the issue of being on the export license: "No problem
I will fix the any unclear matter soon."   GHANEM also
acknowledged the U.S. Department of State brokering registration
requirement: "Please you promise to send me the required
applications for me to start my registration, please if you can
send it, it will help me or send me the shortcut to the website
& I will work on that."

       c.    On July 31, 2014 —— shortly before GHANEM met
with the UCA in Greece —— GHANEM received an e-mail from a U.S.-
based manufacturer of sniper rifles titled "RE: longer than 5000
Meters sniper rifles."   In the e-mail, the author informed
GHANEM: "Shipment to both of these countries requires an
approved US state department export license and end user
certificates.  All items will have to go directly to government
end users."   Based on my review of GHANEM's sent e-mails, I know
that on August 6, 2014, GHANEM forwarded the above e-mail to an
unidentified associate.

     G.    GHANEM's Order with the UCA

     38.   On March 31, 2015, GHANEM sent the UCA an e-mail
entitled "Urgent requirement."   In the e-mail, which I have
reviewed, GHANEM posed the following request:

[The UCA] if I want the following:

AN-PVS-14 QTY 25
AN-AVS 9 QTY 25
PVS-27 Night Vision Scope QTY 2
AN-PEQ-15 Aiming Laser QTY 10

Please let me know the fastest time for delivery.

Regards,
Rami Ghanem

39.   After the UCA advised GHANEM via e-mail of a timeline
to procure and ship the requested military optics, GHANEM
replied on April 1, 2015: "Ok send me the and [sic] invoice for
me to discuss it with my customer."

40.   The UCA replied to GHANEM on April 1, 2015:

Great, will do...When we met last time, you mentioned
you want to use a different description for each item
on the invoices so only you and I understand what's
being bought/sold.  Do you want to give me a "code
word" for each item to describe on the invoice or
should I describe them as they are?

41.   The UCA called GHANEM on April 8, 2015.  The UCA
recorded the call, and I have listened to the recording.  During
the call, GHANEM reported to the UCA that GHANEM became ill and
needed time to recover.

42.   On May 12, 2015, GHANEM sent an e-mail to the UCA
including a file titled "IMG-20150408-WA0020.jpg."  The file,
which I have reviewed, appears to be a screenshot of a document
titled "Subject: URGENT REQUIREMENT OF AMMO."  The file lists
several types of ammunition, missiles, rockets, and other

munitions, including "Hell Fire Missile,"[7] "2.75 rocket," "Tow

Missile (A and B),"[8] and "hand grenades."   The UCA called GHANEM

on the same day, May 12, 2015.  I have listened to a recording

of this call.  The UCA asked GHANEM how he wanted to move

forward with the NVG transaction.  The UCA and GHANEM confirmed

the UCA's pricing for the PVS-9 and PVS-27 NVG systems.  GHANEM

referred to the above list, noting, "the list I gave you, which

has that Hellfire, the whole list is very serious."  GHANEM

added that he was "already supplying the buyer."

43.  On July 24, 2015, GHANEM sent the UCA the following

message via a secure messaging application ("app"):[9]

    12.7 x 99mm.. look for Barret M82 A 1 Barret firearms
    manufacturing
    Ronnie Barret
    .50 cal BMG browning Carabine STEYR HS
    .50 cal BMG 12.7 (IS THE SAME CALL.) as .50 call.
    M107

44.  Based on my training and experience, I believe that

GHANEM was requesting Barret M82A1 and Steyr HS .50 caliber

sniper rifles.  The Barret M82A1 is manufactured in the United

States, while the Steyr is manufactured in Austria and

distributed in the United States.

---

[7] From my training and experience, I have learned that the
Hellfire missile is an air-to-surface missile developed by
Lockheed Martin.
[8] From my training and experience, I have learned that a TOW
missile is a Tube-launched, Optically tracked, Wire-guided anti-
tank missile originally developed by Hughes Aircraft Company.
[9] On May 12, 2015, GHANEM requested that the UCA use a Netherlands-
based secure messaging application.

45.    On July 27, 2015, GHANEM sent the UCA another message via the aforementioned app, asking to expand his order: "Also can you provide me with 100 pistols with silencer any good US even Gluck."  Based on the context, I believe that GHANEM was requesting U.S.-origin pistols, with accompanying silencers, from the UCA.

