1  NICOLA T. HANNA
   United States Attorney
2  PATRICK R. FITZGERALD
   Assistant United States Attorney
3  Chief, National Security Division
   MELISSA MILLS (Cal. Bar No. 248529)
4  GEORGE E. PENCE (Cal. Bar No. 257595)
   Assistant United States Attorney
5  Terrorism and Export Crimes Section
        1500 United States Courthouse
6        312 North Spring Street
        Los Angeles, California 90012
7        Telephone:  (213) 894-0627/2253
        Facsimile:  (213) 894-2927
8        Email:  Melissa.Mills@usdoj.gov
                George.Pence@usdoj.gov
9  CHRISTIAN E. FORD (Cal. Bar No. 264564)
   Trial Attorney
10 Counterintelligence and Export Control Section
   National Security Division
11 Department of Justice
        950 Pennsylvania Avenue, NW
12       Washington, DC 20530
        Telephone:  (202) 233-2049
13 Email:  Christian.Ford@usdoj.gov

14

15                    UNITED STATES DISTRICT COURT

16              FOR THE CENTRAL DISTRICT OF CALIFORNIA

17 UNITED STATES OF AMERICA,          No. CR 15-704(A)-SJO

18           Plaintiff,               GOVERNMENT'S TRIAL MEMO

19              v.                    Trial Date:   10/30/2018
                                      Trial Time:   8:30 a.m.
20 RAMI NAJM ASAD GHANEM,             Location:     Courtroom of the
     aka "Rami Ghanem,"                             Hon. S. JAMES OTERO
21
             Defendant.
22

23      Plaintiff United States of America, by and through its counsel

24 of record, the United States Attorney for the Central District of

25 California and undersigned counsel, hereby files its Trial Memo.

26 //

27 //

28

1   This Trial Memo is based upon the attached memorandum of points
2   and authorities, the files and records in this case, and such further
3   evidence and argument as the Court may permit.

4   Dated: October 26, 2018          Respectfully submitted,

5                                    NICOLA T. HANNA
                                     United States Attorney
6
                                     PATRICK R. FITZGERALD
7                                    Assistant United States Attorney
                                     Chief, National Security Division
8

9                                    _____/s/_____
                                     GEORGE E. PENCE
10                                   MELISSA MILLS
                                     Assistant United States Attorney
11
                                     Attorneys for Plaintiff
12                                   UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES ................................................ vi

MEMORANDUM OF POINTS AND AUTHORITIES ................................ 1

I.   STATUS OF THE CASE ............................................. 1

     A.   Trial Status ............................................ 1

     B.   Length of Trial ......................................... 2

          1.   Number of Witnesses ................................ 2

               1.   Homeland Security Investigations (HSI)
                    Special Agent (SA) Matthew Peterson ........... 2

               2.   HSI Undercover Agent known to defendant as
                    Nader Kalani ................................. 2

               3.   HSI Source of Information, name known to
                    defendant and his counsel .................... 2

               4.   Dr. Robert Doherty ........................... 2

               5.   Dr. Peter Bartu .............................. 2

               6.   Sandro Kavsadze (recorded testimony pursuant
                    to Rule 15) .................................. 2

               7.   Gia Devidze (recorded testimony pursuant to
                    Rule 15) ..................................... 2

               8.   Zurab Partsakhashvili (recorded testimony
                    pursuant to Rule 15) ......................... 2

               9.   State Department employee Simon Davidson-
                    Hood ......................................... 2

               10.  Defense Department employee Timothy Williams ... 2

               11.  Hellenic National Police Lieutenant Aris
                    Zagakos ...................................... 2

               12.  HSI Foreign Service National Investigator
                    William Tsakis ............................... 2

               13.  HSI Special Agent David Stone ................ 2

               14.  Bureau of Prisons employee Tammi Greer ....... 2

               15.  Faiza Sultan ................................. 2

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                    PAGE

        16.  Hanadi Thomas ................................. 2

        17.  Katherine Hilkert ............................ 3

    2.  Exhibits ......................................... 4

C.  Discovery and Affirmative Defenses ...................... 4

II.  STATEMENT OF FACTS ......................................... 5

    A.  Defendant's Initial Contacts with HSI ............... 5

    B.  First Meeting with the UCA .......................... 6

    C.  Discussions after the First Meeting ................. 7

    D.  Second Meeting with the UCA ......................... 8

    E.  Defendant's Order with the UCA ...................... 9

        1.  Negotiations and Order Placement ............... 9

        2.  Payments and Shipment ......................... 13

    F.  Defendant's Arrest by the Hellenic National Police and
        the Seizure of His Digital Devices ................. 14

    G.  The Forensic Examination of Defendant's Digital
        Devices ............................................ 14

        1.  The MacBook ................................... 15

        2.  The iPad, S4, and S6 .......................... 15

    H.  Defendant's Other Charged Illegal Arms-Trafficking
        Activities ......................................... 16

    I.  The Conspiracy to Use Missile Systems .............. 17

    J.  The Conspiracy to Transfer Missile Systems ......... 19

III.  THE ELEMENTS OF THE CHARGED OFFENSES ..................... 19

    A.  Count 1: Attempted Exportation of Defense Articles
        Without A License .................................. 19

        1.  The Statutory Framework ....................... 19

        2.  Elements of the Crime of Attempted Exportation of
        a Defense Article without a License ........... 21

### TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                              PAGE

    B.   Count 2:  Smuggling ....................................... 21

        1.   The Statutory Framework ............................ 21

        2.   Elements of the Crime of Smuggling ................ 22

    C.   Counts Three and Four:  Money Laundering ............... 22

        1.   The Statutory Framework ............................ 22

        2.   Elements of the Crime ............................. 22

    D.   Count Five: Conspiracy ................................. 23

        1.   The Statutory Scheme .............................. 23

        2.   Elements of the Crime ............................. 23

    E.   Count Six: Brokering Defense Articles and Services
       Without a License ..................................... 23

        1.   The Statutory Framework ............................ 23

        2.   Elements of the Crime ............................. 24

    F.   Count Seven: Conspiracy to Use and to Transfer a
       Missile System Designed to Destroy Aircraft ........... 24

        1.   The Statutory Framework ............................ 24

        2.   Elements of the Crime ............................. 25

IV.  EVIDENTIARY AND LEGAL ISSUES ................................. 26

    A.   Judicial Notice ....................................... 26

    B.   Expert Testimony ...................................... 27

        1.   The International Trade in Arms and Munitions ...... 27

        2.   USML Status of Charged Defense Articles and
           Services .......................................... 29

        3.   Missile Systems Designed to Destroy Aircraft ...... 30

        4.   Other Potential Experts ........................... 33

    C.   Hearsay ............................................... 33

        1.   Certified Business Records of Bank Transactions
           and Defendant's Custodial Location ................ 33

# TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                          PAGE

       2.    Certified Public Records of the Bureau of Prisons .. 34

       3.    Defendant's Statements ............................. 35

       4.    Co-Conspirator Statements ......................... 36

   D.    Physical Evidence ....................................... 39

   E.    Authentication and Identification ....................... 40

   F.    Chain of Custody ........................................ 41

   G.    Cross Examination ....................................... 42

   H.    Impeaching Witnesses .................................... 43

   I.    Photographs ............................................. 44

   J.    Demonstratives .......................................... 44

   K.    Cross-Examination of Defendant .......................... 45

   L.    Proffer Statements ...................................... 47

   M.    Character Evidence ...................................... 47

   N.    Impeachment by Prior Convictions ........................ 48

   O.    Video and Audio Recordings .............................. 49

   P.    Charts and Summary Witnesses ............................ 50

   Q.    Scope of Conspiracy and Inextricably Intertwined Acts ... 52

   R.    Evidence Admissible Under As Direct Evidence or Under Rule 404(b) of the Federal Rules of Evidence ............ 53

   S.    Lay Opinion Testimony Regarding Coded Language .......... 54

   T.    Discretion as to Order of Proof ......................... 56

   U.    Transcripts of Recordings ............................... 58

   V.    Stipulations of Fact .................................... 58

   W.    Translations ............................................ 59

   X.    Rule 15 Depositions ..................................... 59

V.    AFFIRMATIVE DEFENSES ........................................ 60

## TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                          PAGE

   A.   Entrapment ............................................... 60

   B.   Public Authority ......................................... 61

   C.   Other Affirmative Defenses ............................... 63

## TABLE OF AUTHORITIES

DESCRIPTION                                                                PAGE

Amsler v. United States,
    381 F.2d 37 (9th Cir. 1967) ....................................... 43

Bourjaily v. United States,
    483 U.S. 171 (1987) .............................................. 39

Gallego v. United States,
    276 F.2d 914 (9th Cir. 1960)............................... 40, 41, 42

Michelson v. United States,
    335 U.S. 469 (1948) ........................................... 47, 48

Price v. Kramer,
    200 F.3d 1237 (9th Cir. 2000) ................................... 43

Tennessee v. Street,
    471 U.S. 409 (1985) .............................................. 35

United States v. Arias-Villanueva,
    998 F.2d 1491 (9th Cir. 1993) ................................... 38

United States v. Avendano,
    455 F.2d 975 (9th Cir. 1972) .................................... 56

United States v. Black,
    767 F.2d 1334 (9th Cir. 1985)................................... 41

United States v. Blackwood,
    878 F.2d 1200 (9th Cir. 1989)............................... 41, 49

United States v. Bout,
    731 F.3d 233 (2d Cir. 2013)..................................... 18

United States v. Bridgeforth,
    441 F.3d 864 (9th Cir. 2006).................................... 37

United States v. Burden,
    217 F. Supp. 3d 348 (D.D.C. 2016)............................... 30

United States v. Burreson,
    643 F.2d 1344 (9th Cir. 1981)............................... 35, 36

United States v. Castaneda,
    16 F.3d 1504 (9th Cir. 1994).................................... 39

United States v. Castro-Trevino,
    464 F.3d 536 (5th Cir. 2006).................................... 29

United States v. Chi Mak,
    683 F.3d 1126 (2012)............................................ 29

TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                                    PAGE

United States v. Chu Kong Yin,
    935 F.2d 990 (9th Cir. 1991).................................... 41

United States v. Collicott,
    92 F.3d 973 (9th Cir. 1996)..................................... 36

United States v. Cowley,
    720 F.2d 1037 (9th Cir. 1983)................................... 33

United States v. De Bright,
    730 F.2d 1255 (9th Cir. 1984)................................... 40

United States v. De Peri,
    778 F.2d 963 (9th Cir. 1985)................................ 50, 51

United States v. Duka,
    671 F.3d 329 (3d Cir. 2011)..................................... 38

United States v. Fagan,
    996 F.2d 1009 (9th Cir. 1993).............................. 46, 47

United States v. Freeman,
    498 F.3d 893 (9th Cir. 2007).............................. 50, 56

United States v. Fu Chin Chung,
    931 F.2d 43 (11th Cir. 1991).................................... 29

United States v. Gadson,
    763 F.3d 1189 (9th Cir. 2014)................................... 55

United States v. Gardner,
    611 F.2d 770 (9th Cir. 1980).................................... 52

United States v. Gay,
    967 F.2d 322 (9th Cir. 1992).................................... 45

United States v. Gordon,
    844 F.2d 1397 (9th Cir. 1988)................................... 39

United States v. Hammadi,
    737 F.3d 1043 (6th Cir. 2013)................................... 19

United States v. Harrington,
    923 F.2d 1371 (9th Cir. 1991)............................. 40, 41

United States v. Hynes,
    467 F.3d 951 (6th Cir. 2006).................................... 38

United States v. Jackson,
    882 F.2d 1444 (9th Cir. 1989)............................. 46, 54

TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                                    PAGE

United States v. Kaiser,
  660 F.2d 724 (9th Cir. 1981)............................... 39, 42

United States v. King,
  472 F.2d 1 (9th Cir. 1973)..................................... 42

United States v. King,
  587 F.2d 956 (9th Cir. 1978).................................. 49

United States v. Layton,
  720 F.2d 548 (9th Cir. 1983).................................. 38

United States v. Lechuga,
  888 F.2d 1472 (5th Cir. 1989)................................. 38

United States v. Limones,
  8 F.3d 1004 (5th Cir. 1993)................................... 38

United States v. Lloyd,
  807 F.3d 1128 (9th Cir. 2015)................................. 37

United States v. Loftis,
  843 F.3d 1173 (9th Cir. 2016)................................. 53

United States v. Lopez-Figueroa,
  316 F. App'x 548 (9th Cir. 2008).............................. 36

United States v. Matta-Ballesteros,
  71 F.3d 754 (9th Cir. 1995)................................ 40, 42

United States v. May,
  622 F.2d 1000 (9th Cir. 1980)................................. 44

United States v. McCollom,
  664 F.2d 56 (5th Cir. 1981)................................... 48

United States v. McMurray,
  34 F.3d 1405 (8th Cir. 1994).................................. 39

United States v. Meeks,
  756 F.3d 1115 (8th Cir. 2014)................................. 38

United States v. Meyers,
  847 F.2d 1408 (9th Cir. 1988)................................. 51

United States v. Miranda-Uriarte,
  649 F.2d 1345 (9th Cir. 1981)................................. 45

United States v. Mitchell,
  502 F.3d 931 (9th Cir. 2007).................................. 36

TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                         PAGE

United States v. Munoz,
   233 F3d 1117 (9th Cir. 2000)........................................ 46

United States v. Natale,
   526 F.2d 1160 (2d Cir. 1975)........................................ 42

United States v. Nazemian,
   948 F.2d 522 (9th Cir. 1991)........................................ 39

United States v. Noushfar,
   78 F.3d 1442 (9th Cir. 1996)........................................ 50

United States v. Oaxaca,
   569 F.2d 518 (9th Cir. 1978)........................................ 44

United States v. Ontiveros,
   598 F. App'x 482 (9th Cir. 2015).................................... 55

United States v. Ortega,
   203 F.3d 675 (9th Cir. 2000)........................................ 35

