NICOLA T. HANNA
United States Attorney
PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division
MELISSA MILLS (Cal. Bar No. 248529)
GEORGE E. PENCE (Cal. Bar No. 257595)
Assistant United States Attorney
Terrorism and Export Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0627/2253
    Facsimile: (213) 894-2927
    Email: Melissa.Mills@usdoj.gov
          George.Pence@usdoj.gov
CHRISTIAN E. FORD (Cal. Bar No. 264564)
Trial Attorney
Counterintelligence and Export Control Section
National Security Division
Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530
    Telephone: (202) 233-2049
    Email: Christian.Ford@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 15-704(A)-SJO |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | |
| RAMI NAJM ASAD GHANEM, aka "Rami Ghanem," | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and undersigned counsel, hereby files Government's Sentencing Position.

1    The government's sentencing position is based upon the attached
2    sentencing memorandum and exhibits, the files and records in this
3    case, the Pre-Sentence Investigation Report, and such further
4    evidence and argument as the Court may permit.

5    Dated: May 13, 2019              Respectfully submitted,

6                                     NICOLA T. HANNA
                                      United States Attorney
7
                                      PATRICK R. FITZGERALD
8                                     Assistant United States Attorney
                                      Chief, National Security Division
9

10

11

12                                    MELISSA MILLS
                                      GEORGE E. PENCE
13                                    Assistant United States Attorneys

14                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

DESCRIPTION                                                                PAGE

TABLE OF AUTHORITIES ............................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .............................. 1

I.    SUMMARY OF GOVERNMENT'S POSITION ............................ 1

II.   FACTUAL BACKGROUND .......................................... 2

      A.    Procedural History ..................................... 2

      B.    The Undercover Transaction ............................. 3

      C.    Defendant's Prolific Unlawful Arms Trafficking
            Activities Unrelated to the Undercover Transaction ....... 5

            1.    Negotiations, Offers, Contracts, and Other
                  Documents Offering a Snapshot of Defendant's
                  High-Volume, High-Dollar Illegal Arms Business ...... 5

                  a.    Defendant's Negotiation and Execution of a
                        Contract to Purchase a Quarter Billion
                        Dollars in Arms and Ammunition ................. 6

                  b.    Defendant's Signed Contract to Broker
                        Hundreds of Rocket-Propelled Grenade
                        Launchers and Related Munitions to Egypt ....... 9

                  c.    Defendant's Shipment of Ammunition to Libya
                        Using a Fraudulent Malawian End-User
                        Certificate ................................. 11

                  d.    Representative Examples of Defendant's Other
                        Illegal Arms Transactions ................... 12

                        (A)   Defendant's Brokering of Various Arms
                              and Ammunition to Libya ................. 12

                        (B)   Defendant's Brokering of M240 Machine
                              Guns to Egyptian Military ............... 13

                        (C)   Defendant's Brokering of 1,400,000
                              Rounds of Assault-Rifle Ammunition to
                              the Egyptian Military ................... 13

                  e.    Defendant's Offers and Negotiations to Buy
                        and Sell Multi-Million Dollar Combat
                        Aircraft ................................... 14

            2.    Financial Records Reflecting Some of the Massive
                  Profits Defendant Gained From the Crimes of
                  Conviction ........................................ 15

## TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                                    PAGE

    D.   Defendant's Conspiracy to Use and to Transfer Anti-
        Aircraft Missiles ....................................... 25

III. GOVERNMENT'S SENTENCING POSITION AND RECOMMENDATION ......... 27

    A.   Sentencing Guidelines Calculations ..................... 27

        1.   The Applicable Guidelines ......................... 27

        2.   Government's Response to Defendant's Objections
            to the PSR ........................................ 28

            a.   Objection to Paragraphs 13 through 26 of the
                PSR .......................................... 28

            b.   Objection to Paragraphs 38 through 59 ........ 29

            c.   Objection to Paragraphs 60-61 ................ 30

    B.   The Court Should Impose a Sentence Including a Prison
        Term of More Than 25 Years Based on the Factors in 18
        U.S.C. § 3553(a) ....................................... 30

        1.   Nature, Circumstances, and Severity of the
            Offenses .......................................... 30

        2.   History and Characteristics of the Defendant ....... 33

            a.   Defendant's Motive of Greed and Wanton
                Disregard for Human Life ..................... 33

            b.   Defendant's Relevant Conduct ................. 35

                (A)   Defendant's Pursuit of Black-Market
                    Uranium ................................ 35

                (B)   Defendant's Counterfeit Currency
                      Operations ............................. 36

                (C)   Defendant's Pursuit of a Counterfeit
                      Passport ............................... 37

                (D)   Defendant's Involvement in Other
                      Illegal Activity ....................... 39

            c.   Defendant's False Statements to USPO ......... 41

        3.   Avoidance of Sentencing Disparities ............... 41

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                    PAGE

    C.    The Court Should Impose a Fine of $300,000 After
          Defendant's Attorneys Have Been Fairly Compensated for
          Their Services ........................................ 44

IV.  GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING POSITION ..... 44

V.   CONCLUSION ................................................. 46

# **TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

Cases

United States v. Al-Kassar,
  660 F.3d 108 (2d Cir. 2011) .................................. 42

United States v. Bout,
  731 F.3d 233 (2d Cir. 2013) .................................. 42

United States v. Chen,
  526 Fed.Appx. 772 (9th Cir. 2013) ........................... 42

United States v. Cromitie,
  727 F.3d 194 (2d Cir. 2013) .................................. 42

United States v. Garavito-Garcia,
  2015 WL 13708830 (S.D.N.Y. 2015) ............................ 42

United States v. Hammadi,
  737 F.3d 1043 (6th Cir. 2013) ................................ 41

United States v. Lakhani,
  480 F.3d 171 (3rd Cir. 2007) ............................ 42, 46

United States v. Pouryan,
  628 Fed.Appx. 18 (2d Cir. 2015) ............................. 42

Statutes

18 U.S.C. § 371 .................................................. 2

18 U.S.C. § 554 .................................................. 2

18 U.S.C. § 1956(a)(2)(A) ........................................ 2

18 U.S.C. § 2332g ........................................... passim

18 U.S.C. § 3553(a) ...................................... v, 29, 30

22 U.S.C. § 2778 ................................................. 2

Rules

U.S.S.G. § 2K2.1(b)(1)(E) ........................... v, 28, 29, 30

USSG § 2K2.1 .................................................... 27

USSG § 2M5.2 .................................................... 27

USSG § 2S1.1 .................................................... 27

USSG § 2K2.1(a)(5) .............................................. 27

USSG § 2K2.1(b)(3)(A) ........................................... 27

USSG § 2M5.2(a)(1) .............................................. 28

USSG § 2S1.1(b)(2)(B) ........................................... 28

Other Authorities

150 Cong. Rec. S11939-01 ........................................ 31

S11997, 2004 WL 2812449 ......................................... 31

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. SUMMARY OF GOVERNMENT'S POSITION

For years, defendant bought, sold, and brokered the sale of millions of rounds of ammunition, each of which had the potential and the purpose to end a human life. The machine guns, assault rifles, mortars, rocket-propelled grenades, and anti-tank weapons that were also his stock and trade had virtually limitless potential to sow death and destruction both on and off the battlefield, particularly when coupled with the unending stream of ammunition that defendant marketed to feed those weapons. Defendant was undoubtedly aware that the machinery of death in which he trafficked had the power to shatter (and may have shattered) countless lives, including civilian lives. He was cavalier about those lives and his role in endangering them for his own financial benefit, and he admitted to being indifferent to the possibility that his weapons and ammunition would be used against civilians. Defendant's callous disregard for human life in pursuit of riches is particularly aggravating.

Defendant also conspired to transfer, and to use, surface-to-air missiles. Because of the unique danger that anti-aircraft missiles present to commercial aircraft and to other U.S. national security interests, the conspiracy to transfer or use even one of these weapons carries a mandatory minimum penalty of 25 years' imprisonment. Defendant procured anti-aircraft missile operators to shoot down airplanes operated by the democratically elected and internationally recognized government of Libya and offered these mercenaries a $50,000 bonus to do so. In addition to that conspiracy to use shoulder-fired anti-aircraft missiles, defendant also sought to enrich himself by selling many hundreds of anti-aircraft missiles

of all varieties to militant factions and governments around the world. Defendant's efforts to proliferate these weapons on the global black market jeopardized civilians, U.S. military forces, allied forces, U.S. diplomacy and foreign policy, and other national security interests.

The 25-year mandatory minimum is insufficient in light of the breadth and gravity of defendant's efforts to use and to transfer anti-aircraft missiles, his brokering of vast quantities of almost limitless types of heavy weapons of war and ammunition over the years, and his acknowledged disregard for human life in pursuit of personal wealth. The government respectfully recommends that the Court impose a sentence including a prison term of more than 25 years.

## II. FACTUAL BACKGROUND

### A. Procedural History

On December 22, 2015, defendant was charged in a four-count indictment (the "original Indictment") with violations of 22 U.S.C. § 2778 (Arms Export Control Act), 18 U.S.C. § 554 (Smuggling), and 18 U.S.C. § 1956(a)(2)(A) (Money Laundering). A superseding indictment filed on March 24, 2017, charged defendant with three additional counts alleging violations of 18 U.S.C. § 371 (Conspiracy, Count 1), 22 U.S.C. § 2778 (Arms Export Control Act, Count 2), and 18 U.S.C. § 2332g (Conspiracy to Use and to Transfer Missile Systems Designed to Destroy Aircraft, Count 3) (the "First Superseding Indictment" or "FSI").

On October 29, 2018, without a plea agreement, defendant entered pleas of guilty to the four-count original indictment and Counts 1 and 2 of the FSI. On October 30, 2018, trial commenced as to Count 3

of the FSI.  On November 15, 2018, the jury return a verdict of guilty.

The United States Probation Office (USPO) disclosed the presentence report (PSR) on January 28, 2019.  On April 1, 2019, defendant filed objections to the PSR, as detailed below. Thereafter, the prosecution and the USPO engaged in several communications about the Sentencing Guidelines calculations.  As of the date of filing, the USPO had not made a final decision as to its recommended calculations.  The government's Sentencing Guidelines analysis is provided below.  The sentencing hearing is set for June 3, 2019.

