TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MELISSA MILLS (Cal. Bar No. 248529)
Assistant United States Attorney
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-0627
    Facsimile:  (213) 894-2927
    Email:  Melissa.Mills@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 15-704-FLA |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION; DECLARATION OF MELISSA MILLS; EXHIBITS 2022-1 THROUGH 2022-14 |
| v. | |
| RAMI NAJM ASAD GHANEM, aka "Rami Ghanem," | Hearing Date: April 29, 2022 Hearing Time: 10:30 a.m. Location:    Courtroom of the Hon. Fernando L. Aenlle-Rocha |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorney Melissa Mills, hereby

files its Sentencing Position.

    This Sentencing Position is based upon the attached sentencing

memorandum; the supporting declaration of Melissa Mills and the

exhibits thereto; the government's prior sentencing memoranda and the

exhibits thereto; the government's trial exhibits, testimony, and

other evidence introduced at trial; the files and records in this

case; the Pre-Sentence Investigation Report; the U.S. Probation

1   Office's disclosed recommendation letter, and such further evidence

2   and argument as the Court may permit.

3   Dated: April 15, 2022              Respectfully submitted,

4                                      TRACY L. WILKISON
                                       United States Attorney
5
                                       SCOTT M. GARRINGER
6                                      Assistant United States Attorney
                                       Chief, Criminal Division
7

8
                                       _____
9                                      MELISSA MILLS
                                       Assistant United States Attorney
10
                                       Attorneys for Plaintiff
11                                     UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2  DESCRIPTION                                                    PAGE

3  TABLE OF AUTHORITIES..............................................iv

4  MEMORANDUM OF POINTS AND AUTHORITIES...............................1

5  I.   INTRODUCTION..................................................1

6  II.  PROCEDURAL HISTORY............................................3

7  III. FACTUAL BACKGROUND............................................6

8       A.   Defendant's Initial Contacts with HSI...................6

9       B.   First Meeting with the UCA..............................8

10      C.   Discussions after the First Meeting....................10

11      D.   Second Meeting with the UCA............................11

12      E.   Defendant's Order with the UCA.........................12

13           1.   Negotiations and Order Placement..................12

14           2.   Payments and Shipment.............................15

15      F.   Defendant's Arrest by the Hellenic National Police and
             the Seizure of His Digital Devices.....................16
16
        G.   Defendant's Prolific Unlawful Arms Trafficking
17           Activities Unrelated to the Undercover Transaction.....16

18           1.   Negotiations, Offers, Contracts, and Other
                  Documents Offering a Snapshot of Defendant's
19                High-Volume, High-Dollar Illegal Arms Business....18

20                a.   Defendant's Negotiation and Execution of a
                       Contract to Purchase a Quarter Billion
21                     Dollars in Arms and Ammunition...............19

22                b.   Defendant's Signed Contract to Broker
                       Hundreds of Rocket-Propelled Grenade
23                     Launchers and Related Munitions to Egypt.....22

24                c.   Defendant's Shipment of Ammunition to Libya
                       Using a Fraudulent Malawian End-User
25                     Certificate..................................24

26                d.   Representative Examples of Defendant's Other
                       Illegal Arms Transactions....................25
27
                       (A)  Defendant's Brokering of Various Arms
28                          and Ammunition to Libya.................25

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                          PAGE

        (B)  Defendant's Brokering of M240 Machine Guns to Egyptian Military.................25

        (C)  Defendant's Brokering of 1,400,000 Rounds of Assault-Rifle Ammunition to the Egyptian Military.....................26

    e.  Defendant's Offers and Negotiations to Buy and Sell Multi-Million Dollar Combat Aircraft.......................................27

  2.  Financial Records Reflecting Some of the Profits Defendant Gained From the Crimes of Conviction......28

H.  Defendant's Conspiracy to Use and to Transfer Anti-Aircraft Missiles......................................36

  1.  Conspiracy to Use Anti-Aircraft Missiles...........37

  2.  Conspiracy to Transfer Anti-Aircraft Missiles.......41

I.  Defendant's Other Relevant Conduct.....................49

  1.  Defendant's Pursuit of Black-Market Uranium........49

    (A)  Defendant's Counterfeit Currency Operations...............................52

  2.  Defendant's Pursuit of a Counterfeit Passport.......53

  3.  Defendant's Involvement in Other Illegal Activity...54

  4.  Defendant's False Statements to USPO................56

IV.  GOVERNMENT'S SENTENCING POSITION AND RECOMMENDATION..........57

A.  Sentencing Guidelines Calculations.....................57

  1.  The Applicable Guidelines..........................57

B.  Response to Defendant's Objections to PSR..............58

  1.  The PSR Correctly Declined to Apply a Reduction For Acceptance of Responsibility...................58

  2.  The PSR Appropriately Applied the Guidelines, and USPO's Recommended Upward Departure Is Justified....61

    a.  The USPO Correctly Recommended a Substantial Upward Departure in Accordance With the Sentencing Guidelines..........................61

ii

**TABLE OF CONTENTS (CONTINUED)**

<u>DESCRIPTION</u>                                                                                    <u>PAGE</u>

        b.   The USPO's Recommended Upward Departure Is Fully Consistent With the Constitution.........66

        c.   Defendant Is Not Entitled To Sentencing Leniency On the Basis of Alleged Lack of Evidence of Completion of His Arms Transactions...................................68

        d.   The USPO Correctly Considered Defendant's Extraterritorial Violation of U.S. Laws As Relevant Conduct..............................70

  C.   The Court Should Impose a Sentence Including a Prison Term of 30 Years Based on the Factors in 18 U.S.C. § 3553(a)...........................................71

    1.   Nature, Circumstances, and Severity of the Offenses...................................71

    2.   History and Characteristics of the Defendant........75

        a.   Defendant's Motive of Greed and Wanton Disregard for Human Life.......................75

        b.   Other Characteristics.........................77

    3.   Avoidance of Sentencing Disparities.................77

    4.   Other 3553(a) Factors..............................80

V.   CONCLUSION................................................80

1

<strong><u>TABLE OF AUTHORITIES</u></strong>

2

<u>DESCRIPTION</u> <span style="float:right"><u>PAGE</u></span>

3

Cases

4

5

<u>Jones v. United States</u>,
  135 S.Ct. 8 (2014) ......................................... 66, 73

6

7

<u>United States v. Al-Kassar</u>,
  660 F.3d 108 (2d Cir. 2011) ................................... 78

8

<u>United States v. Booker</u>,
  543 U.S. 220 (2005) ......................................... 61

9

10

<u>United States v. Bout</u>,
  731 F.3d 233 (2d Cir. 2013) ................................... 77

11

<u>United States v. Carter</u>,
  560 F.3d 1107 (9th Cir. 2009) ................................. 77

12

13

<u>United Stats v. Chao Fan Xu</u>,
  706 F.3d 965 (9th Cir. 2013).................................. 70

14

15

<u>United States v. Chen</u>,
  526 Fed.Appx. 772 (9th Cir. 2013) ............................ 78

16

<u>United States v. Cole</u>,
  357 F.3d 780 (8th Cir. 2004) ...................... 70, 72, 76, 77

17

18

<u>United States v. Cromitie</u>,
  727 F.3d 194 (2d Cir. 2013) ................................... 77

19

20

<u>United States v. Garavito-Garcia</u>,
  2015 WL 13708830 (S.D.N.Y. 2015) ............................. 78

21

<u>United States v. Garrido</u>,
  596 F.3d 613 (9th Cir. 2010) ................................. 59

22

23

<u>United States v. Ghanem</u>,
  993 F.3d 1113 (9th Cir. 2021) ............................ 37, 68

24

25

<u>United States v. Green</u>,
  940 F.3d 1038 (9th Cir. 2019) ................................ 60

26

27

<u>United States v. Grissom</u>,
  525 F.3d 691 (9th Cir. 2008) ............................ 67, 68

28

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

United States v. Hammadi,
   737 F.3d 1043 (6th Cir. 2013) ................................... 77

United States v. Johnson,
   952 F.2d 565 ......................................... 64, 65, 66

United States v. Lakhani,
   480 F.3d 171 (3rd Cir. 2007) ................................... 78

United States v. Nordby,
   225 F.3d 1053 (9th Cir. 2000) .................................. 59

United States v. Pedrioli,
   978 F.2d 457 (9th Cir. 1992) ............................... 62, 63

United States v. Pouryan,
   628 Fed.Appx. 18 (2d Cir. 2015) ............................... 78

United States v. Rosales,
   917 F.2d 1220 (9th Cir. 1990) .................................. 59

United States v. Rudy Yujen Tsai,
   954 F.2d 155 (3rd Cir. 1991).............................. 63, 64

United States v. Watts,
   519 U.S. 148 (1997) ........................................ 67, 68

United States v. Wills,
   881 F.2d 823 (9th Cir. 1989) ............................... 61, 62


Statutes

18 U.S.C. § 371.................................................. 4

18 U.S.C. § 554.................................................. 3

18 U.S.C. § 1956................................................ 58

18 U.S.C. § 1956(a)(2)(A)........................................ 3

18 U.S.C. § 2332g....................................... 4, 37, 72, 78

18 U.S.C. § 3553(a)........................................... v, 71

18 U.S.C. § 3553(a)(2).......................................... 80

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                    <u>PAGE</u>

18 U.S.C. § 3584(b)............................................... 61

18 U.S.C. § 3661................................................. 66

22 U.S.C. § 2778............................................... 3, 4

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

**I.    INTRODUCTION**

3      Defendant made his living as an arms dealer at the highest

4  levels of the international black market, trading in virtually every

5  conventional weapon of war used in armed conflict today, and

6  simultaneously dabbling in black-market uranium, a critical component

7  of nuclear and biological weapons.  For years, defendant bought,

8  sold, and brokered the sale of millions of rounds of ammunition, each

9  of which had the potential and the purpose to end a human life.  The

10  machine guns, assault rifles, rockets, mortars, rocket-propelled

11  grenades, and anti-tank weapons that were also his stock and trade

12  had virtually limitless potential to sow death and destruction both

13  on and off the battlefield, particularly when coupled with the

14  unending stream of ammunition that defendant marketed to feed those

15  weapons.  Defendant offered his wares to customers located in many

16  war-torn corners of the world, and he had no qualms about selling

17  weapons to Hezbollah, a designated foreign terrorist organization.

18      Defendant was undoubtedly aware that the machinery of death in

19  which he trafficked had the power and the purpose to shatter (and may

20  indeed have shattered) countless lives, including civilian lives.

21  Indeed, defendant was cavalier about those lives and his role in

22  endangering them for his own financial benefit, and he coolly

23  admitted that he was wholly indifferent to the possibility that his

24  weapons and ammunition would be used against refugees and other

25  civilians.  The night before his arrest, defendant confided to an

26  undercover agent that while he did not want to *knowingly* have a role

27  in killing refugees, if he sold weapons to Saudi Arabia that were

28  then used to kill, for instance, refugees in Yemen or Syria, "that's

their business." Exhibit 1104. Defendant's callous disregard for human life in pursuit of riches is particularly aggravating.

In the course of his business buying, selling, and brokering instruments of death all over the globe over the course of years, defendant also conspired to use and to transfer anti-aircraft missiles. Notably, the evidence at trial established that a principal object of that conspiracy was accomplished: mercenary missile operators stood guard with those anti-aircraft missiles at an airport outside Misrata, Libya, incentivized by defendant's offer of a $50,000 bounty if they successfully shot down an airplane operated by the democratically elected and internationally recognized government of Libya. The presence of those missiles and their operators in Libya imperiled not only those aircraft and pilots, but the delicate balance of United States national security and foreign policy in North Africa and the Middle East.

In addition to his conspiracy to use shoulder-fired anti-aircraft missiles against Libyan government aircraft, defendant also sought to enrich himself by selling many hundreds of anti-aircraft missiles of all kinds to militant factions and governments around the world. Defendant's proliferation of these weapons on the global black market jeopardized civilians, U.S. military forces, allied forces, civilian air traffic, U.S. diplomacy and foreign policy, and other national security interests.

On the morning of his arrest, defendant described an enthusiasm for war that doubtless was not shared by those bearing the bloody brunt of his illegal weapons proliferation in war-torn corners of the world. In the hours before he was arrested on the first four charges, defendant had this to say:

2

> I wake up every day in the morning.  First two things I do
> at the same time, coffee, the cigarette is ready.  I go to
> the TV and press on the news.  I go on news.  If there is
> peace I go [defendant pantomimed going to sleep], if there
> is war, I wake up.  I'm happy.  There is more business for
> me.  It doesn't matter where is the business, where is the
> war.  Even if it's in Haiti, I will fly there.  I love war
> because it's business, you know.

Exhibit 1105.

The Ninth Circuit's vacatur of one count of conviction for an erroneous jury instruction on extraterritorial venue does not change either defendant's conduct or the appropriate sentence.  Indeed, nothing has changed to warrant a sentence different from the one imposed by the judge who presided over this case for three years, including the presentation of evidence at trial; who carefully reviewed all sentencing briefs, testimony, exhibits, and factors; and who found that even the 25-year mandatory minimum sentence was insufficient to account for the gravity of defendant's offense conduct.  The interests of justice compel the same sentence for the same conduct by the same defendant, which was proven beyond a reasonable doubt.  Pursuant to USSG 1B1.3, which provides that defendant must be held accountable for all his relevant criminal conduct, and the 3553(a) sentencing factors, a sentence of 30 years remains appropriate.

## II.  PROCEDURAL HISTORY

On December 22, 2015, defendant was charged in a four-count indictment (the "original Indictment") with violations of 22 U.S.C. § 2778 (Arms Export Control Act), 18 U.S.C. § 554 (Smuggling), and 18 U.S.C. § 1956(a)(2)(A) (Money Laundering), which arose from his efforts to purchase arms illegally from a Homeland Security Investigations ("HSI") undercover agent (the "UCA").

1      A superseding indictment (the "First Superseding Indictment" or

2  "FSI") filed on March 24, 2017, charged defendant with three

3  additional counts alleging violations of 18 U.S.C. § 371 (Conspiracy,

4  Count 1), 22 U.S.C. § 2778 (Arms Export Control Act, Count 2), and

5  18 U.S.C. § 2332g (Conspiracy to Use and to Transfer Missile Systems

6  Designed to Destroy Aircraft, Count 3) (referred to herein as "the

7  anti-aircraft missile count").  For reasons relating to extradition,

8  the three-count FSI did not incorporate the four counts from the

9  original indictment, and the two indictments were joined in

10  preparation for trial.  CR 264.

11      The afternoon before trial, on October 29, 2018, without a plea

12  agreement, defendant entered pleas of guilty to the four-count

13  original indictment and Counts 1 and 2 of the FSI.  Counts 1 and 2 of

14  the FSI alleged that, among other weapons, defendant conspired to

15  transfer Igla, Strela, and S-400 Triumph anti-aircraft missiles, and

16  to use Igla anti-aircraft missiles, as similarly alleged in the

17  vacated anti-aircraft missile count.[1]

18      On October 30, 2018, trial commenced as to Count 3 of the FSI.

19  On November 15, 2018, the jury returned a verdict of guilty.

20  Immediately following the jury's verdict, Judge Otero commented that

21  the evidence of defendant's guilt on the anti-aircraft missile count

22  was "overwhelming."  CR 387 at 13.

23

24

_____

25      [1] See FSI Count 1, Overt Acts 1, 2, 5, 8, 11-17, 23-26, 29, 31-
35, 39; see also FSI Count 2 (list of munitions that defendant
26  brokered included Igla 9K38 surface-to-air missile launchers, Igla
9K38 surface-to-air missiles, Strela surface-to-air missile
27  launchers, Strela surface-to-air missiles, operators for Igla
surface-to-air missiles launchers, technicians for Igla surface-to-
28  air missile launchers, and trainers for Igla surface-to-air missile
launchers).

1    In preparation for sentencing, the parties submitted extensive

2    briefing.  In particular, in light of defendant's eve-of-trial pleas

3    of guilty to six of the seven indicted counts, the government

4    submitted its key trial exhibits on those six counts and summaries

5    thereof, in order to allow the Court to evaluate the nature and full

6    extent of defendant's conduct on the counts that were not litigated

7    at trial.[2]  CR 431, 432.

