UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-oOo-

HONORABLE FERNANDO AENLLE-ROCHA, UNITED STATES DISTRICT JUDGE

UNITED STATES OF AMERICA,

Plaintiff,

v. No. 2:15-CR-00704-FLA

RAMI GHANEM, also known as
RAMI NAJM ASAD GHANEM,

Defendant.

# REPORTER'S TRANSCRIPT OF SENTENCING

LOS ANGELES, CALIFORNIA

OCTOBER 21, 2022

---

SUZANNE M. McKENNON, CRR, RMR
UNITED STATES COURT REPORTER

UNITED STATES COURTHOUSE
350 W 1st STREET, ROOM 3411
LOS ANGELES, CALIFORNIA 90012
(213) 894-3913
suzanne@ears2hands.com

APPEARANCES:

On Behalf of the Government:

ANNAMARTINE SALICK, Assistant United States Attorney
ALEXANDER ROBBINS, Assistant United States Attorney
United States Attorney's Office
Terrorism and Export Crimes Section
312 N Spring Street, Suite 1200
Los Angeles, California 90012

Also on Behalf of the Government: Jolinda Pasciucco, HSI

On Behalf of the Defendant:

BENJAMIN L. COLEMAN, Attorney at Law
Benjamin L. Coleman Law PC
1350 Columbia Street, Suite 600
San Diego, California 92101

MEGHAN A. BLANCO, Attorney at Law
Law Offices of Meghan Blanco
28202 Cabot Road, Suite 300
Laguna Niguel, California 92677

(Proceedings commenced on October 21, 2022 at 10:10 a.m.)

THE COURTROOM DEPUTY: Calling Item Number 2, LA CR-15-00704, United States of America versus Rami Najm Asad Ghanem.

Counsel, please make your appearances beginning with the government.

MS. SALICK: Good afternoon -- or good morning, Your Honor. Annamartine Salick on behalf of the United States. I'm joined at counsel table by HSI Special Agent Jolinda Pasciucco, and AUSA Alex Robbins, who represented the government in the appeal.

THE COURT: Good morning.

MR. COLEMAN: Good morning, Your Honor. Ben Coleman for Mr. Ghanem, who is present. Also at counsel table with me is Megan Blanco.

THE COURT: Good morning to everyone. Welcome.

MS. BLANCO: Good morning.

THE COURT: Good morning. All right. I'm going to ask Counsel and Mr. Ghanem to go to the lectern, please. If Mr. Ghanem is uncomfortable standing, he's welcome to sit. I typically have defendants stand at the lectern for sentencing, but if it's physically challenging for him in any way, he's welcome to sit. Okay?

THE DEFENDANT: As you wish, Your Honor.

THE COURT: However, you're most comfortable, sir.

THE DEFENDANT: I can stand.

THE COURT: This might take a while, just so you understand.

THE DEFENDANT: Thank you.

THE COURT: So you're welcome to sit, if not now, at any time. All right?

THE DEFENDANT: Thank you.

THE COURT: It's not a problem.

THE DEFENDANT: Thank you.

THE COURT: All right. So, Mr. Ghanem, I am Judge Aenlle-Rocha, and we're here today for your re-sentencing. This case was previously before Judge Otero, as I know you know.

On October 29 of 2018, Mr. Ghanem pleaded guilty to a four count indictment, along with Counts 1 and 2 of a first superseding indictment.

And on October 30, the next day, trial began as to Count 3 of the first superseding indictment.

On November the 15th of 2018, the jury returned a guilty verdict on Count 3.

And on August 19 of 2019, Judge Otero held a sentencing hearing and imposed a 30-year term of imprisonment. Judge Otero imposed a sentence of 360 months as to Count 3 of the first superseding indictment. He imposed the statutory maximum as to the remaining counts of conviction with Counts 1 and 2 to

run consecutively and the remaining counts to run concurrently.

Count 1, the sentence for each count was, as to Count 1, 240 months; Count 2, 120 months. And those two counts ran consecutively. And then all other counts ran concurrently, Count 3 was 240 months; Count 4 was 240 months; the first superseding indictment, Count 1, was 60 months; and the first superseding indictment, Count 2, was 240 months.

Mr. Ghanem appealed his conviction. And on appeal, the Ninth Circuit vacated Mr. Ghanem's conviction as to Count 3 of the first superseding indictment, which was a conspiracy to use and to transfer antiaircraft missiles, on the ground that the Court's jury instruction on extraterritorial venue was erroneous. Jurisdiction was returned to this District Court for the purpose of re-sentencing on the remaining six counts of conviction.

As a result of Judge Otero's retirement in 2020, the case was reassigned to me on July 7 of 2021.

So, Mr. Ghanem, I want to explain to you a little bit about how the re-sentencing hearing will be going forward today. You may already be familiar with some of what I'm about to say as a result of your first sentencing hearing before Judge Otero in August of 2019.

Under the Sentencing Reform Act of 1984, the United States Sentencing Commission issued guidelines for judges to consider when sentencing an individual in a criminal case. The

sentencing guidelines are advisory, which means that they are not binding on judges. Even though they are not mandatory, I am still required to arrive at a sentencing guideline range and to consider that range, along with a number of other factors, before imposing a final sentence.

As a result, during this re-sentencing hearing, I will be making calculations under the sentencing guidelines and arriving at a guideline range, and I will consider that range. I will also consider a number of other factors. In your case, I do not believe there was a plea agreement, so I will not need to consider the impact of a plea agreement.

If there are objections to the sentencing guidelines, -- and I know that your attorneys have filed objections to at least some aspect of the sentencing guideline calculation -- I will consider those objections, and I will rule on the objections during this hearing.

I will also consider and hear statements made by the prosecutor and by your attorneys, and I will hear any statement that you may wish to make. You are not obligated to make a statement. I will consider the recommendation of the probation officer. I will consider whether the sentencing guideline sentence is appropriate after determining whether an upward or a downward departure from the guideline range is appropriate in your case.

I will, also, consider a number of factors, that are set

forth at Title 18 United States Code section 3553(a), to determine whether I should impose a sentence within the guidelines or outside the guidelines. And those factors include all of the following: the nature and circumstances of the offense or offenses in your case and your history and characteristics, the need for the sentence imposed to reflect the seriousness of the offenses, to promote respect for the law, and to provide a just punishment for the offenses, to afford adequate deterrence to criminal conduct, to protect the public from further crimes by you, and to provide you with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The factors I am required to consider also include the kinds of sentences available and the need to avoid a sentencing disparity among defendants with similar records who have been convicted of similar conduct, along with the need to provide restitution to victims of the offenses. Not all of these factors, that I have just set forth and described to you, may apply in your case.

So in preparing for today's hearing, I have read and considered the reports and recommendations of the United States Probation Office, the sentencing memoranda that was filed by the prosecutor and by your attorney, along with a classified document that was filed by your attorney. So we will now move forward.

I will ask the government: Are there any victims in this case?

MS. SALICK: No, Your Honor.

THE COURT: Okay. Have both parties received and reviewed the final presentence report?

MS. SALICK: Yes, Your Honor.

MR. COLEMAN: Yes, Your Honor.

THE COURT: And, Counsel, have you had sufficient time to read and discuss the final presentence report and recommendation with your client, Mr. Ghanem?

MR. COLEMAN: Yes, Your Honor.

THE COURT: I am going to summarize the presentence report's guideline recommendations. The report provides for a base offense level of 26, a two-level increase because Mr. Ghanem was convicted of the money laundering offense at 18 U.S.C. section 1956, and that results in an adjusted and in a total offense level of 28. He has no criminal history points, and thus he is a Criminal History Category I.

So this results in a sentencing guideline range of 78 to 97 months, a supervised release guideline range of one to three years, a guideline fine range of $25,000 to $1 million, a special assessment of $100 for each count of conviction. And based on my review of the parties' sentencing memoranda, it appears that the parties are in agreement as to the sentencing guideline calculations including the total offense level, the

criminal history, and each of the adjustments I just summarized, and that Mr. Ghanem's only objection is to the probation officer's failure to apply a two-level downward adjustment for acceptance of responsibility.