46.    On August 4, 2015, the UCA sent an e-mail to GHANEM titled "Requirement (July 27, 2015)."  The UCA wrote, in pertinent part:

> Rami,
>
> Here is a breakdown for your most recent inquiry:
>
> Kahr Arms CW9 9mm: $ 650.00 EA
> Threaded Barrel for Kahr CW9: $210.00 EA
> AAC Evolution Suppressor 9mm: $780.00 EA
>
> If you are interested and like the numbers I have quoted, let's try and get together in [Asia] soon to discuss/finalize this transaction in person (work out shipping and financing) as well as move the "HF" and the "T" requirements forward...

47.    Based on the context and my conversations with the UCA, I believe that the "'HF' and the 'T' requirements" are a reference to GHANEM's request for Hellfire and TOW missiles, as discussed above.

48.    The following day, on August 5, 2015, the UCA called GHANEM.  The call was recorded, and I have listened to, as well as reviewed a transcript of, the recording.  Below are excerpts of the conversation, in pertinent part:

```
UCA:  Did you get the e-mail I sent you about the pistols?
GHANEM:  Yes
UCA:  What do you think?
GHANEM:  It's ok, as long as we get it with a complete
system, no problem.
```

The conversation continued:

```
UCA:  So you let me know how things go with this one.
GHANEM:  I need it.
UCA:  All right.  Let's make it happen.
. . .
GHANEM:  How many you can get me?
UCA:  About 150 now.
GHANEM:  How fast?
UCA:  Where do you want it to go?
GHANEM:  Same destination.
UCA:  Okay.  Well I guess we can talk about destination in
person, but I can, I can get it ready to go as soon as I
get a down payment, man, and start paying these guys off.[10]
GHANEM:  Tell me the procedure and timing, and we move.
UCA:  Ok.  So procedure, let me get about maybe 40 percent
to put a good chunk of change down for; how many do you
need, 100 or 150?
GHANEM:  Let's go for 100.
UCA:  Let's, let's do 100.
```

Later in the same conversation, GHANEM re-broached his
requirement for sniper rifles:

```
GHANEM:  Okay.  I'll leave it to you, just tell, tell me
how much, but I need, I need at least 10 or 20 of the
snipers.
UCA:  The rifles?
GHANEM:  Rifles, sniper.  Yes.
UCA:  Yeah, that's, that's not going to be a problem,
Rami, I mean, my hooks in [a state in the southwest United
States] will get that in five, ten days.  That's not a big
deal.
GHANEM:  The same, the same, calculate at least 10 of them
for now.
UCA:  Okay.
GHANEM: Okay.
```

---

[10] Based on my conversations with the UCA, I know that the UCA
was referring to making a down payment with the manufacturer of
the items.

UCA:   You want .50 cal or .308?
GHANEM:   I need the one that's 12.7, which is .50 I think.
UCA: Okay, okay.
GHANEM:   Actually it's 12.7; the 50 I think it's 12.7.
UCA:   Yeah.   I'll double check but I think it is.
GHANEM:   If you have, if you have laser for it, it will be great.
UCA:   Do you, do you want infrared, or do you want red laser?
GHANEM:   I need the laser to be installed on the gun, on the pistols.   The other side cannot see it.

GHANEM expressed his urgency for the order during the conversation:

GHANEM:   I need these items ASAP.
UCA:   Okay.   Let me work up the numbers, and I'll add the .50 cals to your list.   And uh, you want me to send you an invoice, or just a simple e-mail until we see each other in person?
GHANEM:   As you like, it doesn't matter.
UCA:   Okay.   Alright.
GHANEM:   But if, if you give me breakdown, how much like the complete list, and how much is it.
UCA:   Okay
GHANEM:    So I will know how much to bill these people individual items.
UCA:   Okay.
GHANEM:   And please make sure I get at least 10 more or 15 snipers.
UCA:   10 more .50 cal snipers?
GHANEM:   Yes.
UCA:   Okay.   Yeah.   That's not a problem.
GHANEM:   10 or 15 if you can put your hands on them.