United States v. Osazuwa,
   564 F.3d 1169 (9th Cir. 2009)....................................... 48

United States v. Perez,
   658 F. 658.......................................................... 56

United States v. Perez,
   658 F.2d 654 (9th Cir. 1981)........................................ 37

United States v. Perry,
   857 F.2d 1346 (9th Cir. 1988)....................................... 49

United States v. Protac, Inc.,
   869 F.2d 1288 (9th Cir. 1989)....................................... 37

United States v. Pulungan,
   569 F.3d 326 (7th Cir. 2009)........................................ 30

United States v. Robinson,
   967 F.2d 287 (9th Cir. 1992)........................................ 42

United States v. Rubino,
   431 F.2d 284 (6th Cir. 1970)........................................ 52

United States v. Russell,
   411 U.S. 423 (1973)............................................. 60, 62

United States v. Santiago,
   837 F.2d 1545 (11th Cir. 1988)...................................... 38

TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                          PAGE

United States v. Scales,
  594 F.2d 558 (6th Cir. 1979)...................................... 51

United States v. Simas,
  937 F.2d 459 (9th Cir. 1991)...................................... 56

United States v. Smith,
  441 F.3d 254 (4th Cir. 2006)...................................... 38

United States v. Smith,
  591 F.3d 974 (8th Cir. 2010)...................................... 49

United States v. Stearns,
  550 F.2d 1167 (9th Cir. 1977)..................................... 44

United States v. Tafollo-Cardenas,
  897 F.2d 976 (9th Cir. 1990)...................................... 33

United States v. Turner,
  528 F.2d 143 (9th Cir. 1975).................................. 56, 58

United States v. Vera,
  770 F.3d 1232 (9th Cir. 2014)..................................... 29

United States v. Vizcarra-Martinez,
  66 F.3d 1006 (9th Cir.1995)....................................... 53

United States v. Weiland,
  420 F.3d 1062 (9th Cir. 2005)..................................... 34

United States v. Weiner,
  578 F.2d 757 (9th Cir. 1978)...................................... 42

United States v. Whitman,
  771 F.2d 1348 (9th Cir. 1985)..................................... 35

United States v. Wright,
  412 F. App'x 993 (9th Cir. 2011).................................. 44

United States v. Yarborough,
  852 F.2d 1522 (9th Cir. 1988)..................................... 38

United States v. Zavala-Serra,
  853 F.2d 1512 (9th Cir. 1988)..................................... 39

United States v. Zemek,
  634 F.2d 1159 (9th Cir. 1980)..................................... 56

United States v. Zhen Zhou Wu,
  711 F.3d 1 (2013)................................................. 30

1    **TABLE OF AUTHORITIES (CONTINUED)**

2    <u>DESCRIPTION</u>                                                    <u>PAGE</u>

3    Statutes

4    18 U.S.C. § 371 ................................................. 23

5    18 U.S.C. § 372 .................................................. 1

6    18 U.S.C. § 554 .............................................. 1, 21

7    18 U.S.C. § 1956(a)(2)(A) .................................... 1, 22

8    18 U.S.C. § 2332g ..................................... 1, 18, 19, 24

9    22 U.S.C. § 2778 ............................................. 1, 29

10   Rules

11   Fed. R. Evid. 106 ............................................... 36

12   Fed. R. Evid. 401(a) ........................................... 42

13   Fed. R. Evid. 405(a) ....................................... 47, 48

14   Fed. R. Evid. 608(a) ........................................... 43

15   Fed. R. Evid. 608(b) ........................................... 43

16   Fed. R. Evid. 611(a) ........................................... 52

17   Fed. R. Evid. 611(b) ........................................... 42

18   Fed. R. Evid. 701 .............................................. 55

19   Fed. R. Evid. 801(a) ........................................... 33

20   Fed. R. Evid. 801(c) ........................................... 33

21   Fed. R. Evid. 801(d) ........................................... 35

22   Fed. R. Evid. 801(d)(2) ........................................ 35

23   Fed. R. Evid. 801(d)(2)(A) ..................................... 35

24   Fed. R. Evid. 801(d)(2)(E) ..................................... 37

25   Fed. R. Evid. 802 .............................................. 33

26   Fed. R. Evid. 901(a) ........................................... 41

27   Fed. R. Evid. 901(b) ........................................... 49

28   Fed. R. Evid. 902(4) ........................................... 34

1

**TABLE OF AUTHORITIES (CONTINUED)**

2 <u>DESCRIPTION</u>                                                                 <u>PAGE</u>

3 Fed. R. Evid. 1006 .................................................. 51

4 Federal Rule of Criminal Procedure 16(a)(1)(G) ..................... 3

5 Federal Rules of Evidence 702 .................................. 3, 55

6 Regulations

7 22 C.F.R. § 121.1 ............................................. 20, 29

8 22 C.F.R. § 123.1(a) ............................................. 20

9 22 C.F.R. § 127.1(a)(1) ...................................... 20, 21

10 22 C.F.R § 129.2 ................................................. 24

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   STATUS OF THE CASE**

    **A.   Trial Status**

On December 22, 2015, defendant Rami Najm Asad-Ghanem ("defendant") was charged in an original four-count indictment (the "original Indictment") with violations of 22 U.S.C. § 2778 (Arms Export Control Act), 18 U.S.C. § 554 (Smuggling), and 18 U.S.C. § 1956(a)(2)(A) (Money Laundering).  A superseding indictment filed on March 24, 2017, charged defendant with three additional counts alleging violations of 18 U.S.C. § 372 (Conspiracy), 22 U.S.C. § 2778 (Arms Export Control Act), and 18 U.S.C. § 2332g (Conspiracy to Use and to Transfer Missile Systems Designed to Destroy Aircraft) (the "First Superseding Indictment" or "FSI").  On June 22, 2018, the Court granted the Government's Motion for Joinder Pursuant to Rule 13, thus joining the original Indictment and FSI for trial.

On July 20, 2018, defendant filed a notice withdrawing his previously-filed jury trial waiver.  Trial is set to commence on October 30, 2018, at 8:30 a.m.  Defendant is in custody pending trial.

On October 22, 2017, the Court granted the Government's unopposed application for a pre-trial ruling on the government's proposed trial indictment, thereby combining the charges in the original Indictment and FSI into a single Trial Indictment  to be provided to the jury, with an appropriate cautionary instruction that the indictment or summary thereof is not evidence.

**B.**   **Length of Trial**

    1.   Number of Witnesses

The government expects that its case-in-chief (with a reasonable allotment for cross-examination) will take three weeks to present. The government may call the following witnesses in its case-in-chief:

1. Homeland Security Investigations (HSI) Special Agent (SA) Matthew Peterson

2. HSI Undercover Agent known to defendant as Nader Kalani

3. HSI Source of Information, name known to defendant and his counsel

4. Dr. Robert Doherty

5. Dr. Peter Bartu

6. Sandro Kavsadze (recorded testimony pursuant to Rule 15)

7. Gia Devidze (recorded testimony pursuant to Rule 15)

8. Zurab Partsakhashvili (recorded testimony pursuant to Rule 15)

9. State Department employee Simon Davidson-Hood

10. Defense Department employee Timothy Williams

11. Hellenic National Police Lieutenant Aris Zagakos

12. HSI Foreign Service National Investigator William Tsakis

13. HSI Special Agent David Stone

14. Bureau of Prisons employee Tammi Greer

Defendant has indicated his intent to enter into a stipulation to the accuracy of certain translations from Arabic and Russian. Should defendant not enter into those stipulations, the government would also call the following witnesses:

15. Faiza Sultan

16. Hanadi Thomas

1    17.   Katherine Hilkert

2  The government may call other witnesses as needed to establish the

3  authenticity of government exhibits and the accuracy of translations

4  of both written and recorded communications.

5    The government may seek to introduce evidence pursuant to

6  stipulations or through judicial notice.  The government may also

7  call rebuttal witnesses if necessary following defendant's case.

8    In letters dated July 23, August 31, and October 17, 2018 the

9  government provided notice under Federal Rules of Evidence 702, 703,

10  and 705, Federal Rule of Criminal Procedure 16(a)(1)(G), and

11  paragraph 10(b)(x) of the Court's standing criminal trials order that

12  some of the anticipated testimony of witnesses whose testimony may be

13  considered expert testimony, including the following: Robert A.

14  Doherty, Ph.D, Peter Bartu, Ph.D, Simon Davidson Hood, Timothy

15  Williams, Robert Whittington, HSI SA Matthew L. Peterson, and various

16  linguists.

17    The letters identified the subject matter of the anticipated

18  testimony as well as the qualifications of each witness to provide

19  such testimony.  The Court ordered that any objections to the expert

20  disclosures be made before trial, so that they could be considered at

21  a pre-trial hearing.  (Dkt. 148.)  Defendant made no such objections.

22    Pursuant to a Court order, the parties provided reciprocal

23  disclosure of witness lists on September 28, 2018.  Defendant gave

24  notice that he intends to call one witness, Aref Al Zaben.  The

25  government has moved to preclude that witness on the basis that

26  pursuant to defendant's offer of proof, the witness could only offer

27  testimony that is irrelevant, is hearsay, or has already been

28  precluded by the Court's order as to defendant's noticed defense of

3

1  public authority.   The Court has ordered defendant to make a more

2  detailed offer of proof by Monday, October 29.

3       The Court ordered also the parties to provide reciprocal notice

4  of any expert testimony.   Despite passage of the original deadline

5  and a subsequent deadline months ago, to date, defendant has provided

6  none.   To the extent defendant attempts to introduce or call any

7  expert testimony at trial, the United States reserves the right to

8  object to such testimony and to seek to have such testimony

9  precluded.

10          2.   Exhibits

11      The government intends to offer approximately 500-600

12  documentary exhibits in its case in chief.   This number is a small

13  fraction of the many tens of thousands of highly relevant documents

14  revealed by the investigation.

15      C.   Discovery and Affirmative Defenses

16      The United States has also requested reciprocal discovery and

17  Jencks material from defendant.   To date, defendant has provided the

18  government with a stack of documents that purportedly describe the

19  SOI's criminal history.   Defendant has not produced any other

20  reciprocal discovery to which the United States is entitled under

21  Rules 16 and 26.2 of the Federal Rules of Criminal Procedure or the

22  Jencks Act.   Thus, to the extent defendant attempts to introduce or

23  use any documents at trial that he has not previously produced, the

24  United States reserves the right to object and to seek to have such

25  documents precluded.   On October 22, 2018, the Court granted in part

26  the Government's motion to preclude defendant from offering evidence

27  or argument of the SOI's purported criminal convictions, thereby

28

precluding defendant from offering the aforementioned stack of documents as evidence at trial.

The government also requested notice of any affirmative defenses that defendant intends to raise, including entrapment, mental condition, and duress.  Defendant notified the Government of his intent to pursue (1) an entrapment defense with respect to the charges in the original Indictment and (2) a public authority defense with respect to the charges in the FSI.

On June 21, 2018, the Court denied the Government's motion to preclude the entrapment defense and granted the Government's motion to preclude the public authority defense.

## II.   STATEMENT OF FACTS

The government expects that the evidence at trial will establish the following facts, among others:

### A.   Defendant's Initial Contacts with HSI

In May 2014, a Los Angeles supplier of military goods advised HSI that Defendant had contacted the supplier to solicit a business relationship.  HSI conducted background investigation on Defendant and subsequently learned that an existing HSI SOI had worked with Defendant in the security-procurement business many years before.

In June 2014, at HSI's direction, the SOI re-established contact with Defendant via email and telephone.  In July 2014, at HSI's direction, the SOI introduced Defendant by phone to the HSI UCA based in Los Angeles.  During their initial phone conversation, which was recorded, Defendant said that he needed various weapons and other military equipment.  The UCA told Defendant that he could help procure some of Ghanem's requested items, including sniper rifles and night-vision optics, but that the order would have to be "under the

5

table." Defendant affirmed that he wanted to proceed with the transaction and that he understood the risks involved, noting that he is also a U.S. citizen and is therefore "in the same boat."

The UCA sent Defendant pricing information for several military items that Defendant had requested in the phone call, including 200 US-made M-4 carbine assault rifles. In a subsequent recorded phone conversation in August 2014, Defendant and the UCA planned an in-person meeting in Greece in September 2014 to discuss business operations, including the outstanding order for M-4s as well as larger future orders. During that call, Defendant said that he had a strong market with Shi'a groups in Iran, Iraq, and Lebanon, and he again affirmed that he did not intend to apply for an export license and that the transaction would be "under the table."

### B.   First Meeting with the UCA

On September 18, 2014, Defendant met with the UCA and the SOI in Athens, Greece. During this meeting, which was recorded, Defendant advised that his network in Beirut, Lebanon, includes a contact that Ghamen believed was connected to the designated terrorist organization known as Hezbollah. Defendant also said that he had requirements for goods — including Bell helicopters and F-5 and F-14 military fighter jets — on behalf of Iranian customers that he did not identify. Defendant provided the UCA with documents partially written in Farsi (the official language of Iran) that addressed these requests.

During the meeting, at defendant's request, the parties agreed not to make future references to Iran, and to instead use the cover term "Ireland" when discussing Iran. Defendant made reference to his "black market" activities in the Eastern Block and stated that he

could get "anything" for the UCA from there.  Defendant further
reaffirmed his understanding of U.S. legal requirements for export
licenses and end-user certificates, noting that he needed to be
careful because he is a U.S. citizen.  Defendant noted that he was
dealing with Hezbollah in Iraq, and also that he had a weapons market
in Africa.

At this meeting, Defendant said that he was looking for a
particular sniper rifle that could cover a distance of 4500-5000
meters.  He added that he was dealing with a small U.S. company, and
that he was communicating with a person there who was willing to make
as many of the rifles as Defendant required.  Defendant clarified
that they were discussing 500 pieces, and that the rifles would be
custom made for him.  Defendant said that his contact told him that
"ITAR" was required and that the contact would not ship the items
illegally.  Defendant said that he would obtain cover documentation
for that arms shipment from an Iraqi official, because this shipment
was one area of business to cover "illegally."