## B.    The Undercover Transaction

Beginning in July 2014, defendant sought to illegally purchase from a Homeland Security Investigations ("HSI") undercover agent a large volume of weapons, munitions, and night vision optics. Defendant's opening bid in these negotiations requested "as many as you have" of machine guns, assault rifles, sniper rifles, rocket-propelled grenades, mortars, missiles, and ammunition of every available caliber.  On numerous occasions, defendant acknowledged that their business was being conducted "illegally" and "under the table."  In communications with the undercover agent, defendant described some of his many other "black market" arms transactions and detailed his regular business practice of using "cover" contracts to conceal the illicit nature of his weapons business.

The list of military articles that defendant sought from the undercover agent in connection with what defendant described as his $2 billion per year business shifted over time.  Among the items he sought from the undercover agent were Hellfire air-to-ground

missiles, TOW anti-tank guided missiles, and surface-to-air missiles. Defendant told the undercover agent about his ties to the leadership of Hezbollah, which is designated as a foreign terrorist organization by the U.S. State Department, and explained that he had high-level contacts in the governments of numerous countries and militant groups around the world, including the Chinese government, the Saudi Arabian government, the Jordanian and Egyptian militaries, high-level Iranian customers, and the Libya Dawn rebel militant faction,[1] among others — — claims that were corroborated by defendant's records.  Eventually, in August 2015, defendant settled on what he described as a small initial $220,000 order to include .50-caliber sniper rifles, pistols, silencers, ammunition, and night-vision optics, promising to negotiate much larger future orders if the undercover agent was able to deliver that first shipment.  Defendant made two $90,000 payments toward this order and made arrangements to inspect the weapons in Greece in December 2015, where he was arrested on a complaint.  The subsequent original indictment alleged violations of the Arms Export Control Act, smuggling, and money laundering.

---

[1] Defendant's primary business contact in the Libya Dawn faction was the self-styled "prime minister" of that group, Khalifa Al-Ghawil.  On April 19, 2016, a few months after defendant's arrest, the U.S. Department of the Treasury designated Al-Ghawil as a "Specially Designated National."  See https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20160419.aspx (last accessed May 3, 2019).  As a result of this designation, which is reserved for countries subject to sanctions as well as hostile individuals and groups such as terrorists and narcotics traffickers — Al-Ghawil's assets were blocked and U.S. citizens were prohibited from dealing with him.  See https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx (last accessed May 3, 2019).

### C. Defendant's Prolific Unlawful Arms Trafficking Activities Unrelated to the Undercover Transaction

At defendant's arrest in Greece, authorities seized 19 digital devices from his person and his hotel room.  On these devices, agents discovered further evidence of defendant's prolific global arms-trafficking business, including numerous communications reflecting defendant's efforts to buy and sell a wide array of heavy weapons.

#### 1. Negotiations, Offers, Contracts, and Other Documents Offering a Snapshot of Defendant's High-Volume, High-Dollar Illegal Arms Business

Defendant's communications and other records over the years before his arrest offer a window into the vast dimensions of his lucrative international arms-trafficking business.  From the volumes of defendant's negotiations, requests, quotations, offers, contracts, invoices, and other documents reflecting his frenetic efforts to profit from the brokering and sale of as many weapons and other munitions as he possibly could, the government below details multiple executed and/or completed deals, as well as several illustrative examples of defendant's other efforts to close illegal arms deals that may or may not have seen fruition.[2]

---

[2] This uncertainty as to whether or not particular transactions were completed is because only a fraction of defendant's communications and other business records were available to investigators.  Since the government's access was limited to certain email or Skype communications that defendant chose to retain in his email and/or on penetrable devices that he brought to Greece, the investigation essentially cast a beam of light into the dark shadows of defendant's illegal activity, with much of that activity still obscured.  In light of defendant's documented penchant for moving sensitive communications to the many encrypted messaging applications that he used, or to telephonic or in-person conversations, those gaps will remain.  In addition, due to defendant's and his co-conspirators' reliance on overseas banks and shell companies, the only bank and corporate records available to U.S. law enforcement were those attached to emails that defendant retained.

a.   *Defendant's Negotiation and Execution of a Contract to Purchase a Quarter Billion Dollars in Arms and Ammunition*

Throughout the spring of 2015, defendant pursued massive quantities of arms and ammunition to sell to his customer in Libya for hundreds of millions of dollars.  **These efforts ultimately led defendant to negotiate and sign a contract to illegally broker $250,000,000 in munitions, including missiles, rockets, mortars, grenade launchers, sniper rifles, assault rifles, and ammunition, to a militant faction in Libya.**

Defendant's communications reveal his awareness that his customer for this transaction, the Libya Dawn militant faction, was the subject of United Nations sanctions:

- Exhibit 508[3]:  Defendant stated: "can you supply Libya… Tripoli EUC."  His prospective supplier replied: "Not sure if Libya EUC is even recognized."

- Exhibit 511:  Defendant stated:  "Ivan. . . was very clear that he can't supply to Libya."

Thus, defendant had difficulty procuring a supplier that would sell to him with an end-user certificate from Tripoli.  As one prospective supplier told him, "we know current official Government of Libya is not any more in Tripoli!!!"  (Exhibit 502)  Defendant thus began to explore ways to covertly mask the ultimate destination of this

---

Nonetheless, given the longstanding relationships between defendant and his repeat suppliers and buyers that endured across multiple transactions, one may reasonably infer that defendant was ultimately able to perform as he promised.  Had he not done so, his contacts in the ruthless and lawless world of illegal arms trafficking would have — at a minimum — ceased dealing with him.

[3] References are made herein to Exhibits and Trial Exhibits.  Where an exhibit was admitted at trial and is already part of the record, it is referenced as a Trial Exhibit; otherwise, it is referenced as an Exhibit.  Copies of all referenced Exhibits are submitted along with this memorandum.

illegal shipment of arms and ammunition, specifically by purchasing an end-user certificate to falsely reflect the ultimate end user:

- <u>Exhibit 507</u>:  Defendant stated: "we are dealing with Tripoli government and it's very hard now days due to the mix up between the two sides of Libya. If you can find me a source from one of those countries not so much attached to UN matter such as Albania."

- <u>Exhibit 508</u>:  Defendant proposed to a co-conspirator, who had advised that the Libya end-user certificate would not be recognized, "Maybe you can give me an offer for the items I had sent by email using country Belize EUC and also to support your work Tripoli EUC."  The co-conspirator agreed that they could try this scheme.

- <u>Exhibit 535</u>:  Defendant contacted a prospective supplier and advised, "we are looking for a good contact with Head of the army or president in any African countries to help us in the supply of ammunitions to help us [either] by selling us directly from their old stock and they buy a new one or help us in issuing an end user certificate and we will pay. . . for the service."

Defendant continued to pursue a supplier for this large transaction, which defendant preferred to structure as a contract encompassing a small "trial" shipment before the much larger full shipment would be made.  At the conclusion of negotiations with the selected supplier, Quisianto Trading Limited, **defendant and the supplier ultimately signed a contract to broker $250,000,000 in arms and ammunition** to Libya.

- <u>Exhibit 516</u>:  Defendant's prospective supplier sent defendant a draft contract including an annex described as a "trial with small quantities."  The "small quantities" envisioned by this contract consisted of $17,862,700 in anti-tank missiles, rockets, mortars, and ammunition.

- <u>Exhibit 517</u>:  Defendant forwarded the draft contract for the $17,862,700 small trial order to his customer in Libya was the notation, "This is the correct agreement to be signed."

- Exhibit 518:  The end-user certificate from the Libya Dawn militant faction for millions of rounds of ammunition, tens of thousands of (each) mortars and rockets, thousands of missiles, and other munitions listed the supplier as "Gateway to MENA for Logistics Services, represented by Mr. Rami Ghanem."  The reference number on the end-user certificate was 8628-57.

- Exhibit 519-522:  Defendant and his customer exchanged emails wherein the customer amended the quantities of munitions listed in the end-user certificate.

- Exhibits 524-530:  Defendant contacted several suppliers with whom he had worked on other illegal arms deals to find a supplier for the munitions required for this transaction.

- Exhibits 531-534:  A co-conspirator, Tahsin Ammouri, offered defendant some of the munitions he was seeking and told defendant that he could send them to Libya.  Defendant expressed doubt that the Tripoli end-user certificate would be accepted, but Ammouri assured him that it would. Defendant proposed that a "trial order" include 23mm, 14.5mm, and 127mm ammunition.  Defendant contacted his Libyan client with information about the proposed deal.

- Exhibit 536-537:  Defendant and Ammouri exchanged legal documentation, including a power of attorney and an amendment to the end-user certificate.

- Exhibit 540-541:  Ammouri sent defendant an invoice for $249,591,800 as the purchase price of the contract; and an annex reflecting a first delivery of ammunition for $26,808,960.

- Exhibit 542:  Defendant's customer, the self-styled prime minister of the Libya Dawn faction, sent defendant a new end-user certificate for ammunition and rockets.

- Exhibit 543:  Ammouri sent defendant a draft of the contract for listed arms and ammunition at a total purchase price of $249,500,800; and an annex reflecting the "small quantity of first trial shipment," for $4,032,440.  The contract document and the annex reflected the invoice number "8628-57," which is the reference number of defendant's Libyan end-user certificate.

- Exhibit 544: Ammouri sent to defendant a modified version of the contract reflecting, per defendant's request, a small trial shipment of $2,500,000 in ammunition.

- Exhibit 546: Ammouri sent defendant the "final contract" containing all amendments as requested by defendant, and requested that defendant provide his banking details.

- Exhibit 547: Defendant returned to Ammouri the final contract for $250,000,000 in arms and ammunition, with a trial order for $2,489,970 in ammunition. Defendant initialed every page of the contract and signed and stamped his business seal on the final page.

- Exhibit 549: Defendant provided his banking details to Ammouri as required by the contract.

- Exhibit 550: Ammouri sent defendant the last page of the signed and stamped quarter-billion contract No. 8628-57, which contained signatures, business seals, and initials of both defendant as the buyer of the arms and ammunition and Alexei Kharlanov of Quisiano Trading Limited as the seller.