8    On August 19, 2019, Judge Otero conducted a sentencing hearing.

9    The government called Dr. Robert Doherty, an expert with 30 years of

10   experience in anti-aircraft missiles, to provide testimony as to the

11   unique dangers that proliferation of this category of weapon presents

12   to civilian targets, commercial aircraft, and U.S. national security

13   and foreign policy interests.[3]

14   At sentencing, Judge Otero found that the 25-year mandatory

15   minimum applicable to the anti-aircraft missile count was

16   substantially inadequate to fairly account for defendant's egregious

17   offense conduct, his relevant conduct, and the § 3553(a) sentencing

18   factors.  Accordingly, the Court imposed a sentence including a 30-

19   year term of imprisonment.  The Court imposed the statutory maximum

20   as to the remaining counts of conviction, as follows:

21       Count 1 (AECA): 240 months
         Count 2 (smuggling): 120 months
22       Count 3 (money laundering): 240 months
         Count 4 (money laundering): 240 months
23       FSI Count 1 (conspiracy): 60 months

24   _____

25       [2] To aid the Court, and because the facts relating to
     defendant's offense conduct and relevant conduct remain unchanged
26   from the time of the 2019 briefing, the government has incorporated
     herein portions of the factual descriptions from its prior briefing.

27       [3] Dr. Doherty also testified at trial.  The Court permitted his
     limited additional testimony at sentencing on certain discrete areas
28   that the government elected not to elicit before the jury due to Rule
     403 concerns.

5

1    FSI Count 2 (AECA): 240 months

2    The Court further ordered that all sentences run concurrently with

3    the 360 months imposed on FSI Count 3, the anti-aircraft missile

4    charge.  CR 448.

5        On appeal, the Ninth Circuit rejected most of defendant's claims

6    but ultimately vacated his conviction for conspiracy to use and to

7    transfer anti-aircraft missiles on the ground that the Court's jury

8    instruction on extraterritorial venue was erroneous.  Jurisdiction

9    was returned to the district court for the purpose of resentencing on

10   the remaining six counts of conviction.  In light of Judge Otero's

11   2020 retirement, the case was reassigned to this Court on July 7,

12   2021.

13       On December 13, 2021, the United States Probation Office

14   ("USPO") issued the presentence report ("PSR") and a disclosed

15   recommendation letter recommending that this Court impose a sentence

16   of 20 years' imprisonment.  On January 10, 2022, defendant filed

17   objections to the PSR, as detailed below.  The government concurs

18   with USPO's calculations as to the sentencing guidelines articulated

19   in the PSR and has no objections to the PSR.  The sentencing hearing

20   is set for April 29, 2022.

21   **III.  FACTUAL BACKGROUND**

22       **A.    Defendant's Initial Contacts with HSI**

23       In May 2014, a Los Angeles supplier of military goods advised

24   HSI that defendant had contacted the supplier to solicit a business

25   relationship.  HSI conducted background investigation on defendant

26   and subsequently learned that an existing HSI source of information

27   ("SOI") had worked with defendant in the security-procurement

28   business many years before.  CR 406 at 10-11.

1    In June 2014, at HSI's direction, the SOI re-established contact

2   with defendant via email and telephone.  Id. at 11-13.  Defendant

3   replied to the SOI's email outreach the same day, launching without

4   preamble into the following immediate request to buy "heavy arms"

5   destined for Iraq:

6

7   | **From:** | Rami Ghanem <ramithe@gmail.com> |
    | **Sent:** | Wednesday, June 18, 2014 3:29 AM |
8   | **To:** | @gmail.com> |
    | **Subject:** | RE: Weapons and MunitionROM Worksheet.xlsx |

9

10    1. AK 47 as many as you have
11    2. All type of Sniper rifle as many as you have
12    3. Machine Gun (7.62x54, 12.7mm, 14.5mm, 23mm) all types and as many as
         you have
13    4. PKC as many as you have
14    5. Mortar (60mm, 80mm & 120mm) mortar and missile as many as you have
15    6. Anti-tank and anti-armored vehicles
      7. Armored vehicles
16    8. Ammunitions for all type any QTY you have will buy

17   As soon as I arrive to Iraq they will require heavy arms for us to be prepared.

18  Mills Declaration, Exhibit 2022-1.

19    In July 2014, at HSI's direction, the SOI introduced defendant

20  by phone to the HSI UCA based in Los Angeles.  During their initial

21  phone conversation, which was recorded and played at trial, defendant

22  said that he needed various weapons and other military equipment.

23  Exhibit 1025.  The UCA told defendant that he could help procure some

24  of Ghanem's requested items, including sniper rifles and night-vision

25  optics, but that the order would have to be "under the table."  CR

26  428 at 62.  Defendant affirmed that he wanted to proceed with the

27  transaction and that he understood the risks involved, noting that he

28  was also a U.S. citizen and was therefore "in the same boat."  Id.

1  Defendant also made clear to the UCA that he was in the market for

2  "massive" quantities of weapons, ammunition, and munitions, stating

3  that his clientele "don't buy by small quantities," and noting, by

4  way of example, that defendant was looking to purchase "100 million"

5  rounds of AK-47 ammunition.  Exhibit 1025.

6      The UCA sent defendant pricing information for several military

7  items that defendant had requested in the phone call, including 200

8  US-made M-4 carbine assault rifles.  Mills Decl., Exhibit 2022-2.  In

9  a subsequent recorded phone conversation in August 2014, defendant

10 and the UCA planned an in-person meeting in Greece in September 2014

11 to discuss business operations, including the outstanding order for

12 M-4s as well as larger future orders.  CR 428 at 65.  During that

13 call, defendant said that he had a strong market with Shi'a groups in

14 Iran, Iraq, and Lebanon, and he again affirmed that he did not intend

15 to apply for an export license and that the transaction would be

16 "under the table."  Id.

17      **B.   First Meeting with the UCA**

18      On September 18, 2014, defendant met with the UCA and the SOI in

19 Athens, Greece.  Ex. 1033.  During this meeting, which was recorded,

20 defendant described his extensive global arms-trafficking network.

21 Defendant advised that his connections in Beirut, Lebanon, included

22 the head of in Hezbollah in Iraq (a group designated by the United

23 States as a foreign terrorist organization).  Id.  Defendant noted

24 that he also had a weapons market in Africa.  Id.

25      Defendant stated, "The black market, I always done it with the

26 Eastern Bloc.  Anything you need, let me know.  I have a very good

27 relation, I have very good people I deal with, ex-generals, ex –

28 okay?"  Id.  Defendant further reaffirmed his understanding of U.S.

8

legal requirements for export licenses and end-user certificates

("EUCs")[4], noting that he needed to be careful because he is a U.S.

citizen.  <u>Id.</u>  Defendant explained that he made illicit transactions

appear to be legal by creating false paperwork to give the

transactions the venire of legitimacy:  "Everything we do is legal.

And we legalize it, it's always legal.  Okay?  So there is nothing

such a thing as shipping items without documents.  You create the

documents."  <u>Id.</u>

At this meeting, defendant said that he was looking for a

particular sniper rifle that could cover a distance of 4500-5000

meters.  <u>Id.</u>  He added that he was dealing with a small U.S. company,

and that he was communicating with a person there who was willing to

make as many of the rifles as defendant required.  <u>Id.</u>  Defendant

clarified that they were discussing 500 pieces, and that the rifles

would be custom made for him.  <u>Id.</u>  Defendant said that his contact

told him that "ITAR" was required and that the contact would not ship

the items illegally.  <u>Id.</u>  Defendant said that he would obtain cover

documentation for that arms shipment from an Iraqi official, because

this shipment was one area of business to cover "illegally."  <u>Id.</u>

Defendant stated that he had requirements for goods — including

Bell helicopters and F-5 and F-14 military fighter jets — on behalf

of Iranian customers that he did not identify.  <u>Id.</u>  Defendant

provided the UCA with documents partially written in Farsi (the

official language of Iran) that addressed these requests.  <u>Id.</u>  At

---

[4] At trial, the government established that an EUC is an
official document used in international transfers, including those
involving defense articles and services, to certify that the buyer is
the final recipient of the materials, and is not planning on
transferring the materials to another party.

1  defendant's request, the parties agreed not to make future references

2  to Iran in their dealings, and to instead use the cover term

3  "Ireland" when discussing Iran.   Id.

4     Defendant and the UCA also discussed at the meeting defendant's

5  payment plans for their transaction.   Id.   Defendant said that cash

6  would not work, so he planned to use a bank wire to pay.   Id.   He

7  further noted that it was his standard practice to use a "cover"

8  contract that would "change the items" detailed in the contract but

9  give the correct price.[5]   Id.

10    C.   **Discussions after the First Meeting**

11    Shortly after the September 2014 meeting, defendant e-mailed the

12  UCA requesting an update on the status of the M-4 rifles that

13  defendant had requested; the UCA replied that the 500 M-4s would be

14  available for delivery within days after defendant secured funding.

15  Mills Decl., Exhibit 2022-3.

16    In January 2015, defendant called the UCA.   In this recorded

17  phone call, which was played at trial, defendant expressed suspicions

18  about the UCA's potential affiliation with law enforcement and voiced

19  reservations about working with the UCA, saying that it was important

20  to know who he was dealing with, because "one mistake, and you lose

21  what you built all your life."   Exhibit 1002.   After his suspicions

22  were allayed, defendant said that he needed night-vision goggles for

23  "MI-24" (an attack helicopter manufactured in Russia), and the UCA

24  responded that he would look into whether he could acquire this item.

25

26

27     [5] As detailed herein, the evidence established that defendant
   frequently used cover terms such as "fruits," "vegetables,"
28  "generators," and industrial equipment to mask the true nature of the
   illegal weapons and ammunition that he was brokering.

Id.  On this phone call, defendant and the UCA also agreed to meet
again in person.  Id.

    **D.  Second Meeting with the UCA**

In March 2015, defendant again met with the UCA and the SOI in
Athens, Greece, to discuss potential business.  CR 404 at 11.  On
March 10, 2015, defendant met with the UCA and the SOI and discussed
the UCA's ability to supply military goods, particularly night-vision
goggles and other military optics.  Exhibit 1003.  This meeting was
recorded.  The following day, the UCA sent defendant an e-mail
confirming the UCA's ability to supply defendant with the requested
goods.  Mills Decl., Exhibit 2022-4.

On March 11, 2015, defendant engaged in multiple meetings with
the UCA and the SOI to discuss volume and other sales and export
logistical details for the military optical equipment requested by
defendant.  CR 404 at 15, 24.  Defendant and the UCA agreed that the
equipment would be exported from the United States without a license.
Ex. 1004.  The UCA showed defendant working models of night-vision
goggles requested by defendant.  Id.  After inspecting the models,
defendant made two speakerphone calls to clients whom defendant
believed would be interested in the equipment.  Id.  One of the
prospective buyers asked where defendant could deliver the night-
vision equipment, to which defendant gleefully replied that he could
deliver them to the buyer's "bedroom."  Id.  On March 12, 2015,
defendant called the UCA and told him that defendant had received
positive feedback on the military optical equipment from potential
buyers in Egypt, Ukraine, and Greece.  Id.

1   **E. Defendant's Order with the UCA**

2    1. <u>Negotiations and Order Placement</u>

3  On March 31, 2015, defendant sent the UCA an e-mail entitled

4 "Urgent requirement," which requested specific quantities of the

5 military optical equipment discussed at the March 2015 meetings in

6 Athens and inquiring as to the fastest time for delivery.  Mills

7 Decl., Exhibit 2022-5.  After the UCA advised defendant of a timeline

8 to procure and ship the requested military optics, defendant sent

9 another e-mail asking the UCA to send an invoice.  <u>Id.</u>  Defendant

10 subsequently advised the UCA that defendant had become ill and needed

11 time to recover.

12  On May 12, 2015, defendant sent the UCA an e-mail containing an

13 attached screenshot of another e-mail entitled "URGENT REQUIREMENT OF

14 AMMO."  Mills Decl., Exhibit 2022-6.  That e-mail listed several

15 types of missiles, rockets, ammunition, and other munitions,

16 including "Hell Fire Missile," "2.75 rocket," "Tow Missile (A and

17 B)," and "hand grenades."  Upon receiving this message, the UCA

18 called defendant.  During the call, defendant referred to the e-mail

19 he had sent to the UCA that day, noting "the list I gave you, which

20 has that Hellfire, the whole list is very serious."  Ex. 1006.

21 Defendant added that he was "already supplying the buyer."  <u>Id.</u>

22 Defendant and the UCA also discussed pricing and logistics for the

23 military optical equipment that defendant had requested.  <u>Id.</u>

24  On July 24, 2015, defendant sent the UCA a message requesting

25 Barrett M82A1 .50 caliber sniper rifles and Steyr HS .50 caliber

26 sniper rifles.  Mills Decl., Exhibit 2022-7.  On July 27, 2015,

27 defendant sent the UCA another message asking to expand his order to

28 include 100 US-made "pistols with silencer."  Mills Decl., Exhibit

1  2022-8.  Specifically, defendant asked, "Also can you provide me with
2  100 pistols with silencer any good US even Gl[o]ck."  Id.

3       On August 5, 2015, in a recorded phone conversation, defendant
4  acknowledged asked the UCA to proceed with an order for 100 pistols.
5  Ex. 1007.  In the same phone call, defendant also requested that the
6  UCA procure on his behalf "at least 10 or 20" .50-caliber sniper
7  rifles, as well as laser sights.  Id.  Defendant further requested
8  50,000 rounds of 9mm ammunition.  During this conversation, defendant
9  repeatedly asserted that he needed the requested items "ASAP" and
10 "right away."  Id.

11      Later that day, the UCA sent defendant an e-mail with pricing
12 information and financing terms for the 9mm pistols, barrels,
13 silencers, and ammunition that defendant had requested.  Mills Decl.,
14 Exhibit 2022-9.  On August 6, defendant called the UCA to discuss the
15 contemplated order.  Ex. 1008.  During the call, defendant requested
16 "more advanced" sniper rifles, ultimately requesting five each of
17 "basic," "medium," and "high-end" sniper rifles.  Id.  Defendant also
18 requested night vision scopes for the sniper rifles.  Id.  Defendant
19 further asked the UCA to falsely state on the export documents that
20 the shipment contained juice.  Id.  Defendant advised that he wanted
21 the shipment to be routed through Greece with an ultimate destination
22 of Libya.  Id.  Defendant said that the money for the shipment would
23 come from Jordan.  Id.  On August 7, 2015, in an e-mail to the UCA,
24 defendant provided the name and contact information for his consignee
25 in Libya.  Mills Decl., Exhibit 2022-10.

26      On August 9, 2015, the UCA sent defendant an e-mail with a full
27 breakdown of defendant's requested items, including quantities and
28 pricing.  Mills Decl., Exhibit 2022-11.  Per defendant's request, the

13

various categories of military goods were coded as "juice."  Id.  The grand total for defendant's order at that stage was $408,000.  Id. On August 26, 2015, defendant replied to the UCA's e-mail indicating reductions to the quantity of each of the requested items.  Id.  As noted below, defendant later explained that this revised order was intended as a small precursor order to test the UCA's capabilities. The updated order, which defendant ultimately placed and the UCA purported to ship, came to a total of $220,050 and included .50-caliber rifles, 9-millimeter pistols, suppressors, laser sights, .50-caliber and 9-millimeter ammunition, and night vision optics.  Mills Decl., Exhibit 2022-12.  The UCA advised that a 40% down payment of $88,020 was needed to place the order.  Id.

Per defendant's request, the UCA called defendant that day to discuss the order.  CR 404 at 62.  During this phone call, defendant said that he was going to pay for the order from his own money because he was unable to reach his prospective customer.  Id. Defendant further advised that after this delivery, a "much bigger order" would come.  Id.  Defendant also requested that instead of "juice," the weapons and other military items be invoiced as industrial generators.  Id.  During the discussion of his intended bank transfer, defendant alluded to the illicit nature of their transaction, noting, "we are not dealing with each other as [weapons manufacturer] Bushmaster and [the] Jordan Armed Forces."  Id.  On August 26, 2015, after the phone call, the UCA sent defendant an e-mail with an invoice detailing the sale of three types of US-origin industrial generators for a total price of $220,050.  Mills Decl., Exhibit 2022-13.  The invoice listed defendant's previously

14

1    identified consignee in Libya as the purchaser, and it included

2    routing information for the UCA's undercover bank account.  Id.

3              2.   Payments and Shipment

4         On September 2, 2015, defendant confirmed to the UCA that

5    defendant had wired $90,000 to the UCA's bank as a down payment on

6    the order.  Mills Decl., Exhibit 2022-14.  The bank records for the

7    UCA's undercover account show that a bank wire deposit from

8    defendant's company, Gateway to MENA, in the amount of $89,971 posted

9    on September 2, 2015.