Is that correct?

MR. COLEMAN: Yes, Your Honor.

THE COURT: So, Counsel, would you like to address -- first of all, your client's objections to the sentencing guideline calculation or the failure to apply a two-level downward adjustment for acceptance of responsibility?

MR. COLEMAN: Yes, Your Honor. The reasoning in the presentence report, I believe, is that Mr. Ghanem pled guilty late, on the eve of trial, and, therefore, he shouldn't get acceptance of responsibility. We believe both the guidelines and the case law are clear that that issue affects whether he gets a third point for acceptance, but it doesn't bear on whether he gets two points for acceptance, and we are not asking for the third point. We recognize that the plea came, you know, relatively late in the day. We're just asking for two points. So that, I guess, complaint or issue with acceptance really is legally invalid.

I know the government has made much in their briefs that there was a comment at the initial presentence interview that Mr. Ghanem had said that he had never seen or touched any military equipment, and, therefore, the government is claiming

that he said something that was false to the probation officer, and that that is a basis to deny acceptance of responsibility. And I just think that there is just a simple misunderstanding of what was said.

And if you look at that part of the presentence report, what Mr. Ghanem was saying is that, before he got into this business, he knew nothing about military equipment and had not seen or touched military equipment, and so he had to research a lot of it on the Internet for him to begin to understand what the business entailed and the different types of equipment that were involved.

So I don't think that there was any type of intentional misrepresentation to the probation office. I think it was just a lack of communication if that's, in fact, what the probation officer meant because, when you look at the context, he's clearly saying, "I didn't know about this before I got in the business, and then I proceeded to do a lot of Internet research on the various equipment to understand what is going on." And, of course, a lot of that research on the Internet is reflected in the various documents that the government has produced as far as their sentencing memo was concerned.

So it's our position that the two levels -- he pled guilty to all the counts that he is being sentenced on -- that the two levels should apply. There is a presumption that acceptance applies when a defendant pleads guilty, and we think the

presumption has not been rebutted in this case.

THE COURT: All right. Thank you.

Would the government like to be heard on the issue of acceptance of responsibility?

MS. SALICK: Yes, Your Honor.

THE COURT: You may. All right. You're welcome to use the lectern if you'd wish.

I don't want to -- and, again, you are welcome to sit down, Mr. Ghanem, if more comfortable.

MS. SALICK: Thank you, Your Honor.

The government is in agreement with the U.S. Probation Office's conclusion that 3E1.1 for acceptance of responsibility is simply not applicable in this case. I believe that the government has fully delineated the evidence showing how the defendant's statements to the probation officers were false, so I will leave that to the papers.

What I would just like to note is that not only does a level two reduction require truthful admission for the conduct of the conviction, it, also, under Note 3, requires truthful admission of the conduct comprising the offense of conviction and not falsely denying any relevant conduct, which is accountable under 1B1.3.

Everything that is being litigated today is putting into doubt, is contesting the relevant conduct. On that basis alone, the government submits that any application or

adjustment for acceptance of responsibility is simply unavailable.

I would also just briefly note, because these are delineated in our papers -- and I won't take anymore of the Court's time -- that in addition to those false statements, the defendant spent several years contesting the offenses, litigating the offenses, cross-examining witnesses at a four-week trial, has continued to fight the convictions, and as evidenced from the sentencing paper his Counsel submitted in connection with today's hearing, continues to attempt to minimize or sanitize his conduct.

And so for those reasons and the reasons in our brief addressing this point, we agree with the probation's calculation that any credit for acceptance of responsibility is absolutely not applicable in this case.

THE COURT: All right. Anything else on this point, Mr. Coleman?

MR. COLEMAN: No, Your Honor.

THE COURT: All right. I would like to give each side and, of course, Mr. Ghanem an opportunity to speak before I impose sentence.

So, Mr. Coleman, would you like to -- I imagine you would. And I also want to be clear. I view this as a very serious case, a very significant case, so there is no urgency here. I want to give each side a fair and complete opportunity to be

heard. Okay?

MR. COLEMAN: Understood, Your Honor.

THE COURT: We're not under any rush.

MR. COLEMAN: Thank you, Your Honor.

Before I begin, I just wanted to note that Mr. Ghanem's daughter is here. His grandson, who he has never seen because he was in custody for so long, he saw him for the first time today, he is also here but, I think he is out in the well so that he won't disturb the proceedings. So I just wanted to note that family support before I begin.

The first issue that I wanted to address is that really the only case that the government cites to justify what they're asking for here, which is, in essence, a 20- to 25-year upward departure or variance, is a case called Johnson out of the First Circuit. And we believe Johnson actually supports our position.

Before I explain that, I just wanted to indicate that what happened in Johnson was that there were defendants who were on U.S. soil who were plotting to use surface-to-air missiles to blow up British helicopters. So you have a difference in that these are people on U.S. soil plotting to do this. And the defendants in that case didn't plead guilty to the offenses of conviction like Mr. Ghanem has; they went to trial.

So the case is different, but the interesting thing, in the government's memorandum, is that they never say what those

defendants received for their sentences. And one defendant received eight years and the other defendant received ten years. That is sort of in line with the recommendation that we are making. So to say that Johnson supports the government, a 30-year sentence, when those defendants got eight and ten years which are very much in line with the sentence that we're proposing, I just don't think that that, you know, does enough work for the government. If anything, that case supports our position with respect to the general sentence that we're recommending. So I wanted to first address that particular issue.

I also wanted to address, again, to show how extraordinary and unusual the government's request is to look at some of the cases that they cited in explaining why under 3553(a)(6) there would be no sentencing disparity here. And, again, all of those cases support our position; they do not support the government's position.

Of course, the Court articulated the 3553(a)(6) standard when you were going over the factors with Mr. Ghanem. And the important thing in 3553(a)(6) is that it's defendants with similar records who have, in fact, been convicted of certain conduct. And what the government has done is cited a series of cases where the defendants had 2332g convictions, which we don't have here anymore, that conviction has been vacated, and where the guidelines range -- there were a 25-year minimum,

mandatory minimums applicable -- and where the guidelines range was life in prison. So, again, we're talking about apples and oranges. They're citing cases that are directly contrary to the 3553(a)(6) standard.

So not only is there a significant legal flaw in that analysis, but if you also looked at the facts of those cases, you will see why those sentences were higher. And I'm not going to go through all of them, because I don't want to take too much time, but I will go through several just to make the point.

The first case they cite is the Hammadi case out of Sixth Circuit. Now, again, the guideline range in that case was life in prison. And so the defendants got what the guideline range was. In addition, those were defendants who were on U.S. soil in Kentucky, and they were conspiring to kill U.S. officers and a U.S. Army Captain. We have none of that here. There is no conspiracy to kill any U.S. Citizens or U.S. officers. They were also sending the equipment from Kentucky, or were trying to send it to, al-Qaeda. Again, we don't have any of that here. So, number one, the facts are extraordinarily different; and, number 2, the convictions are completely different; and, number 3, the guideline range is completely different.

The second case they cite is United States versus Bout, and I did want to briefly discuss this case because Victor Bout was the defendant, and he's been in the news a little bit

lately because there has been discussion about whether the U.S. should conduct a prison transfer and send Mr. Bout back to Russia so that they could get the women's MBA star from Russia back to the United States. There's been that discussion in the news.

And the interesting thing about that discussion is that the district judge who sentenced Mr. Bout was interviewed to see if she would support the prison transfer. She had since stepped down from the bench and gone into private practice. And what she said was she fully supported it because, number one, she felt that Mr. Bout got too much time, and she only sentenced him to 25 years because that was the mandatory minimum; and, number two -- and if she could have, she would have sentenced him to less -- and, number two, given that he's been in custody for several years, she didn't think that he had the contacts or anything to go back into the business, and she felt that the U.S. should conduct a prison transfer.

I would also note that, in the Victor Bout case, not only did he have the 2332g conviction with the 25-year minimum.