During the same phone conversation, GHANEM also noted that he required ammunition for the requested pistols:

GHANEM:   I need uhhh...Do you have 9 millimeter ammunition?
UCA: 9 millimeter?
GHANEM:   Yeah
UCA:   Yeah
GHANEM:   For the pistols.
UCA:   Of course, I'll take care of that.
GHANEM:   Okay
UCA:   How many do you need? 100,000?
GHANEM: Whatever you can give me.

29

```
UCA:  I can probably do 50,000 now.
GHANEM:  Okay, that's good.
...
GHANEM:  These items I need it, I need it right away, so if
we can move on it, please.
UCA:  I'm gonna work on it right now, as soon as I get off
the phone with you.
GHANEM:  Okay
UCA:  Okay?  Expect to get an e-mail from me today.
```

49.   On August 5, 2015, following the above call between

the UCA and GHANEM, the UCA sent GHANEM an e-mail titled

"Pricing for goods we spoke about earlier today."   The message

read (bold in original):

Rami,

Here is your breakdown per our earlier conversation
from this morning:

1. KAHR Arms CW9 9mm Pistol: $650.00 EA x 100 =
**$65,000.00**
2. KAHR Arms Threaded Barrel for CW9: $210.00 EA x 100
= **$21,000.00**
3. AAC Evolution Suppressor: $780.00 EA x 100 =
**$78,000.00**
4. 9mm Ammunition (50,00.00 pieces): **$18,000.00**

Grand total for this order is **$182,000.00**.  I would
need $72,800.00 down payment prior to placing order
with my supplier, another 40% ($72,800.00) when the
shipment is ready to leave the states and the
remaining balance of $36,400.00 when you get the goods
on your end.

With respect to .50 CAL Rifle, I can keep it under
$4600.00 EA if we go with Barrett M99.  If we go with
this one, I can get you fifteen (15) pieces along with
the pistols.  If you want more expensive Barrett
Rifles, then we're looking at getting close to 10K or
more for each rifle. Either way it's your choice.

1.    Barrett M99 .50 CAL Rifle: $4600.00 x 15 =
**$69,000.00**

30

Same financing terms apply to this transaction as well. 40% ($27,600.00) prior to order, another 40% ($27,600.00) when they're ready to ship and remaining balance of $13,800.00 when you collect them on your end.

If you want ammunition for the rifles and long range target acquisition is your intention, I would go with American Eagle 660. 10,000.00 rounds will cost you $32,000.00.

40% ($12,800.00) + 40% ($12,800.00) + 20% ($6400.00) applies to this as well.
If you decide to go with everything, I would need an initial down payment of **$113,200.00** to start this order.

Let me know what you think.

50.    On August 6, 2015, GHANEM called the UCA to discuss the potential order of weapons.  The call was recorded and I have listened to it.  During the call, GHANEM requested "more advanced" sniper rifles, ultimately requesting five each of "basic," "medium" and "high-end" sniper rifles.  GHANEM and the UCA discussed smuggling routes and methods, including GHANEM's requested destination of Libya:

GHANEM:  How fast you can deliver it?  Let's see.
UCA:  Well, I don't want to take a chance and load this on an aircraft, so it's going to have to be by sea.  It's going to take at least four to five weeks.
GHANEM:  Okay.
UCA:  Okay?
GHANEM:  Okay.
UCA:  And it's going to be in a container and it's going to be mixed with household goods.  Everything is gonna be safe on my end.  Believe me.
GHANEM:  Okay.  If you can, if you can, if you can put juice with it, it's fine.
UCA:  Juice?  Put on, on the, on what, on the export

31

documents?
GHANEM:  On the container.
UCA:  Yeah, yeah, of course.  What else do you want me
to describe it as, so it's easier for you to clear it
on your end?
GHANEM:  Juice, juice, it's fine.
UCA:  Juice?
GHANEM:  Don't worry.  As long as it arrives, as long
as it arrives then we will take care of it.
UCA:  Okay, just tell me where to bring it to and I
will bring it and I will classify it as juice.  Don't
worry.
GHANEM:  In Misrata, it's fine, it's not a thing.
There's a big port there.
UCA:  Where?
GHANEM:  Misrata, in Tripoli, err, in Libya.
UCA:  In Libya.  Okay.  Alright, because my
calculations were to Greece, so from Greece to Libya
it's, it's gonna probably add another week, if not ten
days.  Are you okay with that?
GHANEM:  No problem, no, yeah, yeah, yeah, I'm fine.
Just, what I need from you, I need from you an
invoice, and declare as juice, for the 40 percent so I
can uh, transfer it to you right away.
UCA:  So let me re-work the numbers.