Defendant and the UCA also discussed at the meeting Defendant's
payment plans for their transaction.  Defendant said that cash would
not work, so he planned to use a bank wire to pay.  He further noted
that it was his standard practice to use a "cover" contract that
would "change the items" detailed in the contract but give the
correct price.

C.   Discussions after the First Meeting

Shortly after the September 2014 meeting, Defendant e-mailed the
UCA requesting an update on the status of the M-4 rifles that
Defendant had requested.  The UCA replied that the 500 M-4s would be
available for delivery within days after Defendant secured funding.

1    In January 2015, Defendant called the UCA.  In this recorded
2    phone call, Defendant expressed reservations about working with the
3    UCA, saying that it was important to know who he was dealing with,
4    because "one mistake, and you lose what you built all your life."
5    Defendant later said that he needed night-vision goggles for "MI-24,"
6    and the UCA responded that he would look into whether he could
7    acquire this item.  An Mi-24 is an attack helicopter manufactured in
8    Russia.  On this phone call, Defendant and the UCA also agreed to
9    meet again in person.

10        **D.   Second Meeting with the UCA**

11        In March 2015, Defendant again met with the UCA and the SOI in
12   Athens, Greece, to discuss potential business.  On March 10, 2015,
13   Defendant met with the UCA and the SOI and discussed the UCA's
14   ability to supply military goods, particularly night-vision goggles
15   and other military optics.  This meeting was recorded.  The following
16   day, the UCA sent Defendant an e-mail confirming the UCA's ability to
17   supply Defendant with the requested goods.  Specifically, the e-mail
18   notes that Defendant expressed an interest in PVS-14 Night Vision
19   Goggles, AN/AVS-9 Night Vision Goggles, PVS-27 Night Vision Sniper
20   Scope manufactured by FLIR, and DBAL-A Infrared Illuminator

21        On March 11, 2015, Defendant engaged in multiple meetings with
22   the UCA and the SOI to discuss volume and other sales and export
23   logistical details of the military optical equipment requested by
24   Defendant.  Defendant and the UCA agreed that the equipment would be
25   exported from the United States without a license.  The UCA showed
26   Defendant working models of night-vision goggles requested by
27   Defendant.  After inspecting the models, Defendant made two
28   speakerphone calls to clients whom Defendant believed would be

interested in the equipment.  One of the prospective buyers asked where Defendant could deliver the night-vision equipment, to which Defendant gleefully replied that he could deliver them to the buyer's "bedroom."  Defendant advised the UCA that the prospective buyers were based in Ukraine.  On March 12, 2015, Defendant called the UCA and told him that Defendant had received positive feedback on the military optical equipment from potential buyers in Egypt, Ukraine, and Greece.  The UCA later sent Defendant four e-mails containing datasheets and pricing for each of the four items of optical equipment that they had discussed.

> **E.   Defendant's Order with the UCA**
>
> > 1.   Negotiations and Order Placement

On March 31, 2015, Defendant sent the UCA an e-mail entitled "Urgent requirement" requesting specific quantities of the military optical equipment discussed at the March 2015 meetings in Athens and inquiring as to the fastest time for delivery.  After the UCA advised defendant of a timeline to procure and ship the requested military optics, Defendant sent another e-mail asking the UCA to send an invoice.  On April 8, 2015, Defendant advised the UCA that Defendant had become ill and needed time to recover.

On May 12, 2015, Defendant sent the UCA an e-mail containing a screenshot of another e-mail entitled "URGENT REQUIREMENT OF AMMO." That e-mail listed several types of missiles, rockets, ammunition, and other munitions, including "Hell Fire Missile," "2.75 rocket," "Tow Missile (A and B)," and "hand grenades."  Upon receiving this message, the UCA called Defendant.  In this phone call, which was recorded, Defendant and the UCA discussed pricing and logistics for the military optical equipment that Defendant had previously

requested.  Defendant referred to the e-mail he had sent to the UCA that day, noting "the list I gave you, which has that Hellfire, the whole list is very serious."  Defendant added that he was "already supplying the buyer."

On July 24, 2015, Defendant sent the UCA a message requesting Barrett M82A1 .50 caliber sniper rifles, manufactured in the United States, and Steyr HS .50 caliber sniper rifles, manufactured in Austria.  On July 27, 2015, Defendant sent the UCA another message asking to expand his order to include 100 US-made "pistols with silencer."  Specifically, Defendant asked, "Also can you provide me with 100 pistols with silencer any good US even Gluck."[1]

On August 4, 2015, the UCA sent an e-mail to Defendant providing pricing information for 9mm pistols, 9mm pistol barrels, and silencers for 9mm pistols.  On August 5, 2015, in a recorded phone conversation, Defendant acknowledged that email from the UCA about the pistols and asked the UCA to proceed with an order for 100 pistols.  In the same phone call, Defendant also requested that the UCA procure on his behalf "at least 10 or 20" .50-caliber sniper rifles, as well as laser sights.  Defendant further requested 50,000 rounds of 9mm ammunition.  During this conversation, Defendant repeatedly asserted that he needed the requested items "ASAP" and "right away."

Later that same day, the UCA sent Defendant an e-mail with pricing information and financing terms for the 9mm pistol, barrels, silencers, and ammunition that Defendant had requested.  On August 6,

---

[1] At trial, the UCA will testify based on his knowledge, training, and experience, that he understood "Gluck" to refer to "Glock," a manufacturer of firearms.

10

Defendant called the UCA to discuss the contemplated order.   During the call, which was recorded, Defendant requested "more advanced" sniper rifles, ultimately requesting five each of "basic," "medium," and "high-end" sniper rifles.   Defendant also requested night vision scopes for the sniper rifles. Defendant further asked the UCA to falsely state on the export documents that the shipment contained juice.   Defendant advised that he wanted the shipment to be routed through Greece with an ultimate destination of Libya.   Defendant said that the money for the shipment would come from Jordan.   On August 7, 2015, in an e-mail to the UCA, Defendant provided the name and contact information for his consignee in Libya.

On August 9, 2015, the UCA sent Defendant an e-mail with a full breakdown of Defendant's requested items, including quantities and pricing.   Per Defendant's request, the various categories of military goods were coded as "juice."   The grand total for Defendant's order at that stage was $408,000.

On August 26, 2015, Defendant replied to the UCA's e-mail requesting reductions to the quantity of each of the requested items. That same day, the UCA sent Defendant a message with his revised smaller order.   The updated order, which Defendant ultimately placed, came to a total of $220,050 and included the following items:

| Commodity | Manufacturer | Model Number | Quantity | Price Per Unit | Total |
|---|---|---|---|---|---|
| Pistol | Kahr Arms | TP9 9MM | 40 | $900.00 | $36,000.00 |
| Pistol | Kahr Arms | CW9 9MM | 10 | $650.00 | $6,500.00 |
| Barrel | Kahr Arms | Threaded Barrel | 50 | $210.00 | $10,500.00 |
| Suppressor | AAC | Evolution | 50 | $780.00 | $39,000.00 |
| Laser Sight | Crimson Trace | Laser Sight | 50 | $265.00 | $13,250.00 |

| Commodity | Manufacturer | Model Number | Quantity | Price Per Unit | Total |
|---|---|---|---|---|---|
| Ammunition | Remington | 9MM Luger 115 Grain | 50,000 | $18,000.00 | $18,000.00 |
| Rifle | Barrett | M99 .50 CAL | 5 | $4,600.00 | $23,000.00 |
| Rifle | Barrett | M95 .50 CAL | 3 | $7,100.00 | $21,300.00 |
| Rifle | Barrett | 82A1 .50 CAL | 2 | $9,600.00 | $19,200.00 |
| Ammunition | American Eagle | .50 CAL BMG-660 Grain | 5,000 | $16,000.00 | $16,000.00 |
| MUNS | FLIR | PVS-27 | 1 | $10,500.00 | $10,500.00 |
| Night-Vision Goggle | ITT | PVS-14 | 2 | $3,400.00 | $6,800.00 |
| | | | | GRAND TOTAL | $220,050.00 |

The UCA advised that a 40% down payment of $88,020 was needed to place the order. Per Defendant's request, the UCA called Defendant that day to discuss the order. During this phone call, which was recorded, Defendant said that he was going to pay for the order from his own money because he was unable to reach his prospective customer. Defendant further advised that after this delivery, a "much bigger order" would come. Defendant also requested that instead of "juice," the weapons and other military items be invoiced as industrial generators. During the discussion of his intended bank transfer, Defendant alluded to the illicit nature of their transaction, noting, "we are not dealing with each other as [weapons manufacturer] Bushmaster and [the] Jordan Armed Forces." On August 26, 2015, after the phone call, the UCA sent Defendant an e-mail with an invoice detailing the sale of three types of US-origin industrial generators for a total price of $220,050. The invoice

listed Defendant's previously identified consignee in Libya as the

purchaser.   The invoice also included routing information for the

UCA's undercover bank account in the Central District of California.

2.   Payments and Shipment

On September 2, 2015, Defendant confirmed to the UCA, both by

phone and by e-mail, that Defendant had wired $90,000 to the UCA's

bank as a down payment on the order.   The bank records for the UCA's

undercover account show that a bank wire deposit in the amount of

$89,971 posted on September 2, 2015.   The sender of the wire was

"GATEWAY TO MENA FOR LOGIS."

On October 19, 2015, Defendant spoke with the UCA in a recorded

telephone call.   Defendant said that he would wire the second

installment of $90,000 to the UCA that week.   Pursuant to the

agreement between Defendant and the UCA, that second payment would

trigger the UCA's obligation to ship Defendant's order from the Port

of Los Angeles to Greece.   On the same telephone call, Defendant

committed to meet the UCA in Greece in late November or early

December when the shipment arrived, in order to inspect the shipment

before it was forwarded onward to Defendant's customer in Libya

pursuant to the purchase agreement.   The UCA warned Defendant that he

would not ship the container to Libya until Defendant had personally

inspected it, and Defendant agreed that he would definitely come to

Greece to meet the UCA and inspect the shipment after its arrival.

On October 22, 2015, a second installment of $89,971 was wired

to the UCA's undercover bank account from Defendant's company in

Jordan.   In late October 2015, HSI arranged for a shipping container

ostensibly containing Defendant's order to leave the Port of Los

Angeles on November 3, 2015.

13

**F.    Defendant's Arrest by the Hellenic National Police and the Seizure of His Digital Devices**

On December 8, 2015, defendant and the UCA traveled to a warehouse near Athens, Greece, where the Hellenic National Police ("HNP") arrested defendant pursuant to a Mutual Legal Assistance Treaty request from U.S. officials.

During Defendant arrest, and later at Defendant's hotel room, the HNP seized from defendant the following six electronic media devices (the "digital devices"), among more than a dozen others:

1.    One mobile phone, brand Samsung Galaxy S4 (the "S4");

2.    One mobile phone, brand Apple iPhone (the "iPhone");

3.    One mobile phone, brand Huawei (the "Huawei");

4.    One mobile phone, brand Samsung Galaxy S6 (the "S6");

5.    One tablet, brand Apple iPad (the "iPad");

6.    One laptop computer, brand Apple MacBook (the "MacBook");

The HNP maintained custody and control of the digital devices until May 4, 2016, when HNP Lieutenant Zagakos Aristeidis hand delivered the digital devices to Tsakis Vasileios (also known as William Tzakis), a Foreign Service National Investigator at the U.S. Embassy in Athens.

On May 5, Investigator Tzakis sent the digital devices via United Parcel Service ("UPS") to HSI's office in Long Beach, California.  On or about May 9, 2016, HSI personnel received those digital devices from UPS and checked them into a secure area at the Long Beach office.

**G.    The Forensic Examination of Defendant's Digital Devices**

The parties have entered and filed a stipulation as to the following information.  On or about May 20, 2016, HSI SA Matthew

14

Peterson retrieved the MacBook, the iPad, the S4 and the S6 from the secure evidence storage area and provided them to HSI forensic analysts for extraction.

### 1.   The MacBook

Using Tableau write blocker and FTK Imager, both of which are computer forensic tools used for the acquisition of digital devices, CFA G. Kwan acquired a forensic image of the MacBook, which he provided to SA Peterson.

A forensic image is a bit-by-bit, sector-by-sector direct copy of a physical storage device.  Forensic images include all of the files visible to the operating system, which are said to exist in "allocated space," as well as deleted files and pieces of files left in the slack and free space, which is referred to as "unallocated space."

Thereafter, SA Peterson used EnCase, which is a forensic program used to analyze data from image files, to review the MacBook image and to create a bookmarked report of the files he decided to seize. SA Peterson saved a copy of that report to an HSI computer server, where it remains available to review, download, and print.

### 2.   The iPad, S4, and S6

CFA G. Kwan used Cellebrite, which is a forensic program for mobile devices, to extract images, contacts, call logs, messages, and device locations from the iPad, S4, and S6.  CFA G. Kwan provided those files to SA Peterson for further review.

SA Peterson used Cellebrite to review the files and to create bookmarked reports of the files he decided to seize.  SA Peterson saved copies of those reports to an HSI server.

On or about April 6, 2017, SA Peterson provided the iPhone and the Huawei to HSI CFA Aaron Kwon ("A. Kwon"):

On or before April 10, 2017, CFA A. Kwon used Cellebrite to extract images, contacts, call logs, messages, and device locations from iPhone and Huawei.  CFA A. Kwon provided those files to SA Peterson for further review.

SA Peterson used Cellebrite to review the files and to create bookmarked reports of the files he decided to seize.  SA Peterson saved copies of those reports to an HSI server.

**H.   Defendant's Other Charged Illegal Arms-Trafficking Activities**

From SA Peterson's review of the contents of the digital devices, as well as from other investigation including review of e-mail search warrant returns and wire transfer records, he learned about defendant's involvement in other arms-trafficking activities as charged in Counts Five and Six of the Trial Indictment.