> b. *Defendant's Signed Contract to Broker Hundreds of Rocket-Propelled Grenade Launchers and Related Munitions to Egypt*

Through the fall of 2015, defendant facilitated the supply of rocket-propelled grenades and launchers to the Egyptian Ministry of Defense. Defendant's negotiations successfully culminated in a contract signed just days before his arrest. The contract provided for the supplier, Care Transenergy Ltd., to sell 500 RPG-7 rocket-propelled grenade (RPG) launchers, 500 PGO-7V optical sights for RPG launchers, and related munitions, for a purchase price of $1,202,500.

- Exhibit 610: Defendant sent a signed and initialed contract to his Egyptian business partner. The appendix listed the above-specified munitions as subject of contract and purchase price of $1,202,500.

- Exhibit 611: Defendant and his supplier discussed sending original contract by DHL.

As the broker for this contract, defendant received a commission of hundreds of thousands of dollars.

- Exhibit 600:  The offer defendant received from his supplier included a 20% commission for defendant's Egypt-based company.

- Exhibit 604:  Defendant explained to his supplier, "in your offer you will add our commission" and sent him the specific procedures for how to do so.

This contract may have been another example — like defendant's quarter-billion dollar ammunition contract and his relatively small order of munitions to test the undercover agent's capabilities — of the common practice of preceding massive arms shipments with smaller test orders.  From the initial order and continuing throughout the course of negotiations, the customer's supply requirements specified the intended purchase of a much higher volume of RPGs, launchers, and other munitions.

- Exhibit 600:  Defendant's supplier's initial offer responded to defendant's request for a proposal for 50,000 PG7V rocket-propelled grenade training projectiles, 28,000 live RPG projectiles, 1,100 RPG launcher sets, and 1350 RPG optical sights, for a total of €21,335,500.

- Exhibit 604:  In this message thread between defendant and his supplier, defendant specified requirements for munitions to include 50,000 training RPG projectiles, 20,000 live RPG projectiles, and tens of thousands of live RPG heads and fuses.

- Exhibit 605:  Defendant forwarded to his business partner and co-conspirator the list of munitions referenced in Exhibit 604 and specifications therefor.

- Exhibit 606:  Defendant forwarded same list of munitions and specifications to alternative prospective suppliers.

- Exhibit 608:  Defendant's supplier confirmed the availability of 50,000 live RPGs and 50,000 fuses.  Earlier in the thread, an email from defendant's business partner specified the customer's initial request for 20,000 live

RPGs, 50,000 training RPGs, and 14,000 fuses, and noted that due to their contacts with the Egyptian military, no other supplier would be chosen if they made a competitive offer.

> *c.*   *Defendant's Shipment of Ammunition to Libya Using a Fraudulent Malawian End-User Certificate*

In June and July of 2015, defendant and his co-conspirators prepared to and did ship over a million rounds of ammunition to Libya using a fraudulent end-user certificate.  Defendant's co-conspirator explained that the planes would stop in Lilongwe, Malawi, allegedly for refueling, where the ammunition would be offloaded and shipped to Misrata, Libya, with the assistance of Malawian officials in exchange for a $90,000 bribe.  (Exhibit 565.)  Defendant described this method of delivery as the "black way."  (Exhibit 559.)

- Exhibits 555-567:  This series of emails between defendant and his co-conspirator/business partner shows the final logistical arrangements for two "fruit planes," each bearing an illegal shipment of weapons and ammunition that defendant had brokered and sold to his customer in Libya. This transaction was accomplished using a fraudulent end-user certificate illegally purchased from Malawi for a 6.5% portion of the total transaction price, which reflected the following arms and munitions (Exhibit 557):

  o 40,000 7.62 assault rifles
  o 30,000,000 rounds of small-arms ammunition (12.7mm, 7.62mm, and 14.5mm)
  o 1,000,000 rounds of 23mm anti-aircraft ammunition
  o 1,500 anti-tank grenade launchers
  o 20,000 anti-tank grenades
  o 1,500 7.62mm machine guns
  o 39,000 mortar shells (60mm, 81mm, and 120mm)

Defendant's two "fruit planes" described in these communications delivered 247,820 rounds of 23mm and 14.5mm anti-aircraft ammunition, 126,000 rounds of 12.7mm machine gun ammunition, and 1,355,200 rounds of 7.62mm assault rifle ammunition to feed Libya's civil war. (Exhibit 566.)

11

                      *d.    Representative Examples of Defendant's Other*
                             *Illegal Arms Transactions*

The following representative communications illustrate defendant's efforts to broker hundreds of millions of dollars in various munitions beyond the transactions and commodities proven at trial or in the factual basis for defendant's guilty pleas in which he admitted to brokering and conspiring to transfer the many defense articles and defense services charged in the indictment.

                        (A)   Defendant's Brokering of Various Arms and
                              Ammunition to Libya

- Exhibit 510:  Pursuant to defendant's request, an Israeli co-conspirator sent defendant pro forma invoices for large quantities of various missiles, rockets, mortars, grenade launchers, assault rifles, and ammunition totaling $219,615,450.

- Exhibit 515:  Defendant sent to a co-conspirator a contract for the purchase of a large volume of missiles, rockets, mortars, launchers, sniper rifles, and varying calibers of ammunition for $338,183,200.

- Exhibit 502:  Defendant negotiated his purchase of ammunition and various other munitions to sell to Libya. The seller's quotation included 160 T-72 battle tanks at a per-unit price of $250,000.

- Exhibit 504:  Defendant forwarded to his customer in the Libya Dawn militant faction specifications and photographs of various types of anti-aircraft ammunition.

- Exhibit 554:  **On December 3, 2015 — five days before his arrest** — defendant engaged in negotiations with a co-conspirator to purchase $800,000 in 23mm anti-aircraft ammunition to sell to his customer in the Libya Dawn militant faction.  Defendant promised to be in touch from Athens, where he was ultimately arrested on December 8, 2015.

（B） Defendant's Brokering of M240 Machine Guns
to Egyptian Military

- Exhibit 612:  In an email thread between defendant and
Israeli broker, they discussed defendant's request for 100
U.S.-made M240 machine guns to sell to Egypt.  The broker
quoted a total price of $1,227,000.

- Exhibit 613:  Defendant advised the Israeli broker that he
can provide an end-user certificate, but that "if the
country of the seller are from west Europe… it will not
fly."

- Exhibit 614:  Defendant received paperwork for the sale,
including a "Nontransfer and Use Certificate" from the U.S.
Department of State requiring certification that the
machine guns would not be retransferred.

- Exhibits 615, 616:  These exhibits reflect Egypt's request
for defendant's proposal to sell M240 machine guns.

（C） Defendant's Brokering of 1,400,000 Rounds of
Assault-Rifle Ammunition to the Egyptian
Military

- Exhibits 617-625, 634-635, 637:  In these communications,
defendant negotiated the supply of 1,400,000 rounds of
7.62x52mm linked machine gun cartridges to the Egyptian
army, with a 15% commission for defendant.

- Exhibits 627-633:  Defendant's communications reflect his
negotiation of the supply of large quantities of various
arms and ammunition to the Egyptian military, including
anti-aircraft guns, mortars, rocket-propelled grenades,
machine guns, and assault rifles.  After surveying his own
suppliers, defendant sent his customer a quotation
indicating he had procured 30,000 units of 122mm BM-21 Grad
multiple rocket launchers, offered at $950/unit before
defendant's commission; and 10,000 7.62mm AKM assault
rifles, each offered at $175 before defendant's commission.
(Exhibit 633)

- Exhibit 638:  Defendant solicited an offer to supply 152mm
cannons, 23mm and 14.5mm anti-aircraft guns, and SPG-9
anti-tank cannons to a customer in Iraq.

- Exhibits 640-647:  Defendant negotiated to supply various
arms to the Egyptian armed forces, including 900 machine
guns, 20,000 assault rifles, and 500 rocket launchers with

optics.  Defendant noted to one prospective supplier that this was a "small tender."  (Exhibit 644)

- Exhibit 648:  A week before his arrest, defendant detailed his current orders, which included 10,000,000 rounds of ammunition to South Africa, 100 SPG-9 anti-tank guns to Ethiopia, 4,000,0000 rounds of automatic rifle ammunition to Iraq, and 4,000,000 rounds of pistol ammunition to Iraq.

    e.   *Defendant's Offers and Negotiations to Buy and Sell Multi-Million Dollar Combat Aircraft*

Among the defense articles that defendant sought to broker and sell to other countries and militant groups were combat jets and helicopter gunships, which regularly come equipped with heavy armaments.  Included in the numerous documents reflecting defendant's negotiations and offers to buy and sell these combat aircraft are the following:

- Exhibit 704:  Defendant advised a fellow broker that he was "very interested in the MI 24[4] QTY 2 ready to go."

- Exhibit 707-708:  Days later, another co-conspirator advised defendant of the availability of a "second MI-24" helicopter gunship for $6,150,000.  That day, defendant forwarded the specifications and photographs of the MI-24 to his customer in the Libya Dawn militant faction.

- Exhibit 710:  Defendant contacted a fellow broker to request a quotation for two MI-24 helicopter gunships "ready to go for operation with full arms."

- Exhibit 714:  Defendant's co-conspirator briefed him via email on the state of their "schedule[d] acquisition" of six MIG-29 fighter jets,[5] for which defendant and his co-conspirator had already agreed to pay an "official end price" of between $8,700,000 and $9,100,000, with an "unofficial additional price" of $6,000,000.

---

[4] The Mil Mi-24 is a large, Russian-built, helicopter gunship, attack helicopter and low-capacity troop transport.

[5] The Mikoyan MiG-29 is a twin-engine jet fighter aircraft designed in the Soviet Union as an air superiority fighter during the 1970s, to counter new U.S. fighters such as the McDonnell Douglas F-15 Eagle and the General Dynamics F-16 Fighting Falcon.

- Exhibit 736: Pursuant to his request for MI-24 combat helicopters and MiG-29 fighter jets, defendant received a quotation for five MI-24 at $5,155,000 per helicopter. Defendant replied with interest, asking, "what type of arms does it include?"