10        On October 19, 2015, defendant spoke with the UCA in a recorded

11   telephone call.  Defendant said that he would wire the second

12   installment of $90,000 to the UCA that week.  Ex. 1013.  Pursuant to

13   the agreement between defendant and the UCA, that second payment

14   would trigger the UCA's obligation to ship defendant's order from the

15   Port of Los Angeles to Greece.  On the same telephone call, defendant

16   committed to meet the UCA in Greece in late November or early

17   December when the shipment arrived, in order to inspect the shipment

18   before it was forwarded onward to Defendant's customer in Libya

19   pursuant to the purchase agreement.  Id.  The UCA warned defendant

20   that he would not ship the container to Libya until defendant had

21   personally inspected it, and defendant agreed that he would come to

22   Greece to meet the UCA and inspect the shipment after its arrival.

23   Id.

24        On October 22, 2015, a second installment of $89,971 was wired

25   to the UCA's undercover bank account from defendant's company in

26   Jordan.  In late October 2015, HSI arranged for a shipping container

27   ostensibly containing defendant's order to leave the Port of Los

28   Angeles on November 3, 2015.

**F.   Defendant's Arrest by the Hellenic National Police and the Seizure of His Digital Devices**

On December 8, 2015, defendant and the UCA traveled to a warehouse near Athens, Greece, where the Hellenic National Police ("HNP") arrested defendant pursuant to a Mutual Legal Assistance Treaty request from U.S. officials.  During defendant's arrest, and later at defendant's hotel room, the HNP seized from defendant 19 digital devices, which HSI obtained from HNP and searched pursuant to a U.S. warrant.  On these devices, agents discovered further evidence of defendant's prolific global arms-trafficking business, including numerous communications reflecting defendant's efforts to buy and sell a wide array of heavy weapons.

**G.   Defendant's Prolific Unlawful Arms Trafficking Activities Unrelated to the Undercover Transaction**

The heart of defendant's business was unquestionably focused on the global arms market, as reflected in defendant's below text reply to an inquiry from his co-conspirator, Sergiu Banari:



16

Exhibit 203.  Similarly, defendant advised another prospective
business partner that he was "only focused on the Armed business. . .
Any other business [is] not in my books."



Exhibit 204.

    Days before his arrest, defendant likewise admonished another
correspondent, who had reached out with an offer to sell defendant
the crown jewels of Ethiopia valued at $120 million, "My business is

only related to Arms and security, please do not include me for any

business not related to that."  Exhibit 205.

          1.    <u>Negotiations, Offers, Contracts, and Other Documents</u>
               <u>Offering a Snapshot of Defendant's High-Volume, High-</u>
               <u>Dollar Illegal Arms Business</u>

     Defendant's communications and other records over the years

before his arrest offer a window into the vast dimensions of his

lucrative international arms-trafficking business.  From the volumes

of defendant's negotiations, requests, quotations, offers, contracts,

invoices, and other documents reflecting his frenetic efforts to

profit from the brokering and sale of as many weapons and other

munitions as he possibly could, the government below details multiple

executed and/or completed deals, as well as several illustrative

examples of defendant's other efforts to close illegal arms deals

that may or may not have seen fruition.[6]

---

[6] This uncertainty as to whether or not particular transactions were completed is because only a fraction of defendant's communications and other business records were available to investigators.  Since the government's access was limited to certain email or Skype communications that defendant chose to retain in his email and/or on penetrable devices that he brought to Greece, the investigation essentially cast a beam of light into the shadows of defendant's illegal activity, with much of that activity still obscured.  Due to defendant's documented penchant for moving sensitive communications to the many encrypted messaging applications that he used, or to discussing such matters in telephonic or in-person conversations, those gaps will remain.  In addition, because defendant and his co-conspirators relied on overseas banks and shell companies, the only bank and corporate records available to U.S. law enforcement were those attached to emails that defendant retained.

    Nonetheless, given the longstanding relationships between defendant and his repeat suppliers and buyers that endured across multiple transactions, one may reasonably infer that defendant was ultimately able to perform as he promised.  Had he not done so, his contacts in the ruthless and lawless world of black-market arms trafficking would have — at a minimum — ceased dealing with him.

> a. *Defendant's Negotiation and Execution of a Contract to Purchase a Quarter Billion Dollars in Arms and Ammunition*

Throughout the spring of 2015, defendant pursued massive quantities of arms and ammunition to sell to his customer in Libya for hundreds of millions of dollars.  As detailed below, **these efforts ultimately led defendant to negotiate and sign a contract to illegally broker $250,000,000 in munitions, including missiles, rockets, mortars, grenade launchers, sniper rifles, assault rifles, and ammunition, to a militant faction in Libya.**

Defendant was aware that his customer for this transaction, the Libya Dawn militant faction then based in Tripoli, was the subject of United Nations sanctions, a fact that caused him difficulty procuring a supplier that would sell to him with a Tripoli end-user certificate ("EUC").  As one prospective supplier told defendant, "we know current official Government of Libya is not any more in Tripoli!!!"  Exhibit 502.  In other related communications:

- Exhibit 508:  Defendant stated: "can you supply Libya… Tripoli EUC."  His prospective supplier replied: "Not sure if Libya EUC is even recognized."

- Exhibit 511:  Defendant stated:  "Ivan. . . was very clear that he can't supply to Libya."

Defendant thus began to explore ways to covertly mask the ultimate destination of this illegal shipment of arms and ammunition to the militant faction in Tripoli, specifically by purchasing an end-user certificate to falsely reflect the ultimate end user[7], as demonstrated in the following exhibits:

---

[7] At trial, the evidence showed that defendant routinely created or purchased fraudulent end-user certificates to facilitate his black-market arms deals.  During a conversation wherein defendant

*(footnote cont'd on next page)*

- <u>Exhibit 507</u>:  Defendant stated: "we are dealing with Tripoli government and it's very hard now days due to the mix up between the two sides of Libya. If you can find me a source from one of those countries not so much attached to UN matter such as Albania."

- <u>Exhibit 508</u>:  Defendant proposed to a co-conspirator, who had advised that the Libya end-user certificate would not be recognized, "Maybe you can give me an offer for the items I had sent by email using country Belize EUC and also to support your work Tripoli EUC."  The co-conspirator agreed that they could try this scheme.

- <u>Exhibit 535</u>:  Defendant contacted a prospective supplier and advised, "we are looking for a good contact with Head of the army or president in any African countries to help us in the supply of ammunitions to help us [either] by selling us directly from their old stock and they buy a new one or help us in issuing an end user certificate and we will pay. . . for the service."

As indicated in the following exhibits, defendant continued to pursue a supplier for this large transaction, which defendant chose to structure as a contract encompassing a small "trial" shipment before the much larger full shipment would be made.  At the conclusion of negotiations with the selected supplier, Quisianto Trading Limited, **defendant and the supplier ultimately signed a contract to broker $250,000,000 in arms and ammunition** to a militant faction in Libya.

- <u>Exhibit 516</u>:  Defendant's prospective supplier sent defendant a draft contract including an annex described as a "trial with small quantities."  The "small quantities" envisioned by this contract consisted of $17,862,700 in anti-tank missiles, rockets, mortars, and ammunition.

- <u>Exhibit 517</u>:  Defendant forwarded the draft contract for the $17,862,700 small trial order to his customer in Libya

boasted about his control over the Eastern European "black market" for munitions, defendant himself confirmed to the UCA that it was his practice to create end-user certificates in order to "make it look like it's legal."  Exhibit 1033.

20

was the notation, "This is the correct agreement to be signed."

- Exhibit 518:  The end-user certificate from the Libya Dawn militant faction for millions of rounds of ammunition, tens of thousands of (each) mortars and rockets, thousands of missiles, and other munitions listed the supplier as "Gateway to MENA for Logistics Services, represented by Mr. Rami Ghanem."  The reference number on the end-user certificate was 8628-57.

- Exhibit 519-522:  Defendant and his customer exchanged emails wherein the customer amended the quantities of munitions listed in the end-user certificate.

- Exhibits 524-530:  Defendant contacted several suppliers with whom he had worked on other illegal arms deals to find a supplier for the munitions required for this transaction.

- Exhibits 531-534:  A co-conspirator, Tahsin Ammouri, offered defendant some of the munitions he was seeking and told defendant that he could send them to Libya.  Defendant expressed doubt that the Tripoli end-user certificate would be accepted, but Ammouri assured him that it would.  Defendant proposed that a "trial order" include 23mm, 14.5mm, and 127mm ammunition.  Defendant contacted his Libyan client with information about the proposed deal.

- Exhibit 536-537:  Defendant and Ammouri exchanged legal documentation, including a power of attorney and an amendment to the end-user certificate.

- Exhibit 540-541:  Ammouri sent defendant an invoice for $249,591,800 as the purchase price of the contract; and an annex reflecting a first delivery of ammunition for $26,808,960.

- Exhibit 542:  Defendant's customer, the self-styled prime minister of the Libya Dawn faction, sent defendant a new end-user certificate for ammunition and rockets.

- Exhibit 543:  Ammouri sent defendant a draft of the contract for listed arms and ammunition at a total purchase price of $249,500,800; and an annex reflecting the "small quantity of first trial shipment," for $4,032,440.  The contract document and the annex reflected the invoice number "8628-57," which is the reference number of defendant's Libyan end-user certificate.

21

- Exhibit 544:  Ammouri sent to defendant a modified version of the contract reflecting, per defendant's request, a small trial shipment of $2,500,000 in ammunition.

- Exhibit 546:  Ammouri sent defendant the "final contract" containing all amendments as requested by defendant, and requested that defendant provide his banking details.

- Exhibit 547:  Defendant returned to Ammouri the final contract for $250,000,000 in arms and ammunition, with a trial order for $2,489,970 in ammunition.  Defendant initialed every page of the contract and signed and stamped his business seal on the final page.

- Exhibit 549:  Defendant provided his banking details to Ammouri as required by the contract.

- Exhibit 550:  Ammouri sent defendant the last page of the signed and stamped quarter-billion contract No. 8628-57, which contained signatures, business seals, and initials of both defendant as the buyer of the arms and ammunition and Alexei Kharlanov of Quisianto Trading Limited as the seller.

    b.   *Defendant's Signed Contract to Broker Hundreds of Rocket-Propelled Grenade Launchers and Related Munitions to Egypt*

Through the fall of 2015, defendant facilitated the supply of rocket-propelled grenades and launchers to the Egyptian Ministry of Defense, as shown by the following exhibits.  Defendant's negotiations successfully culminated in a contract signed just days before his arrest.  The contract provided for the supplier, Care Transenergy Ltd., to sell 500 RPG-7 rocket-propelled grenade (RPG) launchers, 500 PGO-7V optical sights for RPG launchers, and related munitions, for a purchase price of $1,202,500.

- Exhibit 610:  Defendant sent a signed and initialed contract to his Egyptian business partner.  The appendix listed the above-specified munitions as subject of contract and purchase price of $1,202,500.

- Exhibit 611:  Defendant and his supplier discussed sending original contract by DHL.

As the broker for this contract, defendant was to receive a commission of hundreds of thousands of dollars.

- Exhibit 600:  The offer defendant received from his supplier included a 20% commission for defendant's Egypt-based company.

- Exhibit 604:  Defendant explained to his supplier, "in your offer you will add our commission," and sent him the specific established procedures for how to do so.

This $1,202,500 weapons contract may have been another example —— like defendant's quarter-billion-dollar ammunition contract and his relatively small order of munitions to test the undercover agent's capabilities —— of defendant's common practice of preceding massive arms shipments with (relatively) smaller test orders.  From the initial order and continuing throughout the course of negotiations, the customer's supply requirements specified the intended purchase of a much higher volume of RPGs, launchers, and other munitions.

- Exhibit 600:  Defendant's supplier's initial offer responded to defendant's request for a proposal for 50,000 PG7V rocket-propelled grenade training projectiles, 28,000 live RPG projectiles, 1,100 RPG launcher sets, and 1350 RPG optical sights, for a total of €21,335,500.

- Exhibit 604:  In this message thread between defendant and his supplier, defendant specified requirements for munitions to include 50,000 training RPG projectiles, 20,000 live RPG projectiles, and tens of thousands of live RPG heads and fuses.

- Exhibit 605:  Defendant forwarded to his business partner and co-conspirator the list of munitions referenced in Exhibit 604 and specifications therefor.

- Exhibit 606:  Defendant forwarded same list of munitions and specifications to alternative prospective suppliers.

- Exhibit 608:  Defendant's supplier confirmed the availability of 50,000 live RPGs and 50,000 fuses.  Earlier in the thread, an email from defendant's business partner specified the customer's initial request for 20,000 live

23

RPGs, 50,000 training RPGs, and 14,000 fuses, and noted that due to their contacts with the Egyptian military, no other supplier would be chosen if they made a competitive offer.

             *c.*    *Defendant's Shipment of Ammunition to Libya Using a Fraudulent Malawian End-User Certificate*

In June and July of 2015, defendant and his co-conspirators prepared to, and did, ship over a million rounds of ammunition to Libya using a fraudulent end-user certificate.  Defendant's co-conspirator explained that the planes would stop in Lilongwe, Malawi, allegedly for refueling, where the ammunition would be offloaded and shipped to Misrata, Libya, with the assistance of Malawian officials in exchange for a $90,000 bribe.  (Exhibit 565.)  Defendant described this black-market method of delivery as the "black way."  Exhibit 559.  The following exhibits reflect this shipment:

- Exhibits 555-567:  This series of emails between defendant and his co-conspirator/business partner shows the final logistical arrangements for two "fruit planes," each bearing an illegal shipment of weapons and ammunition that defendant had brokered and sold to his customer in Libya. This transaction was accomplished using a fraudulent end-user certificate illegally purchased from Malawi for a 6.5% portion of the total transaction price, which reflected the following arms and munitions (Exhibit 557):

    o  40,000 7.62 assault rifles
    o  30,000,000 rounds of small-arms ammunition (12.7mm, 7.62mm, and 14.5mm)
    o  1,000,000 rounds of 23mm anti-aircraft ammunition
    o  1,500 anti-tank grenade launchers
    o  20,000 anti-tank grenades
    o  1,500 7.62 machine guns
    o  39,000 mortar shells (60mm, 81mm, and 120mm)

Defendant's two "fruit planes" described in these communications delivered 247,820 rounds of 23mm and 14.5mm anti-aircraft ammunition, 126,000 rounds of 12.7mm machine gun ammunition, and 1,355,200 rounds

24

of 7.62mm assault rifle ammunition to feed Libya's civil war.
(Exhibit 566.)

> d.   *Representative Examples of Defendant's Other*
> *Illegal Arms Transactions*

The following representative communications illustrate additional efforts by defendant to broker hundreds of millions of dollars in various munitions.

> (A)   Defendant's Brokering of Various Arms and
> Ammunition to Libya

- Exhibit 510:  Pursuant to defendant's request, an Israeli co-conspirator sent defendant pro forma invoices for large quantities of various missiles, rockets, mortars, grenade launchers, assault rifles, and ammunition totaling $219,615,450.

- Exhibit 515:  Defendant sent to a co-conspirator a contract for the purchase of a large volume of missiles, rockets, mortars, launchers, sniper rifles, and varying calibers of ammunition for $338,183,200.

- Exhibit 502:  Defendant negotiated his purchase of ammunition and various other munitions to sell to Libya. The seller's quotation included 160 T-72 battle tanks at a per-unit price of $250,000.

- Exhibit 504:  Defendant forwarded to his customer in the Libya Dawn militant faction specifications and photographs of various types of anti-aircraft ammunition.

- Exhibit 554:  **On December 3, 2015 — five days before his arrest** —— defendant engaged in negotiations with a co-conspirator to purchase $800,000 in 23mm anti-aircraft ammunition to sell to his customer in the Libya Dawn militant faction.  Defendant promised to be in touch from Athens, where he was ultimately arrested in this case on December 8, 2015.

> (B)   Defendant's Brokering of M240 Machine Guns
> to Egyptian Military

- Exhibit 612:  In an email thread between defendant and Israeli broker, they discussed defendant's request for 100

U.S.-made M240 machine guns to sell to Egypt.  The broker quoted a total price of $1,227,000.

- Exhibit 613:  Defendant advised the Israeli broker that he can provide an end-user certificate, but that "if the country of the seller are from west Europe… it will not fly."

- Exhibit 614:  Defendant received paperwork for the sale, including a "Nontransfer and Use Certificate" from the U.S. Department of State requiring certification that the machine guns would not be retransferred.

- Exhibits 615, 616:  These exhibits reflect Egypt's request for defendant's proposal to sell M240 machine guns.

        (C)   Defendant's Brokering of 1,400,000 Rounds of Assault-Rifle Ammunition to the Egyptian Military

- Exhibits 617-625, 634-635, 637:  In these communications, defendant negotiated the supply of 1,400,000 rounds of 7.62x52mm linked machine gun cartridges to the Egyptian army, with a 15% commission for defendant.