(Interruption by court reporter.)

MR. COLEMAN: I'm sorry.

But he was also convicted of conspiring to kill U.S. nationals and U.S. officers, something we don't have here. So, again, the government is citing a case that is completely different from this case.

I'll go through one more. I could say a lot about all of them, but I'm just going in the order that they're listed. And they all have the same themes, which is that the defendants were convicted of 25-year minimums with a guideline range of life in prison.

But I'll take the Cromitie case, which is spelled C-r-o-m-i-t-i-e, the Second Circuit case, that is the third case that they've cited. Again, defendant's convicted of 25-year mandatory minimums. We're talking about domestic terrorism. These are defendants in New York who are plotting to blow up a synagogue in Riverdale, New York, and plotting to send explosives and explode a military airport in New York. I believe it was in Newburgh, New York. I think it's Stewart Airport Base. That's what they were doing in the United States, plotting to kill innocent, observing Jews in New York at a synagogue, and then to blow up a military airport in New York. Those defendants were -- they got the 25 years, and that was the minimum because they were convicted of 2332g counts.

So we're talking about drastically different types of cases that they're using to try to justify the extraordinary upward departure or variance in this case. We've cited the cases that have explained that the guidelines contemplate -- the guidelines, that apply in this case, contemplate that the conduct will implicate national security. That's already taken

into account under the guidelines.

And if the Court -- and I understand the Court has said it's a serious case, and we understand it's a serious case. If the Court thinks that -- and while we don't agree; we think that a sentence at upper end of the range would be appropriate -- but if the Court thinks that an upward departure or an upward variance is appropriate, the kind that the government is talking about, a 20- to 25-year upward departure or upward variance, they've cited no case to ever support that type of upward departure or variance.

So maybe a modest upward departure or variance would be in order. We don't believe so. We think that the guidelines adequately take the conduct into account and at least the upper end of the guideline range is sufficient and not greater than necessary, which is the standard for 3553(a), but certainly not the type of upward departure or variance that the government is asking for.

In addition, Mr. Ghanem has been in custody for nearly seven years now. He's 56 years old. He's not in good health. You can even just look at his teeth. He's almost missing all of them. A sentence of 20 or 30 years will effectively be a life sentence. You know, if he is able to survive that type of sentence with his medical conditions, I don't think he'll live long afterward. And, again, the 3553(a) test is sufficient but not greater than necessary. And a sentence of essentially life

in prison, which is what the government is asking, is certainly greater than necessary when the guideline range is, if the Court gives acceptance, 63 to 78 months; if it doesn't, 78 to 97 months, I believe it is, significantly greater than necessary.

And those are the main points that I wanted to make, Your Honor.

THE COURT: Okay. Thank you very much.

Would Mr. Ghanem like to address the Court? Obviously, he's not obligated to make a statement, but he is most welcome to make a statement. And Counsel, of course, is ably representing him. But I am happy to hear any statement Mr. Ghanem would like to make if he wishes to make one.

MR. COLEMAN: Let me just one moment speak to Mr. Ghanem.

THE COURT: Yes.

(A discussion off the record between Counsel and Defendant.)

MR. COLEMAN: He'll make a brief statement, Your Honor.

Would you like him to come to the podium?

THE COURT: However, he's most comfortable. If he wishes to make it from his seat, he may do that.

THE DEFENDANT: Thank you, Your Honor.

First of all, I'm a U.S. Citizen. I used to live in Arlington, Texas. The girl down -- that is my girl, my

sweetheart. She was born in Arlington, Texas. I will never, ever, make no mistake, be a part or associate with anybody that would harm this country. So it give me a goose bump when I hear, when they talking about cases related to somebody tried to harm this country. I just want to make sure to tell you I will never, ever be a part of that. And thank you for your time, Your Honor.

THE COURT: Thank you. Thank you, Mr. Ghanem.

And thank you, Counsel.

All right. Ms. Salick, would you like to be heard?

MS. SALICK: Yes, Your Honor.

THE COURT: You may.

I do have -- a couple of questions come to mind, and I don't mean to take you off of whatever points you wish to make, which you are free to make. But, obviously, I did not have the benefit of being the trial Judge in the case and hearing the evidence presented at trial.

And just in my review of the case, the case law, these cases do seem to be sort of far and few between. There aren't a lot of them. A number of them are pre-Booker, and, of course, the landscape was a bit different then.

So if you have any insight as to -- you know, Counsel has addressed, defense Counsel has addressed, the facts in a number of these cases, you know, and harm intended or aimed at the United States versus, you know, our case. It appears that the

conduct is directed at other countries that are enduring civil war and other forms of instability. So if you have any insights to that.

And, of course, Mr. Coleman, if you have anything else to add, I will give you an opportunity to add that.

Go ahead. And anything else you want me to hear.

MS. SALICK: Thank you, Your Honor. And I will happily address those two points. And like you, I was not the representative from the government during this trial, but I followed the case well and also have reviewed everything that has been submitted, so I will assist the Court in any way that I can and address those two specific questions that the Court raised.

By way of introduction, I want to begin by returning to the six counts to which the defendant pleaded guilty for which we are here to resentence him. And these six counts barely begin to capture the defendant's decades-long career as an international arms trafficker at the highest level. They barely capture the extent of the defendant's career made by exploiting human suffering by indiscriminately trading in weapons of war and instruments of death by fueling militias, a foreign terrorist organization designated by the United States government and our country's foreign adversaries.

He defendant chose, he purposefully inserted himself, into theaters of war both internal and international armed conflict.

And through the types of weapons but also the amount of weapons and ammunition the defendant traded in, he quite literally had the ability to change the balance of power, to bring down governments, to prop up autocratic regimes, and to decimate civilian populations suffering in the grips of civil war.

Most significantly, defendants only motive was greed. He was not motivated by ideology or patriotism or nationalism. Instead he supplied massive quantities of weapons and ammunition across the globe for one purpose, greed. And he prided himself on being willfully blind to the end result of the weapons that he sold. And at other times he, in fact, requested confirmation that his articles, his weapons of war obtained their deadly goal.

Defendant was a profiteer, to borrow Judge Otero's words at the 2019 sentencing hearing, and most devastatingly displayed a chilling indifference to the human cost his arms business took to human life.

Now, although the Ninth Circuit vacated one count of conviction, the 2332g antiaircraft charge, which the jury found defendant guilty of beyond a reasonable doubt after a four-week trial, defendant's conduct, the conduct to which he is being sentenced, has not changed. And for the purpose of today's argument only, I want to put aside all the evidence and all the records related to the 2332 count. It is a small fraction of the defendant's decades-long career as an arms trafficker.

And for the reasons briefed in the sentencing paper and as detailed in the PSR and the U.S. Probation Office recommendation letter, the government requests an admittedly extraordinary departure from the applicable guidelines and that is because this is an extraordinary case which gets directly to this Court's question as to the dearth of similar situated cases.

Defendant's conduct is so extraordinarily aggravating both in the scope of the deals he made and in the amount of weapons and ammunition he personally transferred. They cannot be captured -- his conduct cannot be captured by the guidelines range. And his conduct, again, speaking only about the charged conduct, is of such an insidious nature as to warrant the significant upward departure the government is requesting.

And to underscore the point, while the government submits this Court should and may consider and is within its legal authority to consider all of the evidence supporting the dismissed -- excuse me, the vacated conviction, the Court need not even look at those facts to reach the sentence the government is seeking based on the conduct as charged and as the defendant has admitted in the six counts of conviction that we are here today to resentence on.

I want to just very briefly offer, as detailed in both the government's papers and the Probation Office's letter and PSR, that the Court may achieve this sentence, may account for the

inability of the guidelines to capture the defendant's conduct in one of three ways, any of which is sufficient to legally support the Court's acceptance of an admittedly extreme departure from the guidelines range. And I believe it is noteworthy that the defendant's conduct, while not adequately captured by the guidelines, easily falls within one of these three methods to support a significant upward departure.