As noted below, GHANEM ultimately paid for the weapons from a
bank account in Jordan.  GHANEM forecast this payment method
during the recorded conversation on August 6:

GHANEM:  The money, the money, the money will come to
you from Jordan.
UCA:  From Jordan?  Okay.  You can, you can deposit it
into my U.S. account, right?
GHANEM:  I can transfer it there in no time.  Just
make, make an invoice for uhh, whatever you need to
get it, and uhh, send it.
UCA:  Okay.
GHANEM:  So, it's preferred, uh, preferred to be
juice, it's fine.
UCA:  Okay.  Okay, so, let me...
GHANEM:  (Interrupting) Each item, each item, each
item, you want to.... uh, now you want to ship with,
and make it juice item on invoice.
UCA:  Okay.  So I'm going to send you an e-mail for
the actual stuff that you're buying.  Okay?  And then
I'm going to transfer the quantity on an invoice, and

I'll describe it as juice coming from Port of Long
Beach, right, to Libya.  Send me the, the name of, uh
the consignee, whoever is going to be receiving it,
and the port you want it to go.

51.  On August 7, 2015, GHANEM sent the UCA an e-mail

identifying GHANEM's consignee in Libya:

All Shipments to be addressed to the following Company:

Kayan International
Misurata - Libya
Phone : 218 51 5222039
Mobile +218911203989

52.  On the same day, GHANEM also sent the UCA an e-mail

containing an image of Kayan International letterhead, which had

the content of the document redacted except for the company's

name, telephone number, fax number, location in Misurata, Libya,

and the website "www.kayangroup.com."

53.  On August 9, 2015, the UCA sent GHANEM the following

e-mail, coding the military items as "juice," per GHANEM's

request:

        Here is your revised breakdown:
        1.   KAHR Arms full size TP9 9mm Pistol with extended
        magazine: $900.00 EA x 5O = $45,000.00 (apple juice)
        2. KAHR Arms compact CW9 9mm Pistol: $650.00 EA x 100
        =$32,500.00    (apple juice)
        3. KAHR Arms Threaded Barrel for TP9 &CW9: $210.00
        EA x 100 =$21,000.00    (apple juice)
        4. AAC Evolution Suppressor: $780.00 EA x 100 =
        $78,000.00    (apple juice)
        5. User Sight designed for KHAR Arms Handguns: $265.00
        EA x 100 - $26,500.00   (apple Juice)
        6. 9mm Ammunition(50,00.00 pieces):  $18,000.00
        (apple juice)
        7. Barrett M99 .50 CAL Rifle: $4600.00 EA x 5 =
        $23,000.00 (basic)   (orange juice)
        8. Barrett M95 .50 CAL Rifle: $7100.00 EA x 5 =

                                33

```
$35,500.00  (medium)   (orange juice)
9. Barrett 82A1 .50 CAL Rifle: $9600.00 EA x 5 =
$48,000.00  (high-end)   (orange juice)
10..50 CAL Ammunition (American Eagle 660): 10,000
rounds = $32,000.00   (orange juice)
11.PVS-27 Night Vision Scope for.50 CAL: $10,500.00
EA x 3 = $31,500.00   (pineapple juice)
12.PVS-14 Night Vision Goggles: $3400.00 EA x 5 -
$17,000.00   (pineapple juice)
```

> Grand total for this order is $408,000.00.  I would
> need 40% down payment ($163,200.00) prior to placing
> the order with my supplier. Another 40%
> ($163,200.00) when the shipment is ready to leave
> the States and the remaining balance of $81,600.00
> when you get the goods on your end.