The government intends to focus its presentation as to these charges on evidence of specific transactions alleged in Counts Five and Six, including defendant's efforts to broker and transfer anti-aircraft missiles between 2013 and 2015 (summarized below); and defendant's brokering and transferring of the services of mercenaries to operate Igla and Quadrat surface-to-air missiles (summarized below).  This presentation will also show the chronology of defendant's efforts to broker and transfer large quantities of weapons and ammunition to a militant faction competing for control of the government of Libya in 2014 and 2015.  Evidence of this transaction includes transmittal of an end-user certificate ("EUC") numbered 8628-57 for munitions (including 5,000,000 rounds each of

23-millimeter, 14.5-millimeter, and 7.62x54 ammunition, 10,000 GRAD
122-millimeter rockets, 3,000,000 rounds of 12.7-millimeter
ammunition, 150 Konkurs anti-tank missile launchers, 1500 Konkurs
anti-tank missiles, and numerous other defense articles) and bearing
defendant's name as the supplier, as well as defendant's and his co-
conspirators' communications reflecting their negotiation of this
deal.  The evidence also includes a contract, referencing the above-
described EUC numbered 8628-57 and bearing defendant's and his co-
conspirators' signatures, for over $249 million in those weapons and
ammunition, including the same above-described quantities of heavy
ammunition and weapons listed on the EUC.

The government will also present selected evidence of
defendant's efforts to transfer the numerous other military articles
and services as alleged in Counts Five and Six of the Trial
Indictment.  This evidence largely draws from the large volume of
communications among defendant and his co-conspirators reflecting
their negotiations on these proposed deals, as well as from wire
transfer records.

## I.   The Conspiracy to Use Missile Systems

From SA Peterson's review of the contents of the digital
devices, he learned about defendant's involvement in a conspiracy to
use and to transfer missile systems, as detailed below.

From approximately late 2014 until the time of his arrest,
defendant, along with Mohammed Al-Daboubi, a former general in the
Jordanian Air Force, operated a Jordan-based arms trafficking
business called Gateway to MENA.

Between February 2015 and June 2015, defendant and Al-Daboubi
worked to procure the services of Igla missile system operators to

fight in Libya.[2]  Defendant simultaneously endeavored to procure the
services of Quadrat surface-to-air missile operators and specialists.
Defendant negotiated with the suppliers of these services, David
Shikhashvili and Sandro Kavsadze, to pay each Igla operator $10,000
for two months on duty in Libya and offered the operators a bonus of
$50,000 and an early release from duty if they managed to shoot down
an aircraft.  Defendant and Al-Daboubi also arranged for the
operators to travel to Libya.  The two Igla operators, Devidze and
Partsakhashvili, along with Kavsadze, traveled to Libya on or around
April 30, 2015, and written communications among the parties confirm
that they were on duty there in May 2015.

The evidence as to this transaction includes communications
reflecting defendant's negotiation of the terms of the deal,
including salary and length of service; his payment of $20,000 for
the services of the Igla operators and $50,000 for the services of
the Quadrat operators and specialists; his offer of a bonus of
$50,000 to the Igla operators if they were successful in their
mission of shooting down a jet; and his facilitation of the Igla
operators' travel to Libya in late April 2015.  The evidence further
includes the video-recorded testimony of Kavsadze, Devidze, and

---

[2] Dr. Robert Doherty will testify at trial that the 9K38 Igla is
a Russian man-portable infrared homing surface-to-air missile system.
The purpose of this system is to destroy aircraft.  In their
negotiations and arrangements for Igla operators, defendant and his
co-conspirators typically refer to the system simply as "Igla," but
defendant has in the course of a prior transaction referred to it as
"Igla 9K38 + missiles."  The Igla surface-to-air missile system has
previously been charged, and upheld, as a "missile system designed to
destroy aircraft" pursuant to 18 U.S.C. § 2332g.  See United States
v. Bout, 731 F.3d 233 (2d Cir. 2013) (affirming 18 U.S.C. § 2332g
conviction based on conspiracy to acquire and use Igla surface-to-air
missile systems).

Partsakhashvili, which the Court permitted the parties to take and to use at trial pursuant to Rule 15.

###### J.    The Conspiracy to Transfer Missile Systems

In addition to the aforementioned conspiracy to use missile systems designed to destroy aircraft, defendant also conspired with multiple individuals to transfer such systems in violation of 18 U.S.C. § 2332g.  The evidence of this conspiracy will include communications reflecting defendant's efforts between 2013 and 2015 to procure an S-400 Triumph anti-aircraft missile system from the Russian government on behalf of the royal family of Saudi Arabia.  It will also include communications, offer letters, and EUCs reflecting defendant's efforts to broker and transfer Igla and Strela[3] surface-to-air missile systems to a variety of countries, including Libya, the United Arab Emirates, Iraq, and Saudi Arabia.

## III. THE ELEMENTS OF THE CHARGED OFFENSES

### A.    Count 1: Attempted Exportation of Defense Articles Without A License

#### 1.    The Statutory Framework

The relevant provisions of the Arms Export Control Act ("AECA") are codified at Title 22, United States Code, Section 2778(b)(2) and (c).  Specifically, § 2778(b)(2) provides:

---

[3] Dr. Robert Doherty will testify at trial that the Strela is a Soviet-designed surface-to-air missile system that preceded the Igla. The purpose of the Strela system is to destroy aircraft.  There have been several design updates to the first-generation 9K31 Strela 1M system, but the missiles used are interchangeable among them.  In an offer letter, defendant referenced the launchers only as "Strela" and the missiles as "Strela Missiles."  The Strela has been previously charged, and upheld, as a "missile system designed to destroy aircraft" pursuant to 18 U.S.C. § 2332g.  See United States v. Hammadi, 737 F.3d 1043 (6th Cir. 2013) (affirming conviction based on conspiracy to transfer Strela surface-to-air missile systems).

1   Except as otherwise specifically provided in regulations
    issued under subsection (a)(1) of this section, no defense
2   articles or defense services designated by the President
    under subsection (a)(1) of this section may be exported or
3   imported without a license for such export or import,
    issued in accordance with this chapter and regulations
4   issued under this chapter, except that no license shall be
    required for exports or imports made by or for an agency of
5   the United States Government (A) for official use by a
    department or agency of the United States Government, or
6   (B) for carrying out any foreign assistance or sales
    program authorized by law and subject to the control of the
7   President by other means.

8   Section 2778(c) provides:

9   Any person who willfully violates any provision of this
    section . . . or any rule or regulation issued under this
10  section . . . , shall upon conviction be fined for each
    violation not more than $1,000,000 or imprisoned not more
11  than 20 years, or both.

12   The items or categories of items that are defense articles and

13  defense services subject to export control have been delegated by the

14  President to the Secretary of State with the concurrence of the

15  Secretary of Defense.  E.g., E.O. 13637, Sec. 1(n)(i) (Mar. 8, 2013).

16  The list of items and categories of items designated as defense

17  articles and defense services resides in the United States Munitions

18  List ("USML"), which is set forth in the International Traffic in

19  Arms Regulations ("ITAR") at 22 C.F.R. § 121.1.

20   The regulations promulgated under the authority of AECA follow

21  its provisions regarding the requirement for a license.  22 C.F.R.

22  § 123.1(a) provides that "[a]ny person who intends to export . . . a

23  defense article must obtain the approval of the Directorate of

24  Defense Trade Controls prior to the export."  22 C.F.R. § 127.1(a)(1)

25  provides that "[w]ithout first obtaining the required license or

26  other written approval from the Directorate of Defense Trade

27  Controls, it is unlawful . . . [t]o export or attempt to export from

28  the United States any defense article or technical data . . . for

1   which a license or written approval is required."  22 C.F.R.

2   § 127.1(a)(1) (emphasis added).

3             2.    Elements of the Crime of Attempted Exportation of a
                    Defense Article without a License

4

5        Count One of the Trial Indictment charges defendant with

6   attempting to cause the export from the United States of a defense

7   article without a license.  In order for the defendant to be found

8   guilty of that charge, the government must prove each of the

9   following elements beyond a reasonable doubt:

10            First, defendant intended to willfully cause another person

11   to export from the United States of an article designated in the

12   United States Munitions List ("USML") – a "defense article" – without

13   a license or other written authorization issued by the State

14   Department; and

15            Second, defendant did something that was a substantial step

16   toward willfully causing another person to export from the United

17   States an article designated in the USML without a license or other

18   written authorization issued by the State Department.

19   B.    Count 2:  Smuggling

20        1.    The Statutory Framework

21   The text of 18 U.S.C. § 554 is as follows:

22   Whoever fraudulently or knowingly exports or sends from the
     United States, or attempts to export or send from the
23   United States, any merchandise, article, or object contrary
     to any law or regulation of the United States, or receives,
24   conceals, buys, sells, or in any manner facilitates the
     transportation, concealment, or sale of such merchandise,
25   article or object, prior to exportation, knowing the same
     to be intended for exportation contrary to any law or
26   regulation of the United States, shall be fined under this
     title, imprisoned not more than 10 years, or both.

27

28

1          2.   <u>Elements of the Crime of Smuggling</u>

2      The elements of the crime of smuggling are as follows:

3      First, defendant knowingly received, concealed, bought, or sold

4  merchandise, articles, and objects, or in any manner facilitated the

5  transportation, concealment, or sale of such merchandise, articles,

6  and objects, prior to exportation; and

7      Second, at that time, defendant knew the merchandise, articles,

8  and objects to be intended for exportation contrary to any law or

9  regulation of the United States.

10     **C.   Counts Three and Four:   Money Laundering**

11          1.   <u>The Statutory Framework</u>

12     The text of 18 U.S.C. § 1956(a)(2)(A) provides:

13     Whoever transports, transmits, or transfers, or attempts to
       transport, transmit, or transfer a monetary instrument or
14     funds from a place in the United States to or through a
       place outside the United States or to a place in the United
15     States from or through a place outside the United States —
       (A) with the intent to promote the carrying on of specified
16     unlawful activity. . . shall be sentenced to a fine of not
       more than $500,000 or twice the value of the monetary
17     instrument or funds involved in the transportation,
       transmission, or transfer, whichever is greater, or
18     imprisonment for not more than twenty years, or both.

19  18 U.S.C. § 1956(a)(2)(A).

20          2.   <u>Elements of the Crime</u>

21     The elements of the crime of money laundering are as follows:

22     First, defendant transported money to a place in the United

23  States from or through place outside the United States; and

24     Second, defendant acted with the intent to promote the carrying

25  on of a specified unlawful activity, namely, smuggling or exporting

26  of defense articles without a license in violation of AECA and the

27  ITAR.

28

**D.   Count Five: Conspiracy**

    1.   The Statutory Scheme

The text of 18 U.S.C. § 371 provides, in pertinent part:

> If two or more persons conspire either to commit any
> offense against the United States, or to defraud the United
> States, or any agency thereof in any manner or for any
> purpose, and one or more of such persons do any act to
> effect the object of the conspiracy, each shall be fined
> under this title or imprisoned not more than five years, or
> both.

18 U.S.C. § 371.

    2.   Elements of the Crime

The elements of the crime of conspiracy are as follows:

First, beginning on a date unknown, but no later than September 4, 2013, there was an agreement between two or more persons to commit at least one crime as charged in the Trial Indictment;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and,

Third, one of the members of the conspiracy performed at least one overt act on or after September 4, 2013, for the purpose of carrying out the conspiracy.

**E.   Count Six: Brokering Defense Articles and Services Without a License**

    1.   The Statutory Framework

At the time of the offense conduct, AECA imposed registration and licensing requirements on U.S. persons who engage in "brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service" and who are "in the business of brokering activities with respect to the manufacture, export, import, or transfer of any foreign defense article or defense

service." 18 U.S.C. § 2778(b)(1)(A)(ii)(I)-(IV).  "Brokering

activities" meant any action on behalf of another to facilitate the

manufacture, export, permanent import, transfer, re-export, re-

transfer, or furnishing of a U.S. or foreign defense article or U.S.

or foreign defense service, regardless of its origin." 22 C.F.R

§ 129.2.  A "broker" meant any person (including a natural person,

corporation, business association, partnership, society, trust, or

any other entity, organization, or group) engaged in the business of

brokering activities and who was: (a) a U.S. person, wherever

located; (b) a foreign person located in the United States; or (c) a

foreign person located outside the United States where the foreign

person is owned or controlled by a U.S. person.  22 C.F.R. § 129.2.

          2.    Elements of the Crime

     The elements of the crime of brokering defense articles and

defense services without a license are as follows:

     First, defendant engaged in the business of brokering activities

with respect to the export or transfer of an article or service;

     Second, the article or service was designated in the USML;

     Third, the defendant engaged in such brokering activities

without first registering with or obtaining a license or other

written authorization from the Secretary of State; and

     Fourth, the defendant acted willfully.

     **F.    Count Seven: Conspiracy to Use and to Transfer a Missile
             System Designed to Destroy Aircraft**

          1.    The Statutory Framework

     The text of 18 U.S.C. § 2332g provides, in pertinent part, as

follows:

(1) In general.--Except as provided in paragraph (3), it shall be unlawful for any person to knowingly produce, construct, otherwise acquire, transfer directly or indirectly, receive, possess, import, export, or use, or possess and threaten to use--

    (A) an explosive or incendiary rocket or missile that is guided by any system designed to enable the rocket or missile to—

        (i) seek or proceed toward energy radiated or reflected from an aircraft or toward an image locating an aircraft; or

        (ii) otherwise direct or guide the rocket or missile to an aircraft;

    (B) any device designed or intended to launch or guide a rocket or missile described in subparagraph (A); or

    (C) any part or combination of parts designed or redesigned for use in assembling or fabricating a rocket, missile, or device described in subparagraph (A) or (B).

. . . .

    (b) Jurisdiction.--Conduct prohibited by subsection (a) is within the jurisdiction of the United States if--

    . . . .