    2.    Financial Records Reflecting Some of the Massive Profits Defendant Gained From the Crimes of Conviction

The evidence gathered during the government's investigation of defendant also includes invoices, bank transfers, and other financial records documenting defendant's extensive brokering of defense articles and services, including the services of mercenary fighters to fight in foreign wars. Many of these records overtly confirm defendant's payments for defense articles and services through 2014 and 2015, including the following:

- Exhibit 800: Invoices from defendant's company to his customer in Libya reflect $98,000 in helicopter armaments, $690,000 in salary and fees for L39 attack aircraft operational crew, and $1,800,000 in salary and fees for an F-1 fighter jet[6] operational crew.

- Exhibit 801: Invoices from defendant's company to his customer in Libya reflect a total of $3,685,740 in combat aircraft tools and parts and mercenary services.

- Exhibit 802: Emails between defendant and his co-conspirator included business report reflecting payments of $531,016 on the combat aircraft tools and parts and mercenary services reflected in Exhibit 801.

- Exhibit 803: An email report from defendant's business partner/co-conspirator to defendant reflects expenditures totaling $68,600 relating to pilots for MIG-25 fighter jets.

- Exhibit 804: Defendant forwarded to his business partner the $68,600 accounting report in Exhibit 803, but tacked on an additional $30,000 profit for defendant. Defendant also took the first business partner's $9,000 estimate for the services of combat aircraft technicians and inflated it by more than 50% before passing it along to the second

---

[6] The Dassault F1 is a French fighter and attack aircraft.

15

business partner.  The second business partner replied with a complaint that the resulting total of $98,600, with additional services for $15,000, was "expensive."[7]

- Exhibit 805:  An email to defendant from his co-conspirator accounted for many hundreds of thousands of dollars in mercenary services provided, and monthly profit for defendant on these transactions.

- Exhibit 806:  Invoices to defendant's customer in Libya reflect a total of $1,106,000 in defense articles and mercenary services.

- Exhibit 807:  Invoices to defendant's customer in Libya reflect a total of €346,000 in parts for F-1 fighter jets and $744,220 in mercenary services.

- Exhibit 808:  Invoices to defendant's customer in Libya reflect a total of $633,000 in defense articles and mercenary services.

- Exhibits 809-810:  Emails to defendant from his co-conspirator accounted for hundreds of thousands of dollars in mercenary services provided and related expenses, and monthly profits for defendant on these transactions.

- Exhibit 811:  Invoices to defendant's customer in Libya reflect a total of $2,490,000 in mercenary services for F-1 and L39[8] combat aircrews.

- Exhibit 812:  An email to defendant from his co-conspirator accounted for mercenary services provided, and monthly profits for defendant on these transactions.

Other financial records from defendant's communications do not overtly indicate the purchase and sale of defense articles and mercenary services, but rather purport to reflect innocuous transactions for other goods and services.  This evidence, which

---

[7] Defendant's willingness to siphon tens of thousands of dollars from his closest business partners by adding upwards of 30-50% profit for himself further illustrates his greed and his lack of regard even for those inside his circle of accomplices.

[8] The Aero L-39 Albatross is a Czechoslovakian high-performance jet trainer.

reflects defendant's regular and admitted use of cover documentation to conceal the illicit nature of the weapons and mercenary services in which he trafficked, includes the following:

- Exhibit 813:  An email from defendant to his business partner attached two invoices to their customer in Libya. Defendant described the attachments as follows: "one to use as a cover for the money transfer and the 2nd one the original invoice for the services."  The "cover" invoice purported to reflect the sale of 30 Toyota Hilux trucks for a total of $744,220.  The real invoice reflected the sale of mercenary air crew services and also totaled $744,220.

- Exhibits 814-815, 816 at red-tabbed page only: Communications between defendant, his bank, and a co-conspirator reflect defendant's receipt and laundering of the $744,220 referenced in Exhibit 813.

- Exhibit 817:  This exhibit shows a new cover invoice to defendant's customer in Libya for $744,220 purporting to reflect sale of 30 Toyota Hilux trucks, but in fact reflected the sale of three more months of mercenary services.

- Exhibits 819-820:  These contemporaneous emails contain two sets of invoices to defendant's customer.  The first set purports to reflect the sale of 43 Toyota Hilux vehicles for a total of $1,623,000.  The second reflects the true sale of $1,623,000 in defense articles, including a guided missile kit for a helicopter gunship, and mercenary services, including a crew of anti-aircraft missile operators.

- Exhibit 821:  This invoice to defendant's company purported to reflect the $335,829 purchase of computer equipment and related services, with a transmittal email to defendant from his co-conspirator explaining that the invoice in fact related to the mercenary services of a MI-24 helicopter gunship crew.

- Exhibit 822:  This invoice to defendant's company purported to reflect $66,099 and $45,125 purchases of "building construction materials," with a transmittal email to defendant from his co-conspirator explaining that the invoice in fact related to the mercenary services of a MIG-23 fighter jet crew totaling $111,224.

17

- Exhibit 823:  This invoice to defendant's company purported to reflect the $326,800 purchase of "building materials," with a transmittal email from his co-conspirator explaining that the invoice in fact related to the mercenary services of a MI-24 helicopter gunship crew.

- Exhibits 824-826:  This cover invoice from defendant's company to a Libyan customer purported to reflect the purchase of 27 GMC trucks for a total of $875,363.  Wire transfer records over the subsequent two days reflect payment from Libya Dawn militant faction to defendant's company in the total amount of $875,363.

- Exhibits 827-833:  Communications over successive days reflect various iterations of cover invoices to the Libya Dawn faction for a total of $972,630, and payment to defendant's company in that amount.  The cover commodities referenced in this transaction range from GMC and Toyota Hilux trucks to spare parts to generators to building materials to construction materials and scaffolding.

- Exhibits 834-835:  Emails and a cover invoice from defendant's company reflect the purported sale to the Libya Dawn militant faction of $500,000 in Toyota Hilux trucks, and resulting payment by Libya Dawn in that amount on that cover invoice.

- Exhibit 836:  Three cover invoices from defendant's company to the Libya Dawn militant faction reflect a total amount owed of $1,690,000, purportedly reflecting the purchase of 50 Toyota Land Cruiser trucks.

- Exhibit 837:  Cover invoices to defendant's company from a co-conspirator shell company purportedly reflect the purchase of "building materials and transport services" in the amount of $111,900.  The transmittal email to defendant from his co-conspirator explained that the invoice in fact covered the salaries of mercenary crew members of MI-24 helicopter gunships.

- Exhibit 838:  A cover invoice to defendant's company from a co-conspirator shell company purportedly reflected the purchase of "building materials" in the amount of $25,000.  By the transmittal email, defendant's co-conspirator advised defendant that this invoice covered expenses related to mercenary MI-24 crew members.

18

- Exhibit 840:  Three cover invoices to defendant's company purportedly reflected the purchase of construction equipment in the total amount of $249,159.  The transmittal email advised defendant that these invoices covered MI-24 mercenary crew member salaries for two months and related expenses.

- Exhibit 840:  A cover invoice to defendant's company purportedly reflected the purchase of building equipment in the amount of $93,500.  The transmittal email to defendant explained that the invoice actually covered payment for the services of mercenary L39 crew members.

- Exhibit 841:  A cover invoice to defendant's company purportedly reflected $33,467 due for the purchase of construction materials.  The transmittal email to defendant stated that this invoice covered expenses related to mercenary MI-24 crew members.

- Exhibit 842:  Three cover invoices to defendant's company purported to reflect the purchase of $239,463 in building equipment.  In the transmittal email, defendant's co-conspirator explained to defendant that the invoices covered salary and expenses related to mercenary crew members of L39 and MI-24 combat aircraft.

- Exhibits 843-844:  Two cover invoices to defendant's company purportedly reflected the purchase of cement totaling $240,800.  The transmittal email advised defendant that these invoices covered salaries for L39 and MI-24 combat air crews.  A SWIFT bank record reflects payment to defendant's company on one of these invoices.

One set of documents shows particularly clearly defendant's systematic and methodical use of cover documentation.  On May 3, 2015, defendant emailed a contact at a generator company asking for updated pricing information on generator equipment.  (Exhibit 845) The following day, the contact replied with the requested pricing information, which defendant emailed to his business partner and co-conspirator in the following Word document on May 5, 2015:

| S/N | Standard parts | | |
|---|---|---|---|
| 1. | Generator System 20KW | | Blade |
| 2. | | | Generator |
| 3. | | | Yaw Shaft |
| 4. | Dumping Load | | |
| 5. | Off grid Rectifier / Dumping Controller | | |
| 6. | Siemens PLC Controller | | |
| 7. | **Off grid Inverter (Single-phase)** | | |
| 8. | 6 | Guyed tower(12m) | |
| 9. | 7 | Free Standing Tower(12m) | |
| 10. | with Guyed Tower | | |
| 11. | with Free Standing Tower | | |

(Exhibits 846-47)

Defendant's co-conspirator replied the same day with an email stating, "[a]s you wanted done for all transfers," and attached the following invoice purporting to cover the sale of the generator equipment specified in defendant's earlier email:

| Description | Q-ty | Prise | Amount |
|---|---|---|---|
| Generator system 20 KW: | | | |
| blade | 8 | 2520 USD | 20160 USD |
| generator | 8 | 2850 USD | 22800 USD |
| Yaw shaft | 8 | 2800 USD | 22400 USD |
| Dumping Load | 7 | 2130 USD | 14910 USD |
| Off grid Rectifier / Dumping Controller | 11 | 2655 USD | 29205 USD |
| Siemens PLC Controller | 9 | 5240 USD | 47160 USD |
| Off grid Inverter (Single-phase) | 18 | 1560 USD | 28080 USD |
| Guyed tower(12m) | 14 | 3420 USD | 47880 USD |
| Free Standing Tower(12m) | 9 | 2755 USD | 24795 USD |
| with Guyed Tower | 10 | 1580 USD | 15800 USD |
| with Free Standing Tower | 11 | 1710 USD | 18810 USD |
| Total:   **Payment for building materials/equipment acc contr11/15 dd 02.02.15** | | | **292 000 USD** |

(Exhibit 848)

Additional invoices and communications between defendant and his co-conspirator make use of these same generator commodities as cover items and reflect money transfers on those cover invoices. (Exhibits 849–862) Many of those invoices and communications further clarify that the cover terms mask the true nature of mercenary services. (See, e.g., Exhibit 855 describing the cover invoice as for ("the new L39 salary for 5th month"); Exhibit 858 ("attached invoice for L39"), Exhibit 859 ("L39 Invoice"); Exhibit 861 ("Invoice Renault + L"); Exhibit 862 ("L39 + F")[9]; Exhibit 850 (referencing a team of F-1 pilots that defendant procured from Ecuador))

---

[9] Defendant's communications reveal that he brokered the mercenary services of combat pilots and crew members for the F-1 fighter jet.