- Exhibits 627-633:  Defendant's communications reflect his negotiation of the supply of large quantities of various arms and ammunition to the Egyptian military, including anti-aircraft guns, mortars, rocket-propelled grenades, machine guns, and assault rifles.  After surveying his own suppliers, defendant sent his customer a quotation indicating he had procured 30,000 units of 122mm BM-21 Grad multiple rocket launchers, offered at $950/unit before defendant's commission; and 10,000 7.62mm AKM assault rifles, each offered at $175 before defendant's commission. (Exhibit 633)

- Exhibit 638:  Defendant solicited an offer to supply 152mm cannons, 23mm and 14.5mm anti-aircraft guns, and SPG-9 anti-tank cannons to a customer in Iraq.

- Exhibits 640-647:  Defendant negotiated to supply various arms to the Egyptian armed forces, including 900 machine guns, 20,000 assault rifles, and 500 rocket launchers with optics.  Defendant noted to one prospective supplier that this was a "small tender."  (Exhibit 644)

- Exhibit 648:  A week before his arrest, defendant detailed his current orders, which included 10,000,000 rounds of

1    ammunition to South Africa, 100 SPG-9 anti-tank guns to
     Ethiopia, 4,000,0000 rounds of automatic rifle ammunition
2    to Iraq, and 4,000,000 rounds of pistol ammunition to Iraq.

3           e.   *Defendant's Offers and Negotiations to Buy and*
                 *Sell Multi-Million Dollar Combat Aircraft*
4

5    Among the defense articles that defendant sought to broker and

6    sell to other countries and militant groups were combat jets and

7    helicopter gunships, which regularly come equipped with heavy

8    armaments.  Included in the numerous documents reflecting defendant's

9    negotiations and offers to buy and sell these combat aircraft are the

10   following:

11        • Exhibit 704:  Defendant advised a fellow broker that he was
            "very interested in the MI 24[8] QTY 2 ready to go."
12
13        • Exhibit 707-708:  Days later, another co-conspirator
            advised defendant of the availability of a "second MI-24"
14          helicopter gunship for $6,150,000.  That day, defendant
            forwarded the specifications and photographs of the MI-24
15          to his customer in the Libya Dawn militant faction.

16        • Exhibit 710:  Defendant contacted a fellow broker to
            request a quotation for two MI-24 helicopter gunships
17          "ready to go for operation with full arms."

18        • Exhibit 714:  Defendant's co-conspirator briefed him via
            email on the state of their "schedule[d] acquisition" of
19          six MIG-29 fighter jets,[9] for which defendant and his co-
            conspirator had already agreed to pay an "official end
20          price" of between $8,700,000 and $9,100,000, with an
            "unofficial additional price" of $6,000,000.
21
22        • Exhibit 736:  Pursuant to his request for MI-24 combat
            helicopters and MiG-29 fighter jets, defendant received a
23          quotation for five MI-24 at $5,155,000 per helicopter.

24

25   _____

26        [8] The Mil Mi-24 is a large, Russian-built, helicopter gunship,
     attack helicopter and low-capacity troop transport.

27        [9] The Mikoyan MiG-29 is a twin-engine jet fighter aircraft
     designed in the Soviet Union as an air superiority fighter during the
28   1970s, to counter new U.S. fighters such as the McDonnell Douglas F-
     15 Eagle and the General Dynamics F-16 Fighting Falcon.

                                     27

Defendant replied to express interest, asking, "what type of arms does it include?"

2.   Financial Records Reflecting Some of the Profits Defendant Gained From the Crimes of Conviction

The evidence gathered during the government's investigation of defendant also includes invoices, bank transfers, and other financial records documenting defendant's extensive brokering of defense articles and services, including the services of mercenary fighters to fight in foreign wars.  Many of these records overtly confirm defendant's payments for defense articles and services through 2014 and 2015, including the following:

- Exhibit 800:  Invoices from defendant's company to his customer in Libya reflect $98,000 in helicopter armaments, $690,000 in salary and fees for L39 attack aircraft operational crew, and $1,800,000 in salary and fees for an F-1 fighter jet[10] operational crew.

- Exhibit 801:  Invoices from defendant's company to his customer in Libya reflect a total of $3,685,740 in combat aircraft tools and parts and mercenary services.

- Exhibit 802:  Emails between defendant and his co-conspirator included business report reflecting payments of $531,016 on the combat aircraft tools and parts and mercenary services reflected in Exhibit 801.

- Exhibit 803:  An email report from defendant's business partner/co-conspirator to defendant reflects expenditures totaling $68,600 relating to pilots for MIG-25 fighter jets.

- Exhibit 804:  Defendant forwarded to his business partner the $68,600 accounting report in Exhibit 803, but defendant tacked on an additional $30,000 profit for himself. Defendant also took the first business partner's $9,000 estimate for the services of combat aircraft technicians and inflated it by more than 50% before passing it along to the second business partner.  The second business partner replied with a complaint that the resulting total of

_____

[10] The Dassault F1 is a French fighter and attack aircraft.

28

$98,600, with additional services for $15,000, was "expensive."[11]

- Exhibit 805:  An email to defendant from his co-conspirator accounted for many hundreds of thousands of dollars in mercenary services provided, and monthly profit for defendant on these transactions.

- Exhibit 806:  Invoices to defendant's customer in Libya reflect a total of $1,106,000 in defense articles and mercenary services.

- Exhibit 807:  Invoices to defendant's customer in Libya reflect a total of €346,000 in parts for F-1 fighter jets and $744,220 in mercenary services.

- Exhibit 808:  Invoices to defendant's customer in Libya reflect a total of $633,000 in defense articles and mercenary services.

- Exhibits 809-810:  Emails to defendant from his co-conspirator accounted for hundreds of thousands of dollars in mercenary services provided and related expenses, and monthly profits for defendant on these transactions.

- Exhibit 811:  Invoices to defendant's customer in Libya reflect a total of $2,490,000 in mercenary services for F-1 and L39[12] combat aircrews.

- Exhibit 812:  An email to defendant from his co-conspirator accounted for mercenary services provided, and monthly profits for defendant on these transactions.

Other financial records from defendant's communications do not overtly indicate the purchase and sale of defense articles and mercenary services, but rather purport to reflect innocuous transactions for other goods and services.  Defendant's standard practice of using "cover" terms on invoices and other business

---

[11] Defendant's willingness to siphon tens of thousands of dollars from his closest business partners by adding upwards of 30-50% profit for himself further illustrates his greed and his lack of regard even for those inside his inner circle.

[12] The Aero L-39 Albatross is a Czechoslovakian high-performance jet trainer.

documentation was established at length at trial, as were his

repeated assertions describing his business as focused exclusively on

the transfer of arms and security services.  Beyond the evidence

introduced at trial, additional evidence reflecting defendant's

regular and admitted use of cover documentation to conceal the

illicit nature of the weapons and mercenary services in which he

trafficked includes the following:

- Exhibit 813:  An email from defendant to his business
  partner attached two invoices to their customer in Libya.
  Defendant described the attachments as follows: "one to
  use as a cover for the money transfer and the 2nd one the
  original invoice for the services."  The "cover" invoice
  purported to reflect the sale of 30 Toyota Hilux trucks
  for a total of $744,220.  The real invoice reflected the
  sale of mercenary air crew services and also totaled
  $744,220.

- Exhibits 814-815, 816 at red-tabbed page only:
  Communications between defendant, his bank, and a co-
  conspirator reflect defendant's receipt and laundering of
  the $744,220 referenced in Exhibit 813.

- Exhibit 817:  This exhibit shows a new cover invoice to
  defendant's customer in Libya for $744,220 purporting to
  reflect sale of 30 Toyota Hilux trucks, but in fact
  reflected the sale of three more months of mercenary
  services.

- Exhibits 819-820:  These contemporaneous emails contain
  two sets of invoices to defendant's customer.  The first
  set purports to reflect the sale of 43 Toyota Hilux
  vehicles for a total of $1,623,000.  The second reflects
  the true sale of $1,623,000 in defense articles,
  including a guided missile kit for a helicopter gunship,
  and mercenary services, including a crew of anti-aircraft
  missile operators.

- Exhibit 821:  This invoice to defendant's company
  purported to reflect the $335,829 purchase of computer
  equipment and related services, with a transmittal email
  to defendant from his co-conspirator explaining that the
  invoice in fact related to the mercenary services of a
  MI-24 helicopter gunship crew.

- Exhibit 822:  This invoice to defendant's company purported to reflect $66,099 and $45,125 purchases of "building construction materials," with a transmittal email to defendant from his co-conspirator explaining that the invoice in fact related to the mercenary services of a MIG-23 fighter jet crew totaling $111,224.

- Exhibit 823:  This invoice to defendant's company purported to reflect the $326,800 purchase of "building materials," with a transmittal email from his co-conspirator explaining that the invoice in fact related to the mercenary services of a MI-24 helicopter gunship crew.

- Exhibits 824-826:  This cover invoice from defendant's company to a Libyan customer purported to reflect the purchase of 27 GMC trucks for a total of $875,363.  Wire transfer records over the subsequent two days reflect payment from Libya Dawn militant faction to defendant's company in the total amount of $875,363.

- Exhibits 827-833:  Communications over successive days reflect various iterations of cover invoices to the Libya Dawn faction for a total of $972,630, and payment to defendant's company in that amount.  The cover commodities referenced in this transaction range from GMC and Toyota Hilux trucks to spare parts to generators to building materials to construction materials and scaffolding.

- Exhibits 834-835:  Emails and a cover invoice from defendant's company reflect the purported sale to the Libya Dawn militant faction of $500,000 in Toyota Hilux trucks, and resulting payment by Libya Dawn in that amount on that cover invoice.

- Exhibit 836:  Three cover invoices from defendant's company to the Libya Dawn militant faction reflect a total amount owed of $1,690,000, purportedly reflecting the purchase of 50 Toyota Land Cruiser trucks.

- Exhibit 837:  Cover invoices to defendant's company from a co-conspirator shell company purportedly reflect the purchase of "building materials and transport services" in the amount of $111,900.  The transmittal email to defendant from his co-conspirator explained that the invoice in fact covered the salaries of mercenary crew members of MI-24 helicopter gunships.

31

- Exhibit 838:  A cover invoice to defendant's company from a co-conspirator shell company purportedly reflected the purchase of "building materials" in the amount of $25,000.  By the transmittal email, defendant's co-conspirator advised defendant that this invoice covered expenses related to mercenary MI-24 crew members.

- Exhibit 840:  Three cover invoices to defendant's company purportedly reflected the purchase of construction equipment in the total amount of $249,159.  The transmittal email advised defendant that these invoices covered MI-24 mercenary crew member salaries for two months and related expenses.

- Exhibit 840:  A cover invoice to defendant's company purportedly reflected the purchase of building equipment in the amount of $93,500.  The transmittal email to defendant explained that the invoice actually covered payment for the services of mercenary L39 crew members.

- Exhibit 841:  A cover invoice to defendant's company purportedly reflected $33,467 due for the purchase of construction materials.  The transmittal email to defendant stated that this invoice covered expenses related to mercenary MI-24 crew members.

- Exhibit 842:  Three cover invoices to defendant's company purported to reflect the purchase of $239,463 in building equipment.  In the transmittal email, defendant's co-conspirator explained to defendant that the invoices covered salary and expenses related to mercenary crew members of L39 and MI-24 combat aircraft.

- Exhibits 843-844:  Two cover invoices to defendant's company purportedly reflected the purchase of cement totaling $240,800.  The transmittal email advised defendant that these invoices covered salaries for L39 and MI-24 combat air crews.  A SWIFT bank record reflects payment to defendant's company on one of these invoices.

Invoices and communications between defendant and his co-conspirator show them obtaining prices for generators and related non-military commodities and then making use of that pricing on cover invoices for military equipment.  Exhibits 846-862.  Many of those invoices and communications further clarify that the cover terms mask

1   the true nature of mercenary services.   See, e.g., Exhibit 855,

2   describing the cover invoice as for ("the new L39 salary for 5th

3   month"); Exhibit 858 ("attached invoice for L39"), Exhibit 859 ("L39

4   Invoice"); Exhibit 861 ("Invoice Renault + L"); Exhibit 862 ("L39 +

5   F")[13]; Exhibit 850 (referencing a team of F-1 pilots that defendant

6   procured from Ecuador).

7        While the evidence —— including defendant's own words —— shows

8   that he was driven by greed, defendant also apparently took a

9   personal interest in the performance of some of the mercenaries whom

10  he sent into combat.  In one message exchange with an F-1 fighter

11  pilot operating in Libya, defendant requested information about a

12  particular air attack, and the pilot replied with a report that the

13  "main target [was] destroyed in Sirte" with a single bomb and

14  gunfire.  Defendant praised the pilot's successful offensive

15  operation and gave him a "thumbs up" emoji.  (Exhibit 735)

16       On the basis of the evidence described herein, Counts One and

17  Two of the FSI charged defendant with conspiracy to violate the Arms

18  Export Control Act and unlawful brokering of weapons.  In pleading

19  guilty to those counts, defendant admitted to brokering and

20  conspiring to transfer the following items:

| Commodity |
| --- |
| 12.7-millimeter NSVT machine guns |
| 7.62-millimeter AKS assault rifles |
| 7.62-millimeter AKM assault rifles |
| 7.62-millimeter PKM medium machine guns |
| 7.62-millimeter SVD sniper rifles |
| Sniper rifles |
| CZ-999 pistols 9-millimeter pistols |

[13] Defendant's communications reveal that he brokered the mercenary services of combat pilots and crew members for the F-1 fighter jet.

| Commodity |
|---|
| Glock 9-millimeter pistols |
| AK-47 assault rifles |
| Dragonov sniper rifles |
| 14.5-millimeter KPVT machine guns |
| 60-millimeter mortar shells |
| 81-millimeter mortar shells |
| 120-millimeter mortar shells |
| 7.62 x 39-millimeter ammunition |
| Ammunition |
| 23-millimeter ammunition |
| Zsu-23-2 23-millimeter ammunition |
| 5.56 x 45-millimeter ammunition |
| BS-41 14.5-millimeter ammunition |
| 9 x 19-millimeter ammunition |
| Zsu-57-2 57-millimeter anti-aircraft ammunition |
| M51 37-millimeter anti-aircraft armor-piercing capped trace |
| 7.62 x 39-millimeter ammunition |
| 7.62 x 54-millimeter ammunition |
| 7.62 x 54-millimeter BKC ammunition |
| 12.7 x 108-millimeter ammunition |
| Dishka 127 x 108-millimeter ammunition |
| 14.5 x 114-millimeter ammunition |
| 23 x 152-millimeter ammunition |
| D20 152-millimeter tank rounds |
| M48 76-millimeter tank rounds |
| D30 122-millimeter towed howitzer heat tank rounds |
| 12.7 x 108-millimeter ammunition |
| RPG-7 anti-tank rocket-propelled grenade launcher |
| Kornet anti-tank guided missile launchers |
| Kornet anti-tank guided missiles |
| Igla 9K38 surface-to-air missile launchers |
| Igla 9K38 surface-to-air missiles |
| MI-24 rocket launchers |
| 57-millimeter rockets |
| 80-millimeter rockets |
| 122-millimeter S-13T rockets |
| 122-millimeter S-13 OF rockets |
| 130-millimeter rockets |
| 240-millimeter rockets |
| GRAD 122-millimeter rockets |

| Commodity |
|---|
| 122-millimeter GRAD rocket launcher |
| 107-millimeter GRAD rocket launcher |
| RPG-7 HEAT rounds |
| AT-2 Swatter guided missiles |
| AT-6 Spiral missiles |
| Konkurs anti-tank missile launchers |
| Konkurs anti-tank missiles |
| AGS-17 30-millimeter grenade launchers |
| Anti-tank grenade launchers RPG-7 |
| Anti-tank grenades PG-7V |
| Fagot 9K111 anti-tank guided missile launchers |
| Fagot 9M111 anti-tank guided missiles |
| M70 Osa 90-millimeter anti-tank guided missile launchers |
| M79 Osa 90-millimeter anti-tank guided missile launchers |
| 9M133 Kornet (Konkurs) anti-tank guided missile launchers including tripods and thermal sights |
| 9M133 Kornet (Konkurs) anti-tank guided missiles |
| 85-millimeter RPG-7 anti-tank launcher including telescopic sight |
| PG-7VL 85-millimeter HEAT projectiles |
| SKIF anti-tank guided missile launchers |
| SKIF anti-tank guided missiles |
| Strela surface-to-air missile launchers |
| Strela surface-to-air missiles |
| M79 Osa RBR 90-millimeter anti-tank guided rocket launchers |
| M79 Osa RBR 90-millimeter anti-tank guided rockets |
| M79 Osa RBR 90-millimeter anti-tank guided rocket tubes |
| 9M151 Metis-M anti-tank guided missile launchers |
| 9M131 Metis-M anti-tank guided missiles |
| Metis-M tripod launchers |
| Konkurs tripod launchers |
| 9P163-1 Kornet tripod launchers |
| PG-7VLT tandem-charge anti-tank warheads |
| PG-7VR 85-millimeter HEAT tandem projectiles |
| Shershen-D anti-tank guided missile launchers |
| Shershen-D anti-tank guided missiles |
| Spare parts for T-72 battle tanks |
| Spare parts for BTR-80 amphibious armored personnel carriers |
| MI-24 attack helicopters |
| MIG-29 fighter jets |
| Operators for Igla surface-to-air missile launchers |

35

| Commodity |
| --- |
| Technicians for Igla surface-to-air missile launchers |
| Trainers for Igla surface-to-air missile launchers |
| Special forces fighters |
| MI-24 attack helicopter pilots |
| L39 attack aircraft pilots |
| F-1 fighter jet pilots |
| MIG-25 fighter pilots |
| PVS-27 night-vision weapon sight |
| MI-24 night-vision equipment |
| Shershen-D thermal sights |
| Shershen-D PN-S combat module guidance devices |
| 1PBN86-VI Metis-M thermal sights |
| Konkurs thermal sights |
| 1PN79-1 Kornet thermal sights |

## H.   Defendant's Conspiracy to Use and to Transfer Anti-Aircraft Missiles

Searches of defendant's digital devices and email account yielded copious evidence that, between 2013 and his arrest in December 2015, defendant conspired to transfer and to use anti-aircraft missiles.  Based on that evidence, Count Three of the FSI charged defendant with violating 18 U.S.C. § 2332g.  While that count was vacated on the ground of an erroneous jury instruction on venue, the evidence supporting it, which informed the jury's verdict of guilt beyond a reasonable doubt, constitutes relevant conduct for this Court to consider in sentencing.  See U.S.S.G. § 1B1.3; see also United States v. Ghanem, 993 F.3d 1113, 1129 (9th Cir. 2021) (explaining that its decision to vacate the anti-aircraft missile count on venue jury instruction grounds turned on the substantial connection between the anti-aircraft missile conduct and the conduct alleged in the counts to which defendant pleaded guilty).