First, under relevant conduct, under 1B1.3, and, again, focusing solely on the relevant conduct underlying the six counts of conviction to which the defendant pleaded guilty, there is a sufficient basis to depart from the guidelines.

Second, the Court may make an upward departure under either 5K2.14 or 2M5.2, Note 2. These are the provisions which related to harms to national security and foreign security.

And, third, the Court may make an upward variance under 3553, either based on the nature and circumstances of this offense, the scope, and the breadth of the defendant's conduct and the history and characteristics of the defendant; the defendant's continued inability to take responsibility and to accept the grave damage, as we just heard, his action caused to foreign nations and to our own or based on the aggravated -- based on 3553(b)(1), the aggravating circumstances not adequately considered by the guidelines.

Defendant's efforts to sanitize his conduct are unavailing. We have discussed this at length, but I wanted to

focus on two items that the Court inquired about. The first is whether the defendant should be allowed leniency because his conduct did not occur on U.S. soil. It is simply illogical to believe that the defendant's conduct did not touch, did not affect, did not significantly impact the security of the United States.

At a very base level, the defendant himself is a United States citizen. As the defendant just stated, he is a citizen and previously resided in Texas. But the defendant chose, he inserted himself into international foreign armed conflicts. And he affected our nation's security when he, at numerous instances as captured and as detailed in all of the exhibits and records attached to the sentencing memoranda, took sides, inserted himself into ongoing foreign conflicts, supplied arms to individuals who purported to be leaders of militant factions, militant factions that were fighting against nations supported by the U.S. government and in some cases even supported by U.S. personnel.

The defendant also had no qualms as demonstrated in the recorded statements introduced at trial and attached in the transcripts to the sentencing memo to supply these arms, these weapons in astonishing numbers to a designated foreign terrorist organization, a designation the United States government makes at the highest levels of our government after determining that that organization is engaged in terrorism

which by its nature affects the United States.

With respect to defendant's claims that the sentence the government is asking for would result in an unwarranted disparity and this Court's request or inquiry related to other cases where similar facts are adduced, I, one, note all of the 25-year plus sentences that the government recited in its sentencing position paper -- and I can point the Court to those cases although I know the Court is well-aware of those cases. And I would also note that one of the reasons that we cannot find a case or that a case is not easily found with the same facts is because the defendant's conduct is so exceptional.

The lack -- or I should say the limited support -- and I'm not even comfortable with that word because I think there is significant support for our position. But it is correct that this is not a drug case or a felon in possession case where we can look to many, many cases. And that is because this case is so exceptional in nature.

I would also note that these arguments were similarly made to Judge Otero. And in his wisdom, in 2019, he placed no merit on these claims because he, too, as the Probation Office and the government have repeatedly shown, was taken aback by the breadth and scope of the defendant's decades-long career as an international arms trader.

I wanted to quickly note a clarification to the defendant's recitation of the facts in Johnson and to an

attempt to sanitize the defendant's conduct because it occurred overseas. The United States government prosecutes many serious cases where the conduct occurs overseas. In today's world, it is simply impossible to divorce conduct that is specifically aimed at the balance of power between nations and conduct that is specifically aimed at changing governments and supporting autocratic regimes. It is simply impossible to attempt to say that such conduct somehow did not touch the United States.

For all of the reasons -- and I won't take anymore time on this issue because I do believe it is fully briefed and supported by the evidence -- there is no basis to allow leniency based on the idea that the defendant's conduct did not touch the soil of the United States government -- of the United States.

I also -- just with respect to the Johnson case, because defense took issue with that, I would note that in that case the defendant was convicted of supplying bomb-making parts. And it would be illogical to equate the supplying of bomb-making parts to the millions of rounds of ammunition and the hundreds of thousands of weapons of war that the defendant traded in.

Before I stop there, I am ready to address any additional questions the Court may have, but in preparing for this, I wanted to return not to further argument from the government but to the defendant's own reflections on his career as an

international arms dealer.

In a 2005 recorded conversation that was played at trial and transcripts of which were attached to the government's sentencing memoranda, the defendant stated in discussing his criminal conduct: "I wake up every day in the morning. I go to the news. If there is peace, I go to sleep. If there is war, I wake up. I am happy. There is more business for me. I love war because it is business."

With that, Your Honor, the government asks that you make an exceptional upward variance because this case is exceptional. And I am happy to answer any other questions the Court may have.

THE COURT: All right. Thank you, Counsel.

Mr. Coleman or Ms. Blanco, anything else?

MR. COLEMAN: Yes, Your Honor. I did want to make a few points. Some of the things that were said and said in very sort of grandiose and generalized terminology is just not true. I think perhaps five or six times the government repeated that Mr. Ghanem was a decades-long arms trafficker. That's just not true. The conspiracies here are from 2013 to 2015. Maybe he got into the business about 2011, 2012 and was arrested in 2015, three to four years. He was not a decades-long arms trafficker. That is just flat out incorrect.

The government made -- concluded with a statement that they said was made in 2005. It wasn't. It was made in 2015 on

the day he was arrested.

So it's this tendency to exaggerate some of the things and our position that I would like -- and I understand the government wants to do that, because they're asking for something is that's exaggerated and extraordinary. But I would like to bring it back down to the specific legal principles and some of the specific facts in the case.

The government said we're asking for leniency. We're asking for the guideline sentence. We're not asking for a downward departure. We're not asking for downward variance. We're asking for the guidelines. So in that sense we're not asking for leniency.

And so when the government says, "Well, Judge Otero gave a particular sentence," well, yes, he did when there was a 25-year minimum and guidelines range of life in prison. That's a lot different than when the guideline range is in the neighborhood that we're talking about of five to eight years depending on whether he gets acceptance of responsibility. It's a completely different legal landscape.

The Court had asked about the fact that some of these cases or most of them are pre-Booker, and some of them, I think, are pre-Booker or most of them are pre-Booker, but I think even under a 3553(a) analysis, the point of those cases is captured. And that is why I went to 3553(a)(6), which is that, when you're doing a comparative analysis in trying to

make sure that there is not unwarranted disparity, which is the essential purpose of the guidelines is to make sure that we're not sentencing different people to dramatically different things, you need to look at the counts of conviction. It's what the defendant has been convicted of. And so I think the same analysis that occurred in those pre-Booker cases carries over into the 3553(a) world when you look at 3553(a)(6).

I wanted to make one point about sort of the foreign conduct aspect. Yes, the government prosecutes extraterritorial cases, and this is a very vigorous extension of extraterritorial prosecution. I think the point that we've been trying to make is that, when you start to do that and there is no direct emphasis or focus on U.S. citizens or U.S. military, you start to fall into a bit of a gray area for some of these things.

And as an example, the government makes much of the fact that Mr. Ghanem, while living in Egypt, was hired by the Egyptian military to seek out military weapons. The government has not explained how that is a violation of U.S. law. If Mr. Ghanem is in Egypt and the Egyptian military is asking him to look into that, it is not clear to me, at least, when you look at this very difficult regulatory regime of figuring out what you can and can't do, that it is a violation of American law. But if it is -- and let's assume that it is -- it's not the basis for 20- to 25-year upward departure when there is no

indication that there is any specific intent to harm a U.S. individual or U.S. military.

So the point that we're making is that this case is far different than even the other cases where defendants were convicted of 2332g and with conspiracy to kill U.S. citizens or U.S. military. We don't have that here. This is a vigorous extension of extraterritorial prosecution abroad.

Is the conduct serious? Yes, it is. We're not saying it's not, and we're not asking for any leniency. We're asking the Court to follow the guidelines. If the Court feels that the guidelines are not sufficient and an upward departure or variance is appropriate, then an upward departure or variance of the type that is often taken in cases, whether it's two levels or four levels, then that degree of magnitude would be certainly sufficient and not greater than necessary.

But to add on dozens of levels and decades of time in prison, when there is no direct intent to threaten or kill a U.S. military person or a U.S. citizen, we believe would be creating not only an unwarranted disparity under 3553(a)(6) but would also be contrary to the guidelines regime. Thank you.

THE COURT: Thank you.

Ms. Salick, anything else?