54.   On August 26, 2015, GHANEM sent the UCA an e-mail.
The e-mail, which I have reviewed, included a screenshot of the
UCA's message, above, with reductions to the requested quantity
of each of the items. GHANEM highlighted the reduced quantities
of the items in red font.

55.   On August 26, 2015, the UCA sent GHANEM a secure
message via the aforementioned app, which included GHANEM's
smaller, updated order:

> Your updated order comes out to $220,050.00.  I need
> the initial down payment of 40% ($88,020.00) to place
> the order.  You're ready to transfer the funds?  I can
> send you wire information today.  Do you want the
> invoice showing juice going to Libya to show the
> actual amount?  If not, how much do you want me to
> price it as?

56.   On August 26, 2015, GHANEM responded to the UCA via
the app, asking, "Please call me to discus[s] the invoice.
Thanks."   The UCA called GHANEM, per his request, on August 26,

2015.  I have listened to a recording of this conversation.

During the call, GHANEM noted that he was going to pay for this

order with his own money because GHANEM was not able to reach

his potential customer.  GHANEM also requested that the weapons

be invoiced as "generators" vice juice, due to an issue with

GHANEM's bank.  A transcript of the call is below, in pertinent

part:

> GHANEM:  The reason I put this, I don't want to uh, I
> could not reach my guy, he's out of the country, and I
> don't want to delay anything, I'm back to my normal
> life, so I want to take this on my own, and, and do
> it.
> UCA:  Okay
> GHANEM:    And [static] after deliver this, it will be
> much bigger order will come.
> UCA:  No problem.  Okay.
> GHANEM:  But, because of the bank, we are not dealing
> with juice.  What can you put, like equipment,
> anything?
> UCA:  Okay, so what do you want me to put down?  Do
> you want me to, uh, you tell me.
> GHANEM:  Put generators, put anything like this for
> the total.
> UCA:  Okay, hang on a second.  So I'll just put like,
> industrial equipment.  How's that?
> GHANEM:  Yeah, but, uh, eh, they, they don't take,
> see listen, our bank is very sensitive, and, uh total
> bank is sensitive, they don't take only one word, you
> need to put, if you put anything you need
> specification maybe.
> UCA:  Okay.  I see what you're saying.  Okay.  I can
> put like different model generators, you know, like
> two, three different kinds.  Umm, how's that?
> GHANEM:  Yeah, yeah, no problem.  But at least,
> whatever you put, you put specification, the quantity
> and the total.
> UCA:  Okay, and the total, do you want it to...
> GHANEM:  (Interrupting) When you send, when you send,
> when you send the invoice, you send, ahh, the, the
> total.

UCA:   Uh huh.
GHANEM:   Ahhh, uhhh, just send it to me, and I will, I
will arrange with them how to take care of it.
UCA:   Okay, now, do you want the invoice to show the
exact amount you are paying for this transaction?  Two
hundred and twenty thousand dollars and...
GHANEM:   (Interrupting) Yes, yes
UCA:   Yeah, okay?
GHANEM:   Yes, yes.  Coming from my account.
UCA:   Okay.  Alright, so I'll put the exact number.
GHANEM:   Okay.
UCA:   Okay.  Do you want me to send you...
GHANEM:   (Interrupting) And I will, I will, you don't
need, you don't need to put forty percent, thirty
percent.  I will have transferred what I owe.
UCA:   No, yeah, uhh, you know what I'm gonna do?  I'll
just send you the invoice showing different types of
industrial equipment for a total amount of two hundred
and twenty thousand dollars and fifty; two hundred and
twenty thousand fifty.  Okay, and then you do on your
end whatever, whatever you need to do.
GHANEM:   Okay.
UCA:   Okay?  Do you want me to send you my bank
infor...?
GHANEM:   (Interrupting)  Let me...
UCA:   Go ahead
GHANEM:   No, no, just it's, now just it's, it's all in
your hands.
UCA:   Okay, I'll send you...
GHANEM:   (Interrupting) I don't want to go, we are
not, we are not dealing with, we are not dealing with
each other as uhhh, uhhhh, Bushmaster and ahhh our
Jordan Armed Forces.
UCA: No

57.  Based on my training and experience, I believe that
GHANEM's mention of "Bushmaster" is a reference to Bushmaster
Firearms International, a United States-based weapons
manufacturer, and the Jordanian Armed Forces, which uses U.S.-
manufactured weapons.  More specifically, I believe that GHANEM
is highlighting that the transaction between the UCA and GHANEM

is not an authorized foreign weapons procurement transaction, in which the U.S. Government would issue the appropriate export licenses to assist in arming an allied foreign military with U.S.-origin weapons.