        (2) the offense occurs outside of the United States and is committed by a national of the United States;

. . . .

(c) Criminal penalties.--

    (1) In general.--Any person who violates, or attempts or conspires to violate, subsection (a) shall be fined not more than $2,000,000 and shall be sentenced to a term of imprisonment not less than 25 years or to imprisonment for life.

    2.   Elements of the Crime

The elements of the crime of conspiring to use and to transfer missile systems designed to destroy aircraft are as follows:

First, beginning on a date unknown, but no later than September 9, 2013, there was an agreement between two or more persons to use or to transfer a missile system designed to destroy aircraft;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act on or after September 9, 2013 for the purpose of carrying out the conspiracy.

The elements of transferring or using missile systems designed to destroy aircraft are as follows:

First, a member of the conspiracy was a national of the United States; and

Second, it was a purpose of the conspiracy to knowingly produce, construct, otherwise acquire, transfer directly or indirectly, receive, possess, import, export, or use, or possess and threaten to use any of the following: (1) an explosive or incendiary rocket or missile that is guided by any system designed to enable the rocket or missile to seek or proceed toward energy radiated or reflected from an aircraft toward an image locating an aircraft or otherwise direct or guide the rocket or missile to an aircraft; (2) any device designed or intended to launch or guide such a rocket or missile; or (3) any part or combination of parts designed or redesigned for use in assembling or fabricating such a rocket, missile, or device.

## IV.   EVIDENTIARY AND LEGAL ISSUES

### A.   Judicial Notice

The Government has requested judicial notice of the following fact:

1          On April 5, 2017, defendant was detained and first brought
           before a United States Magistrate Judge in Los Angeles,
2          California, in the Central District of California, to be
           arraigned on Counts One through Three of the First
3          Superseding Indictment ("FSI"), which charges now appear as
           Counts Five through Seven of the Trial Indictment.

4

5      As detailed in the Government Request for Judicial Notice (Dkt.

6  319), upon which the Court has not yet ruled, this fact is subject to

7  judicial notice and is relevant to establishing that venue is proper

8  in this district.

9      **B.**   **Expert Testimony**

10       1.   The International Trade in Arms and Munitions

11     To aid the jury in understanding the evidence that will be

12  presented, which will largely consist of communications among

13  defendant and co-conspirators regarding the brokering, export,

14  transfer, and sale of weapons, ammunition, other munitions, and

15  mercenary services, the government will offer limited expert

16  testimony by HSI Special Agent Matthew Peterson to educate the jury

17  as to the international market for arms and the business patterns and

18  practices commonly employed by those involved in it.  This testimony

19  may include the fact that many countries require end-user

20  certificates (EUCs) and other official documentation for transactions

21  involving arms originating therein; the black market for such EUCs

22  and other documents, and the common practice of forging, creating, or

23  altering such documentation; the common use of coded language and

24  coded cover documentation by black-market arms traffickers, and

25  typical examples of such codes; the diverse methods of communication

26  typically employed among those in the network of international black-

27  market arms traffickers; the fact that black-market arms brokers

28  often serve as middlemen, buying or selling depending on the needs

1   and stocks of suppliers and customers; typical pricing structures in

2   the black market for various arms; the common practice of marketing

3   defense articles and services in conflict-afflicted areas where

4   demand is high and profit margins are substantial; the vernacular and

5   methods of communication commonly used in the trade; processes and

6   practices required by the U.S. government in the weapons trade; and

7   other related areas.  SA Peterson may also testify as to the

8   structure of governmental and non-governmental arms-procurement

9   networks, and as to his knowledge of certain prominent individuals in

10  those roles.

11       SA Peterson will also testify about various types of weapons and

12  their nomenclature and characteristics, including but not limited to

13  pistols, rifles, assault rifles, machine guns, and other firearms;

14  small arms ammunition; rockets, mortars, missiles, and launchers;

15  anti-tank weapons; artillery; and anti-aircraft systems.  He may also

16  testify about the nomenclature for and characteristics of various

17  other types of military equipment, including optical equipment;

18  assault, cargo and transport aircraft; tanks; armored personnel

19  carriers; and vehicles.  SA Peterson's testimony will be based on his

20  training, education, and military and work experience, including his

21  experience working on numerous weapons-proliferation investigations.

22       The government has provided notice of the above-described areas

23  of anticipated testimony by SA Peterson, and defendant did not raise

24  any objections to this evidence by the Court-ordered deadline or at

25  any other time.  Because SA Peterson will also testify as a lay

26  witness about percipient facts relevant to the investigation, the

27  government will request that the Court read an appropriate dual-role

28  testimony instruction to the jury immediately prior to his testimony

as well as at the end of the case.  See Ninth Circuit Model Criminal
Jury Instruction 4.14; see also United States v. Vera, 770 F.3d 1232,
1246 (9th Cir. 2014).  The government will provide this requested
instruction in its proposed jury instructions.

        2.   USML Status of Charged Defense Articles and Services

    The USML, contained in regulations promulgated by DOS pursuant
to the AECA, 22 U.S.C. § 2778 "consists of categories of defense
articles that cannot be imported or exported without a license."
United States v. Fu Chin Chung, 931 F.2d 43, 45 (11th Cir. 1991) (per
curiam); see 22 C.F.R. § 121.1.  "To sustain a conviction under 22
U.S.C. § 2778, the government must prove beyond a reasonable doubt
that the defendant willfully exported or attempted to export defense
articles that are on the United States Munitions List without a
license."  United States v. Castro-Trevino, 464 F.3d 536, 543 n. 14
(5th Cir. 2006)(quotation marks and citation omitted).  The
government must therefore prove that the defense article was on the
USML at the time of the alleged conduct.

    Courts of appeals, including the Ninth Circuit, have sustained
convictions for AECA violations where the government submitted at
trial, in order to meet that burden, a certification from the U.S.
State Department that the article at issue was, in fact, on the USML.
United States v. Chi Mak, 683 F.3d 1126, 1140 (2012) (sustaining
conviction based on U.S. State Department certification that
documents were technical data on the USML); United States v. Piquet,
372 Fed. Appx. 4, 5 (2010) (unpublished) (same).

    The recent trend, however, is for the government to present
expert and/or lay testimony concerning both the applicable USML
categories and the specifications of the articles at issue that

establish that they are on that list.  See, e.g., United States v. Burden, 217 F. Supp. 3d 348, 351-52 (D.D.C. 2016) (denying motion for judgment of acquittal; DDTC employee testified that certain items constituted defense articles).

This trend addresses concerns raised by some courts that removing from the jury the question of whether the item at issue fell under the Munitions List based on the State Department's after-the-fact determinations may violate defendant's right to a jury finding on each essential element of the crime.  See, e.g., United States v. Zhen Zhou Wu, 711 F.3d 1 (2013) (vacating convictions on that ground); United States v. Pulungan, 569 F.3d 326, 328 (7th Cir. 2009) (reversing conviction; citing concern that DDTC's "claim of authority to classify any item as a 'defense article,' without revealing the basis of the decision and without allowing any inquiry by the jury, would create serious constitutional problems.").

### 3.   Missile Systems Designed to Destroy Aircraft

To make a conviction decision on Count Three of the FSI, the jury must decide whether various weapons systems that the government alleges defendant conspired to transfer and to use met the following definition:

(A) an explosive or incendiary rocket or missile that is guided by any system designed to enable the rocket or missile to--

(i) seek or proceed toward energy radiated or reflected from an aircraft or toward an image locating an aircraft; or

(ii) otherwise direct or guide the rocket or missile to an aircraft;

(B) any device designed or intended to launch or guide a rocket or missile described in subparagraph (A); or

30

(C) any part or combination of parts designed or redesigned for use in assembling or fabricating a rocket, missile, or device described in subparagraph (A) or (B).

To aid the jury in making this determination as to each relevant weapons system, the government will call Dr. Robert Doherty. Dr. Doherty has decades of experience in the scientific and intelligence analysis of anti-aircraft missile systems, with a specific focus on Soviet and Russian surface-to-air missile systems. Dr. Doherty will testify as to his familiarity with various anti-aircraft missile systems, including the following: Igla, Strela, S-400 Triumph, S-300, S-200, S-75, Grom, Osa, Pechora, Quadrat/Kvadrat, Tunguska, and Buk.  This testimony may include descriptions of the design, engineering, capabilities, limitations, modifications, and methods of employment of each system; the NATO and other designators and alternative nomenclatures therefor; variants of and precursors to each system; the availability, proliferation, and typical pricing of each system; the processes by which systems are negotiated and distributed; the methods by which individual systems are operated, maintained, serviced, and checked for functionality; and the deployment of these systems in the field.  Dr. Doherty's testimony may also include a detailed explanation of the precise mechanism by which each system is employed, as well as a description of the training required to effectively use, maintain, and repair each system.  Dr. Doherty may also testify about the production and distribution of various anti-aircraft weapons systems by and to various countries and regions, and specifically about efforts by countries, including Saudi Arabia, to obtain the S-400 missile system.  He may further testify as to the country of origin of each

31

system, as well as specific countries that are known for production, modification, and/or supply of surface-to-air missiles.

Dr. Doherty will testify that certain anti-aircraft missile systems, including Igla, Strela, S-400 Triumph, Grom, Osa, Pechora, and quadrat systems, among others, use explosive or incendiary rockets or missiles guided by systems designed to enable the rocket or missile to seek or proceed toward energy radiated or reflected from an aircraft or toward an image locating an aircraft, or to otherwise direct or guide the rocket or missile to an aircraft.  He will further testify that these systems employ devices designed or intended to launch or guide a rocket or missile toward an aircraft.

Drawing from his knowledge of the geographic proliferation of anti-aircraft missile systems, Dr. Doherty may testify about the acquisition of various anti-aircraft missile systems — including Igla and Strela systems — by the Gaddafi regime in Libya and the presence and deployment of some such systems in post-Qaddafi Libya.  His testimony may also describe the common employment of Toyota Hilux trucks as a vehicle of choice for mounting certain heavy weapons systems, including anti-aircraft missile systems.

Dr. Doherty may also testify as to his knowledge of air defense production facilities and training regimes in the militaries of various countries, including the Soviet Union, the Russian Federation, and other former Soviet republics.  Drawing from that knowledge, he may testify as to his familiarity with Soviet and Russian air defense production and training facilities, as well as the state-sponsored export program for military articles.

         4.   Other Potential Experts

    The government has noticed other experts, including linguists,
in the event stipulations as to undisputed facts are not reached.

**C.   Hearsay**

    Federal Rule of Evidence 801(c) defines "hearsay" as "a
statement, other than one made by the declarant while testifying at
the trial or hearing, offered in evidence to prove the truth of the
matter asserted."  Fed. R. Evid. 801(c); United States v. Cowley, 720
F.2d 1037, 1044 (9th Cir. 1983).  A "statement" is (1) an oral or
written assertion or (2) nonverbal conduct of a person if it is
intended to be an assertion.  See Fed. R. Evid. 801(a).  Hearsay is
admissible as substantive evidence only as provided by the Federal
Rules of Evidence.  See Fed. R. Evid. 802, 803, 804, 807; United
States v. Tafollo-Cardenas, 897 F.2d 976, 979 (9th Cir. 1990).

         1.   Certified Business Records of Bank Transactions and
              Defendant's Custodial Location

    The government intends to introduce certified records of
business activities made and kept in the regularly course of the
business of the Clearing House Interbank Payments System ("CHIPS" and
the "CHIPS Business Records"), which is a United States private
clearinghouse for large-value transactions.

    On October 22, 2018, the Court granted the government's motion
in limine requesting a a pre-trial ruling that (1) the CHIPS Business
Records are self-authenticating under Federal Rule of Evidence 902 as
certified domestic records of a regularly conducted activity, and
that the Government need not call the CHIPS custodian of records to
testify at trial, and (2) those records are otherwise admissible

1 under well-established exceptions to the hearsay rule, including

2 Federal Rule of 803(6) (Records of a Regularly Conducted Activity).

3          2.   Certified Public Records of the Bureau of Prisons

4      The government also intends to introduce United States Bureau of

5 Prisons ("BOP") Inmate History Records (the "BOP Records").

6 Documents that are self-authenticating public records under Rule

7 902(4) are admissible under Rule 803(8).  Rule 902(4) provides for

8 the self-authentication of:

9          A copy of an official record . . . if the copy is certified
           as correct by: (A) the custodian or another person
10         authorized to make the certification; or (B) a certificate
           that complies with Rule 902(1), (2), or (3), a federal
11         statute, or a rule prescribed by the Supreme Court.

12 Fed. R. Evid. 902(4).

13     Here, the Certificate of Record attached to the BOP Records

14 identifies its signer as the official custodian of the records of the

15 Metropolitan Detention Center – Los Angeles ("MDC-LA") and the

16 certified record as "SENTRY Printout of 'ARS' INMATE HISTORY[] (1

17 page)."  This certificate suffices to authenticate the BOP Records

18 under Rule 902(4)(A).  The BOP Records and the Certificate of Record

19 are attached hereto as Exhibit C.

20     Although hearsay is generally inadmissible, Federal Rule of

21 Evidence 803(8)(A)(i) establishes an exception for, in pertinent

22 part, "[a] record or statement of a public office if . . . it sets

23 out . . . the office's activities."  Here, the essential function or

24 activity of the MDC-LA is to detain federal prisoners.  That activity

25 is recorded in the BOP Records, which show defendant's location

26 throughout his time in federal custody.  See United States v.

27 Weiland, 420 F.3d 1062, 1074 (9th Cir. 2005) (holding that records

28 contained in "penitentiary packet" were self-authenticating public

34

records under Rules 902(4) and 902(2) and in admissible pursuant to the hearsay exception in Rule 803(8)).