1    While the evidence — including defendant's own words — shows
2    that he was driven by greed, defendant also took a personal interest
3    in the destruction wrought by some of the mercenaries whom he sent
4    into combat.   In one message exchange with an F-1 fighter pilot
5    operating in Libya, defendant requested information about a
6    particular air attack, and the pilot replied with a report that the
7    "main target [was] destroyed in Sirte" with a single bomb and
8    gunfire.   Defendant praised the pilot's successful offensive
9    operation and gave him a "thumbs up" emoji.   (Exhibit 735)

10    On the basis of that and other evidence, Counts One and Two of
11    the FSI charged defendant with conspiracy to violate the Arms Export
12    Control Act and unlawful brokering of weapons.   In pleading guilty to
13    those counts, defendant admitted to brokering and conspiring to
14    transfer the following items:

| Commodity |
| --- |
| 12.7-millimeter NSVT machine guns |
| 7.62-millimeter AKS assault rifles |
| 7.62-millimeter AKM assault rifles |
| 7.62-millimeter PKM medium machine guns |
| 7.62-millimeter SVD sniper rifles |
| Sniper rifles |
| CZ-999 pistols 9-millimeter pistols |
| Glock 9-millimeter pistols |
| AK-47 assault rifles |
| Dragonov sniper rifles |
| 14.5-millimeter KPVT machine guns |
| 60-millimeter mortar shells |
| 81-millimeter mortar shells |
| 120-millimeter mortar shells |
| 7.62 x 39-millimeter ammunition |
| Ammunition |
| 23-millimeter ammunition |
| Zsu-23-2 23-millimeter ammunition |
| 5.56 x 45-millimeter ammunition |

| Commodity |
| --- |
| BS-41 14.5-millimeter ammunition |
| 9 x 19-millimeter ammunition |
| Zsu-57-2 57-millimeter anti-aircraft ammunition |
| M51 37-millimeter anti-aircraft armor-piercing capped trace |
| 7.62 x 39-millimeter ammunition |
| 7.62 x 54-millimeter ammunition |
| 7.62 x 54-millimeter BKC ammunition |
| 12.7 x 108-millimeter ammunition |
| Dishka 127 x 108-millimeter ammunition |
| 14.5 x 114-millimeter ammunition |
| 23 x 152-millimeter ammunition |
| D20 152-millimeter tank rounds |
| M48 76-millimeter tank rounds |
| D30 122-millimeter towed howitzer heat tank rounds |
| 12.7 x 108-millimeter ammunition |
| RPG-7 anti-tank rocket-propelled grenade launcher |
| Kornet anti-tank guided missile launchers |
| Kornet anti-tank guided missiles |
| Igla 9K38 surface-to-air missile launchers |
| Igla 9K38 surface-to-air missiles |
| MI-24 rocket launchers |
| 57-millimeter rockets |
| 80-millimeter rockets |
| 122-millimeter S-13T rockets |
| 122-millimeter S-13 OF rockets |
| 130-millimeter rockets |
| 240-millimeter rockets |
| GRAD 122-millimeter rockets |
| 122-millimeter GRAD rocket launcher |
| 107-millimeter GRAD rocket launcher |
| RPG-7 HEAT rounds |
| AT-2 Swatter guided missiles |
| AT-6 Spiral missiles |
| Konkurs anti-tank missile launchers |
| Konkurs anti-tank missiles |
| AGS-17 30-millimeter grenade launchers |
| Anti-tank grenade launchers RPG-7 |
| Anti-tank grenades PG-7V |
| Fagot 9K111 anti-tank guided missile launchers |
| Fagot 9M111 anti-tank guided missiles |

23

| Commodity |
|---|
| M70 Osa 90-millimeter anti-tank guided missile launchers |
| M79 Osa 90-millimeter anti-tank guided missile launchers |
| 9M133 Kornet (Konkurs) anti-tank guided missile launchers including tripods and thermal sights |
| 9M133 Kornet (Konkurs) anti-tank guided missiles |
| 85-millimeter RPG-7 anti-tank launcher including telescopic sight |
| PG-7VL 85-millimeter HEAT projectiles |
| SKIF anti-tank guided missile launchers |
| SKIF anti-tank guided missiles |
| Strela surface-to-air missile launchers |
| Strela surface-to-air missiles |
| M79 Osa RBR 90-millimeter anti-tank guided rocket launchers |
| M79 Osa RBR 90-millimeter anti-tank guided rockets |
| M79 Osa RBR 90-millimeter anti-tank guided rocket tubes |
| 9M151 Metis-M anti-tank guided missile launchers |
| 9M131 Metis-M anti-tank guided missiles |
| Metis-M tripod launchers |
| Konkurs tripod launchers |
| 9P163-1 Kornet tripod launchers |
| PG-7VLT tandem-charge anti-tank warheads |
| PG-7VR 85-millimeter HEAT tandem projectiles |
| Shershen-D anti-tank guided missile launchers |
| Shershen-D anti-tank guided missiles |
| Spare parts for T-72 battle tanks |
| Spare parts for BTR-80 amphibious armored personnel carriers |
| MI-24 attack helicopters |
| MIG-29 fighter jets |
| Operators for Igla surface-to-air missile launchers |
| Technicians for Igla surface-to-air missile launchers |
| Trainers for Igla surface-to-air missile launchers |
| Special forces fighters |
| MI-24 attack helicopter pilots |
| L39 attack aircraft pilots |
| F-1 fighter jet pilots |
| MIG-25 fighter pilots |
| PVS-27 night-vision weapon sight |
| MI-24 night-vision equipment |
| Shershen-D thermal sights |
| Shershen-D PN-S combat module guidance devices |
| 1PBN86-VI Metis-M thermal sights |

| Commodity |
|---|
| Konkurs thermal sights |
| 1PN79-1 Kornet thermal sights |

### D.    Defendant's Conspiracy to Use and to Transfer Anti-Aircraft Missiles

Searches of defendant's digital devices and his email account yielded copious evidence that, between 2013 and 2015, defendant conspired to transfer and to use anti-aircraft missiles.  Based on that evidence, Count Three of the FSI charged defendant with violating 18 U.S.C. § 2332g.

The evidence at trial included numerous written communications reflecting defendant's conspiracy to use, buy, sell, and transfer many hundreds of anti-aircraft missiles, including highly sophisticated vehicle-borne systems capable of tracking and destroying an airplane hundreds of miles away; agile man-portable systems that were easily transferred and simple to use; and stationary missile systems capable of launching multiple warheads. It further included representative bank records showing a snapshot of the money that changed hands in defendant's various illegal arms and mercenary transactions.

In addition to defendant's efforts to transfer surface-to-air missiles, defendant also conspired to use surface-to-air missiles. Specifically, the evidence showed that defendant engaged in and profited from multiple transactions involving the provision of mercenary anti-aircraft missile specialists to shoot down airplanes over Libya.  That evidence included many of defendant's own communications on those transactions, and those documents were corroborated by the video-recorded testimony of three co-conspirators

involved in one such deal.  Specifically, the government offered the
recorded testimony of two anti-aircraft missile operators and a
fellow arms broker who participated in one of defendant's many
illegal deals and to whom defendant offered a $50,000 bonus if they
were successful in shooting down an airplane.

These specialists, who were desperate enough to risk their lives
fighting in a bloody civil war on another continent, received a
relative pittance for their services, while defendant pocketed
several times what the mercenaries themselves were promised.
(Compare Trial Exhibit 426 (defendant allocated $50,000 total for
three Quadrat surface-to-air missile specialists for Libya), with
Trial Exhibits 819-820 (defendant charged his Libyan customer
$185,000 for services of the same Quadrat surface-to-air missile
crew))  One of the Igla missile operators whose recorded testimony
was shown at trial, Zurab Partsakhashvili, testified that he needed
the money from this mercenary job to pay for his child's cancer
surgery.  Another missile operator, Gia Devidze, testified that he
needed the money to address his family's desperate financial
situation.  Both missile operators testified that they received only
a small portion of the money they were promised — which was itself a
meager fraction of the money that defendant and his fellow brokers
pocketed from the missile operators' risk and labor.  (See also Trial
Exhibits 819-20; Trial Exhibit 422 (as defendant and his co-
conspirator discuss the allocation of defendant's funds and where to

1  find an additional $9,000, the co-conspirator advised that they could

2  "deduct" it from the money paid to the missile operator))[10]

3  **III. GOVERNMENT'S SENTENCING POSITION AND RECOMMENDATION**

4      **A.  Sentencing Guidelines Calculations**

5          1.  The Applicable Guidelines

6      The applicable guidelines section for Counts 1 (Arms Export

7  Control Act) and 2 (Smuggling) of the Indictment and Counts 1

8  (Conspiracy) and 2 (Arms Export Control Act) of the First Superseding

9  Indictment is USSG 2M5.2.  The applicable guidelines section for

10  Counts 3 and 4 (Money Laundering) of the Indictment is USSG 2S1.1.

11  The applicable guidelines section for Count 3 (Conspiracy to Use and

12  to Transfer Missile Systems Designed to Destroy Aircraft) of the FSI

13  is USSG 2K2.1.