36

1              1.   Conspiracy to Use Anti-Aircraft Missiles

2        The evidence at trial showed that defendant engaged in and

3   profited from multiple transactions whereby he provided mercenary

4   anti-aircraft missile specialists to shoot down airplanes over Libya.

5   That evidence included many of defendant's own communications on

6   those transactions, and those documents were corroborated by the

7   testimony of three co-conspirators involved in one such transaction.

8   Specifically, the jury heard at trial the testimony of Zurab

9   Partsakhashvili and Gia Devidze, two Georgian operators of Igla anti-

10  aircraft missiles, whose mercenary services defendant procured and

11  then brokered to a rebel faction in Libya.[14]   The jury also heard the

12  testimony of Sandro Kavsadze, a Georgian arms broker who operated as

13  a middleman and escorted the Igla operators to their duty station in

14  Libya, and to whom defendant conveyed an offer of a $50,000 bonus to

15  any operator who succeeded in shooting down an airplane in Libya.

16       The evidence at trial extensively detailed this completed

17  transaction.  In early 2015, defendant negotiated with another co-

18  conspirator from the Republic of Georgia, David Shikhashvili, to

19  purchase —— among other defense articles and services —— the services

20  of the two mercenaries to fire Igla anti-aircraft missiles and one or

21  more mercenaries to fire Quadrat anti-aircraft missiles, for a total

22  of $398,000.[15]  Exhibits 400, 401, 403-406.  Exhibit 5400 included the

23  following photographs of Quadrat and Igla anti-aircraft missile

24  systems:

25  _____

26       [14] The sworn testimony of Partsakhashvili, Devidze, and Kavsadze
    was taken and preserved overseas, offered at trial, and admitted
27  pursuant to Rule 15 of the Federal Rules of Criminal Procedure.

         [15] As established at trial, the Igla system is a man-portable
28  shoulder-fired anti-aircraft missile system.  The Quadrat system is a
    mobile anti-aircraft missile system.

1
2
3
4
5
6
7
8
9
10
11

## 2K12 "Kub"/ 2K12E "Kvadrat" ("Cub"/"Quadrat")

 

12
13

Exhibit 5400 at 14.

14

## Igla-S MANPADS and 9M342 Missile

15
16
17
18
19
20
21
22
23

 

24
25

Exhibit 5400 at 7-8.

26
27
28

1   The evidence further showed that on February 10, 2015,
2   defendant's business partner, Mohamed Aldaboubi, paid the $398,000
3   invoice for these munitions and mercenary services to operate the
4   Igla and Quadrat anti-aircraft missiles, and that defendant forwarded
5   the record of the Swift wire transfer to Shikhashvili that same day.
6   Exhibits 407-408.  After payment, defendant and Shikhashvili
7   continued to negotiate the exact terms of the deal, and Shikhashvili
8   advised defendant of his trouble in obtaining the anti-aircraft
9   missile mercenaries.  Exhibits 409-12.  For example, on February 17,
10  2015, Shikhashvili told defendant, "Copy of the passports for
11  quadrant and igla can not be given now because several persons just
12  refused because of war situation there."  Exhibit 410.  Defendant
13  continued to press Shikhashvili to promptly provide the Igla and
14  Quadrat operators and other defense services and equipment,
15  threatening that if Shikhashvili did not come through soon, defendant
16  would cancel his order and "go back to my other supplier," and to get
17  the goods and services through "my other sources." Exhibits 410, 412.
18      On March 9, 2015, defendant sent a Skype message to Kavzadze,
19  who was acting as a middleman between defendant and Shikhashvili,
20  advising that he needed three Quadrat surface-to-air missile
21  specialists and two Igla operators/trainers.  As an incentive to the
22  Igla operators, defendant offered that any mercenary who successfully
23  shot down a Libyan aircraft would be given a $50,000 bonus and
24  permitted to go home immediately.  Exhibits 413, 424.  Once the Igla
25  operators were identified, defendant sent their passports to his
26  Libyan militia client; arranged for their visas and transportation to
27  Misurata, Libya, along with Kavzadze as an escort; and met with
28  Kavzadze in Istanbul while en route with the mercenaries to their

1    duty station.  Exhibits 420, 439-445.

2         The Igla operators, who were desperate enough to risk their

3    lives fighting in a bloody civil war on another continent, received a

4    relative pittance for their services, while defendant pocketed

5    several times what he paid another broker for those services.

6    Compare Exhibit 426 (defendant allocated a $50,000 total payment to

7    his broker —— who presumably took his own sizeable cut —— for three

8    Quadrat surface-to-air missile specialists for Libya), with Exhibits

9    819-820 (defendant charged his Libyan customer $185,000 for services

10   of that same Quadrat surface-to-air missile crew).  One of the Igla

11   missile operators whose recorded testimony was shown at trial,

12   Partsakhashvili, testified that he needed the money from this

13   mercenary job to pay for his child's cancer surgery.  Exhibit 1015,

14   transcript at 32.  Another missile operator, Devidze, testified that

15   he needed the money to address his family's desperate financial

16   situation.  Exhibit 1016, transcript at 55-56, 66.  Both missile

17   operators testified that they ultimately received only a small

18   portion of the fees they were promised —— which was itself a meager

19   fraction of the money that defendant and his fellow brokers pocketed

20   from the missile operators' risk and labor.  See also Exhibits 819-

21   20; Exhibit 422 (as defendant and his co-conspirator discussed the

22   allocation of defendant's funds and where to find an additional

23   $9,000, the co-conspirator advised that they could "deduct" it from

24   the money paid to the missile operator).[16]

25

26        [16] Examples of defendant's underhanded, deceitful, and in some
     cases exploitative business practices abound.  As another
27   illustration of his willingness to take advantage of desperate men
     who were risking their lives to line defendant's pockets, defendant
28   deliberately crafted his mercenary contracts to be governed by the
                                                    (footnote cont'd on next page)

## 2.  Conspiracy to Transfer Anti-Aircraft Missiles

In addition to defendant's conspiracy to use anti-aircraft missiles, the evidence at trial included numerous written communications reflecting defendant's conspiracy to buy, sell, and transfer many hundreds of anti-aircraft missiles, including highly sophisticated vehicle-borne systems capable of tracking and destroying an airplane hundreds of miles away; smaller and less costly mobile systems with a shorter range; agile man-portable systems that were easily transferred, inexpensive, and simple to use; and stationary missile systems capable of launching multiple warheads.

Defendant's extensive communications advertised his willingness and ability to buy, sell, and broker anti-aircraft missiles of all kinds.  These ranged from the small, shoulder-fired, man-portable air-defense systems ("MANPADs", including Igla, Strela, and others) favored by insurgents and terrorists because of their agility on the battlefield, low cost, and the relative ease of obtaining them, to the massive and highly sophisticated vehicle-borne Russian S-400 and S-300 Triumph systems, which —— as established through the trial testimony of the government's missile expert, Dr. Doherty —— can track and destroy an airplane hundreds of miles away and sells for billions of dollars.  Exhibit 5400 contained the following photograph of an S-400 anti-aircraft missile system:

laws of Serbia —— a country with no nexus to defendant, the work, or the mercenaries —— for the stated reason that Serbian law made it illegal to work as a mercenary, and thus no aggrieved mercenary would ever be able to challenge defendant's contract in court.  See e.g. Exhibits 723, 728.

Exhibit 5400 at 1.

The following photograph of an S-300 anti-aircraft missile system was
also admitted as part of Exhibit 5400:



Exhibit 5400 at 4.

Examples of the abundant evidence showing defendant's involvement in brokering these various anti-aircraft missile systems include the following:

- Exhibits 302-303: In 2013, defendant engaged in a Skype discussion with a Russian supplier. Defendant advised that his client, "The government of Saudi Arabia," was seeking to purchase an "S-400 Triumf." Defendant told his supplier that if the supplier could obtain approval from the Russian authorities for Saudi Arabia's purchase of this tightly controlled multibillion-dollar anti-aircraft missile system, "I can arrange from Saudi to complete the deal." Defendant further noted that, "the Saudi King had already approved" the deal. After his supplier relayed the terms of the proposed deal, defendant replied that he had discussed those terms with "my Saudi partners HRH [his royal highness] prince Saud."[17]

- Exhibit 300: On September 6, 2013, via Skype message, defendant conveyed to another arms broker, "Just for your information Prince Saud receive a green line from King to purchase the S 400 this is billions of dollars."[18]

- Exhibit 305: On September 9, 2013, defendant conveyed to his business partner via Skype that he was pursuing a deal to supply arms, including Igla MANPADs, "in a covert way" to a client in the United Arab Emirates who would provide the arms to Arab rebel groups in Libya, Syria, and the Kurdish region of Iraq. Defendant explained that the client did not have an end-user certificate and did not want to obtain necessary approvals for the arms.

- Exhibit 307-308: On September 9, 2013, defendant conveyed the same information from Exhibit 305 to another potential supplier seeking the same list of armaments, including Igla MANPADs, for sale to his client in the UAE.

- Exhibit 309: On September 29, 2013, defendant sent the same list from Exhibits 305, 307, and 308 to another potential

[17] At trial, the government's anti-aircraft missile expert testified that in 2013, the Saudi government was seeking to acquire an S-400 Triumph anti-aircraft missile system from the Russian government. CR 424 at 50:16-53:8, 54:6-55:12.

[18] At trial, the government's anti-aircraft missile expert testified that the price of an S-400 Triumph anti-aircraft missile system ranged from hundreds of millions to billions of dollars. CR 424 at 55:21-56:6.

44

supplier of the arms defendant sought to purchase,
including Igla MANPADs.

- <u>Exhibits 312-314</u>: Email discussions between defendant and
  another co-conspirator regarding a list of weapons that
  defendant sought to sell to a customer in Erbil, Iraq,
  including "30 + 300" Igla 9K38 surface-to-air missiles.

- <u>Exhibits 315-316</u>: On July 3, 2014, defendant offered to
  sell 95 Igla surface-to-air missiles to a customer in Iraq
  at $88,300 each.

- <u>Exhibit 318</u>: On July 30, 2014, defendant offered to sell to
  the Ministry of Defence in Saudi Arabia 400 Strela surface-
  to-air missiles at $75,830 each and 95 Igla surface-to-air
  missiles at $77,375 each.

- <u>Exhibit 319</u>: On August 30, 2014, defendant sent to a co-
  conspirator "a list of items [for] which we will have an
  order very soon from KSA [the government of the Kingdom of
  Saudi Arabia]," which included 95 Igla MANPADs, 8 Strela
  MANPAD missile launchers and 400 Strela MANPAD missiles.

- <u>Exhibit 324</u>: On November 11, 2014, defendant asked an
  Israeli supplier whether he could provide "any air defense
  unit carried on shoulder."

- <u>Exhibit 326</u>: On November 13, 2014, defendant provided the
  same Israeli supplier a draft fraudulent end-user
  certificate and asked that the supplier "see if you can add
  any air Defence systems to the EUC."

- <u>Exhibit 328</u>: On December 8, 2014, defendant sent his
  business partner an email with a list of "Follow up" items
  that began with "Air [defense] system" and "Air Defence
  maintenance team."

- <u>Exhibit 329</u>: On December 23, 2014, defendant emailed with a
  co-conspirator about the transfer of 25 Osa surface-to-air
  missiles and one Pechora surface-to-air missile system to
  defendant's customer in Libya.  Exhibit 5400 included the
  following photographs of Osa and Pechora missile systems:

45



Exhibit 5400 at 15.

## S-125 Pechora Missile System

 

Exhibit 5400 at 16.

- <u>Exhibit 333</u>: On January 5, 2015, defendant received an email from a supplier located in Israel stating that they would soon provide defendant with requested "answers for the air defense systems."

- <u>Exhibits 334-344</u>: These exhibits include defendant's January 5-11, 2015 communications with Shikhashvili and other co-conspirators involving defendant's creation of a fraudulent end-user certificate that reflects defendant's role as the supplier of 50 Igla 9M313 surface-to-air missiles to a militant faction in Libya, and an ultimate payment by defendant relating to weapons listed on that end-user certificate.

- <u>Exhibit 339</u>: On January 7, 2015, amidst defendant's correspondence with Shikhashvili and others regarding the creation of a fraudulent end-user certificate so that Igla anti-air missile systems, among other weapons, could be sold to defendant's client in Libya, defendant emailed to Shikhashvili on January 7, 2015, attaching the below photograph of an Igla shoulder-fired anti-aircraft missile system in the field.  <u>See also</u> CR 424 at 62:21-64:10.



Exhibit 339.

- Exhibit 304: On May 19, 2015, defendant received an email from a co-conspirator advising defendant on efforts to supply the government of Saudi Arabia with an S-300 or S-400 anti-aircraft system.

- Exhibit 346: This communication from defendant to a co-conspirator discussed the prospective sale of a variety of weapons and munitions including 500 Igla 9M342 surface-to-air missile systems, 1500 ground power units for Igla systems, and 20 launcher mechanisms for Igla systems.

- Exhibit 349: This communication from defendant to a co-conspirator identified a large volume of weapons and ammunition intended for use in an end-user certificate "for our agreed country," including "6 Anti-air Defence System with Missile".

## I.   Defendant's Other Relevant Conduct

### 1.   Defendant's Pursuit of Black-Market Uranium[19]

During the same time period, defendant was also involved in the trade of black-market uranium, a critical component in the development of nuclear weapons and dirty bombs.  In a text exchange beginning on June 4, 2015, defendant engaged in the following conversation:

Jayjay:      Will you be interested in uranat in Niger
             . . . I mean uranium.

Defendant:   Yes but the French are controlling it in
             Niger and I have somebody from China.

Jayjay:      This from black market. It will be suplied
             outside Niger. The people are here in Benin.
             It is very serious. Think about . . . . The
             people doing are also from Niger. They are
             very powerfull

Defendant:   I don't understand are you selling the uranium or
             are you offering the mining opportunity

Jayjay:      It is selling business in the black not
             officially.  But the minister of mines is
             involved, top secret.

---

[19] While the previously assigned judge declined to place any weight on this evidence in 2019 (CR 457 at 33:22-34:1), it now falls to this Court to consider all of the relevant evidence and determine how to weigh it.  See United States v. Ponce, 51 F.3d 820, 826 (9th Cir. 1995) (district court not bound by prior sentencing findings); United States v. Matthews, 278 F.3d 880, 885-86 (9th Cir. 2002).

1      Defendant:      How much per M/Ton[20]

2      Jayjay:         I do not know yet since I did not know whether

3                       you might be interested. Now that you make me
                       know, i will find out and come back to you.

4      Defendant:      Soon while i am in China

5      Jayjay:         OK sir

6      [ten days later]

7      Defendant:      Any news about uranium?





Exhibit 1106.

[20] A metric tonne (or metric ton) is a unit commonly used to measure a quantity of uranium.