MS. SALICK: Just to -- I did misspeak. My apologies for that. The quote was from 2015. I did not mean to mislead the Court. And that is stated as a 2015 date in all of our

papers.

THE COURT: All right. Thank you.

All right. Thank you, Counsel and Mr. Ghanem. Obviously, this is a very significant case involving very serious acts.

Does either Counsel know of any reason why sentence should not now be imposed?

MR. COLEMAN: No, Your Honor.

MS. SALICK: No, Your Honor.

THE COURT: All right. Because I was not the trial Judge, I have spent what I consider a meaningful amount of time in reviewing the parties' papers and the underlying trial exhibits to try to give myself a sense of what it was like to sit in Judge Otero's chair during that trial.

And I will do the best I can with the knowledge that I've acquired to date and the benefit of Counsels' arguments today. I will begin first by calculating the appropriate sentencing guideline range, and I will then impose my sentence and state the reasons for my sentence. Because of the significant factual history in the case, I expect it will take me a little bit of time to go through the various sentencing factors and the underlying facts.

And I want you to know, Mr. Ghanem, that I do appreciate the fact that you are a United States citizen, and at least I think you believe that the conduct that you engaged in was not intended to injure the United States, but I'm afraid, I think,

it indirectly injured the interests of the United States.

So I am consulting and taking into account the 2021 edition of the sentencing guidelines, and I adopt the following sentencing guideline factors and calculations. The parties do not object to the Probation Office's criminal history calculation, so I find it to be accurate in statement.

I adopt the criminal history calculation. Mr. Ghanem has zero criminal history points; thus, he will receive a Criminal History Category of I.

The parties disagree about the total offense level in this action. The Probation Office and the government calculate the total offense level as 28. The defense calculates the total offense level as 26. The parties agree that pursuant to guidelines section 2M5.2(a)(1), that the base offense level is 26 and that a two-level increase applies because Mr. Ghanem was convicted for a violation of 18 U.S.C. section 1956.

As stated today during the hearing and the papers, Mr. Ghanem believes a two-level reduction applies for acceptance of responsibility under Section 3E1.1 because, essentially, he pleaded guilty to all counts of conviction. Mr. Ghanem pleaded guilty to six of the seven counts in the indictment and the first superseding indictment on Friday, October 16 of 2018. Four days before the case was set to begin trial the following Tuesday, October 20 of 2018, Mr. Ghanem informed the prosecutor that he intended to enter a plea of

guilty. On Monday, October 19, 2018, the day before trial, Mr. Ghanem pleaded guilty to six of the seven counts.

And as to Count 3 of the first superseding indictment, Mr. Ghanem exercised his constitutional right to a jury trial. And although the Ninth Circuit vacated Mr. Ghanem's conviction as to Count 3 of the first superseding indictment, I still may consider the evidence underlying that count as relevant conduct under the sentencing guidelines.

The application notes to guidelines section 3E1.1 do provide useful guidance. Application note 1 provides that, in determining whether a defendant qualifies for an adjustment based on acceptance of responsibility, I may consider whether he truthfully admitted the conduct comprising the offenses of conviction and whether he truthfully admitted or did not falsely deny any additional relevant conduct.

I may also consider his voluntary termination or withdrawal from criminal conduct, his voluntary -- among other factors that are set forth in that note, his voluntary surrender to authorities promptly after commission of the offense, voluntary assistance to authorities in the recovery of fruits and instrumentalities to the offense, and the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

Mr. Ghanem pleaded guilty to six of seven counts, but he did so on the eve of trial after several years of litigation.

Therefore, in my view, his decision to plead guilty does not demonstrate timeliness in accepting responsibility.

In addition, with respect to the other factors I just recited, he did not voluntarily terminate his criminal conduct. There is also a provision for voluntary payment of restitution before adjudication of guilt. There was no restitution paid. He did not voluntarily surrender to authorities or assist authorities in the recovery of the fruits and instrumentalities of his offenses.

In connection with preparing the presentence report on December the 18th of 2018, in the presence of his attorney, the probation officer interviewed Mr. Ghanem at the Metropolitan Detention Center here in Los Angeles. And on the advice of Counsel, which, of course, he is entitled to follow and invoke, he declined to speak about the offense, but he did state that he accepted responsibility.

Coming forward in time, in October of 2021 when the Probation Office was preparing its revised presentence report, Mr. Ghanem told the probation officer that not much had changed and that there was no real need for another interview.

So as stated in the Application Note 3, although entry of a guilty plea prior to commencement of trial and truthfully admitting the conduct comprising the offenses of conviction, combined with truthfully admitting or not falsely denying additional relevant conduct, is evidence of acceptance of

responsibility, this evidence may be outweighed by conduct that is inconsistent with acceptance of responsibility. And a defendant who enters a plea of guilty is not entitled to an adjustment under section 3E1.1 as a matter of right.

Based on my review of this file, it does not appear to me that Mr. Ghanem has ever accepted true responsibility for the full scope of his conduct. To the contrary, it appears that he has deflected such responsibility. He has minimized his involvement in the crimes of conviction. For example, at his original sentencing, Mr. Ghanem's Counsel minimized Mr. Ghanem's involvement and argued that he was not an international arms dealer.

The most recent sentencing memorandum argues that, virtually, all of his foreign conduct "involved discussions that Mr. Ghanem undertook on behalf of foreign governments to secure military equipment and that almost none of it ever materialized."

Mr. Ghanem also declined to speak with the Probation Office about the offenses to which he pleaded guilty, so I do find that Mr. Ghanem's conduct is inconsistent with acceptance of responsibility, and I decline to apply the two-level downward adjustment for acceptance of responsibility. As a result, the total offense level remains at level 28 as calculated by the Probation Office.

As Counsel correctly stated, sentencing guideline range

for this offense level and a Criminal History Category of I is 78 to 97 months.

As I said earlier, Title 18 U.S. Code section 3553(a) lists the factors that I'm required to consider before I can impose an appropriate sentence. Mr. Ghanem filed a sentencing memorandum, which included letters of support from members of his family, a retired U.S. Army Master Sergeant who concedes that he is unfamiliar with the details of Mr. Ghanem's case or the reasons for his arrest and detention, and a retired CIA officer who served in Jordan and who retired from the CIA in 1998, which was 15 to 17 years before the acts that are set forth in the indictment and the first superseding indictment.

Interestingly, that officer writes that Mr. Ghanem informed him in 2011 that Mr. Ghanem had told him that "He had established important senior contacts among the new leadership and government in Libya," which may correspond with Counsel's argument to the Court that Mr. Ghanem's involvement in this particular line of work may have begun around that time. None of these letters, though, suggest that the authors were truly familiar with the criminal acts that Mr. Ghanem admitted to committing as a result of his guilty plea.

The prosecutor also filed a sentencing memorandum, and I reviewed -- which I reviewed, and I also reviewed the final presentence report. As I've stated, the parties' respective memoranda for sentencing, the government's exhibits,

Mr. Ghanem's letters of support, and I have considered and weighed the parties' arguments today and Mr. Ghanem's statement to the Court.

So pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that defendant Rami Najm Asad Ghanem is hereby committed on Counts 1, 2, 3, and 4 of the indictment and Counts 1 and 2 of the first superseding indictment to the custody of the Bureau of Prisons for a term of 360 months.

The term consists of the following: 240 months on Count 1 of the indictment, 120 months on Count 2 of the indictment to run consecutive to the 240 months imposed on Count 1 of the indictment, 240 months on each of Counts 3 and 4 of the indictment to run concurrent with the 360 months imposed on Counts 1 and 2 of the indictment, 60 months on Count 1 of the first superseding indictment to run concurrent with the 360 months imposed on Counts 1 and 2 of the indictment, and 240 months on Count 2 of the first superseding indictment to run concurrent with the 360 months imposed on Counts 1 and 2 of the indictment.