58.   On August 26, 2015, the UCA sent GHANEM the following e-mail message:

> Here you go brother, please conform[sic] the consignee address and let me know if you need me to make any changes.  I will send you another email containing product data sheets for the Generators listed on the invoice for your reference.

59.   Attached to the UCA's e-mail was an invoice, which I have reviewed, titled "Invoice 08-26-15.pdf," detailing the sale of three types of identified U.S.-origin industrial generators, in quantities of 30, 20, and 35, for a total price of $220,050.00.  The invoice lists "Kayan International" in Libya as the buyer of the generators and includes the UCA's undercover bank account name, number, and routing information, which is based in the Central District of California.

60.   On September 2, 2015, GHANEM sent to the UCA with the following e-mail message:

> Hello [the UCA],
>
> Our bank had confirmed receiving the money to your bank, please confirm.
>
> Regards,
>
> Rami Ghanem

61.   On September 2, 2015, GHANEM called the UCA.  The call was recorded, and I have listened to the recording.  GHANEM again confirmed that he wired the down payment for the weapons to the UCA:

> UCA:  I was actually getting ready to send you an e-mail. Umm, checked with the bank.  The wire is processing right now.  It's for eighty-nine thousand nine hundred and I think seventy one dollars, so, thank you for that.
> GHANEM:  We sent ninety, uh, ninety thousand.  They deducted this small stuff, I don't know why.
> UCA:  Yeah, they usually deduct that wire transfer fee.

62.   On September 3, 2015, I learned from an HSI undercover account manager that the undercover bank account that the UCA provided to GHANEM for payment of his military goods order received a bank wire deposit in the amount of $89,971.00, which posted on September 2, 2015.  According to the bank wire record, which I have reviewed, the sender of the wire was: "GATEWAY TO MENA FOR LOGIS."  Based on my review of GHANEM's Gmail account, I known that GATEWAY TO MENA FOR LOGISTIC SERVICES is a Jordan-based branch of GHANEM's trading and shipping enterprise.  I believe that the full name of GHANEM's company was truncated in the bank wire due to character limitations, which I have previously observed in my investigations.

63.   On October 19, 2015, the UCA spoke with GHANEM by phone.  During the call, a recording of which I have listened to, GHANEM inquired about the status of his weapons shipment. The UCA informed GHANEM that the weapons shipment was nearly

ready and would be ready for export after receiving the next installment of the invoice balance, which, as previously discussed with GHANEM, would be the next 40 percent of the total invoice. The UCA informed GHANEM that the shipment would be routed through Greece on its way to Libya, and invited GHANEM to inspect the shipment. GHANEM told the UCA that he would come to Greece to inspect the weapons shipment.

64. During the October 19, 2015, call with the UCA, GHANEM called his business associate, whom GHANEM stated is the Libya-based recipient of the weapons shipment.[11] GHANEM spoke to the associate in Arabic. I have consulted with an HSI SA who is a native fluent speaker of Arabic and who has listened to the Arabic portion of the aforementioned phone call between GHANEM and the associate. According to the Arabic-speaking HSI agent, GHANEM and his associate discussed the anticipated timeline of the shipment.

65. On October 22, 2015, I learned from an HSI undercover account manager that the undercover bank account that the UCA provided to GHANEM for payment of his military goods order received a second bank wire deposit in the amount of $89,971.00, which posted on October 22, 2015. According to the bank wire

---

[11] Based on my review of the recording, I believe that GHANEM used a second phone to call his Libya-based associate while on the phone with the UCA, and put the second phone on speaker mode to allow the UCA to hear the associate.

record, which I have reviewed, the sender of the wire again appeared to be GHANEM's Jordan-based company: "GATEWAY TO MENA FOR LOGISTICS S."