### 3.   Defendant's Statements

The government intends to admit statements made by defendant, including in recorded conversations and e-mail and text message communications.  Statements by a party opponent when offered against that party are excluded from the hearsay definition.  See Fed. R. Evid. 801(d)(2)(A).  Thus, defendant's statements may be admitted against him.  Statements not offered for their truth, but to provide context for what the defendant has said, such as the statements of the SOI and the UC, are not hearsay.  See United States v. Whitman, 771 F.2d 1348, 1352 (9th Cir. 1985) (upholding admission of recorded conversations between government informant and the defendant's co-conspirator, as the "statements were not admitted for their truth but to enable the jury to understand the [co-conspirator's] taped statements").  The admission of non-hearsay statements generally does not violate the Confrontation Clause.  See Tennessee v. Street, 471 U.S. 409, 414 (1985) (noting that nonhearsay "raises no Confrontation Clause concerns").

When the government offers some of a defendant's prior statements, the door is not thereby opened to the defendant to put in all of her out-of-court statements because, because, when offered by the defendant, the statements are hearsay.  See Fed. R. Evid. 801(d)(2); United States v. Burreson, 643 F.2d 1344, 1349 (9th Cir. 1981).  Accordingly, exculpatory statements made by a defendant are hearsay and are not admissible at trial, when offered by the defendant.  See Fed. R. Evid. 801(d), 802; United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000).

1    The only recognized limitation of this principle is the

2    "doctrine of completeness," which has been applied by some courts to

3    admit additional portions of a defendant's prior statements where

4    necessary to explain an admitted statement, place it in context, or

5    avoid misleading the trier of fact.  See Fed. R. Evid. 106; Burreson,

6    643 F.2d at 1349.  However, the completeness doctrine does not

7    require introduction of portions of a statement that are neither

8    explanatory of, nor relevant to, the admitted passages.  See United

9    States v. Mitchell, 502 F.3d 931, 965 (9th Cir. 2007); United States

10   v. Collicott, 92 F.3d 973, 983 (9th Cir. 1996) (holding that Federal

11   Rule of Evidence 106 does not compel admission of otherwise

12   inadmissible hearsay evidence); see also United States v. Lopez-

13   Figueroa, 316 F. App'x 548, 550 (9th Cir. 2008) (defendant could not

14   introduce own statements redacted from confession by government).  As

15   the Ninth Circuit has recognized, "it is often perfectly proper to

16   admit segments . . . without including everything, and adverse

17   parties are not entitled to offer additional segments just because

18   they are there and the proponent has not offered them."  Collicott,

19   92 F.3d at 983.

20          4.   Co-Conspirator Statements

21   The government also intends to admit statements made by

22   defendant's unindicted co-conspirators, including in e-mail and text

23   message communications.  The Federal Rules of Evidence define as non-

24   hearsay any "statement [that] is offered against an opposing party

25   and . . . was made by the party's coconspirator during and in

26

27

28

                                    36

furtherance of the conspiracy."[4]  Fed. R. Evid. 801(d)(2)(E).  The
admission of co-conspirator statements requires only that:  "(1)
there was a conspiracy, (2) the defendant and the declarant were
participants in the conspiracy, and (3) the statement was made by the
declarant during and in furtherance of the conspiracy."  United
States v. Bridgeforth, 441 F.3d 864, 869 (9th Cir. 2006).

     Regarding the first factor – the existence of the conspiracy -
"[t]he question is merely whether there was proof of a sufficient
concert of action to show the individuals have been engaged in a
joint venture."  United States v. Lloyd, 807 F.3d 1128, 1161 (9th
Cir. 2015).

     Regarding the second factor – that the defendant and declarant
were participants in the conspiracy - only slight evidence is
necessary to connect a coconspirator to the conspiracy.  The required
quantum of proof is minimal.  See United States v. Perez, 658 F.2d
654, 658 (9th Cir. 1981).  "[P]articipation as an aider and abetter
is sufficient" to establish the requisite connection to the
conspiracy, and a declarant need not be charged alongside the
defendant or even convicted of conspiracy to admit the declarant's
statements under the co-conspirator exception.  See United States v.
Protac, Inc., 869 F.2d 1288, 1294 (9th Cir. 1989).

     Regarding the third factor – that the statement was made in
furtherance of the conspiracy – the scope of statements considered to

---

[4] It bears mention that "[t]he requirements for admission of a
co-conspirator's statement under Federal Rule of Evidence
801(d)(2)(E) are identical to the requirements of the Confrontation
Clause.  Therefore, if a statement is admissible under Rule
801(d)(2)(E), the defendant's right of confrontation is not
violated."  United States v. Bridgeforth, 441 F.3d 864, 868-69 (9th
Cir. 2006) (citation omitted).

be in furtherance of the conspiracy is quite broad.  It includes statements made to induce or enlist further participation in the group's activities, prompt further action on the part of conspirators, reassure members of a conspiracy's continued existence, allay a co-conspirator's fears, and keep co-conspirators abreast of ongoing activities.  See United States v. Arias-Villanueva, 998 F.2d 1491, 1502 (9th Cir. 1993), overruled on other grounds by United States v. Jimenez-Ortega, 472 F.3d 1102 (9th Cir. 2007); United States v. Yarborough, 852 F.2d 1522, 1535-36 (9th Cir. 1988); United States v. Layton, 720 F.2d 548, 557 (9th Cir. 1983), overruled on other grounds by United States v. W.R. Grace, 526 F.3d 499, 506 (9th Cir. 2008) (en banc).[5]  Bragging, boasts, and other comments designed to obtain confidence fall within the exception, United States v. Lechuga, 888 F.2d 1472, 1480 (5th Cir. 1989); United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir. 1988).  So, too, do statements that "identify the coconspirators" or "discuss a coconspirator's role in the conspiracy."  Meeks, 756 F.3d at 1119.  In determining whether a statement was made in furtherance of a

---

[5] Many circuit courts have recognized that the "in furtherance" requirement is to be construed broadly.  See, e.g., United States v. Meeks, 756 F.3d 1115, 1119 (8th Cir. 2014) ("[W]e interpret the phrase in furtherance of the conspiracy broadly."); United States v. Duka, 671 F.3d 329, 348 (3d Cir. 2011) ("The threshold for establishing that a statement was made in furtherance of a conspiracy is not high: the in furtherance of requirement is usually given a broad interpretation." (internal alteration and quotation marks omitted)); United States v. Hynes, 467 F.3d 951, 970 (6th Cir. 2006) ("[T]his court has broadly construed the requirement that statements between coconspirators be 'in furtherance' of the conspiracy . . . ."); United States v. Smith, 441 F.3d 254, 262 (4th Cir. 2006) ("Most courts, including the Fourth Circuit, construe the in furtherance of requirement so broadly that even causal relationships to the conspiracy suffice to satisfy the exception." (internal quotation marks omitted)); United States v. Limones, 8 F.3d 1004, 1008 (5th Cir. 1993) ("[T]he term 'in furtherance' of a conspiracy is broadly construed . . . .").

conspiracy, what matters is the declarant's intent in making the statement, not the statement's effect.  See United States v. Nazemian, 948 F.2d 522, 529 (9th Cir. 1991); United States v. Zavala-Serra, 853 F.2d 1512, 1516 (9th Cir. 1988).

The government need only establish those foundational facts by a preponderance of the evidence.  See Bourjaily v. United States, 483 U.S. 171, 176 (1987).  Because co-conspirator statements fall within a "firmly rooted hearsay exception" that is "steeped in our jurisprudence," once foundational facts are established, "a court need not independently inquire into the reliability of such statements."  Id. at 182-83.

"It is well established" that Rule 801(d)(2)(E) "is to be construed broadly in favor of admissibility."  United States v. McMurray, 34 F.3d 1405, 1412 (8th Cir. 1994).  Although a co-conspirator's statement alone is not enough to establish that it qualifies for admission under Rule 801(d)(2)(E), a court may consider the statement itself in evaluating its admissibility, United States v. Gordon, 844 F.2d 1397, 1402 (9th Cir. 1988), and the burden to introduce extrinsic evidence supporting admissibility is not a heavy one, United States v. Castaneda, 16 F.3d 1504, 1507 (9th Cir. 1994).

D.   **Physical Evidence**

The Government will seek to admit physical evidence of Defendant's crimes seized from Defendant on December 15, 2015, namely, the Digital Devices.  The test of admissibility of physical objects connected with the commission of a crime requires a showing that the object is in substantially the same condition as when the crime was committed (or the object seized).  See United States v. Kaiser, 660 F.2d 724, 733 (9th Cir. 1981) (affirming district court's

admission of physical exhibit), overruled on other grounds by United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc). Factors to be considered are the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermediaries tampering with it. See id. There is, however, a presumption of regularity in the handling of exhibits by public officials. See id.

If the district courts finds that there is a reasonable possibility that the piece of evidence has not changed in a material way, the Court has discretion to admit the evidence. See United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991) (affirming trial's admission of items into evidence). Factors the court may consider in making this determination include the nature of the item, the circumstances surrounding its preservation, and the likelihood of intermeddlers having tampered with it. See Gallego v. United States, 276 F.2d 914, 917 (9th Cir. 1960) (same).

"There is no rule requiring the prosecution to produce as witnesses all persons who were in a position to come into contact with the article sought to be introduced in evidence." Gallego, 276 F.2d at 917. Gaps or defects in the chain of custody go to the weight of the evidence rather than its admissibility. See United States v. Matta-Ballesteros, 71 F.3d 754, 769-70 (9th Cir. 1995) (affirming district court's admission of audiotape recordings into evidence).

**E.   Authentication and Identification**

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by "evidence sufficient to support a finding that the item is what the proponent

claims it is." Fed. R. Evid. 901(a). Federal Rule of Evidence 901(a) requires that the government "make only a prima facie showing of authenticity 'so that a reasonable juror could find in favor of authenticity or identification.'" United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991) (quoting United States v. Blackwood, 878 F.2d 1200, 1202 (9th Cir. 1989)); see also United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985). Once the government meets this burden, "[t]he credibility or probative force of the evidence offered is, ultimately, an issue for the jury." Black, 767 F.2d at 1342.

To be admitted into evidence, a physical exhibit must be in substantially the same condition as when the crime was committed. The court may admit the evidence if there is a "reasonable probability the article has not been changed in important respects." United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991). This determination is to be made by the trial judge and will not be overturned except for clear abuse of discretion. Factors the court may consider in making this determination include the nature of the item, the circumstances surrounding its preservation, and the likelihood of intermeddlers having tampered with it. Gallego v. United States, 276 F.2d 914, 917 (9th Cir. 1960).

**F.   Chain of Custody**

The test of admissibility of physical objects connected with the commission of a crime requires a showing that the object is in substantially the same condition as when the crime was committed (or the object seized). Factors to be considered are the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermediaries tampering with it. There is,

41

however, a presumption of regularity in the handling of exhibits by public officials.  United States v. Kaiser, 660 F.2d 724, 733 (9th Cir. 1981), overruled on other grounds by United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc).  The authenticity of proposed exhibits may be proven by circumstantial evidence.  United States v. Natale, 526 F.2d 1160, 1173 (2d Cir. 1975); United States v. King, 472 F.2d 1, 9-11 (9th Cir. 1973).  Moreover, the prosecution need only prove a rational basis from which the jury may conclude that the exhibits did, in fact, belong to the defendant.  Fed. R. Evid. 401(a).

If the trial judge finds that there is a reasonable possibility that the piece of evidence has not changed in a material way, the Court has discretion to admit the evidence.  Kaiser, 660 F.2d at 733. The government is not required, in establishing chain of custody, to call all persons who may have come into contact with the piece of evidence.  Gallego, 276 F.2d at 917.  Gaps or defects in chain of custody go to the weight of the evidence rather than its admissibility.  United States v. Matta-Ballesteros, 71 F.3d 754, 769-70 (9th Cir. 1995); United States v. Robinson, 967 F.2d 287, 292 (9th Cir. 1992).

### G.   Cross Examination

The scope of a cross-examination is within the discretion of the trial court.  See Fed. R. Evid. 611(b).

The district court has broad authority to control the extent of cross examination, and "in its discretion may limit cross-examination in order to preclude repetitive questions, upon determining that a particular subject has been exhausted, or to avoid extensive and time-wasting exploration of collateral matters."  United States v.

Weiner, 578 F.2d 757, 766 (9th Cir. 1978); see also Price v. Kramer,
200 F.3d 1237, 1252 (9th Cir. 2000) (upholding court's refusal to
allow additional questioning where "defense counsel had already asked
that question and received the same answer a number of times").  This
includes the discretion to preclude repetitive questions by
successive defense counsel in multi-defendant cases.  Amsler v.
United States, 381 F.2d 37, 51 (9th Cir. 1967) (finding pre-trial
order precluding repetitive questioning by successive defense counsel
to be a "reasonable restriction . . . within the sound discretion of
the court").

### H.   Impeaching Witnesses

Federal Rule of Evidence 608(a) permits attacks on a witness's
credibility through testimony about the witness's general character
or reputation for truthfulness or untruthfulness.  Fed. R. Evid.
608(a).  However, extrinsic evidence (including testimony from third-
party witnesses) about the witness's specific instances of conduct
for the purpose of attacking the witness's character for truthfulness
or untruthfulness is prohibited, except in the case of prior
convictions.  Fed. R. Evid. 608(b).  Counsel may only probe specific
instances of conduct probative of a witness's character for
truthfulness or untruthfulness during cross-examination (without
proffering extrinsic evidence) with respect to (1) the testifying
witness or (2) other witnesses about whose character the witness has
testified about.  Id.  Thus, counsel may not offer testimony or any
other extrinsic evidence about specific instances of conduct for the
purpose of attacking a testifying witness's credibility.

## I.   Photographs

The government intends to offer a limited number of representative photographs to aid the jury's understanding of the defense articles alleged in the charges.  Photographs are generally admissible as evidence.  See United States v. Stearns, 550 F.2d 1167, 1171 (9th Cir. 1977) (photographs of crime scene admissible). Photographs should be admitted so long as they fairly and accurately represent the event or object in question.  United States v. Oaxaca, 569 F.2d 518, 525 (9th Cir. 1978).  The Ninth Circuit has held that "[p]hotographs are admissible as substantive as well as illustrative evidence."  United States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980).  Exemplary photos of the defense articles at issue in this case – that is, photos of the types of defense articles at issue, but not the specific defense articles that defendant actually procured or attempted to procure or brokered or attempted the broker the sale of – that the government intends to offer in this regard are attached hereto as Exhibit A.

## J.   Demonstratives

The government may use charts, graphics, and other visual aids to help the jury understand the evidence relating to defendant's complex financial and business transactions.  The government is also considering other potential demonstratives that might facilitate the presentation of its evidence.

Demonstrative aids may be used in the trial judge's discretion with a limiting instruction that they are not evidence, but are used for the purpose of aiding the jury in its examination of the evidence.  United States v. Wright, 412 F. App'x 993, 993 (9th Cir. 2011) (holding no error in use of demonstrative aid by government).

44

**K.   Cross-Examination of Defendant**

A defendant who testifies at trial may be cross-examined as to all matters reasonably related to the issues she puts in dispute during direct examination.  "A defendant has no right to avoid cross-examination on matters which call into question his claim of innocence."  United States v. Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981).

Defendant's credibility will be crucial if he chooses to testify in order to refute the government's showing of knowledge and intent. Indeed, because defendant is the only witness with "direct" evidence of his own knowledge and intent, if he takes the stand to deny any knowledge of the laws prohibiting his charged conduct or his mental state in violating those laws, his credibility becomes a key issue. Accordingly, cross-examination of defendant about other fraudulent conduct in which he has engaged or false statements that he has made is necessary for the jury to weigh whether defendant's denial of knowledge and intent is credible given his other actions.  As the Ninth Circuit has held, Federal Rule of Evidence 608(b) expressly permits questioning into prior behavior to challenge credibility because "[e]vidence of prior frauds is considered probative of the witness's character for truthfulness or untruthfulness."  United States v. Gay, 967 F.2d 322, 328 (9th Cir. 1992).

The Ninth Circuit has repeatedly held that both participation in fraudulent transactions and the use of false statements are considered probative of truthfulness and thus admissible on cross-examination pursuant to Rule 608(b).  See, e.g., United States v. Gay, 967 F2d 322 (9th Cir. 1992) ("Evidence of prior frauds is considered probative of the witness's character for truthfulness or

untruthfulness"); United States v. Jackson, 882 F.2d 1444, 1446 (9th Cir. 1989); United States v. Munoz, 233 F3d 1117, 1135 (9th Cir. 2000) ("Evidence of prior frauds perpetrated by the witness is generally considered probative of the witness's truthfulness") (superseded by statute on other grounds, 18 U.S.C. § 1341).  The fact that defendant's pursuit of this fraudulent transaction and use of false statements continued until approximately one month before his arrest further increases the probative value of this evidence.  See Jackson, 882 F.2d at 1448 (noting that "remoteness remains a relevant factor for the trial court to consider in assessing the probative value of the evidence," and finding that conduct 14 years prior was not too remote to probative).

Rule 608(b) has generally been interpreted to prohibit the admission of extrinsic evidence to prove prior misconduct not resulting in a conviction.  Jackson, 882 at 1448.  However, should defendant falsely testify on cross-examination that he did not engage in these fraudulent schemes or make the statements indicated by the evidence, the government would be permitted to impeach him with that evidence of his prior inconsistent statements pursuant to Rule 613. Id.

The prejudicial effect of such evidence, if any, can be addressed by a limiting instruction.  The admission of evidence harmful to the defendant's case does not necessarily constitute unfair prejudice.  United States v. Fagan, 996 F.2d 1009, 1015 (9th Cir. 1993).  Unfair prejudice results from evidence that "provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its

1  judgment as to his guilt or innocence of the crime charged." Id.
2  (internal quotation marks omitted).

3      **L.   Proffer Statements**

4      On four occasions in 2016, defendant met with HSI agents and the
5  United States Attorney's Office for proffer sessions.  Should
6  defendant testify contrary to his statements during the proffer
7  session, the government intends to cross-examine him based on the
8  information he provided and statements he made during the proffer
9  session.  In the proffer agreements that defendant and his counsel
10 signed prior to commencing each proffer session, he agreed that the
11 government may use defendant's statements at the proffer session for
12 the purposes of cross-examination should he testify, or to refute or
13 counter at any stage of the proceedings (including during the
14 government's case-in-chief at trial) any evidence, argument,
15 statement or representation offered by or on behalf of defendant.

16     **M.   Character Evidence**

17     The Supreme Court has recognized that character evidence --
18 particularly cumulative character evidence -- has weak probative
19 value and great potential to confuse the issues and prejudice the
20 jury.  Michelson v. United States, 335 U.S. 469, 480, 486 (1948).
21 Trial courts thus have wide discretion to limit the presentation of
22 character evidence.  Id. at 480.

23     In addition, the form of the proffered evidence must be proper.
24 Federal Rule of Evidence 405(a) sets forth the sole methods for which
25 character evidence may be introduced.  It specifically states that,
26 where evidence of a character trait is admissible, proof may be made
27 in two ways: (1) by testimony as to reputation and (2) by testimony
28 as to opinion.  See Fed. R. Evid. 405(a).  Thus, a defendant may not

1  introduce specific instances of his good conduct through the
2  testimony of others.  See Michelson, 335 U.S. at 477.  On cross-
3  examination of a defendant's character witness, however, the
4  government may inquire into specific instances of a defendant's past
5  conduct relevant to the character trait at issue.  See Fed. R. Evid.
6  405(a).  In particular, a defendant's character witnesses may be
7  cross-examined about their knowledge of the defendant's past crimes,
8  wrongful acts, and arrests.  See Michelson, 335 U.S. at 482.  The
9  only prerequisite is that there must be a good-faith basis that the
10  incidents inquired about are relevant to the character trait at
11  issue.  See United States v. McCollom, 664 F.2d 56, 58 (5th Cir.
12  1981).

13      **N.  Impeachment by Prior Convictions**

14      Defendant has advised that he intends to inquire whether the
15  government's source of information has sustained prior criminal
16  convictions in Jordan, pursuant to Federal Rule of Evidence 609.  In
17  response to the government's motion in limine to preclude admission
18  of the underlying documents and inquiry into the SOI's knowledge of
19  any such convictions, Defendant has agreed not to attempt to offer
20  the underlying documents purportedly evidencing criminal convictions,
21  as they clearly do not meet the requirements of Rule 609.  The Court
22  has reserved ruling as to whether defendant may so inquire.  The
23  scope of inquiry permitted when lodging such attacks is limited.
24  "Absent exceptional circumstances, evidence of a prior conviction
25  admitted for impeachment purposes may not include collateral details
26  and circumstances attendant upon the conviction.  Generally, only the
27  prior conviction, its general nature, and punishment of felony range
28  are fair game . . . ."  United States v. Osazuwa, 564 F.3d 1169, 1175

(9th Cir. 2009) (alterations adopted) (citations omitted) (internal quotation marks omitted).  Exceptional circumstances may include, for example, when a witness attempts to "explain away" prior convictions by offering their "own version of the underlying facts" that tend to create a false impression about the conviction.  See United States v. Perry, 857 F.2d 1346, 1352 (9th Cir. 1988).  Otherwise, the scope of examination regarding prior convictions should be limited to the "to establishing the bare facts of the conviction: usually the name of the offense, the date of the conviction, and the sentence." Weinstein's Federal Evidence § 609.20[2] at 609-57-60.

Accordingly, in the event the Court rules that any inquiry into these alleged convictions is appropriate, the Court should permit cross-examination into only the date of the conviction, the crime, and the sentence imposed.

O.   **Video and Audio Recordings**

The government will introduce numerous clips from video and audio recordings of telephone conversations and in-person meetings involving the Defendant.  A recording is admissible upon a showing that it is "accurate, authentic, and generally trustworthy." United States v. King, 587 F.2d 956, 961 (9th Cir. 1978).  For example, testimony that a recording depicts evidence that the witness observed is sufficient to authenticate the recording.  Fed. R. Evid. 901(b); United States v. Smith, 591 F.3d 974, 979-80 (8th Cir. 2010).

There is no rigid set of requirements to lay the foundation for the government's evidence.  As long as the government makes a prima facie showing of authenticity, the "probative force of the evidence offered is, ultimately, an issue for the jury." United States v. Blackwood, 878 F.2d 1200, 1202 (9th Cir. 1989).  The government will

49

1   rely on the testimony of Inspector Rosas, who can authenticate the
2   recording of the interview she conducted of defendant.

3        All duly admitted recorded conversations must be played in open
4   court.  Allowing jurors to take into the jury deliberation room
5   recorded conversations that were not played in open court is
6   structural error requiring automatic reversal if a defendant objects
7   to allowing the jurors to have the un-played calls in the jury room.
8   United States v. Noushfar, 78 F.3d 1442, 1445-46 (9th Cir. 1996).

9        A lay witness, including a participant in a recorded
10  conversation, may give opinion testimony on the meaning of otherwise
11  vague or ambiguous statements made in the recordings.  See United
12  States v. Freeman, 498 F.3d 893, 902 (9th Cir. 2007) ("A lay witness
13  may provide opinion testimony regarding the meaning of vague or
14  ambiguous statements [in recorded conversations]"); United States v.
15  De Peri, 778 F.2d 963, 977-78 (9th Cir. 1985).

16       **P.   Charts and Summary Witnesses**

17       To streamline the presentation of evidence for the jury, the
18  government intends to use a summary chart as part of its case in
19  chief.  This chart summarizes the source of each exhibit that was
20  extracted from defendant's digital devices or his e-mail account.  In
21  a case involving hundreds of such exhibits that originated from
22  multiple sources, use of this chart will aid the jury in
23  understanding where specific pieces of evidence were found and will
24  save considerable time by obviating the need for a government witness
25  to identify the source of each exhibit one by one.  A prototype of
26  the chart that the government intends to offer in this regard is
27  attached hereto as Exhibit B.

28

Charts and summaries of evidence are governed by Federal Rule of Evidence 1006, which permits the introduction of charts, summaries, or calculations of voluminous writings, recordings, or photographs which cannot conveniently be examined in court. See Fed. R. Evid. 1006. Accordingly, a summary chart may be admitted as substantive evidence when the proponent establishes that the underlying documents upon which the summary is based are voluminous, admissible, and available for inspection. Id.; see also United States v. Meyers, 847 F.2d 1408, 1412 (9th Cir. 1988). All that is required for the rule to apply is that the underlying writings be voluminous and that in-court examination not be convenient. United States v. Scales, 594 F.2d 558, 562 (6th Cir. 1979). Although the materials underlying the summary must be "admissible," they need not themselves be "admitted" into evidence. Meyers, 847 F.2d at 1412.

In addition, the summary chart must be accurate, authentic, and properly introduced. Scales, 594 F.2d at 562. Where a chart does not contain complicated calculations that would require an expert for accuracy, authentication of the chart requires only that the witness (1) have properly catalogued the exhibits and records upon which the chart is based; and (2) have knowledge of the analysis of the records referred to in the chart.

Neither of these requirements necessitates any special expertise. The person who supervises the compilation of the summary chart is the proper person to attest to its authenticity and accuracy. Id. at 563. In addition, summary charts may be used by the government in its opening statement. Indeed, "such charts are often employed in complex conspiracy cases to provide the jury with an outline of what the government will attempt to prove." United

1   States v. De Peri, 778 F.2d 963, 979 (3d Cir. 1985) (approving
2   government's use of chart); United States v. Rubino, 431 F.2d 284,
3   290 (6th Cir. 1970) (same).

4       Also, apart from Rule 1006, a summary of evidence may be
5   presented to the jury with proper limiting instructions.  Rule 611(a)
6   recognizes that the trial court must "exercise reasonable control
7   over the mode and order of interrogating witnesses and presenting
8   evidence so as to (1) make the interrogation and presentation
9   effective for the ascertainment of the truth, [and] (2) avoid
10  needless consumption of time . . . ."  Fed. R. Evid. 611(a); see also
11  United States v. Gardner, 611 F.2d 770, 776 (9th Cir. 1980) (in tax
12  case, use of chart summarizing defendant's assets, liabilities, and
13  expenditures "contributed to the clarity of the presentation to the
14  jury, avoided needless consumption of time, and was a reasonable
15  method of presenting the evidence").

16      **Q.   Scope of Conspiracy and Inextricably Intertwined Acts**
17      Among other violations, defendant is charged with conspiracy to
18  violate the Arms Export Control Act, engaging in unlawful brokering
19  activities without a license, and conspiracy to transfer and to use
20  missile systems designed to destroy aircraft.  These allegations stem
21  from defendant's numerous transactions and negotiations involving the
22  weapons systems, munitions, defense services, and other controlled
23  items, including those listed in the First Superseding Indictment
24  ("FSI") (collectively, "the FSI commodities").  Beyond the FSI
25  commodities, the evidence reflects that defendant also engaged in
26  other illicit transactions and negotiations involving a wide array of
27  other defense articles and services.

28

1  In many instances, defendant's own communications with his co-
2  conspirators as to the FSI commodities also simultaneously reference
3  other defense articles and services not specifically enumerated in
4  the FSI.  In such instances, defendant's engagement in illegal
5  brokering activities relating to FSI commodities as well as other
6  controlled items in the same communications clearly "constitutes a
7  part of the transaction that serves as the basis for the criminal
8  charge."  United States v. Vizcarra-Martinez, 66 F.3d 1006, 1012 (9th
9  Cir.1995) ("Thus, when it is clear that particular acts of the
10 defendant are part of, and thus inextricably intertwined with, a
11 single criminal transaction, we have generally held that the
12 admission of evidence regarding those acts does not violate Rule
13 404(b).").  Where defendant chose to engage in illegal brokering
14 activities with regard to a variety of items that he himself lumped
15 together in a single offer or negotiation, all of the controlled
16 commodities in which he sought to traffic are "so interwoven with the
17 charged offense that they should not be treated as other crimes or
18 acts for purposes of 404(b)."  United States v. Loftis, 843 F.3d
19 1173, 1177 (9th Cir. 2016).

20      R.   **Evidence Admissible Under As Direct Evidence or Under Rule
            404(b) of the Federal Rules of Evidence**
21

22 The government has given notice of its intent to offer evidence
23 that in 2015, during the charged conduct, defendant procured a
24 fraudulent Ukrainian travel document in a false name in order to
25 conceal his true identity and facilitate his illegal activities,
26 which involved substantial international travel.  As articulated in
27 the government's notice and in its opposition to defendant's motion
28 in limine to preclude this evidence, the evidence is admissible as

direct evidence showing defendant's consciousness of guilt.  It is also admissible pursuant to Rule 404(b) as evidence of defendant's intent, preparation, plan, knowledge, absence of mistake, and lack of accident.  The Court reserved ruling on this issue.

In the event that the government does not offer this evidence in its case in chief (either because the Court precludes it or because the government elects not to offer it), this evidence would be proper on cross-examination of defendant and/or in rebuttal should defendant testify.  In addition to its admissibility as evidence of consciousness of guilt and intent, this evidence of defendant's participation in a fraudulent transaction and his use of false statements is probative of his truthfulness.

The fact that defendant's pursuit of this fraudulent transaction and use of false statements continued until approximately one month before his arrest further increases the probative value of this evidence.  See Jackson, 882 F.2d at 1448 (noting that "remoteness remains a relevant factor for the trial court to consider in assessing the probative value of the evidence," and finding that conduct 14 years prior was not too remote to probative).

Should defendant testify, inquiry and evidence of various other fraudulent transactions in which defendant has engaged and other false statements he has made would also be appropriate.

**S.   Lay Opinion Testimony Regarding Coded Language**

A witness who is "not testifying as an expert" may nonetheless offer testimony "in the form of an opinion" provided the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other

specialized knowledge within the scope of Rule 702." <u>See</u> Fed. R. Evid. 701.  In this regard, it bears mention that the Federal Rules of Evidence do not distinguish between "lay witnesses" and "expert witnesses," but between lay and expert testimony.  <u>See</u> J. Cotchett, Federal Courtroom Evidence, § 701.2 (5th ed. 2008).

Under Rule 701, the government may properly ask lay witnesses to testify about their opinion regarding the content and meaning of telephone calls and written communications to which they were not a party.  <u>See, e.g.</u>, <u>United States v. Ontiveros</u>, 598 F. App'x 482, 484 (9th Cir. 2015) ("The district court properly admitted government witness Max Torvisco's testimony as lay testimony under Federal Rule of Evidence 701.  Torvisco satisfied Rule 701's perception requirement because, as a member of the Mexican Mafia, he had personal knowledge of the contents of the calls and could testify to known facts, including coded terms used by his co-conspirators."); <u>see also</u> <u>United States v. Gadson</u>, 763 F.3d 1189, 1212-13 (9th Cir. 2014) (same, regarding testimony of law enforcement officer).

Law enforcement testimony regarding jargon and coded language "may be both expert and lay testimony, depending on the circumstances." <u>Gadson</u>, 763 F.3d at 1212 (internal quotation mark omitted).  It is well settled that law enforcement officers who have been involved in an investigation may testify regarding the proper interpretation of ambiguous conversations based on their investigative work.  <u>See id.</u> at 1209-10 (allowing law enforcement officer to offer lay testimony regarding proper interpretation of coded language, and nothing that the officer "had been involved in the investigation of the drug conspiracy since early 2010," had included searches of multiple residences, surveillance, and review of

prison phone calls); see also United States v. Freeman, 498 F.3d 893, 904-05 (9th Cir. 2007) (officer's interpretation of intercepted phone calls admissible under Rule 701 where interpretation was "of ambiguous conversations based upon [the officer's] direct knowledge of the investigation"); United States v. Simas, 937 F.2d 459, 464-65 (9th Cir. 1991) (admission of lay testimony by law enforcement officers regarding "their understanding of what [defendant] meant to convey by his vague and ambiguous statements" was not abuse of discretion).

In this case, the government has notified defense counsel that SA Peterson will testify regarding his understanding of ambiguous terms in various communications among defendants and other co-conspirators.  SA Peterson's testimony is permissible as lay opinion testimony, because it is based on his experience as an investigator on this case since 2014.

## T. Discretion as to Order of Proof

The order of proof is a matter committed to the discretion of the district court, which may conditionally introduce evidence or otherwise permit deviations from the natural order of a case.  E.g. United States v. Zemek, 634 F.2d 1159, 1169 (9th Cir. 1980); see also United States v. Perez, 658 F. 658 (court may admit co-conspirator statement subject to motion to strike if foundation for admissibility not laid, so long as the motion to strike would cure any defect); United States v. Turner, 528 F.2d 143, 162 (9th Cir. 1975) ("The trial judge has wide discretion in supervising the order of proof in a conspiracy case."); United States v. Avendano, 455 F.2d 975, 975 (9th Cir. 1972) (calling witnesses out-of-order).

1    The government intends to call several witnesses and requests

2    that if necessary their schedules be accommodated.  In particular,

3    the government has given notice of an intent to call U.S. State

4    Department employee Simon Davidson-Hood as an expert to establish

5    that defense articles and defense services at issue in this case were

6    designated on the United States Munitions List and that defendant's

7    conduct constituting in brokering as that term is used in the ITAR.

8    Mr. Davidson-Hood will also offer percipient witness testimony that

9    he confirmed that defendant did not have a license from the State

10   Department to engage in any of the charged conduct.  Due to family

11   obligations, Mr. Davidson-Hood, who resides out of state, must return

12   home before the evening of November 7, 2018, and must remain there

13   through November 14, 2018.  Because of the possibility that the

14   government could conclude its case in chief before Mr. Davidson-

15   Hood's availability re-opens, the government intends to call him

16   before November 7, 2018.  That may either mean calling him before the

17   SA Peterson or possibly even the undercover agent testifies as to

18   many of the defense articles and services at issue, or interrupting

19   SA Peterson's or the undercover agent's testimony to offer Mr.

20   Davidson-Hood (the government prefers the former as less disrupting

21   and confusing to the jury).

22   Additionally, the government intends to call as witnesses two

23   Greek citizens who reside in Athens, Greece.  Their testimony is

24   expected to be very brief.  One, a lieutenant with the Hellenic

25   National Police, will testify that he participated in and observed

26   the seizure of digital devices from defendant's presence and premises

27   at and after his arrest in Greece, and that he provided them to an

28   investigator employed by HSI at the U.S. Embassy Athens.  The second,

the aforementioned investigator with HSI in Athens, will testify that
he received the digital devices and sent them to HSI in Long Beach.
The defense has declined to stipulate to this expected testimony, and
the government has thus arranged for their travel to Los Angeles.
The government reasonably expects to call both of these witnesses to
testify between November 3-5, 2018, and has accordingly requested
them to be present during that time frame.  Should the trial not
proceed according to the timetable the government reasonably
anticipates, the government nonetheless intends to call them during
that time frame in order to permit them to return to Greece, where
they have work and other obligations.

**U.   Transcripts of Recordings**

The government has prepared written transcripts of the audio
recordings as an aid to the jury in listening to recordings.  See
United States v. Turner, 528 F.2d 143, 167 (9th Cir. 1975)
(permitting the transcripts of sound recordings to be used
contemporaneously with the introduction of the recordings into
evidence).  Copies of the government's transcripts have been provided
to the defense and are available, should the Court desire them in
advance of trial.  The transcripts will be displayed on a screen
simultaneous to the playing of the audio files, but the transcripts
will not be admitted into evidence.

**V.   Stipulations of Fact**

The government and the defense have entered into and filed a
stipulation to certain facts surrounding the forensic extraction of
data from defendant's digital devices.

58

**W.    Translations**

Some of the evidence, including recordings and written documents, have been translated from a foreign language.  The government and the defense have agreed in principle to enter stipulations to the accuracy of those translations, and the government anticipates offering such stipulations when all final translations have been received.

**X.    Rule 15 Depositions**

Between June 20, 2018, and June 28, 2018, at the request of both parties and pursuant to an order of the Court, the government and defense counsel deposed three foreign witnesses in Tel Aviv, Israel, and Tbilisi, Georgia.  The Court presided over, and defendant Rami Ghanem attended, those depositions via video teleconference. Defendant's lead defense counsel, Michael Evans, participated in the depositions live, and his second defense counsel, H. Dean Steward, participated via video teleconference from defendant's location.

The parties filed a joint motion requesting an order finding the three foreign witnesses to be unavailable for purposes of Rule 84(a)(5), and permitting them to use the recorded testimony pursuant to Rule 804(b)(1) and Rule 15(h), subject to evidentiary objections that may be raised to specific portions of the testimony.  The Court granted that motion in a ruling from the bench on October 22, 2018.

The government proposes to play substantial portions of the direct testimony and cross-examination of the three foreign witnesses, with the exception of testimony as to which objections were lodged and sustained.  The defense has indicated its assent to that proposed procedure.  No foundational or other witness is required to introduce the testimony.

1    During the depositions, the Court received certain exhibits that
2    were separately offered by both parties.  The government proposes to
3    halt the deposition play-back immediately prior to the discussion of
4    each exhibit that was admitted into evidence, and publish the exhibit
5    at issue, so that the jury may review it during that portion of the
6    deposition testimony.

7    **V.    AFFIRMATIVE DEFENSES**

8        **A.    Entrapment**

9        Defendant has given notice of an intent to pursue an entrapment
10   defense as to Counts One through Four of the Trial Indictment.
11   Entrapment is "a relatively limited defense." United States v.
12   Russell, 411 U.S. 423, 434 (1973).  It is rooted in the notion that
13   criminal liability should not lie where the government induced a
14   defendant to commit crimes that he would not otherwise have been
15   inclined to commit. Id. at 434-35.  The entrapment defense does not
16   apply to the brokering violations alleged in Counts Five and Six, nor
17   does it apply to the anti-aircraft missile trafficking violations
18   alleged in Count Seven.

19       The entrapment defense has two elements: 1) defendant was
20   induced to commit the crime by a government agent, and 2) defendant
21   was not otherwise predisposed to commit the crime.  To establish that
22   defendant was not entrapped to commit the crimes alleged in Counts
23   One through Four, the government must thus prove beyond a reasonable
24   doubt either that defendant was predisposed to commit those offenses,
25   or that he was not induced by a government agent to commit them.

26       For its case in chief, the government has prepared a relatively
27   streamlined presentation of the massive volume of relevant evidence
28   uncovered by the investigation.  However, should defendant pursue the

entrapment defense, the government would present a far more robust
sampling of the multitude of evidence showing defendant's vast,
varied, and far-reaching arms-trafficking activities in order to meet
its burden to show that defendant was predisposed to enter into the
discrete and comparatively small transaction involving the undercover
agent.  Depending on what defendant offers, the government may also
rebut it with additional evidence as to the lack of inducement by any
government agent.

### B.    Public Authority

Defendant gave notice of intent to pursue a defense of public
authority in February 2018, as required by Rule 12.3 and the order of
this Court.  Rule 12.3 specified that for "any defense of actual or
believed public authority," this notice was required to identify: 1)
the law enforcement agency or federal intelligence agency on whose
behalf defendant claimed to have acted, 2) the agency member on whose
behalf defendant claimed to have acted, and 3) the time during which
defendant claimed to have acted.  Defendant's notice listed one U.S.
agency, namely "Homeland Security ICE," and one individual, namely a
source of information (SOI) used by the government to introduce the
undercover agent to defendant, as the "agency member."  No other U.S.
agencies were identified as purported sources of actual or believed
public authority for defendant's criminal violations.  Defendant's
notice also listed a foreign entity, namely "Libyan Defense
Ministry/Crisis Operations Management Room," and agency members as
"Prime Minister Khalifa al-Ghawil and members of the Libyan Defense
Ministry/Crisis Operations Management Room."

In April 2018, as required by Rule 12.3 and multiple orders of
the Court, defendant provided a list of witnesses in support of his

1   public authority defense, which gave notice of defendant's intent to
2   rely on twelve witnesses in support of his noticed defense of public
3   authority.  Armed with those required notices, the parties proceeded
4   to litigate the availability of a defense of actual or believed
5   public authority in this case.  That litigation, and the Court's
6   resulting order, were premised on the notice that defendant provided
7   as required by Rule 12.3.

8      In a written order dated June 21, 2018, the Court granted the
9   government's motion to preclude defendant's noticed public-authority
10  defense.  (CR 265)  Finding that the SOI had no actual authority to
11  sanction defendant's crimes, the Court held that defendant was
12  precluded from premising an affirmative defense of public authority
13  on his contact with the SOI.  (Id.)  The Court further held that
14  defendant was precluded as a matter of law from presenting a defense
15  that Libyan individuals gave him public authority to commit the
16  crimes charged.  (Id.)

17     On September 28, 2018, defendant gave notice of his intent to
18  call one witness, Aref Al Zaben.  On October 12, 2018, defendant
19  attempted to give belated notice that Mr. Al Zaben would support his
20  defense of public authority.  The government has moved to exclude
21  evidence from this witness as irrelevant, inadmissible hearsay,
22  precluded by failure to give the notice required by Rule 12.3 within
23  the time frame set by the Court and the Rule, and precluded by the
24  Court's prior order.  The Court has ordered defendant to provide a
25  more detailed offer of proof by October 29, 2018.[6]

26

27     [6] The Court has further ordered defendant not to disclose
classified information, a prospect raised by certain elements of Mr.
28  Al Zaben's background.  As noted in the government pleadings on this

## C.    Other Affirmative Defenses

Defendant has not given notice of any other affirmative defenses.

---

issue, defendant, his counsel, and Mr. Al Zaben are not in a position to know or evaluate what information may be classified by the U.S. government.   The Court and the prosecution may be similarly unable to make such a determination.