14      On April 1, 2019, defendant filed objections to the PSR,

15  including an objection to the grouping of the missile offense with

16  the other crimes.  The prosecution does not object to defendant's

17  request for the offenses not to group.  Should the Court follow

18  defendant's request not to group the offenses, the government submits

19  that the following Sentencing Guidelines should apply:

20  Group 1 (anti-aircraft missiles)

21  Base Offense Level        18        [USSG § 2K2.1(a)(5)]

22  Offense involving missiles   +15        [USSG § 2K2.1(b)(3)(A)]

23

24

---

25  [10] Other aggravating examples of defendant's underhanded and
deceitful business practices abound.  As another illustration of his
willingness to take advantage of the desperate mercenaries who were
26  risking their lives to line defendant's pockets, defendant
deliberately crafted his mercenary contracts to be governed by the
27  laws of Serbia — a country with no nexus to defendant, the work, or
the mercenaries — for the express reason that Serbian law made it
28  illegal to work as a mercenary, and thus no one would ever be able to
challenge the contract in court.  (See e.g. Exhibits 723, 728)

| More than 200 missiles | +10 | [USSG § 2K2.1(b)(1)(E)] |
|---|---|---|
| | — | |
| Total offense level | 43 | |

Group 2 (other arms trafficking offenses and money laundering)

| Base offense level | 26 | [USSG § 2M5.2(a)(1)] |
|---|---|---|
| Money laundering | +2 | [USSG § 2S1.1(b)(2)(B)] |
| | — | |
| Total offense level | 28 | |

### 2. Government's Response to Defendant's Objections to the PSR

On April 1, 2019, defendant filed objections to the PSR. The following are defendant's remaining objections[11] and the government's responses thereto.

### a. Objection to Paragraphs 13 through 26 of the PSR

Defendant objects that the part of the PSR describing defendant's Offense Conduct should be limited to the factual basis in his guilty plea to Counts One through Four of the Indictment and Counts One and Two of the FSI, because defendant maintains his innocence to Count Three of the FSI. This objection is meritless. Defendant's guilt on Count Three of the FSI was determined by a jury, and the USPO would have been delinquent in its duty to prepare a report to assist the Court at sentencing had it not specified all of the conduct for which defendant has been adjudged guilty. Moreover, the Court is not limited to the very narrow facts selected by defendant in his admissions of guilt to the first six counts, but must broadly consider the nature of the offense, the history and

---

[11] In addition, defendant raised other objections, which are discussed below.

characteristics of defendant, and other factors in determining an appropriate sentence.   See 18 U.S.C. § 3553(a).

> b.   *Objection to Paragraphs 38 through 59*

Defendant objects to the application of the 10-level increase under USSG 2K2.1(b)(1)(E) on the grounds that the offense involved "only two surface-to-air missiles" and he did not agree to sell, nor did he have available, 200 or more surface-to-air missiles.   The evidence admitted at trial disproved defendant's claim.

Citing to a communication in which defendant offered to sell 400 surface-to-air missiles which were "available for immediate shipment," the PSR accurately concludes that a ten-level increase is warranted because the offense involved 200 or more missiles.   Id. ¶ 44.   With respect to the number of anti-aircraft missiles involved in defendant's offense, the following additional evidence from trial is further illuminating:

- Exhibit 312: A list of weapons provided by defendant to a co-conspirator in October 2013 for transfer to defendant's customer in Erbil, Iraq, included "30 + 300" Igla 9K38 surface-to-air missiles.

- Exhibit 316: On July 3, 2014, defendant offered to sell 95 Igla surface-to-air missiles to a customer in Iraq at $88,300 each.

- Exhibit 318: On July 30, 2014, defendant offered to sell to the Ministry of Defence in Saudi Arabia 400 Strela surface-to-air missiles at $75,830 each and 95 Igla surface-to-air missiles at $77,375 each

- Exhibit 329: On December 23, 2014, defendant emailed with a co-conspirator about the transfer of 25 Osa surface-to-air missiles and one Pechora surface-to-air missile system to defendant's customer in Libya.

- Exhibits 334-344: These exhibits include defendant's January 2015 communications with co-conspirators involving an end-user certificate that reflects defendant's role as

29

the supplier of 50 Igla 9M313 surface-to-air missiles to a
militant faction in Libya, and an ultimate payment by
defendant relating to weapons listed on that end-user
certificate.

- Exhibit 346: This communication from defendant to a co-
  conspirator discussed the prospective sale of a variety of
  weapons and munitions including 500 Igla 9M342 surface-to-
  air missile systems, 1500 ground power units for Igla
  systems, and 20 launcher mechanisms for Igla systems.

- Exhibit 349: This communication from defendant to a co-
  conspirator identified a large volume of weapons and
  ammunition intended for use in an end-user certificate "for
  our agreed country," including "6 Anti-air Defence System
  with Missile".[12]

Accordingly, as found by the USPO, defendant's offense involved well
over 199 missiles, justifying the ten-level increase prescribed by
U.S.S.G. § 2K2.1(b)(1)(E).

### c. Objection to Paragraphs 60-61

Defendant objects to the facts reflecting his involvement in the
trade of black-market uranium and counterfeit currency on the ground
that no related evidence was presented at trial. The government
intends to offer evidence of these facts at the sentencing hearing,
including by the exhibits attached hereto and through the
foundational testimony of HSI Special Agent Matthew Peterson.

### B. The Court Should Impose a Sentence Including a Prison Term of More Than 25 Years Based on the Factors in 18 U.S.C. § 3553(a)

#### 1. Nature, Circumstances, and Severity of the Offenses

Missile systems designed to destroy aircraft, like those
defendant conspired to transfer and use, are governed by a separate

---

[12] For purposes of this summary, the government cites to unique
references to anti-aircraft missiles and does not include the many
instances in which the same or a similar list was circulated to
multiple parties.

1 statute with a 25-year mandatory minimum sentence because they are
2 extremely dangerous and devastatingly effective.  Some, like the
3 shoulder-fired versions included in defendant's portfolio, are highly
4 portable, easily smuggled across borders, relatively inexpensive,
5 easy to fire, effective at a range of altitudes, and readily
6 transferrable among militant groups who may use them against both
7 military and civilian targets to further their political or
8 ideological goals.  Even in the absence of the mandatory minimum
9 applicable in this case, a prison term of more than 25 years is
10 warranted.

11     At the sentencing hearing, if permitted by the Court, the
12 government intends to offer testimony from an expert in surface-to-
13 air missiles detailing the dangers that illegal proliferation of
14 these weapons presents to civilian aircraft, as well as to U.S.
15 military targets.  That testimony will include unclassified
16 information regarding historical uses of anti-aircraft missiles
17 against civilian targets, including commercial airliners.  As the
18 legislative history of 18 U.S.C. § 2332g shows, Congress expressly
19 recognized in enacting this statute that anti-aircraft missiles are a
20 serious threat to commercial aviation that carry the potential to
21 easily kill vast numbers of people.  See, e.g., 150 Cong. Rec.
22 S11939-01, 150 Cong. Rec. 150 Cong. Rec. S11939-01, 150 Cong. Rec.
23 S11939-01, S11997, 2004 WL 2812449 ("MANPADS are portable,
24 lightweight, surface-to-air missile systems designed to take down
25 aircraft.  Typically they are able to be carried and fired by a
26 single individual.  They are small and thus relatively easy to
27 conceal and smuggle.  A single attack could kill hundreds of persons
28 in the air and many more on the ground."); id. at S11998-99 ("A 2000

State Department report stated that 'one of the leading causes of loss of life in commercial aviation worldwide has been from MANPADS . . . attacks, with over 30 aircraft lost.'  According to a Congressional Research Service report issued last year, there have been at least 36 known missile attacks on commercial planes in the last 25 years; 35 of those incidents took place in war-torn areas, mainly in Africa.")

Details on many past incidents in which commercial airliners were targeted, often successfully, by anti-aircraft missiles are available on open-source media.[13]

Further compounding defendant's prolific activities relating to the transfer and use of anti-aircraft missiles, his conduct is also aggravated by the sheer volume of other weapons and ammunition in which defendant trafficked over the years.  Beyond anti-aircraft missiles, defendant's trade included bulk quantities of anti-tank missiles, rockets, mortars, grenades, and the launchers therefor; machine guns of various sizes; sniper rifles, assault rifles, pistols, and other small arms; night-vision equipment and other sensitive military technology; attack aircraft; tanks, radar systems; mercenary fighters; and many millions of rounds of ammunition.  The

---

[13] See, e.g.,
https://www.washingtonpost.com/posteverything/wp/2014/07/18/missiles-are-now-so-advanced-that-its-amazing-more-planes-havent-been-shot-down/?utm_term=.e14a9b1e3b88 (last accessed May 5, 2019) (attached as Exhibit 1100); https://nypost.com/2014/07/23/missiles-threaten-civilian-planes-all-over-the-world/ (last accessed May 5, 2019) (attached as Exhibit 1101);
https://www.nytimes.com/2018/05/24/world/europe/russia-malaysia-airlines-ukraine-missile.html; http://time.com/3002171/malaysia-airlines-ukraine-crash-airliners-shot-down/ (last accessed May 5, 2019 (attached as Exhibit 1102);
https://en.wikipedia.org/wiki/List_of_airliner_shootdown_incidents (last accessed May 5, 2019 (attached as Exhibit 1103).

1   sheer scope and volume of these brokering activities underscores
2   defendant's own professed willingness to sell anything, anywhere, to
3   anyone.

4       This is not a regulatory offense.  Defendant did not merely
5   neglect to register as an arms broker or as a missile salesman.  U.S.
6   law regulates the brokering and transfer of weapons by U.S. citizens
7   even overseas because those transfers threaten U.S. and allied forces
8   abroad, upset the balance of strategic alliances, and otherwise
9   compromise U.S. national interests.  Moreover, U.S. law implements
10  the nation's international commitments, including, as is specifically
11  applicable in this case, the nation's commitment to enforce a United
12  Nation's arms embargo on Libya during the bloodiest days of that
13  country's ongoing civil war.  It is not the prerogative of private
14  citizens to decide which governments and militant factions around the
15  world to arm with missiles and tanks and machine guns and fighter
16  jets.  Defendant knew that his black-market weapons business was
17  illegal, which explains his regular practice of using cover
18  documentation to mask the true nature of the illicit weapons in which
19  he dealt.

20          2.   History and Characteristics of the Defendant

21               a.   Defendant's Motive of Greed and Wanton Disregard
                      for Human Life
22

23      Unlike some missile-trafficking defendants charged in other
24  cases who were motivated by ideology, defendant is a true mercenary.
25  As is abundantly clear from the global breadth of his vast market,
26  and as he stated in his own words, his motive for trafficking in
27  massive quantities of devastating weapons and ammunition across the
28  globe was simple greed.

In recorded conversations with the undercover agent, defendant displayed a chilling indifference to the heavy human cost of the arms-trafficking business that lined his pockets. The night before his arrest, defendant explained that he engaged in willful blindness about where the deadly weapons from which he profited were used, and against whom. (Exhibit 1104 at 50-52) Defendant noted that he did not want to knowingly be a part of killing civilians — or at least of "Arab refugees" — but with the notable caveat that if he sold weapons to Saudi Arabia and Saudi Arabia then transshipped his weapons for use in armed conflicts in Yemen and Syria that involved heavy civilian casualties, "that's their business." Id. As defendant summarized it, "That's my rules on Saudi Arabia." Id.[14] Defendant chose to operate by those "rules" when selling and brokering countless machine guns and mortars and automatic rifles across the globe. That defendant equally applied these "rules" to weapons as dangerous to civilian targets and as coveted by terrorist groups as man-portable anti-aircraft missile systems is additional aggravating evidence justifying a strong sentence.

On the morning of his arrest, defendant described an enthusiasm for war that doubtless was not shared by those bearing the bloody brunt of his illegal weapons proliferation in war-torn corners of the world. In the hours before his arrest, defendant had this to say:

> I wake up every day in the morning. First two things I do at the same time, coffee, the cigarette is ready. I go to the TV and press on the news. I go on news. If there is peace I go [to sleep], if there is war I wake up. I'm happy. There is more business for me. It doesn't matter where is the business, where is the war. Even if it's in

---

[14] At the sentencing hearing, the government intends to play the recording of these and other statements by defendant referenced herein. For each, the transcript is attached hereto for the Court's convenience.

Haiti I will fly there.  I love war because it's business, you know.

(Exhibit 1105.)

     *b. Defendant's Relevant Conduct*

       (A) Defendant's Pursuit of Black-Market Uranium

During the course of defendant's charged arms-trafficking activities, he was also involved in the trade of black-market uranium, a critical component in the development of nuclear weapons and dirty bombs.  In a text exchange beginning on June 4, 2015, defendant engaged in the following conversation:

| | |
|---|---|
| Jayjay: | Will you be interested in uranat in Niger<br><br>. . . I mean uranium. |
| Defendant: | Yes but the French are controlling it in Niger and I have somebody from China. |
| Jayjay: | This from black market. It will be suplied outside Niger. The people are here in Benin. It is very serious. Think about . . . . The people doing are also from Niger. They are very powerfull |
| Defendant: | I don't understand are you selling the uranium or are you offering the mining opportunity |
| Jayjay: | It is selling business in the black not officially.  But the minister of mines is involved, top secret. |
| Defendant: | How much per M/Ton[15] |
| Jayjay: | I do not know yet since I did not know whether you might be interested. Now that you make me know, i will find out and come back to you. |
| Defendant: | Soon while i am in China |
| Jayjay: | OK sir |

---

[15] The term "M/Ton" appears to refer to "metric tonne," a unit commonly used to measure a quantity of uranium.

1          . . .

2      Defendant:     Any news about uranium?

3  (Exhibit 1106)  Moreover, defendant's known interest in the black-

4  market trade of uranium dates back to 2012, when he sent a message to

5  a co-conspirator reporting that "900 g of Uranium the free army of

6  Syria trying to move it in exchange for arms."  (Exhibit 1107)

7      Defendant's pursuit of black-market uranium is deeply troubling.

8  According to one notable nuclear expert: "There's no plausible reason

9  for looking for black-market uranium other than for nuclear weapons—

10 or profit, by selling to people who are looking to make nuclear

11 weapons."

12 https://www.usatoday.com/story/news/world/2012/12/10/georgia-nuke-

13 investigations/1757963/ (last accessed May 5, 2019) (attached as

14 Exhibit 1108).  This related conduct exemplifies defendant's own

15 professed lack of regard for the potentially catastrophic

16 consequences of his illegal weapons-proliferation activities, and his

17 acknowledged interest in profit at the expense of human life and

18 safety.  It serves as a particularly strong aggravating factor in

19 this case.

20                    (B)   Defendant's Counterfeit Currency Operations

21     Possibly to fuel his illegal weapons-trafficking business, or

22 perhaps as another means to obtain easy illicit profits, the evidence

23 suggests that defendant engaged in lucrative counterfeit currency

24 operations during the time of the charged conduct.  In the spring of

25 2014, defendant gave one of his business partners his detailed,

26 seasoned advice on the mechanics of counterfeiting:

27     (Co-Conspirator):   I have a Buyer that is interested to
                           buy USD and old Deutsch Marks that are still
28                         on the full sheets of paper, not cut. . . .

|  | This full sheets of USD had been delivered to Iran, Irak (sic) long time ago and still not used.  But, my opinion is, if you ask the right powerful people in these countries, they will tell you a lot more about where to find them. |
|---|---|
| Defendant: | your friend is looking for the papers which he can change it to Euro & Dollars |
| (Co-Conspirator): | Uncut sheets of USD, nominal can be $20, $50, $100 |
| Defendant: | It's a white pepper[16] money note each one is the same size of the 500 Euro other ones same size of the 100 Euro also we have the one for the 100 USD, if you look at it through the light you will be able to see the serial number like a shadow . . . . you add chemicals to it and you use original money to copy the exact shape each 1 (500 Euro makes 2 more of the white one) |

(Exhibit 1109)

Multiple photographs obtained from court-authorized searches of defendant's digital devices depict bulk quantities of $100 bills, €200 notes, and €500 notes.   (Exhibits 1110-1114)

> (C)   Defendant's Pursuit of a Counterfeit
>         Passport

For several months in 2015, during the offense conduct and shortly before his arrest, defendant acquired a sophisticated counterfeit Ukrainian travel document using a false name, false date of birth, a false marriage, and false parentage in order to conceal and facilitate his illegal conduct and obscure his true identity. Moreover, defendant separately explored the possibility of obtaining, for $20,000, a biometrically enabled passport.  The evidence includes documents reflecting the following:

---

[16] This presumably refers to "white paper."  All quotations from exhibits are verbatim, including spelling and typographical errors.

37

- Exhibit 1115: On July 2, 2015, defendant and his business partner Sergiu Banari (referenced in the First Superseding Indictment ("FSI") as Unidentified Co-Conspirator #3) engaged in a text exchange in which Banari provided the following verbatim price list for defendant's fraudulent document:

  > Only international - 12,000$
  > Only international biometric 13500$
  > Full complect your name: international + local = - 15000$
  > Full complect new name. = 20000$

- Exhibit 1116: Shortly thereafter, Banari reported to defendant the "best news in the world" that defendant "will have your new P…" by the end of August, and advised defendant to "choose your name, or if you want I can do it."

- Exhibit 1117: On July 3, 2015, Banari advised defendant by email that defendant's fictitious identity would include the false name "Roman Tarasovici Boico," a made-up mother's name "Hristina Nicolaevna Kostiuc," and a made-up father's name "Taras Vasilievic Boico." Defendant replied that he would "have to go back to school to remember those names."

- Exhibit 1118: On July 4, 2015, Banari told defendant that his Ukrainian contacts recommended that defendant choose a fictitious Arabic name, and manufacture a fictitious Ukrainian marriage, to account for defendant's inability to speak the native language. Defendant replied with a "thumbs up" emoji and told Banari that defendant sent the names to him.

- Exhibit 1119: That day, defendant sent Banari an email with the subject header "Name." The text indicated the name defendant had chosen for his fraudulent travel document as "Rony Youssef Karam." It further indicated false names for defendant's mother and father and a false date of birth.

- Exhibits 1120-21: On September 10, 2015, Banari texted defendant asking him to send a "very simple signature according to the name we choose: Rony Youssef Karam." Defendant replied with photographs of several different handwritten signatures reflecting his fictitious name. The same day, defendant also sent Banari an email entitled "Hello from Roney" with an attachment of one of his signatures using the false name.

38

- Exhibit 1122: On October 25, 2015, Banari sent defendant an email forwarding defendant's fraudulent certificate of marriage and fraudulent certificate to receive internal passport.

- Exhibit 1123: On October 27, 2015, Banari sent defendant a scanned copy of defendant's new false Ukrainian travel document bearing defendant's photograph and the fictitious name and date of birth that defendant selected.

Defendant's willingness to go to substantial lengths to obtain this fraudulent travel document in order to facilitate and conceal his criminal activity further aggravates that criminality.

(D)   Defendant's Involvement in Other Illegal Activity

Defendant's fortune-seeking also led him to pursue deals involving other illegal commodities, including looted antiquities, which draw can massive profits on the black market.  Defendant's digital devices contained multiple photographs of apparent antiquities, including a photo of defendant holding an artifact next to a dated newspaper — a common practice for establishing proof of possession on a particular date.  (Exhibit 1124).  Antiquities looting is frequently concentrated in areas of armed conflict, and the black-market traffic in cultural artifacts is often closely linked to financing those conflicts and arming combatants.  See, e.g., Fabiani, Michelle D., "Disentangling Strategic and Opportunistic Looting: The Relationship between Antiquities Looting and Armed Conflict in Egypt," MDPI, June 14, 2018, last accessed February 12, 2019, https://www.mdpi.com/2076-0752/7/2/22/pdf (attached as Exhibit 1125); see also Pineda, Sam, "Tackling Illicit Trafficking of Antiquities and its Ties to Terrorist Financing," Dipnote, U.S. Department of State Official Blog, June 20, 2018, last

39

1   accessed February 12, 2019,

2   https://blogs.state.gov/stories/2018/06/20/en/tackling-illicit-

3   trafficking-antiquities-and-its-ties-terrorist-financing (attached as

4   Exhibit 1126).

5       Evidence from defendant's digital devices and email account also

6   demonstrates his involvement in the black-market trafficking of

7   diamonds and his use of diamonds to mask and fund illegal arms

8   transactions.  This evidence includes a September 29, 2015 email to

9   defendant from a South Africa entity known as AA Diamonds attaching a

10  quote for sniper rifles, pistols, silencers, and ammunition.

11  (Exhibit 863)  The following day, on September 30, 2015, defendant

12  received another email from AA Diamonds with specifications for four

13  MI-24V helicopter gunships, fully armed with GSH-23L aircraft guns,

14  machine guns, submachine guns, pistols with silencers, and other

15  armaments.  (Exhibit 864.)  On October 9, 2015, defendant forwarded

16  to his business partner an invoice from AA Diamonds purportedly

17  reflecting the purchase of a 4.7-carat polished diamond for $200,000,

18  and a November 5 email to defendant from his business partner

19  contains a SWIFT record of the transfer of $20,000 from their company

20  to AA Diamonds as a down payment on that invoice.  (Exhibits 865-66.)

21  On October 10, 2015, in a call with the undercover agent, defendant

22  confirmed that he was involved in laundering diamonds from South

23  Africa for arms, saying that "I can change diamonds to dollars."

24  (Exhibit 1127)  Defendant's involvement in these illegal activities

25  is further corroborated by a photograph stored on defendant's digital

26  devices depicting a very large, uncut diamond.  (Exhibits 1128-1130)

27  Black market diamonds are another lucrative commodity closely linked

28  to the fueling and financing of armed conflicts and the illegal

1   proliferation of weapons and munitions.  See, e.g., "The Role of
2   Diamonds in Fuelling Conflict," United Nations General Assembly
3   A/71/L.55, January 27, 2017, last accessed February 12, 2019,
4   https://digitallibrary.un.org/record/858195/files/A 71 L-55-EN.pdf
5   (attached as Exhibit 1131).

6                  c.   Defendant's False Statements to USPO

7        Even in the wake of his strategic eleventh-hour guilty pleas and
8   his conviction at trial, defendant seeks to minimize his illegal
9   arms-trafficking activities.  Notwithstanding the reams of evidence
10  of defendant's deep involvement in the illegal brokering and
11  trafficking of weapons over the course of many years, defendant
12  reported to the USPO that "he has never seen or touched any military
13  equipment, including an AK-47," and claimed that his access to
14  weapons was so curtailed that he was limited to learning about them
15  through online research.  Defendant's statements are belied by the
16  reams of evidence at trial and further referenced in the attached
17  exhibit, which includes defendant's detailed discussions and
18  negotiations relating to hundreds of weapons systems and other
19  military articles and services.  His statements to the USPO are also
20  visually belied by two photographs, obtained from defendant's digital
21  devices, in which defendant is pictured in a store-like setting,
22  standing directly in front of a display of numerous assault rifles,
23  holding a large-caliber ammunition round, and pretending to smoke the
24  round like a cigar.  (Exhibits 1132-1133)

25             3.   Avoidance of Sentencing Disparities

26       In every one of the handful of cases resulting in a conviction
27  under 18 U.S.C. § 2332g of which the government is aware, the
28  defendant has received a sentence of at least 25 years.  See United

States v. Hammadi, 737 F.3d 1043, 1046 (6th Cir. 2013) (life
imprisonment on 2332g count); United States v. Bout, 731 F.3d 233,
236-37 (2d Cir. 2013) (25 years on 2332g count); United States v.
Cromitie, 727 F.3d 194, 204 (2d Cir. 2013) (25 years for each of four
defendants (Cromitie, D. Williams, O. Williams, and Payen)); United
States v. Al-Kassar, 660 F.3d 108, 117 (2d Cir. 2011) (30 years for
one defendant (Al-Kassar); 25 years each for two other defendants
(Al-Ghazi and Moreno-Godoy)); United States v. Garavito-Garcia, 2015
WL 13708830, *2 (S.D.N.Y. 2015) (25 years); United States v. Pouryan,
628 Fed.Appx. 18, 20 (2d Cir. 2015) (unreported decision) (25 years
for each of two defendants (Pouryan and Orbach)); United States v.
Chen, 526 Fed.Appx. 772, 775 (9th Cir. 2013) (unreported decision)
(25 years).  Even absent the 25-year mandatory minimum now required
under 18 U.S.C. § 2332g, at least one court has upheld a sentence
much longer than 25 years for conspiring to traffic anti-aircraft
missiles before that statute was enacted.  See United States v.
Lakhani, 480 F.3d 171, 185 (3rd Cir. 2007) (affirming 47-year
sentence for 71-year old defendant who had a 19-year history of
productive assistance to U.S. law enforcement).  The government is
unaware of any of these courts, or any court anywhere, having
expressed reluctance or discomfort with the propriety of a sentence
of 25 years or longer for a defendant convicted of trafficking in and
use of anti-aircraft missiles under 18 U.S.C. § 2332g.

Even without regard to the applicable mandatory minimum, a
sentence of more than 25 years is warranted in this case.  The sheer
volume of anti-aircraft missiles that defendant sought to transfer to
militants operating in the shadows of unstable parts of the world
alone justifies this conclusion. (Compare, e.g., Trial Exhibit 318,

in which defendant offered 400 Strela anti-aircraft missiles and 95
Igla anti-aircraft missiles from his existing stock to various
entities in multiple countries; Trial Exhibit 312, in which defendant
conspired to transfer "30 + 300" Igla surface-to-air missiles to
Erbil, Iraq; and Trial Exhibits 334-343, in which defendant conspired
to transfer 50 Igla surface-to-air missiles to the Libya Dawn
militant faction; with Hammadi, wherein the defendant was convicted
of attempting to transfer two shoulder-fired surface-to-air missiles
and sentenced to life imprisonment.)

Moreover, unlike in any other 2332g case of which the
prosecution team is aware, the evidence suggests that at least one of
defendant's anti-aircraft missile deals came to fruition.   Trial
Exhibits 334-342 detailed the creation of a Libya Dawn end-user
certificate for munitions including 50 Igla surface-to-air missiles.
Trial Exhibits 343 and 344 indicated that defendant's co-conspirator,
David Shikhashvili (who continued to do business with defendant after
this deal), sent defendant an invoice related to this end-user
certificate.

The types of missiles with which defendant operated is further
aggravating.  As established at trial, the highly sophisticated
Russian vehicle-borne S-400 system, which can hunt down and destroy
an airplane hundreds of miles away and sells for billions of dollars,
is tightly controlled by the Russian government and monitored by U.S.
authorities because it can change the balance of power in a region,
threaten existing government systems, and alter foreign policy.   The
protracted efforts by defendant, a private U.S. citizen, to broker
the sale of this highly consequential system to a government in the
Middle East without regard to the impact on U.S. national interests,

alliances, diplomacy, and foreign policy renders his conduct even more serious than the statute and the guidelines reflect.  Moreover, defendant did not stop at merely proliferating these weapons; he conspired to use them to alter the balance of a foreign war.

### C.   The Court Should Impose a Fine of $300,000 After Defendant's Attorneys Have Been Fairly Compensated for Their Services

Based on defendant's representations to USPO, defendant has the ability to pay a fine of $300,000 within 90 days of sentencing.  PSR ¶ 99.  According to the PSR, defendant's brother sold a piece of land for $300,000 to pay for defendant's expenses, including the fees of his retained attorneys.  Id. ¶ 97.  The government respectfully submits that a fine of $300,000 should be imposed.  Should defendant produce to the Court evidence (including bank records, receipts, and itemized billing records) satisfactorily demonstrating that payment to his attorneys has depleted the $300,000 fund described in the PSR, the fine should be adjusted accordingly to reflect defendant's diminished ability to pay it.

## IV.  GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING POSITION

Defendant's sentencing position attempts to paint him as an incompetent bumbler who tried to make it in the illegal arms business but was simply unable to close a deal.  See Def. Sentencing Memorandum at 11-12 ("for over five years, Ghanem solicited others for the sale of surface-to-air missiles without being able to consummate one deal during this time"; "Ghanem has proven to be a poor negotiator and facilitator of these types of deals").  As described above, defendant signed and executed a formal contract to broker a quarter billion dollars in arms and ammunition, along with other high-volume contracts and agreements.  He and his companies are

44

named on end-user certificates and official offers as the supplier of massive quantities of munitions.  His marketing materials repeatedly offered to provide his substantial customer base with a limitless array of weapons, ammunition, and mercenary services.  His email communications reflect a nearly constant flow of communications with fellow black-market arms brokers over the years, negotiating quantities and models and calibers and prices, and arranging for the logistics of transport and concealment of the illegal loads. Defendant's claim of incompetence and lack of follow-through is not credible.  In the high stakes world of black-market arms trafficking, had defendant failed to deliver on his offers and promises as reflected in the evidence, his suppliers and customers and fellow brokers would have (at best) ceased to do business with him.  They did not; the evidence illuminates that defendant conducted many deals through the years with the same parties.

Defendant also requests credit for his purported good works, including rescuing two U.S. business men who were arrested by the Libyan militant faction that defendant supported.  Defendant reports that he valiantly worked his contacts there to "save[] their lives." In a darkly ironic twist, defendant estimates that the same Libya Dawn faction that he supported with vast quantities of arms and ammunition and mercenary services would have otherwise killed these innocent American hostages.  For this, he now demands credit for his humanitarian efforts.

Defendant's self-proclaimed "goodwill" in working with his Libyan contacts to free these two men from their ruthless captors is decidedly less noble when viewed in tandem with a similar episode in which his influence was sought to secure the release of hostages in

Libya. In late 2015, two Serbian diplomats were taken hostage by ISIS[17] in Libya after their diplomatic convoy, which included the Serbian ambassador, was ambushed. See https://www.nytimes.com/2016/02/21/world/middleeast/serbian-hostages-killed-in-us-airstrikes-against-isis-in-libya.html (last accessed May 5, 2019) (attached as Exhibit 1134). On November 25, 2015, in the course of negotiations about an ongoing arms deal, defendant's Serbian business contact asked for defendant's help in securing the release of the hostages. (Exhibit 609.) After urging the Serbian arms broker to "finish this deal ASAP" to satisfy defendant's customer, defendant agreed that he could help secure the release of these hostages from ISIS — but only for the right price. Id. (Defendant: "For the 2 hostages in Libya for sure I can help, what's in it for me?"). A few months later, these hostages were killed in an airstrike on an ISIS training camp. https://www.theguardian.com/world/2016/feb/20/us-airstrikes-libya-serbian-embassy-staffers-killed (last accessed May 5, 2019) (attached as Exhibit 1135).

**V. CONCLUSION**

For the foregoing reasons, the government respectfully submits that an appropriate sentence for defendant in this case is a term of imprisonment of more than 25 years, five years of supervised release, a fine of $300,000, and a $700 mandatory assessment.

---

[17] ISIS, or the Islamic State of Iraq and al Sham, is designated by the U.S. Department of State as a foreign terrorist organization.