1       This evidence establishes several disturbing facts.  It shows
2  that defendant had a fairly firm grasp on the market for uranium,
3  that he knew immediately who was controlling it in the source country
4  it was being offered from, and that he knew the proper units of
5  measure and pricing structure.  Most troubling, it shows that
6  defendant had multiple suppliers for illegal uranium, including one
7  in China **with whom he was already working** and with whom he apparently
8  intended to discuss this opportunity.  It also demonstrates that
9  defendant was sufficiently interested in this opportunity to obtain
10  uranium in a "top secret," "black market" deal involving a corrupt
11  government minister in Niger to follow up with a further inquiry.[21]
12  Id.

13       Defendant's pursuit of black-market uranium is deeply
14  aggravating.  **According to a Harvard-based nuclear nonproliferation**
15  **expert: "There's no plausible reason for looking for black-market**
16  **uranium other than for nuclear weapons —— or profit, by selling to**
17  **people who are looking to make nuclear weapons."**
18  https://www.usatoday.com/story/news/world/2012/12/10/georgia-nuke-
19  investigations/1757963/.  Exhibit 1108.  This related conduct
20  exemplifies defendant's own professed lack of regard for the
21  potentially catastrophic consequences of his illegal weapons-
22  proliferation activities, and his acknowledged interest in profit at
23  the expense of human life and safety.  It is a particularly strong
24  aggravating factor in this case.

25

26

27      [21] Defendant's known interest in the black-market trade of
uranium dates back to 2012, when he sent a message to a co-
28  conspirator reporting that "900 g of Uranium the free army of Syria
trying to move it in exchange for arms."  Exhibit 1107.

1                         (A)   Defendant's Counterfeit Currency Operations

2          Possibly to fuel his illegal weapons-trafficking business, or

3    perhaps as another means to obtain easy illicit profits, the evidence

4    suggests that defendant engaged in lucrative counterfeit currency

5    operations during the time of the charged conduct.  In the spring of

6    2014, defendant gave one of his business partners (Sergiu Banari,

7    referenced in the First Superseding Indictment ("FSI") as

8    Unidentified Co-Conspirator #3) his detailed, seasoned advice on the

9    mechanics of counterfeiting:

10       Banari:        I have a Buyer that is interested to buy USD
                        and old Deutsch Marks that are still on the
11                      full sheets of paper, not cut. . . .  This
                        full sheets of USD had been delivered to
12                      Iran, Irak long time ago and still not used.
                        But, my opinion is, if you ask the right
13                      powerful people in these countries, they
                        will tell you a lot more about where to find
14                      them.

15
         Defendant:    your friend is looking for the papers which he
16                      can change it to Euro & Dollars

17       Banari:        Uncut sheets of USD, nominal can be $20, $50,
18                      $100

19       Defendant:    It's a white [paper] money note each one is the
                        same size of the 500 Euro other ones same size of
20                      the 100 Euro also we have the one for the 100
                        USD, if you look at it through the light you will
21                      be able to see the serial number like a shadow .
                        . . . you add chemicals to it and you use
22                      original money to copy the exact shape each 1
                        (500 Euro makes 2 more of the white one)
23

24   Exhibit 1109 at 20-24.

25       Multiple photographs obtained from court-authorized searches of

26   defendant's digital devices depict bulk quantities of $100 bills,

27   €200 notes, and €500 notes.  Exhibits 1110-1114.

28

                                    52

2.   Defendant's Pursuit of a Counterfeit Passport

For several months in 2015, during the offense conduct and shortly before his arrest, defendant acquired a sophisticated counterfeit Ukrainian travel document using a false name, false date of birth, false marriage, and false parentage in order to conceal and facilitate his illegal conduct and obscure his true identity. Defendant also explored the possibility of obtaining, for $20,000, a biometrically enabled passport.  This evidence includes documents reflecting the following:

- Exhibit 1115: On July 2, 2015, defendant and his business partner Sergiu Banari (Unidentified Co-Conspirator #3) engaged in a text exchange in which Banari provided the following verbatim price list for defendant's fraudulent document:

    Only international - 12,000$
    Only international biometric 13500$
    Full complect your name: international + local = -15000$
    Full complect new name. = 20000$

- Exhibit 1116: Shortly thereafter, Banari reported to defendant the "best news in the world" that defendant "will have your new P…" by the end of August, and advised defendant to "choose your name, or if you want I can do it."

- Exhibit 1117: On July 3, 2015, Banari advised defendant by email that defendant's fictitious identity would include the false name "Roman Tarasovici Boico," a made-up mother's name "Hristina Nicolaevna Kostiuc," and a made-up father's name "Taras Vasilievic Boico."  Defendant jokingly replied that he would "have to go back to school to remember those names."

- Exhibit 1118: On July 4, 2015, Banari told defendant that his Ukrainian contacts recommended that defendant choose a fictitious Arabic name, and manufacture a fictitious Ukrainian marriage, to account for defendant's inability to speak the native language.  Defendant replied with a

"thumbs up" emoji and told Banari that defendant sent the
names to him.

- <u>Exhibit 1119</u>: That day, defendant sent Banari an email with
  the subject header "Name."  The text indicated the name
  defendant had chosen for his fraudulent travel document as
  "Rony Youssef Karam."  It further indicated false names for
  defendant's mother and father and a false date of birth.

- <u>Exhibits 1120-21</u>: On September 10, 2015, Banari texted
  defendant asking him to send a "very simple signature
  according to the name we choose: Rony Youssef Karam."
  Defendant replied with photographs of several different
  handwritten signatures reflecting his fictitious name.  The
  same day, defendant also sent Banari an email entitled
  "Hello from Roney" with an attachment of one of his
  signatures using the false name.

- <u>Exhibit 1122</u>: On October 25, 2015, Banari sent defendant an
  email forwarding defendant's fraudulent certificate of
  marriage and fraudulent certificate to receive internal
  passport.

- <u>Exhibit 1123</u>: On October 27, 2015, Banari sent defendant a
  scanned copy of defendant's new false Ukrainian travel
  document bearing defendant's photograph and the fictitious
  name and date of birth that defendant selected.

Defendant's willingness to go to substantial lengths to obtain
fraudulent travel documents to help facilitate and conceal his
criminal activity further aggravates that criminality.

### 3.    Defendant's Involvement in Other Illegal Activity

Defendant's fortune-seeking also led him to pursue deals
involving other illegal commodities, including looted antiquities,
which draw can massive profits on the black market.  Defendant's
digital devices contained multiple photographs of apparent
antiquities, including a photo of defendant holding an artifact next
to a dated newspaper —— a common practice for establishing proof of
possession on a particular date.  Exhibit 1124.  Antiquities looting

is frequently concentrated in areas of armed conflict, and the black-market traffic in cultural artifacts is often closely linked to financing those conflicts and arming combatants.  See, e.g., Fabiani, Michelle D., "Disentangling Strategic and Opportunistic Looting: The Relationship between Antiquities Looting and Armed Conflict in Egypt," MDPI, June 14, 2018, https://www.mdpi.com/2076-0752/7/2/22/pdf (Exhibit 1125); see also Pineda, Sam, "Tackling Illicit Trafficking of Antiquities and its Ties to Terrorist Financing," Dipnote, U.S. Department of State Official Blog, June 20, 2018, https://blogs.state.gov/stories/2018/06/20/en/tackling-illicit-trafficking-antiquities-and-its-ties-terrorist-financing (Exhibit 1126).

Evidence from defendant's digital devices and email account also demonstrates his involvement in the black-market trafficking of diamonds and his use of diamonds to mask and fund illegal arms transactions.  This evidence includes a September 29, 2015 email to defendant from a South Africa entity known as AA Diamonds attaching a quote for sniper rifles, pistols, silencers, and ammunition.  Exhibit 863.  The following day, on September 30, 2015, defendant received another email from AA Diamonds with specifications for four MI-24V helicopter gunships, fully armed with GSH-23L aircraft guns, machine guns, submachine guns, pistols with silencers, and other armaments.  Exhibit 864.  On October 9, 2015, defendant forwarded to his business partner an invoice from AA Diamonds purportedly reflecting the purchase of a 4.7-carat polished diamond for $200,000, and a November 5 email to defendant from his business partner contains a SWIFT record of the transfer of $20,000 from their company to AA Diamonds as a down payment on that invoice.  Exhibits 865-66.  On October 10,

2015, in a call with the undercover agent, defendant confirmed that he was involved in laundering diamonds from South Africa for arms, saying that "I can change diamonds to dollars."  Exhibit 1127. Defendant's involvement in these illegal activities is further corroborated by a photograph stored on defendant's digital devices depicting a very large, uncut diamond.  Exhibits 1128-1130.  Like looted antiquities, black-market diamonds are another lucrative commodity closely linked to the fueling and financing of armed conflicts and the illegal proliferation of weapons and munitions. See, e.g., "The Role of Diamonds in Fuelling Conflict," United Nations General Assembly A/71/L.55, January 27, 2017, https://digitallibrary.un.org/record/858195/files/A_71_L-55-EN.pdf. Exhibit 1131.

### 4.   Defendant's False Statements to USPO

Even in the wake of his strategic eleventh-hour guilty pleas and his conviction at trial, defendant sought to minimize his illegal arms-trafficking activities.  Notwithstanding the reams of evidence of defendant's deep involvement in the illegal brokering and trafficking of weapons over the course of many years, many of which were in defendant's own verbal and written words, defendant reported to the USPO that "he has never seen or touched any military equipment, including an AK-47," and claimed that his access to weapons was so curtailed that he was limited to learning about them through online research.  CR 390 at ¶ 90.  Defendant's statements are contradicted by voluminous evidence at trial and sentencing, which included defendant's detailed discussions and negotiations relating to hundreds of weapons systems and other military articles and services.  His statements to the USPO are also visually belied by the

following photographs, obtained from defendant's digital devices, in
which defendant is pictured standing directly in front of a display
of numerous assault rifles, holding a large-caliber ammunition round,
and pretending to smoke it like a cigar:



Exhibits 1132-33.

IV.   **GOVERNMENT'S SENTENCING POSITION AND RECOMMENDATION**

A.   **Sentencing Guidelines Calculations**

1.   <u>The Applicable Guidelines</u>

The applicable guidelines section for Counts 1 (Arms Export
Control Act) and 2 (Smuggling) of the Indictment and Counts 1
(Conspiracy) and 2 (Arms Export Control Act) of the First Superseding
Indictment is USSG 2M5.2.  The applicable guidelines section for
Counts 3 and 4 (Money Laundering) of the Indictment is USSG 2S1.1.

| | | |
|---|---|---|
| Base Offense Level: | 26 | [USSG §§ 2M5.2(a)(1)] |
| Conviction under 18 U.S.C. § 1956 | +2 | [USSG § 2S1.1(b)(2)] |
| Total Offense Level: | 28 | |

**B.   Response to Defendant's Objections to PSR[22]**

    **1.   The PSR Correctly Declined to Apply a Reduction For Acceptance of Responsibility**

Defendant's objection to USPO's declination to apply a two-level reduction for acceptance of responsibility under USSG 3E1.1(a) is misplaced. A defendant is not entitled to an adjustment for acceptance of responsibility merely because he pleads guilty. See USSG § 3E1.1, Application Note 3. For strategic reasons, defendant elected to plead guilty on the literal eve of trial to only six of the seven counts charged. All seven counts were closely intertwined and grouped for sentencing purposes. Defendant proceeded to trial on the remaining count, which carried a lengthy mandatory minimum sentence. Defendant's eleventh-hour plea decision can best be understood as a "clever bargain," rather than genuine acceptance of responsibility. United States v. Rosales, 917 F.2d 1220, 1223 (9th Cir. 1990) (overruled on other grounds by United States v. Nordby, 225 F.3d 1053 (9th Cir. 2000)). Defendant's aforementioned untruthful statements to the USPO falsely denying having ever laid eyes on any military equipment further illustrates his lack of actual acceptance of responsibility. CR 390 at ¶ 90.

After years of protracted litigation seeking to eviscerate the government's case on all seven counts, defendant suddenly pleaded

_____

[22] In his objections to the PSR, defendant inaccurately characterized the nature of the Ninth Circuit's decision, which vacated, not reversed, defendant's conviction on the missile count. See CR 490 at 1, 2.

guilty the afternoon before trial on six counts and then proceeded to a lengthy trial on the missile count.  At trial, he extensively cross-examined government witnesses, vigorously argued against his guilt, litigated a motion for directed acquittal arguing that no reasonable jury could have found him guilty on the evidence, and litigated a motion for a new trial on multiple grounds.

After he was convicted, he continued to contest and minimize his guilt at sentencing.  See CR 413 at 4 ("Yet, the evidence at trial showed Ghanem never sold, purchased, imported or exported any surface-to-air missiles nor did he enter into any agreements to do so, despite numerous efforts by an undercover agent to engage him in such activities.  At most, Ghanem solicited many persons for the purchase of surface-to-air missiles which were never consummated"); see also id. at 4 (alleging that some of the missiles that defendant's mercenaries were hired to use were inoperable); id. at 4-5 (arguing that one of defendant's mercenaries was not fully trained and qualified to operate the missiles, and that the other mercenary's eyesight was poor); id. at 6-7 (alleging that defendant's efforts to broker missiles "never came to fruition").

The application note to the sentencing guidelines section on adjustments for acceptance of responsibility provides that the Court should consider defendant's actions in "truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is responsible under § 1B1.3 (Relevant Conduct)."  USSG § 3E1.1, Application Note 1(A).  And the Ninth Circuit has held that a defendant who "falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."  United States v.

1  *Green*, 940 F.3d 1038, 1042-43 (9th Cir. 2019); see also United States

2  v. Ginn, 87 F.32d 367, 370 (9th Cir. 1996) ("a defendant is not

3  entitled to an adjustment when he does not accept responsibility for

4  all of the counts of which he is convicted"; United States v.

5  Garrido, 596 F.3d 613, 619 (9th Cir. 2010) (a defendant must accept

6  responsibility for all grouped offenses in order to receive an

7  acceptance adjustment for those offenses).

8      Defendant has never accepted responsibility for his conspiracy

9  to use and to transfer anti-aircraft missiles.  After being convicted

10 at trial, defendant claimed at sentencing that he hadn't actually

11 committed any real crimes (CR 457 at 46:14-47:4), accused the

12 undercover agent of trying to induce him to broker surface-to-air

13 missiles (CR 413 at 4), complained that the mercenaries whose

14 services he brokered for were unqualified and physically unable to

15 fire anti-aircraft missiles (id. at 4-7), and suggested that he was

16 just a bumbling salesman who wasted years engaging in protracted

17 negotiations on countless deals that never came to fruition (id. at

18 7).

19      Notwithstanding defendant's strategic pleas of guilty to six of

20 the counts against him, the government does not perceive that

21 defendant has expressed genuine contrition and accepted

22 responsibility for any, let alone all, of his relevant criminal

23 conduct.  Nonetheless, the government recognizes that the sentencing

24 judge is in the best position to determine whether defendant has

25 expressed genuine contrition at the time of sentencing and defers to

26 the Court on the applicability of 3E1.1(a).

27

28

2.   The PSR Appropriately Applied the Guidelines, and USPO's Recommended Upward Departure Is Justified

a.   *The USPO Correctly Recommended a Substantial Upward Departure in Accordance With the Sentencing Guidelines*

Defendant's argument that the PSR "misapplie[d]" the sentencing guidelines is misplaced.  Defendant does not appear to object to the applied guidelines themselves, but rather takes issue with USPO's position in the accompanying disclosed recommendation letter that a significant upward departure is warranted by the extraordinarily aggravating facts of this case.  As a starting point, the sentencing guidelines are of course advisory only.  United States v. Booker, 543 U.S. 220 (2005).  This Court has discretion to impose any appropriate sentence up to the 95-year statutory maximum for defendant's six offenses of conviction.[23]

Moreover, defendant's reading of the application notes to the guidelines (which are themselves explanatory and not prescriptive) is selective.  Defendant acknowledges that the offense conduct's effect on "a security or foreign policy interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences" are appropriate factors to consider, but he argues that this is only so within the bounds of the applicable guideline range —— here, 78-97

___

[23] See 18 U.S.C. § 3584(b) ("The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)"); see also United States v. Wills, 881 F.2d 823, 826 (9th Cir. 1989) ("We hold that a judge has discretion to impose a concurrent or consecutive sentence, as a matter of law . . . .   If the guidelines are to be consistent with Title 18, the discretion cannot be taken away.").

months.[24]   Def. Obj. to PSR, at 4; USSG § 2M5.2, application note 2.
But defendant overlooks the next sentence in the same application
note, which states, "Where such factors are present in an extreme
form, a departure from the guidelines may be warranted." Id.   The
presence in "extreme form" of each of these factors in this case
cannot be overstated, and USPO's recommendation of a 20-year sentence
was neither impermissible nor inappropriately high.

Defendant points to United States v. Pedrioli, 978 F.2d 457 (9th
Cir. 1992) in warning the Court not to apply a sentence above the
applicable guidelines range.  As an initial matter, that case was
decided in the pre-Booker days, when judges were shackled by the
then-mandatory sentencing guidelines and lacked the freedom to impose
sentences that were appropriately tailored to the facts of a
particular case.  Substantively, Pedrioli also offers defendant no
support, as its facts are profoundly different.  In Pedrioli, the
court considered whether 800 handguns constituted an "extreme" number
of weapons, such that an upward departure from the mandatory
guidelines range was permissible.  Here, by contrast, the evidence
showed that defendant brokered many millions of rounds of ammunition,
along with virtually innumerable quantities and varieties of
missiles, rockets, mortars, machine guns, sniper rifles, assault
rifles, fighter jets, tanks, assault helicopters, and other heavy
weapons.  The court in Pedrioli further relied on common sense in
holding that when evaluating whether the volume of illicit weapons
trafficked warranted a departure, the type of weapon mattered.  978

[24] As noted herein, defendant argues that he is entitled to a
two-point reduction pursuant to USSG § 3E1.1; thus, in his view, the
applicable guideline range should be 63-78 months.

F.2d at 460 ("What constitutes an 'extreme' number under § 2M5.2 will vary with the type of weapon involved.  Three Tomahawk missiles are different from three armored vehicles, which in turn are different from three handguns.").  Again, the munitions involved in this case are worlds apart, both in quantity and destructive quality, from the 800 low-caliber handguns at issue in Pedrioli.

Defendant likewise relies on Pedrioli for the conclusion that the intended use of his weapons for advanced warfare is irrelevant and inappropriate for consideration, but Pedrioli says no such thing. Def. Obj. to PSR, at 4.  Rather, the court in Pedrioli reviewed and rejected the district court's finding that the 800 handguns at issue were intended to wage war, noting that the PSR indicated an entirely contrary purpose —— namely, that the handguns were smuggled to be given as gifts or favors for the ultimate purpose of being used in gun clubs pursuant to local custom in the Philippines.  978 F.2d at 460.  The court further observed, "we are not persuaded that combatants 'wage war' primarily with small caliber handguns." Id. By marked contrast, *waging war is the only possible use* for the missiles, rockets, mortars, tanks, machine guns, and other assault weaponry that defendant made his living buying and selling.

Defendant also cites to United States v. Tsai, a Third Circuit case that was similarly decided before Booker rendered the guidelines advisory.  954 F.2d 155 (3rd Cir. 1991).  Defendant erroneously characterizes the defendant in that case as a "sophisticated and repeat arms trafficker[] who dealt in weapons of war," and states that "the defendant in Tsai dealt with missile systems and was attempting to obtain thousands of them."  Def. Obj. to PSR at 5. This is a stretch, as the defendant in Tsai was charged with dealing

1    in components that could be used (though not necessarily exclusively)

2    for missile systems.  Tsai, 954 F.2d at 159-160 (explaining that

3    defendant introduced evidence that at least one of the components had

4    non-military uses).  After finding that "[n]o evidence suggest[ed]

5    that the volume and scope of exports involved in this case were

6    extremely large," the Third Circuit found that the 5,000 optical

7    receivers sought by the Tsai defendant did not constitute an

8    "extreme" volume of commerce.  Id. at 165.  That finding is of no

9    moment for defendant here, who unquestionably trafficked in an

10   extreme volume of fully assembled heavy armaments.

11        A more apt case than Pedrioli with his 800 handguns or Tsai with

12   his optical domes is United States v. Johnson, 952 F.2d 565, 584 (1st

13   Cir. 1991.  There, the defendants were convicted of violating AECA by

14   exporting bomb-making materials and of conspiracy to destroy British

15   military helicopters in Northern Ireland.  Id. at 570-71.  In

16   Johnson, as here, USSG § 2M5.2 applied, but the district court found

17   the prescribed guidelines range to be inadequate on the facts of the

18   case and departed upward.  Id. at 582-83.

19        The district court in Johnson carefully detailed the reasons for

20   its departure decision, which included the "cool, deliberative,

21   calculated" quality of the defendants' discussion of the weaponry

22   involved and "the utter lack of any expression of remorse or

23   contrition" in those conversations; the "potential for death to

24   innocent people" caused by the defendants' activities; the "extreme

25   amount of planning and sophistication in the arms export conspiracy";

26   the multiple occurrences of illegal conduct; the threat that the

27   defendants' conduct posed to an American security interest, namely,

28

1   peaceful resolution of a foreign conflict in a strategic region.[25]

2   Id. at 583.  The First Circuit found each of these factors to be an

3   appropriate basis for a departure.[26]   Id.

4       Like defendant here, the defendants in Johnson objected to the

5   district court's consideration of "the threat to national security

6   and the potential for death and destruction" presented by their

7   conduct as aggravating factors, reasoning that the existence of a

8   threat to national security and the potential for death and

9   destruction were presumptions already accounted for in § 2M5.2, the

10  guidelines section applicable to their offenses.  Id. at 584.  The

11  First Circuit roundly rejected that position:

12          We find no merit to these arguments.  Their logic would
            require that an internationally trained terrorist bent on
13          murdering scores of innocent civilians be sentenced no more
            severely than an unlicensed arms dealer; and that one who
14          would provide arms to a body of insurgents be sentenced no
            more harshly than one who would supply them with drug
15          paraphernalia.  The guidelines plainly preclude such
            results.  Section 5K2.0 permits an upward departure where
16          factors —— a threat to national security or terroristic
            purpose, for example —— are present "to a degree

17

18          [25] The sentencing court in Johnson also characterized the
        defendants' conduct as "terrorism."  952 F.2d at 583.  As further
19      noted herein, in a discussion about his arms-trafficking network,
        defendant described his ties to the leadership of Hezbollah, a
20      designated foreign terrorist organization.  Moreover, defendant made
        clear to the UCA that he did not particularly care in whose hands his
21      weapons ended up, so long as he got paid.

22          [26] The Johnson court found that USSG §§ 5K2.0, 5K2.8, and 5K2.14
        all operated to justify the upward departure, and it discussed those
23      sections at some length.  Section 5K2.0 generally provides that the
        sentencing court may impose a sentence outside the range recommended
24      by the guidelines if it finds aggravating or mitigating circumstances
        "of a kind or to a degree not adequately taken into consideration by
25      the Sentencing Commission in formulating the guidelines."  Section
        5K2.8 authorizes a departure for "unusually . . . cruel" or otherwise
26      "extreme conduct."  Section 5K2.14 provides that "[i]f national
        security, public health, or safety was significantly endangered, the
27      court may depart upward to reflect the nature and circumstances of
        the offense."  While the import of these general guidelines
28      considerations may be lessened after Booker, §§ 5K2.0 and 5K2.14 in
        particular underscore the propriety of a substantial upward departure
        on the facts of this case.

                                     65

1
2

substantially in excess of that which ordinarily is
involved in the offense of conviction," or in any
configuration "'not adequately taken into consideration'"
by the Sentencing Commission.

3
4

Id. at 584 (internal citations omitted).  Far more so than even in

5

Johnson, defendant's extreme and extensive conduct, which presented a

6

significant threat to national security and massive potential for

7

death and destruction, certainly warrant an upward departure.

8

Defendant argues that among the 119 defendants sentenced under

9

§ 2M5.2 in 2020, none involved an upward departure, and thus that the

10

PSR's recommendation in this case is an "outlier."  Def. Opp. to PSR,

11

at 6.  As a purely factual matter, defendant's case is most certainly

12

an outlier among the type of garden-variety AECA cases typically

13

sentenced pursuant to § 2M5.2, the vast majority of which do not

14

involve trafficking in immense quantities of rockets, anti-tank

15

missiles, anti-aircraft missiles, mortars, tanks, fighter aircraft,

16

machine guns, automatic rifles, and many millions of rounds of

17

ammunition to feed those weapons.

18

b.   The USPO's Recommended Upward Departure Is Fully
Consistent With the Constitution

19

Defendant cites to a dissent from the Supreme Court's denial of

20

certiorari in Jones v. United States, 135 S.Ct. 8 (2014) in support

21

of his complaint that the upward departure recommended by the USPO is

22

"unconstitutional, or at least constitutionally doubtful," because

23

the Court should not be permitted to consider his anti-aircraft

24

missile trafficking conduct in light of the Ninth Circuit's vacatur

25

of his conviction on venue jury instruction grounds.  Defendant is

26

wrong, as the law is clear that the Court can and should consider his

27

relevant conduct in imposing a sentence.  See 18 U.S.C. § 3661 ("No

28

limitation shall be placed on the information concerning the

1  background, character, and conduct of a person convicted of an

2  offense which a court of the United States may receive and consider

3  for the purpose of imposing an appropriate sentence."); see also

4  United States v. Watts, 519 U.S. 148, 151-152 (1997) (a sentencing

5  court may consider *even conduct of which a defendant has been*

6  *acquitted*) (emphasis added).

7      The dissenting opinion in Jones does not support defendant's

8  position.  In Jones, the jury convicted the defendants of

9  distributing small quantities of crack cocaine, but it acquitted them

10  of a larger drug conspiracy.  Id.  At sentencing, based on evidence

11  that included recordings of the defendants engaging in sales of crack

12  cocaine and testimony from several other members of the conspiracy,

13  the judge found that defendants had in fact engaged in the conspiracy

14  and, in reliance on that judicial finding, sentenced the defendants

15  based on the larger drug quantities involved in the conspiracy.  Id.

16  The convictions were upheld, and upon the Supreme Court's denial of

17  the defendants' petition for certiorari, the dissent posited that the

18  Apprendi rule should have been extended to hold that any fact

19  necessary to prevent a sentence from being substantively unreasonable

20  is an element that must be found by a jury, not a judge.

21      Even if the dissenting votes of three justices were to be

22  credited over the remainder of the Supreme Court and the contrary

23  D.C. Circuit opinion, which remains the law, the key fact found

24  compelling by the Jones dissenters is also inapposite: defendant here

25  was not *acquitted* of the conduct at issue.  Quite the opposite —— on

26  evidence that the trial judge later deemed "overwhelming," a jury

27

28

1    found defendant guilty beyond a reasonable doubt of that conduct.[27]

2    This Court can and should consider that conduct in determining the

3    appropriate sentence.

4         The USPO's recommendation for a very substantial upward

5    departure is entirely warranted.  Indeed, it can be faulted only for

6    not going far enough.

7                    *c.   Defendant Is Not Entitled To Sentencing Leniency
                          On the Basis of Alleged Lack of Evidence of*
8                    *Completion of His Arms Transactions*

9         Defendant repeats his prior claims, unsupported by any evidence,

10   that he merely engaged in "preliminary talk or discussion regarding a

11   wide range of deals," and that "almost all of that discussion never

12   materialized."  Def. Obj. to PSR, at 5; see also Def. 2019 Sentencing

13   Memorandum (CR 413) at 11-12 ("for over five years, Ghanem solicited

14   others for the sale of surface-to-air missiles without being able to

15   consummate one deal during this time"; "Ghanem has proven to be a

16   poor negotiator and facilitator of these types of deals").

17        As described herein, defendant signed and executed a formal

18   contract to broker a quarter *billion* dollars in arms and ammunition,

19   along with other high-volume contracts and agreements.  He and his

20   companies are named on end-user certificates and official offers as

21   the supplier of massive quantities of munitions.  His marketing

22   materials repeatedly offered to provide his substantial customer base

23   with a limitless array of weapons, ammunition, and mercenary

24   services, many of which he boasted that he had in his current stock.

25

26        [27] A more instructive case would be United States v. Grissom, 525
     F.3d 691 (9th Cir. 2008).  There, the Ninth Circuit held that the
27   sentencing court was required to take into account, as relevant
     conduct, not only the quantity of drugs in the count of conviction,
28   but also the quantity of drugs involved in two counts that were
     dismissed.  Id. at 697.

His email communications reflect a nearly constant flow of
communications with fellow black-market arms brokers over the years,
negotiating quantities and models and calibers and prices, and
arranging for the logistics of transport and concealment of the
illegal loads.

Moreover, defendant's claim of incompetence and lack of follow-
through is not credible.  In the high-stakes world of black-market
arms trafficking, had defendant perpetually failed to deliver on his
many offers and promises, his suppliers and customers and fellow
brokers would have (at best) ceased to do business with him.  They
did not; the evidence illuminates that defendant conducted many deals
through the years with the same parties.  The record in this case
belies his claim that he was an ineffectual bumbler who never quite
managed to close any of his innumerable deals.[28]

Because defendant routinely relied on overseas banks for his
arms business (other than the undercover transaction, wherein he used
a U.S. bank as directed by the undercover agent), and because he
relied on false invoices to shield his activities, financial records
reflecting the consummation of many of his transactions is lacking.
Neither that fact nor any other evidence in the record supports his
unsubstantiated suggestion that he never consummated a deal.  Rather,
the above-described evidence admitted at trial and sentencing shows
that defendant was, as he advertised himself to be, perfectly able
and willing to finance and secure a buyer for the undercover arms
transaction (described as a small test order) to which he admitted in

---

[28] Even in a world where that were true, defendant would not be
entitled to sentencing credit for lack of competence in his criminal
aims.

1   his pleas to Counts 1 through 4 of the original indictment, just as

2   he showed the shrewdness and competence of an experienced arms dealer

3   in purchasing for $398,000 and then reselling at a massive profit the

4   services of mercenary missile operators and various other defense

5   articles and services in early 2015.

6                   d.   The USPO Correctly Considered Defendant's
                         Extraterritorial Violation of U.S. Laws As
7                        Relevant Conduct

8        Defendant's cursory suggestion that his conduct should be

9   overlooked because it was largely committed overseas is incorrect,

10  and his reliance on United States v. Chao Fan Xu is particularly

11  inapt.  706 F.3d 965, 993 (9th Cir. 2013), *abrogated on other grounds*

12  *by* RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090 (2016)

13  In Chao Fan Xu, the Ninth Circuit held that a defendant's violation

14  of foreign criminal laws would present undue analytical and

15  comparative-law complexities at sentencing and thus should not be

16  considered as relevant conduct.  Id.  Here, defendant unquestionably

17  violated U.S. criminal laws that expressed prohibited his overseas

18  conduct, so Chao Fan Xu offers him no support.  Likewise, defendant

19  relies on another irrelevant case wherein the Eighth Circuit found

20  that USSG § 5K2.14 —— which provided for an upward departure where

21  "national security, public health, or safety was significantly

22  endangered" —— was inapplicable in an anthrax hoax case where the

23  threat was entirely empty and there was no law enforcement response

24  that endangered safety.  United States v. Cole, 357 F.3d 780, 784

25  (8th Cir. 2004).  Cole is entirely irrelevant.  Defendant's conduct

26  in trafficking massive quantities of heavy weapons to militias,

27  governments, and individuals worldwide is very different than a known

28

1  empty hoax, and it unquestionably endangered national security,
2  public health, and safety.

3      **C.   The Court Should Impose a Sentence Including a Prison Term
           of 30 Years Based on the Factors in 18 U.S.C. § 3553(a)**
4
5          1.   <u>Nature, Circumstances, and Severity of the Offenses</u>

6          As described herein and as further detailed in the trial and
7  sentencing evidence, defendant's prolific arms trade included bulk
8  quantities of anti-tank missiles, rockets, mortars, grenades, and the
9  launchers therefor; machine guns of various sizes; sniper rifles,
10 assault rifles, pistols, and other small arms; night-vision equipment
11 and other sensitive military technology; attack aircraft; tanks,
12 radar systems; mercenary fighters; and countless other heavy weapons,
13 along with many millions of rounds of ammunition to feed them.  The
14 sheer scope and volume of these brokering activities adds credence to
15 defendant's professed willingness and readiness to sell anything,
16 anywhere, to anyone.

17         This is not a regulatory offense.  Defendant did not merely
18 neglect to register as an arms broker or as a missile salesman.  U.S.
19 law regulates the brokering and transfer of weapons by U.S. citizens,
20 even overseas, because those transfers can threaten U.S. and allied
21 forces abroad, upset the balance of strategic alliances, and
22 otherwise compromise U.S. national interests.  Moreover, U.S. law
23 implements the nation's international treaties and commitments,
24 including, as is specifically applicable in this case, the nation's
25 commitment to enforce a United Nation's arms embargo on Libya during
26 the bloodiest days of that country's ongoing civil war.  It is not
27 the prerogative of a private citizen to decide which governments and
28 militant factions around the world to arm with missiles and tanks and

71

machine guns and fighter jets.  And as defendant himself acknowledged, he did not control (or care) where his illegal weapons ended up or against whom they were used.

Defendant's conduct is further aggravated by the inclusion of anti-aircraft missile systems (and the services of specialists to use them) in his extensive arms portfolio.  Missile systems designed to destroy aircraft are governed by a separate statute with a 25-year mandatory minimum sentence because they are extremely dangerous and devastatingly effective.  Some, like the shoulder-fired versions that defendant both brokered and conspired to use, are highly portable, easily smuggled across borders, relatively inexpensive, easily pilfered, simple to fire, effective at a range of altitudes, and readily transferrable among militant groups who may use them against both military and civilian targets to further their political or ideological goals.

As the legislative history of 18 U.S.C. § 2332g shows, Congress expressly recognized in enacting this statute that anti-aircraft missiles are a serious threat to commercial aviation, and that they carry the potential to easily kill vast numbers of people.  See, e.g., 150 Cong. Rec. S11939-01, 150 Cong. Rec. 150 Cong. Rec. S11939-01, 150 Cong. Rec. S11939-01, S11997, 2004 WL 2812449 ("MANPADS are portable, lightweight, surface-to-air missile systems designed to take down aircraft.  Typically they are able to be carried and fired by a single individual.  They are small and thus relatively easy to conceal and smuggle.  A single attack could kill hundreds of persons in the air and many more on the ground."); id. at S11998-99 ("A 2000 State Department report stated that 'one of the leading causes of loss of life in commercial aviation worldwide has been from MANPADS

1  . . . attacks, with over 30 aircraft lost.'  According to a

2  Congressional Research Service report issued last year, there have

3  been at least 36 known missile attacks on commercial planes in the

4  last 25 years; 35 of those incidents took place in war-torn areas,

5  mainly in Africa").

6      At trial, the Court and the jury heard the testimony of Dr.

7  Robert Doherty, the government's expert on anti-aircraft missile

8  systems.[29]  Dr. Doherty explained that one key difference between

9  anti-aircraft missile systems and many other projectile-based weapons

10 is the guided nature of the systems, which enable them to find and

11 track the airborne target and follow it as it moves through the air.

12 CR 424 at 21:3-22:11.  He further testified that, in particular, the

13 shoulder-fired anti-aircraft missile systems that defendant conspired

14 to use and transfer are very straightforward and easy to competently

15 use with little or no training, a feature that further enhances their

16 danger to human life, civilian targets, U.S. national security, and

17 foreign policy interests.  Id. at 33-39; 99:7-100:19.

18     At sentencing in 2019, the Court heard additional testimony from

19 Dr. Doherty on the unique dangers presented by anti-aircraft missile

20 systems.  Dr. Doherty explained that shoulder-fired anti-aircraft

21 missiles, or MANPADs, like those that defendant hired mercenaries to

22 use against aircraft in Libya, had been used "three to four dozen

23 times against civilian aircraft, typically in areas of conflict."  CR

24 457 at 17:8-15.  Dr. Doherty provided illustrative examples of past

25 uses of surface-to-air missiles against civilian aircraft, including

26

27
   [29] Dr. Doherty's relevant experience included 30 years' work at
28 the Defense Intelligence Agency's Missile and Space Intelligence
   Center, where he specialized in man-portable air defense systems.

the 2014 downing of Malaysia Air flight 17 over Ukraine, which resulted in the deaths of all 283 passengers and 15 crew aboard; a 2006 attack on a U.S. military transport carrying a U.S. Congressional delegation out of Iraq, which was thwarted by the military airplane's air defense countermeasures; the 1994 downing of a plane carrying the presidents of Burundi and Rwanda, wherein everyone aboard was killed (a politically motivated attack that spawned the Rwanda genocide); and a thwarted attack against an aircraft carrying the Prime Minister of Israel.  Id. at 19:13-21:12.[30]

Dr. Doherty testified about the factors that render these weapons systems uniquely dangerous, including that, as guided weapons, they are "designed to hone in on an aircraft's heat signature."  Id. at 17:16-19.  He noted that this feature makes MANPADs particularly dangerous to civilian aircraft, which have scheduled departure and arrival times, follow prescribed routes at known altitude and speeds, are not maneuverable, and have no self-protection systems.  Id. at 17:19-24.  Dr. Doherty testified that an attacker armed with a MANPAD would not need to be physically present on or near the premises of an airport, but rather could be stationed "several tens of miles away."  Id. at 18:20-25.  He noted that the

---

[30] Further details on many past incidents in which commercial airliners were targeted, often successfully, by anti-aircraft missiles are available on open-source media See, e.g., https://www.washingtonpost.com/posteverything/wp/2014/07/18/missiles-are-now-so-advanced-that-its-amazing-more-planes-havent-been-shot-down/?utm_term=.e14a9b1e3b88 (Exhibit 1100); https://nypost.com/2014/07/23/missiles-threaten-civilian-planes-all-over-the-world/ (Exhibit 1101); https://www.nytimes.com/2018/05/24/world/europe/russia-malaysia-airlines-ukraine-missile.html; http://time.com/3002171/malaysia-airlines-ukraine-crash-airliners-shot-down/ (Exhibit 1102); https://en.wikipedia.org/wiki/List_of_airliner_shootdown_incidents (Exhibit 1103).

danger is particularly prevalent on an aircraft's approach to the airport, when both altitude and speed are decreasing.  Id. at 19:1-4.

The nature, circumstances, and severity of defendant's offense conduct overwhelmingly militate in favor of a lengthy prison term.

### 2.  History and Characteristics of the Defendant

#### a.  *Defendant's Motive of Greed and Wanton Disregard for Human Life*

Unlike some missile-trafficking defendants charged in other cases who were motivated by ideology, defendant is a true mercenary. As is abundantly clear from the global breadth of his vast market, and as he stated in his own words, his motive for trafficking in massive quantities of devastating weapons and ammunition across the globe was simple greed.  In his sentencing findings, Judge Otero described defendant as "a profiteer," a characteristic that the Court found highly aggravating.  CR 457 at 29:6-19.

In recorded conversations with the undercover agent, defendant displayed a chilling indifference to the heavy human cost of the arms-trafficking business that lined his pockets.  The night before his arrest, defendant explained that he engaged in willful blindness about where the deadly weapons from which he profited were used, and against whom.  Exhibit 1104 at 50-52.  Defendant noted that he did not want to knowingly be a part of killing civilians — or at least "Arab refugees" — but with the notable caveat that if he sold weapons to Saudi Arabia and Saudi Arabia then transshipped his weapons for use in armed conflicts in Yemen and Syria resulting in heavy civilian casualties, "that's their business."  Id.  As defendant neatly summarized it, "That's my rules on Saudi Arabia." Id.  Defendant chose to operate by those "rules" when turning a

willfully blind eye to the ultimate destination of the countless

machine guns and mortars and automatic rifles that he brokered and

sold across the globe.  That defendant equally applied these amoral

"rules" to weapons as dangerous to civilian targets and as coveted by

terrorist groups as man-portable anti-aircraft missile systems is

additional aggravating evidence justifying a strong sentence.

In considering defendant's characteristics, his words on the

morning of his arrest bear repeating:

> DEFENDANT:  I wake up every day in the morning.  First two
>             things I do at the same time, coffee, the
>             cigarette is ready.  I go to the TV and press
>             on the news.  I go on news.  If there is peace
>             I go [to sleep], if there is war I wake up.
>             I'm happy.  There is more business for me.
>
> UCA:        Yeah.
>
> DEFENDANT:  It doesn't matter where is the business, where
>             is the war.  Even if it's in Haiti, I will fly
>             there.
>
> UCA:        You are the original lord of war.
>
> DEFENDANT:  I love war because it's business, you know.
>
> UCA:        Yes.
>
> DEFENDANT:  And don't tell me I am the creator of war.
>             God's the creator of war.  God makes war
>             happen.
>
> UCA:        You just make sure people don't run out of
>             supplies.
>
> DEFENDANT:  I am the mailman.  I am the mailman only.

Exhibit 1105.

At the conclusion of this case, in considering the factors

relevant to an appropriate sentence, Judge Otero opined that

defendant's self-described willful blindness concerning the use of

his weapons to kill civilians and his self-professed love of war

1    because it lined his pockets "summarize best the character of Mr.
2    Ghanem." CR 457 at 28:20-29:19.

3                    b.   *Other Characteristics*

4          The record reflects that defendant has some health problems that
5    can be summarized as challenging but relatively common ailments. See
6    PSR at ¶¶ 73-74; see also CR 457 at 61:19-24. The Court previously
7    considered defendant's "significant health issues" in imposing a 30-
8    year sentence, recommending that he be placed in a facility that
9    could best address those health conditions during that lengthy term.
10   Id. The government is not aware of any new health conditions that
11   warrant additional consideration by the Court, and none are
12   specifically described in the PSR. Thus, it does not appear that
13   defendant suffers from any condition that would mitigate an otherwise
14   appropriate sentence in this case. See United States v. Carter, 560
15   F.3d 1107, 1121-22 (9th Cir. 2009) (finding 471-month sentence for
16   two bank robberies substantively reasonable where the defendant's
17   life challenges were not "so atypical as to put him outside the
18   minerun of roughly similar cases considered by the Sentencing
19   Commission in formulating the guidelines, nor are they so special as
20   to render his overall sentence unreasonable") (internal citations
21   omitted)).

22                3.   Avoidance of Sentencing Disparities

23         In every one of the handful of cases involving trafficking and
24   use of anti-aircraft missiles of which the government is aware, the
25   defendant has received a sentence of at least 25 years. See United
26   States v. Hammadi, 737 F.3d 1043, 1046 (6th Cir. 2013) (life
27   imprisonment on 2332g count); United States v. Bout, 731 F.3d 233,
28   236-37 (2d Cir. 2013) (25 years on 2332g count); United States v.

1  _Cromitie_, 727 F.3d 194, 204 (2d Cir. 2013) (25 years for each of four
2  defendants (Cromitie, D. Williams, O. Williams, and Payen)); _United_
3  _States v. Al-Kassar_, 660 F.3d 108, 117 (2d Cir. 2011) (30 years for
4  one defendant (Al-Kassar); 25 years each for two other defendants
5  (Al-Ghazi and Moreno-Godoy)); _United States v. Garavito-Garcia_, 2015
6  WL 13708830, *2 (S.D.N.Y. 2015) (25 years); _United States v. Pouryan_,
7  628 Fed.Appx. 18, 20 (2d Cir. 2015) (unreported decision) (25 years
8  for each of two defendants (Pouryan and Orbach)); _United States v._
9  _Chen_, 526 Fed.Appx. 772, 775 (9th Cir. 2013) (unreported decision)
10 (25 years); _United States v. Olangian_, 803 Fed. App'x. 536 (2nd Cir.
11 2020) (unreported decision) (25 years).  Even absent the 25-year
12 mandatory minimum now required under 18 U.S.C. § 2332g, at least one
13 court has upheld a sentence much longer than 25 years for conspiring
14 to traffic anti-aircraft missiles before that statute was enacted.
15 _See United States v. Lakhani_, 480 F.3d 171, 185 (3rd Cir. 2007)
16 (affirming 47-year sentence for 71-year old defendant who had a 19-
17 year history of productive assistance to U.S. law enforcement).[31]

18     The sheer volume of anti-aircraft missiles that defendant sought
19 to transfer to militants operating in the shadows of unstable parts
20 of the world alone sets defendant apart from otherwise similarly
21 situated defendants. (Compare, e.g., Exhibit 318, in which defendant
22 offered 400 Strela anti-aircraft missiles and 95 Igla anti-aircraft
23 missiles from his existing stock to various entities in multiple
24 countries; Exhibit 312, in which defendant conspired to transfer "30

25

26 _____

27     [31] It is notable that Judge Otero determined that the interests
   of justice in this case required a sentence well above the 25-year
   mandatory minimum, making clear that the mandatory minimum applicable
28 to the 2332g statute was not the driving factor behind his sentencing
   decision for the conduct now before the Court.

1  + 300" Igla surface-to-air missiles to Erbil, Iraq; and Exhibits 334-
2  343, in which defendant conspired to transfer 50 Igla surface-to-air
3  missiles to the Libya Dawn militant faction; with <u>Hammadi</u>, wherein
4  the defendant was convicted of attempting to transfer two shoulder-
5  fired surface-to-air missiles and sentenced to life imprisonment.)

6       Moreover, unlike in the other anti-aircraft missile trafficking
7  cases of which the prosecution team is aware, the evidence suggests
8  that at least one of defendant's deals resulted in the actual
9  transference of anti-aircraft missiles to an end user.  Exhibits 334-
10 342 detailed the creation of a Libya Dawn end-user certificate for
11 munitions including 50 Igla surface-to-air missiles.  Exhibits 343
12 and 344 indicated that defendant's co-conspirator, David Shikhashvili
13 (who was defendant's partner in procuring the services of the anti-
14 aircraft missile mercenaries discussed herein, and who also continued
15 to do business with defendant after this deal), sent defendant an
16 invoice related to this end-user certificate.

17      The broad spectrum of the types of missiles in which defendant
18 dealt is further aggravating, and further separates him from the
19 heartland of anti-aircraft missile cases, most of which involved only
20 MANPADs.  As established at trial, the highly sophisticated Russian
21 vehicle-borne S-400 system, which can hunt down and destroy an
22 airplane hundreds of miles away and may sell for billions of dollars,
23 is tightly controlled by the Russian government and monitored by U.S.
24 authorities because of the immense impact it can have on the course
25 of a conflict.  The protracted efforts by defendant, a private U.S.
26 citizen, to broker the sale of this highly consequential system to a
27 government in the Middle East without regard to the impact on U.S.
28 national interests, alliances, diplomacy, and foreign policy renders

his conduct even more serious than reflected by the 25-year mandatory minimum sentence applicable to § 2332g convictions.  Moreover, defendant did not stop at merely proliferating these serious weapons; the evidence at trial showed that he conspired to use them to actively interfere in a foreign war.  Defendant's conspiracy to both transfer and use anti-aircraft missiles further distinguishes him from other defendants.

The interest in avoidance of sentencing disparities weighs strongly in favor of a sentence of more than 25 years in this case, where defendant's conduct is more aggravated than that of many others who received 25-year sentences.

4.   Other 3553(a) Factors

As described in 18 U.S.C. § 3553(a)(2), this case requires a sentence that reflects the gravity of defendant's conduct, promotes respect for the law, provides appropriate punishment for the particular offense, provides adequate general and specific deterrence of criminal conduct, and protects the public.  The appropriate sentence to account for these and the other sentencing factors includes a term of imprisonment of 30 years.

V.   **CONCLUSION**

The government requests an extraordinary departure from the guidelines because this is an extraordinary case.  Defendant trafficked in extraordinary quantities of heavy weapons of war for years.  His callous indifference to human suffering and death, including the suffering and death of innocent civilians, is extraordinary.

Moreover, anti-aircraft missiles are extraordinary weapons. This is exemplified by the fact that a base offense level of 26 is

80

appropriate for the vast heartland of cases involving other weapons,
including military equipment, and that Congress *still* saw fit to
impose a 25-year mandatory minimum for proliferation of this
particular category of uniquely destructive weaponry.  These unique
weapons systems have the power to reshape governments, influence
wars, alter borders, and change history.  Defendant, as a private
U.S. citizen who sought to profit from their transfer and use,
prioritized his personal enrichment over the interests of his
country.  His conduct was extraordinarily aggravating.

Immediately before imposing a sentence in 2019 for the conduct
now before this Court, Judge Otero made the following remarks:

> Before I will sentence the defendant, I will just comment
> that the —— as the Government has summarized, Ms. Mills has
> summarized, the breadth and scope and gravity of the
> defendant's arms dealing is really breathtaking and in many
> ways frightening.

CR 457 at 57:11-15.  Judge Otero then imposed a sentence of 30 years,
which he went on to explain as follows:

> In sentencing the defendant, the Court was moved by the
> gravity and enormity of the defendant's conduct in the arms
> —— international arms black market business.  The
> defendant's conduct was aggravated by the sheer number of
> weapons in which the defendant trafficked over a number of
> years including very serious anti-aircraft missiles,
> antitank missiles, rockets, mortars, machine guns, sniper
> rifles, other munitions of various types.

Id. at 61:11-18.

The sentence imposed in this case must fairly account for
defendant's brokering of vast quantities of almost limitless types of
heavy weapons of war and ammunition over the years, the breadth and
gravity of his determined efforts to use and to transfer anti-
aircraft missiles, and his acknowledged disregard for human life in
pursuit of personal wealth.  His conduct remains exactly the same as

81

it was when the Court found that the sentencing factors necessitated a 30-year term of imprisonment.  The appropriate sentence for that conduct also remains exactly the same.  The government respectfully requests that the Court impose a sentence that includes a prison term of 30 years.