Based on the factors set forth at 18 U.S.C. section 3553(a), I believe that a sentence of 360 months and 3 years supervised release is sufficient but not greater than necessary to comply with the objectives of section 3553(a). This sentence will properly hold Mr. Ghanem accountable for his offenses, provide adequate deterrence, protect the public from

further crimes by Mr. Ghanem, and achieve parity with the sentences of defendants with similar records who are convicted of similar offenses, and provide Mr. Ghanem with needed educational or vocational training, medical care, or other correctional treatment.

It is ordered that Mr. Ghanem shall pay the United States a special assessment of $600, which is due immediately. Any unpaid balance shall be due during the period of imprisonment at the rate of not less than $25 per quarter and pursuant to the Bureau of Prisons Inmate Financial Responsibility Program.

All fines are waived, as I find that it will be too difficult to enforce payment of a fine in light of the significant sentence that I have imposed.

In imposing this sentence, I find that there are aggravating or mitigating circumstances of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described in the guidelines as permitted under Title 18 U.S. Code section 3553(b).

In addition, I'm applying an upward departure pursuant to guidelines section 5K2.14 and Application Note 2 of guidelines section 2M5.2, and I'm also varying upwards pursuant to 18 U.S.C. section 3553(a) for a number of reasons that I will explain in a moment.

I recommend that the Bureau of Prisons conduct a mental health evaluation of Mr. Ghanem and provide all necessary treatment, if he's willing to undergo such treatment. I also recommend that the Bureau of Prisons consider Mr. Ghanem for participation in the Residential Drug Abuse Prevention program known as RDAP, if Mr. Ghanem is willing.

And upon his release from imprisonment, Mr. Ghanem shall be placed on supervised release for a term of three years. The term consists of three years on each of Counts, 1, 2, 3, and 4 of the indictment and Counts 1 and 2 of the first superseding indictment.

All such terms to run concurrently under the following terms and conditions:

One, the defendant shall comply with the rules and regulations of the U.S. Probation and Pretrial Services Office and Second Amended General Order 20-04;

Two, the defendant shall not commit any violation of local, state, or federal law or ordinance.

Three, the defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from custody and at least two periodic drug tests thereafter not to exceed eight tests per month as districted by the probation officer.

Four, the defendant shall participate in an outpatient substance abuse treatment and counseling program that includes

urinalysis, breath, and/or sweat patch testing as directed by the probation officer. The defendant shall abstain from using alcohol, any illicit drugs, and from abusing prescription medications during the period of supervision.

Five, as directed by the probation officer, the defendant shall pay all or part of the costs of the court-ordered treatment to the aftercare contractors during the period of community supervision. The defendant shall provide payment and proof of payment as directed by the probation officer. If the defendant has no ability to pay, then no payment shall be required.

Six, during the period of community supervision, the defendant shall pay the special assessment in accordance with this judgment's orders pertaining to such payment.

Seven, the defendant shall not obtain or possess any driver's license, Social Security number, birth certificate, passport, or any other form of identification in any name other than the defendant's true legal name nor shall the defendant use any name other than his true legal name without the prior written approval of the probation officer.

Eight, the defendant shall participate in an anger management program as approved and directed by the probation officer.

Nine, the defendant shall cooperate in the collection of a DNA sample from the defendant.

Ten, the defendant shall submit the defendant's person, property, house, residence, vehicle, papers, computers, cell phones, other electronic communications or data storage devices or media, e-mail accounts, social media accounts, cloud storage accounts, or other areas under the defendant's control to a search conducted by a United States probation officer or law enforcement officer. Failure to submit to a search may be grounds for revocation. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search pursuant to this condition will be conducted at a reasonable time, in a reasonable manner, upon reasonable suspicion that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

I recommend that Mr. Ghanem be housed at a facility that can address his health conditions. And I authorize the Probation and Pretrial Services Office to disclose the presentence report to the substance abuse treatment provider to facilitate the defendant's treatment for narcotic addiction or drug dependency. Further redisclosure of the presentence report by the treatment provider is prohibited without the Court's consent.

Now, I find this sentence to be appropriate for the following reasons: A significant upward variance and departure is necessary due to the seriousness of the offenses which the

sentencing guidelines do not adequately take into consideration.

In determining whether to impose a sentence within the guideline range or whether to vary or depart upwards, the Court may consider without limitation any information concerning the background, character, and conduct of the defendant unless otherwise prohibited by law.

The Court can also consider conduct of which the defendant has been acquitted. Mr. Ghanem has not been acquitted of any conduct. To the contrary, although the Court of Appeals vacated Mr. Ghanem's conviction for conspiracy to use and transfer missile systems designed to destroy aircraft, the circuit court did not find that the evidence at trial was insufficient to support his conviction or that Mr. Ghanem cannot be retried for the same offense in the proper district.

For purposes of today's sentencing hearing, Mr. Ghanem's relevant conduct remains unchanged from the time that Judge Otero, the trial judge, imposed sentence in 2019.

An upward variance may be appropriate under 18 U.S.C. section 3553(b) based on aggravating circumstances not adequately taken into consideration by the Sentencing Commission.

Guidelines section 2M5.2 applies to the exportation of arms, munitions, or other military equipment or services without a valid export license. The base offense level assumes

that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of the United States. However, the base offense level does not adequately capture the extreme conduct present here.

Unlike the conduct in certain of the pre-Booker cases, involving section 2M5.2, cited in the defendant's sentencing memorandum such as Tsai, T-s-a-i, which involved 11 units of missile components or Pedrioli, which involved the smuggling of 800 handguns for a military purpose, Mr. Ghanem was involved in the trafficking of breathtaking quantities of weapons of war, namely rockets, anti-tank missiles, antiaircraft missiles, mortars, tanks, fighter aircraft, machine guns, automatic rifles, and ammunition.

Guidelines section 2M5.2, Application Note 2, provides that an upward departure from the guidelines may be warranted where "The degree to which the violation threatened a security or foreign policy interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences are present in an extreme form."

Also, pursuant to guidelines section 5K2.14, "If national security, public health, or safety was significantly endangered, a Court may depart upward to reflect the nature and circumstances of the offense." I find that a significant upward variance in departure is warranted by the extreme facts

of this case.

From September 4, 2013, through December 8, 2015, Mr. Ghanem was a black market arms trafficker, who collaborated and conspired with others to buy, sell, and broker weapons of war including missile systems designed to destroy aircraft. There was overwhelming evidence presented at trial and summarized in the presentence report that Mr. Ghanem made his living as a high-level arms dealer who regularly dealt with weapons of war, including trading in machine guns and assault rifles and rockets and mortars and rocket-propelled grenades and anti-tank weapons.

Over the course of several years, Mr. Ghanem bought, sold, and brokered the sale of millions of rounds of ammunition. For example, in September of 2013, Mr. Ghanem bought ASOT to acquire surface-to-air missiles and missile launchers on behalf of a foreign government to be covertly supplied to Libya, Syria, and the Kurdish region of Iraq.

In July of 2014, Mr. Ghanem made repeated offers to a foreign government to sell weapons, including 400 Strela, S-t-r-e-l-a, surface-to-air missiles that were, in his words, "Available for immediate shipment."

Also, in July of 2014, Mr. Ghanem asked to buy, again in his words, "As many as you have of heavy arms," including AK-47s, sniper rifles, machine guns, mortars, missiles, armored vehicles, and ammunition from a Homeland Security

Investigations informant, which Mr. Ghanem would require upon his arrival in Iraq.

Mr. Ghanem then sought to procure what he described as massive quantities of weapons and military equipment from an undercover federal agent. He told the agent that his clients did not buy in small quantities and that, for example, he was looking to buy one hundred million rounds of AK-47 ammunition.

On September 18 of 2014, Mr. Ghanem met with the undercover federal agent in Athens, Greece and discussed his extensive global arms trafficking network, including connections with the Iraqi head of Hezbollah, a designated foreign terrorist organization and high-level contacts in numerous foreign governments and militant groups around the world.

In March of 2015, Mr. Ghanem met with the undercover agent again to discuss the proposed transaction.

In August of 2015, Mr. Ghanem placed an order and arranged to export military equipment valued at $220,000 from the United States to Libya and requested that the undercover agent falsely declare the weapons initially as juice on the export documents. Mr. Ghanem intended this to be an initial order to test the agent's capabilities and that larger orders would follow.

On September 2 and October 22 of 2015, Mr. Ghanem sent payments totaling nearly $180,000 from his bank account in Jordan to the undercover agent's account in the United States

for the purchase of military equipment.

Mr. Ghanem made arrangements to inspect the weapons he had ordered in Greece on December 8 of 2015 before the shipment was to be sent to Mr. Ghanem's customer in Libya. When Mr. Ghanem arrived at the prearranged location in Greece, he was arrested.

The night before Mr. Ghanem's arrest, he told the undercover agent that he did not want to knowingly be a part of killing Arab refugees. But if he sold guided missiles to Saudi Arabia, which in turn shipped them to Yemen and Syria resulting in heavy civilian casualties, then, well, "That's their business."

Upon his arrest, Greek law enforcement seized 19 digital devices from Mr. Ghanem's person and hotel room. The devices contained evidence of Mr. Ghanem's words and his global arms trafficking business including numerous communications reflecting Mr. Ghanem's effort to buy and sell a wide array of heavy weapons including antiaircraft missiles and a signed contract to purchase $250,000 in weapons and ammunition and bank transfers for Mr. Ghanem's brokering of the services of mercenary fighters.

Evidence introduced at trial established that Mr. Ghanem had engaged in a conspiracy to transfer and use antiaircraft missiles and that he had engaged in and profited from multiple transactions whereby he provided mercenary antiaircraft missile specialists to shoot down airplanes over Libya. This included

Mr. Ghanem's own communications reflecting his efforts to buy and sell antiaircraft missiles and the testimony, taken outside the United States and presented at trial, of two antiaircraft missile operators and another arms broker who participated in one of Mr. Ghanem's transactions and to whom Mr. Ghanem had offered a $50,000 bounty if they were successful in shooting down an airplane operated by the government of Libya.

In addition, the evidence showed that Mr. Ghanem had the ability to buy, sell, and broker antiaircraft missiles of all kinds ranging from the smaller, shoulder-fired man-portable air-defense systems, known as MANPADs which included IGLA, I-G-L-A, and Strela and others to the larger and more sophisticated vehicle-born Russian S-400 and S-300 Triumf systems.

Mr. Ghanem was without a doubt a prolific international arms trader for several years dealing in anti-tank missiles, rockets, mortars, grenades, and the necessary launchers, machine guns of various sizes, sniper rifles, assault rifles, pistols and other small arms, night vision equipment, and other sensitive military technology, attack aircraft, tanks, radar systems, mercenary fighters, and other heavy weapons, along with many millions of rounds of ammunition.

Mr. Ghanem's own words, written and spoken, demonstrated a lack of respect for human life. He was motivated solely by profit. Mr. Ghanem was, as correctly characterized by

Judge Otero, a profiteer, indifferent to the consequences of his actions.

Mr. Ghanem turned a blind eye to the ultimate destination of the arms he brokered and sold and was indifferent as to whether those weapons were obtained by terrorist organizations or used against civilian targets.

Mr. Ghanem embraced war because war meant profit. In one of the most damning pieces of evidence admitted at trial was Mr. Ghanem's recorded statement to the undercover federal agent, which the prosecutor read into the record during today's hearing.

The presentence report mentions, though it does not treat as relevant conduct and nor do I, that during his commission of the charged offenses, Mr. Ghanem was involved in a trade of black market uranium, a critical component in the development of nuclear weapons and dirty bombs on behalf of a client in China, he said.

Mr. Ghanem's conduct unequivocally endangered the security and foreign policy interests of the United States as well as the safety and security of far less stable nations. According to the evidence presented at trial and summarized in the presentence report, Mr. Ghanem was not a low-level arms trafficker; rather he engaged in repeated high-volume transactions involving costly military equipment over the course of several years. Such transactions required planning,

sophistication, contacts in numerous countries, and a focused effort.

I have also considered Mr. Ghanem's personal history and background in determining the appropriate sentence. Mr. Ghanem was born and raised in Jordan. In approximately 1984, he came to the United States to study. Between 1985 and 1990, he is reported to have obtained English and computer certificates. In 1994, he became a United States citizen.

In approximately 1996, he returned to Jordan to be with his family. Mr. Ghanem had five children and, prior to being arrested, had lived in Egypt with his wife and three of his children.

Mr. Ghanem suffered the painful loss of one of his children to a congenital illness, which caused him a great deal of anguish.

Mr. Ghanem worked for a Jordan-based company called Gateway to MENA from 2011 to December of 2015. Mr. Ghanem stated that the company dealt with military supplies. The evidence at trial showed that he used the company to commit the crimes of conviction.

Mr. Ghanem has no prior criminal convictions in the United States.

He has multiple medical problems including high cholesterol, high blood pressure, diabetes, neuropathy, back pain, sciatic nerve pain, sleep apnea, skin problems, and

dental problems.

Mr. Ghanem's family members have written moving letters of support expressing their love and affection for him and stressing the important role he has played in their lives and the pain they have endured since his arrest in this case as a result of his absence.

I have considered and balanced each of these facts and find that a significant upward variance and departure is warranted given the extremely serious and callous nature, breadth, volume, duration, planning, and sophistication of Mr. Ghanem's offenses, and the threat to the security and foreign policy interest of the United States and the security of more vulnerable nations.

I am aware that I have the discretion to impose an even longer sentence of up to 95 years based on the statutory maximum for the six offenses of conviction, but I declined to do so because I find that a sentence of 360 months is sufficient but not greater than necessary to comply with the purposes of Title 18 United States Code section 3553.

The statement of reasons shall be included in the commitment order and the judgment and shall be provided to the United States Probation Office, the United States Sentencing Commission, and the Bureau of Prisons. Mr. Ghanem is remanded to the custody of the United States Marshal.

Mr. Ghanem, you have the right to appeal your conviction

if you believe your guilty plea was somehow unlawful or involuntary or if there were some other fundamental defect in the proceedings. You also have a right to appeal your sentence if you think your sentence is contrary to law. If you choose to appeal, with few exceptions, a Notice of Appeal must be filed within 14 days of the judgment being entered.

Do you understand this?

THE DEFENDANT: (Inaudible response.)

THE COURT: Is that a "Yes"?

THE DEFENDANT: Yes.

THE COURT: I need to hear you so the court reporter can write it down.

THE DEFENDANT: Yes.

THE COURT: If you are unable to afford a transcript of the record in this case, one will be provided at government expense. If you are unable to pay the cost of an appeal or filing fee, you may apply for leave to appeal in forma pauperis. If you do not have Counsel to act on your behalf and if you request it, the Clerk of the Court will prepare and file a Notice of Appeal on your behalf.

Again, you must make the request within 14 days of entry of judgment. The Notice of Appeal must designate the judgment or order appealed from and the fact that you are appealing to the United States Court of Appeals. You should designate the portion of the proceedings not already on file that you deem

necessary for the court reporter to include.

Anything further?

MR. COLEMAN: Yes, Your Honor. First, we ask that Count 3 of the superseding indictment be dismissed.

THE COURT: Is the government moving to dismiss that count?

MS. SALICK: We are not, Your Honor.

THE COURT: Okay.

MR. COLEMAN: Then we should set a trial. They're already outside the Speedy Trial Act by a wide margin. There is numerous reasons why the count can't go forward, but we're demanding a speedy trial. They've already violated the Speedy Trial Act.

THE COURT: Well, you are asking me to set a trial date? I thought the case couldn't be tried in this district.

MR. COLEMAN: It can't. But they say they are not dismissing. So let's set the case for trial. We will -- there are many reasons why they can't go forward, but if they don't dismiss, then let's set the case for trial.

THE COURT: Well, it doesn't sound like any judge in this district would be the trial judge over this case. Does it not need to be brought in another district? Isn't that what the Ninth Circuit held?

MS. SALICK: Your Honor, the government has no objection to setting an interim trial date at this time. We

will then determine internally where and whether to move forward on the vacated count of conviction.

MR. COLEMAN: We ask for next week. They're already late. They've already blown the Speedy Trial Act. We want our trial right now.

THE COURT: So what is your position with respect to when the Speedy Trial Act started to run?

MR. COLEMAN: They had 180 days, at most. They really had 70 days from the date the mandate spread, but, at most, they had 180 days, and that's run a long, long time ago.

They also -- there are numerous reasons why the case can't go forward, but they said they were going to dismiss. That was the representation that they made to me, they made it to the Probation Office, it was in the presentence report, and now they're going back on their representation.

But set the case for trial next week. We'll file motions to dismiss.

THE COURT: When you said, "They're going back on their representation," what representation was that?

MR. COLEMAN: They represented to me, and if you look at the presentence report, page --

THE COURT: The count would be dismissed?

MR. COLEMAN: Yes. Page 5, Footnote 3, "The government intends to move to dismiss Count 3 of the first superseding indictment without prejudice at or near the time of

resentencing, has not decided whether to retry Ghanem on Count 3 of the first superseding indictment."

THE COURT: I mean, perhaps you can enlighten me, but would that particular count not have to be brought in another district, meaning a grand jury would need to sit and hear evidence and return an indictment as to that count in that other district?

MR. COLEMAN: Well, clearly, the count can't go forward in this district, which is why they should be dismissing it.

THE COURT: Right. I am not really inclined to set a trial date here because it seems pointless to set a trial date here.

MR. COLEMAN: Correct. The count should be dismissed. The count is -- there is no venue here; the count should be dismissed. It violates the doctrine of specialty; the count should be dismissed. They violated the Speedy Trial Act; the count should be dismissed. And they violated the Sixth Amendment. It's already delay -- it's well past the Sixth Amendment docket standard; the count should be dismissed.

They said they were going to dismiss it, and for whatever reason now, they're not. But we're moving to dismiss it for all of those reasons.

MS. SALICK: Thank you, Your Honor. First, all of the arguments defense Counsel made were summarily rejected by

the Ninth Circuit.

With respect to the live issue here today as to the Speedy Trial Act, it's the government's position that a trial should go forward within 70 days pursuant to 3161(e). We are amenable to setting a trial date at this time.

I will note that it is not a decision my office can make without consultation per the United States Justice Manual as to where and whether to bring the charge. I can provide a status report to the Court within a few days as to our intention as to whether and where to proceed.

But we do not believe there is a basis to dismiss the count now and ask, if the defense is demanding for a trial date within the next 70 days -- and within the next few days, I can confirm the government's position in writing to the parties and on the record.

MR. COLEMAN: Your Honor, I have several responses.

THE COURT: Well, I am sure you do. Look, I mean, if the government ultimately decides to move to dismiss the count, I take it you'll be satisfied and you won't need to make much of a response; right? It's up to the government as to whether it wishes to seek to have a grand jury return an indictment in the proper district, should that be possible at this point in time.

MR. COLEMAN: Correct, Your Honor.

THE COURT: I guess, if the government elects to move

forward with the count, we know it can't happen in this district. So setting a trial date here is pointless. I can set a date by which you can file, I guess, a status report as to the remaining count, but it's not going to go to trial in this District regardless of the Speedy Trial Act or anything else. The Ninth Circuit has held that it's not going to trial in this District, so that is not going to happen.

MR. COLEMAN: Right. We just --

THE COURT: How much time do you need to file some kind of a status report as to what you intend to do with this count?

MS. SALICK: We would ask by next Friday, Your Honor, one week.

THE COURT: All right. I think that's reasonable.

MR. COLEMAN: Your Honor, I'd request that the Court hold the judgment until they file their motion. Until they file their status or motion to dismiss.

THE COURT: But the judgment isn't affected by that.

MR. COLEMAN: Well, we --

THE COURT: He's been resentenced on the counts that he pled guilty to, as ordered by the Circuit. That's what I did today. So that remaining count is of no consequence to today's sentencing.

MR. COLEMAN: Well, I mean, properly the government has changed their tune. The case should have been retried

before he was resentenced, but they said they were dismissing the count, which is why we went forward with the sentence.

I mean, there should be a consolidated sentencing proceeding. It's inefficient for me to take two appeals, first to appeal the sentence and then to have to appeal whatever it is that they decide to do. It just seems to make sense to hold the judgment and then let them -- if they need another week, I mean, they've had 18 months to decide, and they already had made a decision to dismiss. So I'd ask that the Court hold the judgment until they let us know what they're going to do.

THE COURT: All right. I'll hold the judgment for a week until Friday until I see the government's status report, but, I mean, I know it's clear that count can't be reprosecuted in this district; otherwise, we wouldn't be here at all.

MR. ROBBINS: Your Honor, Alexander Robbins for the government. I apologize for any confusion on this. Just procedurally, we are not allowed to dismiss this count yet without consulting with other parts of the Department of Justice, which is the reason why we said and, I think, the PSR accurately states that we would intend to dismiss around the time of sentencing, which is still our intent.

I think, perhaps, Mr. Coleman is reading more into it than there is. That statement was accurate. That's where we are now. That's all we're doing.

And to the extent that there is an issue, I guess, I would

ask my colleague Mr. Coleman right now, other than normally would just give him a phone call, would you object -- does the defense object to the government -- to a motion for voluntary dismissal if we bring that up next week?

MR. COLEMAN: No. Well, I do think a dismissal should be with prejudice. The Speedy Trial Act has run. The Sixth Amendment time frame has expired. But I don't object if they dismiss. That's what I'm asking for is for the count to be dismissed.

MR. ROBBINS: Thank you.

THE COURT: Okay. Well, it sounds like the government needs -- I take it, what I'm hearing, is that the government needed to have the sentencing on the other six Counts take place before it could make a final decision exercising its prosecutorial discretion as to whether to proceed or to move to dismiss the count that was vacated by the Circuit.

So a week is not an unreasonable amount of time, so I will give the government until a week from today to file some sort of status report, a motion to dismiss with the Court, and then we'll take it from there. Okay?

MR. COLEMAN: Thank you. Your Honor --

THE COURT: And I'll wait on executing the entry of the final judgment until I have the government's report a week from today.

MR. COLEMAN: Thank you, Your Honor.

I'm not sure that I need to do this, but I am going to be just to be sure because, I think, as Your Honor can understand, we will be appealing the sentence. I want to obviously renew or confirm and preserve our objection as to acceptance of responsibility. I want to renew and preserve our objections as to the substantive reasonableness of the sentence and the procedural reasonableness of the sentence, particularly, as to all of the 3553(a) factors but particularly 3553(a)(6).

And I don't mean to be disrespectful. I understand Your Honor's sentence. But the one thing that I did want to say is that, as far as 3553(a)(6), we have people that have attacked the Capitol, there have been officers killed, they tried to overthrow election and tried and discussed hanging the Vice President of the United States, and they're getting a fraction of 30 years. And if anything endangers the national security of the country, it is those types of acts in our very nation's Capitol. And Mr. Ghanem -- the sentences that they are receiving are a fraction of 30 years.

I just -- if we're talking about national security and 3553(a)(6), I think the case -- the sentence is substantively and procedurally unreasonable.

Thank you, Your Honor.

THE COURT: All right, Counsel.

All right. Thank you, Counsel.

MS. BLANCO: Your Honor, I'm sorry. One final request. Mr. Ghanem's 17-month-old grandson is here --

THE COURT: Yes.

MS. BLANCO: -- who he has never seen.

Would it be possible for me to carry him --

THE COURT: Absolutely.

MS. BLANCO: -- into the well to see Mr. Ghanem?

THE COURT: Yes.

MS. BLANCO: Thank you.

THE COURT: Not a problem.

All right. Thank you.

Good luck, Mr. Ghanem.

THE COURTROOM DEPUTY: All rise.

(Adjourned at 11:55 a.m.)

-oOo-

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript of proceedings in the above-entitled matter.

/s/ Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter

Date: 11/13/2022