66.   After receiving the second payment from GHANEM, HSI agents, including me, began to assemble an undercover ruse shipment for export to GHANEM.[12]   The ruse shipment was exported from the Port of Long Beach on November 2, 2015.   On November 9, 2015, the UCA sent GHANEM an e-mail conveying that GHANEM's shipment had been exported to Greece.   The UCA provided tracking information in the e-mail so that GHANEM and his customer could track the shipment via the designated shipping company's website.

H.   License Determinations

67.   Based on my training and experience, I know that .50 caliber rifles and 9mm pistols, including the models ordered by GHANEM, are covered under Category I(a) of the USML and are thus subject to the ITAR.   I also know, based on my training and experience, that .50 caliber and 9mm ammunition is covered by Category III(a) of the USML.   On September 29, 2015, I reviewed license determinations issued by the DDTC to HSI confirming the above USML categories.   The DDTC also informed my office in September 2015 that the PVS-14 military night vision goggles

---

[12] HSI has exported a 40-foot container, which does not contain any weapons or defense articles, but rather, has been filled with approximately 12,000 pounds of bottled water.

ordered by GHANEM are also on the USML under Category XII(c),
and are therefore ITAR-restricted.  The DDTC has also informed
HSI that the silencers and barrels ordered by GHANEM are also on
the USML, under Categories I(e) and I(g), respectively.

        68.   The above defense articles and accessories, which were
ordered by GHANEM and that GHANEM requested to be falsely
invoiced as "generators," require a valid export license from
the U.S. Department of State prior to export from the United
States.   The U.S. Department of State has informed me that it
does not appear that GHANEM has ever received an export license
from that agency.   Based on information that I received from HSI
Norfolk, I know that a company that GHANEM was previously
associated with in Jordan is listed as the consignee on a
Department of State export license issued in 2007.
Specifically, a Department of State export license, known as the
DSP-5, indicates that a U.S. company applied for, and was
granted, a license from the DDTC to allow for the export of
"communication headsets" to be used as a "a sample for a
governmental tender in Jordan."   The foreign end user is
identified as the "Jordan Armed Forces."   One of GHANEM's former
companies, "CARAVANA MIDDLE EAST CME," is listed as the foreign
consignee of the export.   GHANEM is not referenced by name in
the license.   That license expired on June 15, 2011.   On or
about November 23, 2015, I learned that in December 2014,

"Gateway to MENA" was listed as a foreign end user on a DDTC license related to a "site survey." The license does not authorize the sale of any military weapons or defense articles ordered by GHANEM from the UCA.

69. Based on the above information, there is probable cause to believe that GHANEM has attempted to cause the export of the defense items and accessories without the appropriate licenses, in violation of the AECA and the ITAR, and the outbound smuggling statute; and that GHANEM has transferred money to the United States from outside the United States with the intent to promote those export violations, in violation of the money laundering statute.

### IV.

### SEALING REQUEST

70. The criminal investigation into the activities of GHANEM and his co-conspirators is continuing. Disclosure of the contents of this affidavit would seriously impede the investigation by revealing details of the government's investigations and evidence gathered in connection therewith. It would alert GHANEM as well as any of his co-conspirators to the fact that the government has obtained their e-mails, which would cause them to stop using those e-mail accounts. It would also likely cause them to flee and/or destroy any evidence of these transactions, or potentially manufacture evidence that

concealed the true nature of their conduct. Further, GHANEM and any co-conspirators would be able to learn the extent of the government's investigations as set forth herein. Accordingly, I request that the Court issue an order sealing this affidavit, the complaint, and arrest warrant until further order of this Court.

V.

CONCLUSION

71. Based on the foregoing, I respectfully submit that there is probable cause to believe that GHANEM has committed violations of Title 22, United States Code, Section 2778 (AECA); Title 22 Code of Federal Regulations, Parts 120-130 (ITAR); Title 18, United States Code, Section 554 (Smuggling Goods out of the United States); and Title 18 U.S.C. § 1956(a)(2)(A) (Money Laundering); and I respectfully request that the Court issue the requested criminal complaint and arrest warrant.

_____
Matthew L. Peterson
Special Agent
Homeland Security Investigations

Sworn and subscribed to before me on this _____ day of November, 2015.

_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE